David P. Billings (UT # 11510)
Robert G. Crockett (UT # 12067)
**FABIAN VANCOTT**
215 South State Street, Suite 1200
Salt Lake City, UT 84111-2323
Telephone: (801) 531-8900
Facsimile: (801) 596-2814
rcrockett@fabianvancott.com
dbillings@fabianvancott.com
*Attorneys for John Bean Technologies Corporation*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JOHN BEAN TECHNOLOGIES CORPORATION, a Delaware corporation,<br><br>     Plaintiff,<br><br>  vs.<br><br>B GSE GROUP, LLC, a North Carolina limited liability company, and BRYAN BULLERDICK, an individual,<br><br>     Defendants. | **VERIFIED COMPLAINT**<br><br>Case No.  1:17-cv-00142-CW<br><br><br>Judge: Clark Waddoups<br><br>**JURY TRIAL DEMANDED** |

Plaintiff John Bean Technologies Corporation ("JBT") hereby alleges and complains

against defendants, B GSE Group, LLC ("BGSE") and Bryan Bullerdick ("Bullerdick") (BGSE

and Bullerdick are collectively referred to as "Defendants") as follows:

## NATURE OF THE ACTION

1.     This case arises from Defendants' theft, misappropriation, and infringement of JBT

intellectual property, their unfair business practices and their breach of several contracts, in

blatant violation of federal and state law.

2.     JBT, through its JBT AeroTech division, is a leading manufacturer and supplier of ground support equipment and services for the air transportation industry worldwide. Among other things, the Jetway® Systems business unit of JBT AeroTech division is one of the leading manufacturers of fixed and mobile preconditioned air ("PC Air") units, sold under the Jetaire® brand, and fixed and mobile ground power unit ("GPU") systems, sold under the Jetpower® brand, for commercial and military aircraft, both domestically and internationally.

3.     JBT has manufactured, sold and serviced Jetaire® units and Jetpower® systems to United States and foreign military installations since at least 2003.

4.     Since at least 2011, JBT has bid on and won projects for ground support equipment related to the United States Department of Defense's ("US DOD") Joint Strike Fighter (JSF) Program, the US DOD's next generation strike aircraft being deployed by the Navy, Air Force and Marines, as well as a main line fighter for certain foreign countries.

5.     Deployment of the JSF Program's new aircraft, the F-35, in most cases requires the construction of new maintenance hangars specifically designed for this program at military bases across the United States and in many foreign countries. The new hangars require specialized PC Air units and GPU systems.

6.      JBT invested a significant amount of time and resources into the design, development, and testing of its new Jetaire® units and Jetpower® systems to meet the needs for the new aircraft.

7.     JBT invested over a half million dollars over approximately eighteen months to design, develop, test, and obtain certifications for the Jetpower® systems for the new F-35 aircraft. For the F-35 application of its Jetaire® units, JBT invested several hundred thousand dollars over

4836-8233-0702, v. 1

several years, in addition to a previous million dollar project to design its high-pressure conditioned air units.

8.    For a time, BGSE was an authorized distributor for JBT's Jetaire® units and Jetpower® systems for military and civilian installations. Thereafter, BGSE was a reseller of JBT's products, until JBT recently stopped doing business with BGSE.

9.    Bullerdick, who upon information and belief is an owner of BGSE, was an employee of JBT before, during and after the period that BGSE was an authorized JBT distributor, and went to work for BGSE after he resigned from JBT.

10.    For a time after Bullerdick's employment with JBT ceased, BGSE continued to work with JBT to bid on JSF Program projects with JBT's Jetaire® units and Jetpower® systems. Eventually, BGSE began to partner with other manufacturers on such bids, and JBT began bidding on such projects without BGSE's involvement. On many bids, JBT and BGSE found themselves directly competing for the PC Air units and GPU systems.

11.    One year ago, JBT discovered instances where BGSE has sought to misrepresent its capabilities and/or relationship with JBT. After it discovered that Bullerdick altered an email written by a JBT employee and forwarded it to a general contractor for a project at a domestic U.S. Air Force base, JBT sent a cease and desist letter to Defendants demanding that such activity stop.

12.    In July, 2017, however, JBT discovered much more egregious activity by Defendants, which led to uncovering a wide-ranging scheme of deception and theft, which upon information and belief was done with the intention of profiting off the highly-regarded reputation of JBT for high quality, well-designed and innovative products.

13.    Defendants' actions have included (a) stealing, using and disclosing JBT's trade secrets, (b) breaching contracts with JBT relating to confidentiality and other employment obligations, (c) passing off JBT test reports and product certifications as if they applied to BGSE's own products, (d) falsifying safety certificates, (e) falsifying third party technical compliance certifications, (f) improperly copying JBT's technical specification documents, (g) passing off photos and descriptions of JBT's products as BGSE's products in advertising and promotional material, (h) infringing JBT's registered trademarks on BGSE's website, which improperly drives traffic to BGSE's website, (i) fraudulently claiming rights and involvement in the design of JBT's products that BGSE distributed or resold, and (j) fraudulently seeking registration of a trademark.

14.    Upon information and belief, Defendants have pursued this illegal scheme for their sole pecuniary interest, in order to give themselves an unfair advantage over JBT and other competitors in the marketplace.

15.    Accordingly, this action seeks temporary and permanent injunctive relief to prevent Defendants from using JBT's intellectual property, and to stop Defendants' unfair business practices. In addition, JBT seeks compensatory damages under its contracts with Defendants, as well as under the various other causes of action delineated in this Complaint, together with exemplary and punitive damages, and its attorneys' fees.

## PARTIES, JURISDICTION, AND VENUE

16.    JBT is a Delaware corporation with its principal place of business in Chicago, Illinois. JBT's business unit Jetway®, part of JBT AeroTech division, is based in Ogden, Utah.

17.   BGSE is a North Carolina limited liability company having a principal place of business in Huntersville, North Carolina. On information and belief, BGSE's sole members are Bullerdick and Scott Dills, a resident of North Carolina. BGSE markets and sells products throughout the United States and internationally, including within the State of Utah.

18.   Bullerdick is an individual domiciled in the state of North Carolina, and, on information and belief, is the current President and Managing Member of BGSE. At certain times relevant to this action, Bullerdick was an employee of JBT AeroTech, having the title of Sales Manager.

19.   This is a civil action for misappropriation of trade secrets under the Defense of Trade Secrets Act, 18 U.S.C. § 1832 *et seq.,* for false designation of origin, false description of fact, false advertising and trademark infringement under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, for misappropriation of trade secrets under Utah Code Ann. § 13-24-1 *et seq.*, and for breach of contracts.

20.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over claims for misappropriation of trade secrets under 18 U.S.C. § 1832, and pursuant to 28 U.S.C. § 1338 for violations of Lanham Act Sections 32 and 43(a), 15 U.S.C. §§ 1114, 1125(a).

21.   This Court has supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367(a) over the claims for misappropriation of trade secrets under Utah law and for breach of contract, because these claims arise from the same operative facts giving rise to Plaintiff's claims under federal law.

22.   This Court has personal jurisdiction over both Defendants because they have engaged in minimum contacts with Utah and exercising jurisdiction over BGSE and Bullerdick would not offend traditional notions of fair play and substantial justice.

23.     Additionally, BGSE has consented to the jurisdiction of this Court by entering into a Mutual Non-Disclosure Agreement on November 11, 2011 (the "2011 NDA"), attached hereto as **Exhibit A**, at ¶ 12, and a Distributorship Agreement with JBT on January 11, 2012 (the "2012 Distributorship Agreement"), attached hereto as **Exhibit B**, at ¶ 13.

24.     Venue in the District of Utah is appropriate under 28 U.S.C. § 1391 because a substantial portion of the events giving rise to the claims herein occurred in this District. These events include the misappropriation of trade secret data developed and stored in Utah, contracts executed in Utah, false advertising and false designation of origin occurring in Utah, and past and ongoing harm to JBT in Utah.

### *Bullerdick's Employment with JBT*

25.     Defendant Bryan Bullerdick began working for the JBT AeroTech division on March 28, 2011.

26.     Bullerdick resigned from JBT on April 1, 2014.

27.     Throughout his employment with JBT, Bullerdick was a Sales Manager for Jetway® Aviation Support Equipment ("JASE").

28.     As a Sales Manager for JASE, Bullerdick was responsible for retaining and expanding JBT's sales revenue and for driving new market share for JASE, including by generating sales of Jetaire® preconditioned air units and Jetpower® ground power systems.

29.     Bullerdick was particularly responsible for JASE sales for United States and foreign military installations and was intimately involved in, and had extensive knowledge of, JBT's sales efforts related to the JSF Program for F-35 maintenance hangars.

30.    Throughout his employment, Bullerdick had access to and accessed JBT's proprietary and confidential information related to the Jetaire® units and Jetpower® systems designed and made by JBT specifically for the F-35 maintenance hangars.

31.    As a condition of his employment, on March 28, 2011, Bullerdick signed an acceptance of the terms of his offer of employment, completed an application for employment which included a specific agreement to abide by JBT's policies and procedures, signed JBT's Confidential Information and Inventions Agreement (the "2011 Confidentiality Agreement"), attached hereto as **Exhibit C**, and, within four months of his start date, completed his first online training in JBT's Commitment to Ethics (the "Code of Ethics"), an excerpt of which is attached hereto as **Exhibit D.**

32.    In the 2011 Confidentiality Agreement, Bullerdick agreed to "maintain in confidence all information pertaining to [JBT's] business" to which he had access, including "information related to [JBT's] products, inventions, trade secrets, know-how, systems, formulae, processes" and information of a similar nature. (**Ex. C**, ¶ 5.) Bullerdick further agreed "not to use, communicate or disclose … such information orally, in writing or by publication either during [his] employment or thereafter." (*Id.*)

33.    The 2011 Confidentiality Agreement further required Bullerdick to return to JBT "all writings, documents, files, records, drawings, models, tools, and other property of [JBT] … upon termination of" his employment. (*Id.*)

34.    JBT's Code of Ethics, which every employee is required to agree to on a yearly basis, sets forth JBT's policies related to, among other things, the protection of confidential information and trade secrets. The Code of Ethics states that JBT's trade secrets "may not be

used for the employee's individual benefit," and an employee "cannot disclose or use [JBT's] trade secrets after termination of employment." **(Ex. D, § IV.)**

### *JBT's Relationship with BGSE*

35.   JBT and BGSE entered into the 2011 NDA for the purpose of "exchanging technical information, engineering design and data, cost information, pricing information, etc. (the 'Disclosure Purpose')." (**Ex. A**.)  The 2011 NDA requires the party receiving Confidential Information[1] to keep the information "in confidence…." (**Ex. A**, **¶ 2**.)

36.   On January 11, 2012, JBT and BGSE entered into the 2012 Distributorship Agreement for a term of one year with no provision for automatic renewal. (**Ex. B, ¶ 3.**) Any extension of the relationship between the parties beyond that term required negotiation and mutual signing of a new agreement. (*Id.*).

37.   The 2012 Distributorship Agreement granted BGSE exclusive rights to distribute specific JBT products in the Territory defined as "United States Military Air Bases both within and outside of the United States with projects defined as having Civilian General Contracting with Small Business Set Aside requirements." (**Ex. B, ¶¶ 1.A, 2.**)

38.   Under the 2012 Distributorship Agreement, BGSE agreed not to "register or use any JBT CORPORATION mark or name, or similar mark or name, for the Products or otherwise," with the exception that sales of products carrying a mark placed on it by JBT were permitted. (**Ex. B, ¶ 8.A.**)

---

[1] Confidential Information is defined to include, among other items, "proprietary technical information" and "trade secrets, known-how, designs, and proprietary commercial and technical information, methods, practices, procedures, processes and formulas with respect to manufacturing, assembly, installation, design, or processing of products and any component or part thereof." (**Ex. A, ¶ 1.**)

4836-8233-0702, v. 1

39.   BGSE was also prohibited under the 2012 Distributorship Agreement from distributing "any goods within the Territory which are competitive with the Products." (**Ex. B**, **¶ 4.C.**)

40.   The 2012 Distributorship Agreement stated that in the event that JBT discloses information to BGSE designated by JBT as confidential, BGSE was required to "retain it in confidence and not to use it, or disclose it, except as expressly agreed by JBT CORPORATION." (**Ex. B**, **¶ 6.B.**)

41.   All orders made under the 2012 Distributorship Agreement were subject "to JBT CORPORATION'S standards terms and conditions in effect at the time the order [was] placed." (**Ex. B**, **¶ 7.C.**)  At all relevant times, JBT's standard terms and conditions contained a confidentiality provision that allowed the "Buyer" of JBT's goods to use confidential information provided by JBT only for the operation and maintenance of the purchased equipment and required the "Buyer" to protect the information from disclosure to others.

42.   Upon termination of the 2012 Distributorship Agreement, BGSE was required to "immediately stop using any of JBT CORPORATION'S marks, names, or trade dress on printed materials and otherwise and any language stating or suggesting that [BGSE] is a distributor for the Products." (**Ex. B**, **¶ 11.G.**) Within thirty days after termination, BGSE was further required "to remove all reference to JBT CORPORATION from [BGSE's] letterhead, business forms, advertising literature and place of business," and to refrain from using "any name or trademark suggesting that [BGSE] has any relationship with JBT CORPORATION." (**Ex. B**, **¶ 12.**)

43.   In late 2012, prior to the termination of the 2012 Distributorship Agreement, JBT and BGSE attempted to negotiate an extension but were unable to agree on the terms.

44.    In or about October, 2014, after Bullerdick resigned as an employee of JBT, BGSE and JBT again attempted to negotiate a new distribution agreement. However, the inability to resolve outstanding payment issues and BGSE's demands for exclusivity beyond contracts with small business set-aside requirements were unacceptable to JBT. Accordingly, no agreement was reached.

45.    After termination of the 2012 Distributorship Agreement, BGSE acted as a reseller of JBT products, on the same level as other buyers of JBT products, with all sales being subject to JBT's standard terms and conditions.

46.    While JBT sold to BGSE occasionally for some projects, on other projects, BGSE offered for sale products made by others, in direct competition with JBT's products.

### _Bullerdick's Falsified Email to General Contractor_

47.    In August 2016, JBT was involved in bidding on a number of F-35 maintenance hangar projects. One of these projects was at Luke Air Force Base in Arizona (the "Luke AFB Project"). BGSE was attempting to bid on the Luke AFB Project as well.

48.    In an email to the general contractor for the Luke AFB Project, Bullerdick purported to copy and append an email he had received from JBT's Michael Austin relating to several different projects where JBT was working with BGSE (as JBT's reseller) to supply Jetaire® units and Jetpower® systems. However, Bullerdick doctored Mr. Austin's email to give a false impression of the relationship between BGSE and JBT. Specifically, in addition to a few non-substantive edits, Bullerdick made the following alterations to Mr. Austin's email:

| Mr. Austin (JBT) message to Bullerdick (original) | Austin message to Bullerdick, pasted on Bullerdick email to Mr. Barton (modified as noted) |
|---|---|
| mainly trying to keep the door open for working together | mainly ~~trying to keep the door open~~ for working together |
| Not sure when our redesigned unit would be ready for market | Not sure when ~~our~~ your redesigned unit would be ready for market |

49.   The above changes altered the entire exchange with Mr. Austin such that it falsely conveyed that JBT was to manufacture *BGSE's* 3rd generation HPC unit. Bullerdick made this alteration despite the fact that JBT does not and never has manufactured an HPC unit—or any other product—for or on behalf of Defendants. What JBT *has* done is design, manufacture and sell to BGSE, solely as a reseller, JBT's own branded, proprietary products under JBT trademarks, model names and model numbers. Defendants have neither participated in nor contributed to the design, development or testing of, or have any proprietary rights in any of JBT's products.

50.   After JBT learned of Bullerdick's conduct, it sent a letter to Bullerdick refuting the suggestion that Bullerdick  or BGSE had any proprietary rights in the design of JBT's Jetaire® units and demanding that Defendants cease and desist from altering or misrepresenting any further communications from JBT personnel. Defendants never responded, and JBT believed the issue to have been resolved.

51.   Despite being put on notice that JBT was aware of Defendants' previous attempt at committing fraud, however, Defendants have recently continued their fraudulent activities by altering JBT documents, using and disclosing JBT's confidential information and trade secrets, and misrepresenting JBT's products and prior work as their own.

### *BGSE's First Known Bid Submission with Falsified Documents and JBT's Trade Secrets*

52.   JBT became aware of the next fraudulent activity perpetrated by Defendants in late July, 2017, relating to a bid proposal for a F-35 maintenance hangar project for the Nevatim Israeli Air Force Base (the "Nevatim Project").

53.   JBT, through its Israel-based distributor Bney Meir Ltd. ("Bney Meir"), submitted a bid on the Nevatim Project for the sale of thirteen (13) Jetpower® systems, specifically Jetpower® 270 VDC units, with a bid price of over $1 million. BGSE submitted a separate, competing bid for the Nevatim Project. On information and belief, the contract for the GPUs was believed to have been initially awarded to BGSE.

54.   Suspecting irregularities, Bney Meir filed a bid protest with the general contractor on the Nevatim Project, and received a copy of BGSE's proposal package (the "BGSE Nevatim Proposal").

55.   Included in the BGSE Nevatim Proposal are numerous false statements and altered documents in which BGSE blatantly and deliberately passed off technical information, testing certificates and product installations relating to JBT's Jetpower 270 VDC units as being instead related to BGSE's GPUs.

56.   In particular, and most egregiously, the BGSE Nevatim Proposal includes three pages of a JBT proprietary and confidential Inspection Report & Record for a special factory test on a Jetpower III, 72kw 270vdc unit, conducted on June 6, 2012, which was modified to make it appear that the test form and the tested product were from BGSE (the "Altered Test Report"). The JBT Inspection Report & Record (the "JBT Inspection Report") was prepared and generated in 2012 during Bullerdick's employment by JBT.

57.   Two pages of the Altered Test Report are based on a JBT proprietary testing form that contains numerous references to JBT, including the JBT AEROTECH and JETWAY SYSTEMS marks in the heading and the Jetway Systems address in the footer. Further, both pages also include a confidentiality statement in the footer: "This checklist is the property of JBT AeroTech Jetway Systems and may not be reproduced or distributed without the written consent of JBT AeroTech's Quality Management." The Altered Test Report contains *none* of these items, with only a BGSE logo in the header.

58.   The original JBT Inspection Report for the special factory test on the Jetpower III, 72kw 270vdc unit is maintained confidentially in JBT's files. On both of the form pages in the original, the title of the test is included at the top and includes the JBT model number: "Jetpower III 72kw 270vdc Sys, Special Factory Test." Both pages also include the identifying JBT document number as "QCA JET 4.10.04-179 270v." The Altered Test Report has the same document number on the first page, but no document number on the second page, and the title is the same, but for the deletion of the model number "Jetpower III."

59.   The Altered Test Report further includes a different approver name, model number tested and test location. The actual test results, however, handwritten on both the Altered Test Report and the JBT Inspection Report, are identical. Even the initials identifying the Test Technician are the same: MLF, indicating Mike Fullmer, the head engineer on Jetpower® systems. Apparently, while BGSE changed the name of the test approver from "M Fullmer" in the original to "Bryan Bullerdick" in the Altered Test Report, it forgot to change the test technician's initials.

60.   The Altered Test Report further includes a screen shot of an oscilloscope during operation, but with no explanation of its relevance. The exact same screen shot is included in the original JBT Inspection Report showing the oscilloscope measuring one of the test parameters during the performance of the test recorded in the report. The screen shot was also maintained as confidential by JBT.

61.   Just after the Altered Test Report, the BGSE Nevatim Proposal includes a forged test certificate from the independent testing lab DNB of Coalville, Utah (the "Forged Certificate," attached hereto as **Exhibit E**). The Forged Certificate purports to certify that BGSE product model number BG-270VDC-72kW, the supposed subject of the Altered Test Report, was found to be compliant with the applicable standards listed on the certificate.

62.   In reality, the Forged Certificate is a copy of a *true* Certificate of Test issued by DNB on October 12, 2011 for JBT product model number JTP3 270VDC (the "Original Certificate," attached hereto as **Exhibit F**). The Forged Certificate includes different information only in the Customer, Equipment Description and Type/Model No. fields. All other data, including the test engineer's name and signature, test date, test location and parameters tested are the same.

63.   On July 27, 2017, Les Payne, a Facility Manager with DNB, was contacted by JBT to verify the authenticity of the Forged Certificate as compared to the Original Certificate. Mr. Payne confirmed that the Forged Certificate was a modified copy of the Original Certificate, pointing specifically to the same DNB job number appearing on both documents. Mr. Payne stated that DNB would not use the same job number for two different customers. (*See* email from L. Payne to S. Gwilliam, dated 7/27/2017, attached hereto as **Exhibit G**.)

64.   BGSE utilized and disclosed other trade secrets and confidential information of JBT through a "Specification" for its proposed unit included in the BGSE Nevatim Proposal. BGSE's Specification is substantially copied directly from Chapter 1, Section 2of JBT's manual for its Jetpower® III Plus 90-kVA 400 Hz/270-VDC Ground Power Units.

65.   JBT's manual includes, in the footer of every page, the designation of "Proprietary/Confidential Documentation," with a copyright notice of JBT Corporation.

66.   As noted above, JBT's standard terms and conditions authorized buyers to use JBT's confidential information only for the operation and maintenance of JBT products and required buyers to protect such information from disclosure.

67.   BGSE further included a specification "cut-sheet" for its proposed product that mimics the layout, style and content of JBT's technical specifications for its proposed product. It is likely that the relevant customers of JBT's products, being familiar with JBT technical specification and of BGSE's past status as a distributor of JBT, could be confused into believing that JBT manufactured, sponsored or otherwise was involved with BGSE's product.

68.   BGSE included other false and misleading representations in the BGSE Nevatim Proposal in an attempt to gain an unfair advantage over JBT.

69.   Specifically, at pages 2-24, the BGSE Nevatim Proposal includes a table entitled "Partial Customer List 2010-2014," listing purported customers and equipment installations during those years. BGSE actually had no involvement in most of the listed projects and certainly did not manufacture any of the equipment purported to have been installed. Many of the installations were completed by JBT with no involvement by BGSE, and many were actually completed by third parties with no involvement of either JBT or BGSE. Some on the installations

on the list were completed before 2010 and a few of the "customers" listed, such as Thyssen Stearns, DEW Engineering and TWA Airlines, actually stopped doing business long before 2010.

70.    For the projects that BGSE was actually involved in, its role was merely that of a distributor or reseller of products manufactured by others. For example, several projects listing U.S. military bases as customers were actually projects for which JBT designed and manufactured products, in which JBT sold its products to BGSE acting merely as a reseller.

71.    BGSE made further false statements in the BGSE Nevatim Proposal by trying to pass off specific installations of JBT ground power equipment as being installations of BGSE products. Specifically, in order to meet the Nevatim Project's requirement that the power units proposed in the bid "be standard equipment with at least ten past completed and successfully tested installations," BGSE included a Qualification Log listing eleven different projects at five different U.S. military bases purportedly covering the installation of 56 units of the same power converter unit proposed in the bid.

72.    Of the 56 units which BGSE listed on its Qualification Log, at least 35 were manufactured and sold by JBT, with BGSE acting merely as JBT's distributor or reseller. Of the remaining units, none were manufactured by BGSE.

73.    BGSE also copied several of JBT's proprietary factory test forms, doctored them to remove JBT logos and add BGSE's logo, and included them in the BGSE Nevatim Proposal as evidence of the factory testing that its products purportedly undergo at the factory.

74. JBT maintains its proprietary factory test forms as confidential and takes reasonable steps to ensure such forms are not disclosed to third parties without proper protections and requirements for confidentiality.

75. In total, the BGSE Nevatim Proposal is replete with fraudulent, doctored, and false data and information, and throughout, falsifies both BGSE's credentials and qualifications, and mischaracterizes BGSE's relationship with JBT.

### *BGSE's Second Known Bid Submission with Falsified Documents and JBT's Trade Secrets*

76. On August 2, 2017, JBT learned of another instance where BGSE submitted fraudulent and altered documents in a bid proposal. Specifically, JBT learned that the independent testing lab DNB had been asked to verify a test certificate submitted by BGSE in a post-bid submittal for a F-35 hangar project believed to be at the Naval Air Station Lemoore in Lemoore, California (the "Lemoore Project"). In response, DNB confirmed to Ken Letman of Jacobs Engineering ("Jacobs") that the Certificate of Test submitted by BGSE was a forgery. (*See* email from K. Letman to L. Payne, dated 8/2/2017, attached hereto as **Exhibit H**.)

77. Upon learning of the forgery, Jacobs reviewed BGSE's post-bid submission to Jacobs and contacted JBT to verify the authenticity of other documents. Mr. Letman specifically questioned the authenticity of an Intertek "Authorization to Mark" document submitted by BGSE purporting to certify that its B-Power units were tested by Intertek and authorized to display the "ETL Listed" mark.

78. Intertek's "ETL Listed" mark is seen as being proof of product compliance to North American safety standards. It is widely accepted across the U.S. and Canada as proof of product compliance to published industry standards. The "ETL Listed" mark is accepted on commercial,

government and military contracts as proof that proposed products meet the required safety

standards set in the applicable project specifications.

79.    The required safety standards for 270 VDC power units, such as JBT's Jetpower® III

Plus 400 Hz/270 VDC Combo unit, are different than previous power units because of the DC

current that the unit employs. While JBT eventually received an Authorization to Mark from

Intertek for its 270 VDC units,  thus authorizing JBT to place the mark "ETL Listed" on the

tested products, it was incredibly difficult to meet the required tests and it took a considerable

amount of engineering and testing, and related expense, to do so.

80.    By submitting a forged authorization, BGSE obtained an unfair advantage over

competitors, such as JBT, who expend the time, effort, resources, and cost to ensure that their

products legitimately meet the required industry safety standards.

81.    Upon receiving a copy of the Intertek certificate submitted by BGSE, JBT sent it to

Intertek for verification. Intertek responded that it was a counterfeit document. (*See* email of

Heather De Vries, Directory Coordinator, Intertek, dated 8/25/2017, attached hereto as **Exhibit

I**.)

82.    Jacobs' Mr. Letman also questioned the authenticity of testing data for BGSE's high

pressure preconditioned air products proposed for the Lemoore Project, and whether the

documents were actually for one of JBT's Jetaire ® HPC-F units.

83.    On information and belief, BGSE altered and modified a JBT proprietary and

confidential Inspection Report and Record for a factory test on a Jetaire® HPC-F unit by

removing all references to JBT and substituting BGSE references in their place, just as was done

with the Altered Test Report described in paragraphs 56-60 above relating to the BGSE Nevatim Proposal.

84.   Such actions were clearly taken to trade on JBT's good reputation and pass off BGSE's inferior products as having the same characteristics and qualities as JBT's, while not having to invest in the resources necessary to achieve them.

85.   Further, as with its Jetpower® systems, JBT's inspection and testing reports for its Jetaire® units are proprietary and confidential, protected within the company and not disclosed to third parties without reasonable precautions taken to ensure they remain confidential.

### *BGSE's False Advertising via Website Misrepresentations*

86.   BGSE's efforts to pass its products off as being associated with JBT's goods and reputation for quality products extend to BGSE's current website, viewable at www.bullerdickgse.com, where several photos of products and installations and a purported listing of BGSE projects are actually depictions of JBT's products, installations and projects.

87.   One source of multiple BGSE misrepresentations is found on the front page of BGSE's website, near the bottom, which includes ten different projects with a series of rotating pictures for each project. Many of those were actually installations of *JBT* equipment, not BGSE equipment.

88.   For example, for the project labeled on BGSE's website "BEAUFORT MCAS F35 Hangar Supply and Install P454 270VDC 400HZ PC Air PITS," JBT designed and manufactured the Jetpower® III Plus 270 vdc / 400Hz Combo units and the Jetaire® HPC-F conditioned air units. In fact, some of the pictures included for that project are clearly for JBT equipment:




89.   Several of the other projects listed on the front page of BGSE's website were also ones where the ground power and preconditioned air equipment were designed and manufactured by JBT. At most, BGSE acted as only as a distributor or reseller of JBT's products. These include "US Army Corps Japan F 35 Bases KADINA and OKINAWA," "Yuma MCAS Supply and Install F 35 Hangars," "Naval Air Station North Island," and "LUKE AFB P413 & P931 F 35 hangars."

90.   The project labeled "A380 POWER A380 PC AIR A380 PITS LAX Airport," was another project where JBT designed, manufactured and supplied Jetaire® units and Jetpower® systems. In a brazen – and fraudulent – maneuver of which JBT was not previously aware, BGSE affixed its own logo onto equipment manufactured by JBT. BGSE's website photos obscure the JBT nameplate on the Jetpower® system, thus giving the false impression that BGSE is the manufacturer of all the equipment in the photos:



Thumbnail implying BGSE's Power and PC Air equipment



Different view, with larger BGSE logo and JBT name plate obscured.



View from other side, with BGSE logo and JBT nameplate visible.

91.    Attempts to falsely associate BGSE's products with those of JBT can be found

elsewhere throughout its website. Another example is on the product page related to BGSE's

supposed PC Air products, where BGSE's logo and mark COOL JET are displayed prominently

across the top, along with the notation "Manufactured by TWIST." (*See*

https://www.bullerdickgse.com/pc-air-point-of-use, attached hereto as **Exhibit J.**) The

implication is that all of the products described in the table and in the pictures included on that page are BGSE's products that are manufactured by TWIST.

92.    However, one of the pictures in fact shows a Jetaire® HPC-F unit, designed and manufactured by JBT with a BGSE logo affixed thereto:



93.    Besides the misrepresentations through photographs, BGSE's website also makes false statements and other misrepresentations in text and attachments. BGSE includes a press release dated November 19, 2014 in the website, in which BGSE makes numerous false and misleading statements about its products, the nature of its business and its involvement and ownership in the design of the ground power and high pressure air products it was then supplying. (*See* Nov. 19, 2014 BGSE Press Release, attached hereto as **Exhibit K.**)

94.    The false statements include:

a.    "Since 2010 BGSE Group has been awarded every major F 35 hangar project in the world to supply required POWER, AIR and PIT delivery systems."

b.  "Not only has BGSE Group been [sic] 100% dominate in supplying this specialized equipment, we have 100% repeat business at air stations where our products are now basis of design."

c.  "Our proven systems are the only systems to date commissioned to meet the current customers F 35 requirements."

d.  "Unpublished lessons learned and unwritten knowledge of system requirements make BGSE Group the only company to have all the design and implementation knowledge to completely and successfully integrate these F 35 interface products."

(**Ex. K.**)

95.   Each of these statements was false at the time of this press release and remains false today. Further, upon information and belief, these statements are clearly designed to give the relevant potential customer or other reader the impression that BGSE designs and manufacturers all the equipment for the F-35 hangar projects, including the ground power units and preconditioned air systems which are in fact manufactured by JBT and which BGSE distributed or resold for the vast majority of the projects referred to in the press release. BGSE falsely implies that it has the technical engineering knowledge and know-how to design and build advanced fixed and mobile PC Air systems and fixed and mobile ground power units, when in fact Bullerdick does not have a professional engineering degree or license, nor, on information and belief, do any of BGSE's employees. By contrast, JBT has a substantial R&D capability with numerous licensed, professional engineers who spent hundreds, if not thousands, of hours designing the products which later entered the marketplace under the Jetaire® and Jetpower® brands.

96.   BGSE's false advertising activity is not limited to its own website. On an industry website called "Airport Suppliers," which holds itself out as a global "meeting place" for the aviation industry, BGSE maintains a presence that further perpetuates the falsehoods about its business. (*See https://www.airport-suppliers.com/supplier/bgse-group/*, screen capture dated 8/28/2017, attached hereto as **Exhibit L.**)

97.   On the Airport Suppliers website, BGSE has placed an advertisement that includes descriptions of its alleged pits, GPUs and PC Air units. BGSE states that it "is working with industry manufacturing leaders to develop robust and high quality products for today's demanding marketplace." It then includes a picture of a pit with a JBT logo next to its description of pits, a picture of a JBT Jetpower® unit next to its description of large power units, and a picture of a JBT Jetpower® system next to the description of low profile power units.

98.   BGSE intentionally gives the impression that the JBT Jetpower unit pictured was made for BGSE, by stating that it "provides large 400HZ, 60HZ and 50HZ power converters *manufactured for BGSE Group* to meet complicated customer needs" (emphasis added). This statement is false.

99.   BGSE has also recorded and published several videos on youtube.com, many of which contain either false statements or unauthorized use of photographs of JBT's products, giving the false impression that BGSE has a connection with JBT.

100.  One such video, published by BGSE on September 6, 2015 and located at https://www.youtube.com/watch?v=F4szBRklOAs, is titled "BGSE Group 2016." The video includes a narrator who makes several false statements, including "We have designed the only 100% functional high-pressure PC Air unit for the Joint Strike Fighter." In fact, BGSE has *not*

designed any PC Air units, least of all for the Joint Strike Fighter. By contrast, *JBT* has designed and manufactured several Jetaire® units that have been supplied on several F-35 hangar projects.

### *JBT's Trademarks and BGSE's Website Usage*

101.  JBT has spent a great deal of effort and expense in protecting its valuable intellectual property rights. JBT possess common law and federal registrations in numerous marks used in a variety of different industries, including, but not limited to, military and commercial aircraft ground support equipment and services. The marks JBT has used and continues to use in this industry include JBT, JBT AEROTECH, JETWAY, JETPOWER and JETAIRE (collectively, the "JBT Marks").

102.  JBT owns the following trademark registrations in the United States, copies of which are attached hereto as **Exhibit M**:

| Registration Date | Trademark | U.S. Reg. No. |
|---|---|---|
| 01/29/2013 | JBT (and design) | 4,283,209 |
| 1/29/2013 | JBT | 4,283,208 |
| 8/16/1960 | Jetway | 703,033 |
| 1/19/1984 | Jetpower | 1,282,206 |
| 11/12/2002 | Jetaire | 2,649,668 |

103.  U.S. Registration Nos. 703,033, 1,282,206 and 2,649,668 are incontestable and constitute conclusive evidence, and U.S. Registrations 4,283,209 and 4,283,208 constitute *prima facie* evidence of JBT's ownership of the JBT Marks, JBT's exclusive right to use its Marks throughout the United Sates, and the validity of the registrations and the Marks.

104.  JBT has invested substantial time, money and resources and devoted significant creative energies to the development of the JBT Marks and the goodwill associated therewith, and the

JBT Marks have come to be recognized as strong and well-known marks among the relevant purchasers in the military and commercial aircraft ground support equipment and services industries, among others.

105. As explained above, Defendant BGSE maintains a website having an internet URL address of www.bullerdickgse.com. A screen shot of the home page of BGSE's website, dated 8/29/2017. is attached hereto as **Exhibit N**. The BGSE website's home page, as displayed in a normal internet browser, does not mention JBT nor contain any JBT Marks in the text.

106. JBT, however, discovered that BGSE's website makes use of several of the JBT Marks by embedding them in the metadata of the website. In particular, an advanced search of the "bullerdickgse.com" domain name using Google for any of JBT, JBT AEROTECH, JETWAY or JETAIRE will produce a listing of three different websites within the domain.

107. The html source file for the website www.bullerdickgse.com, viewable with most common web browsers, reveals that the keywords for the page include the generic words and acronyms, among others, "Ground Support Equipment," "GSE," "HPC," "PC Air," and "270VDC," as well as the JBT Marks "JBT," "JBT AeroTech," "Jetaire," and "Jetway." (*See* Source page, www.bullerdickgse.com, dated 8/22/20178, attached hereto as **Exhibit O**.)

108. Using the JBT Marks within the BGSE website's keywords drives web traffic to the site by forcing the site to be included in search results when those search terms are included.

109. BGSE's improper actions in including the JBT Marks in its website's keywords, and embedding the same in BGSE's metadata, are specifically aimed at diverting web users who are expressly looking for JBT's ground support equipment.

### *BGSE's Fraudulent Trademark Application*

110. BGSE's attempts to gain an unfair advantage in the marketplace and to improperly trade

on BGSE's past relationship with JBT extend to an application for trademark filed by BGSE on

December 23, 2016 for the mark COOL JET. (*See* BGSE Trademark Appl. Serial No. 87279604,

attached hereto as **Exhibit P**.) The application, as amended, alleged that the mark was used for

the goods of "aviation and aircraft cooling and heating units," namely, HVAC units, and that the

first use in commerce was at least as early as July 1, 2011.

111. The application was initially rejected by the trademark examiner for being merely

descriptive. In response, on May 15, 2017, Bullerdick submitted a declaration with numerous

demonstrably false statements. (*See* Bullerdick Decl., dated 5/15/2017, attached hereto as

**Exhibit Q.**)

112. First, Bullerdick stated that he served as the President of BGSE since 2011. However,

Ashley Bullerdick signed the 2012 Distributorship Agreement as President of BGSE.

113. Bullerdick next alleged that BGSE used the mark since 2011 for "portable air cooling

and heating units adapted for connection to an aircraft while grounded and stationary; air cooling

and heating units attached to the airport terminal bridge for connection to an aircraft while

grounded and stationary," identified as "Applicant's Goods." However, during this time, and at

least during all of 2012, BGSE was merely a reseller of  units made by JBT and bearing JBT's

trademarks. BGSE did not make any of the goods identified, nor was it authorized to apply its

own mark on any of JBT's goods.

114. Bullerdick next alleged that BGSE was the exclusive supplier of Applicant's Goods "to

American Airlines and to the United States military." This statement is false, as JBT and other

vendors have supplied air cooling units to various U.S. military installations without any involvement of BGSE.

### *Injury to JBT and the Public*

115. BGSE's unauthorized use of the JBT Marks has and will continue to irreparably injure JBT by confusing customers, diverting sales, and diluting the distinctiveness of the JBT Marks. BGSE's continued use of the JBT Marks will irreparably injure JBT, the JBT Marks, the reputation and goodwill associated therewith, JBT's reputation for high-quality products and services in the ground support equipment industry, and the public interest in being free from confusion, mistake or deception.

116. BGSE's use of the JBT Marks has caused and will continue to cause confusion, mistake or deception as to the source or origin of BGSE's goods and services and is likely to falsely suggest a sponsorship, connection, license, endorsement or association of BGSE's goods and services with JBT, thereby injuring JBT and the public.

117. Upon information and belief, BGSE's use of exact imitations of the JBT Marks is part of a deliberate plan to trade on JBT's goodwill and otherwise unfairly compete with JBT and benefit therefrom. As a former licensed distributor whose owner and managing member is a former JBT employee, BGSE knew of JBT's tremendous success in utilizing the JBT Marks in the stream of interstate commerce, and BGSE intentionally engaged in trademark infringement with full knowledge of JBT's rights.

118. BGSE's false and misleading descriptions of fact about its goods and services, its misleading use of JBT's products, photographs and descriptions and its false and misleading statements made in the promotion or advertising of goods in interstate commerce, has harmed

JBT by creating an unfair competitive advantage. BGSE's actions will likely suggest a connection or association of BGSE's goods and services with JBT's goods and services, or that BGSE's goods are of the same quality and are as safe as JBT's goods.

### First Cause of Action
### (Federal Misappropriation of Trade Secrets - 18 U.S.C. § 1831 et seq.)
### *(against Bullerdick and BGSE)*

119. JBT repeats and realleges each and every allegation set forth in paragraphs 1 through 118 above as if fully set forth herein.

120. JBT owns confidential, proprietary, technical, and business information, including but not limited to unique and innovative improvements with respect to aviation ground support equipment, particular ground power units and preconditioned air products for military aircraft, which information constitutes trade secrets under the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*

121. JBT's trade secrets relate to products and services used in interstate commerce, and derive independent economic value from not being generally known to the public or to persons who can obtain economic value from their disclosure or use.

122. JBT has taken commercially reasonable steps to preserve the confidentiality of its trade secrets. These steps include requiring its employees to sign confidentiality agreements such as the 2011 Confidentiality Agreement, and other employment agreements, using passwords to protect access to confidential information on computer computers and electronic storage devices, using nondisclosure agreements with vendors and distributors preserving confidential information and trade secrets, and disclosing its confidential information and trade secrets only to those JBT employees with a need-to-know.

123.  As part of his employment, Bullerdick had access to and obtained possession of large amounts of JBT's trade secrets.

124.  Upon information and belief, Bullerdick kept and used JBT's trade secrets after termination of his employment, despite his contractual obligation not to do so, and despite the requirement that he return any confidential information.

125.  As an authorized distributor of Jetaire® units and Jetpower® systems to U.S. military bases, BGSE had access to and obtained possession of large amounts of JBT's trade secrets.

126.  Upon information and belief, BGSE kept and used JBT's trade secrets after the termination of the 2012 Distribution Agreement, despite the contractual obligation not to use such information and to return the same upon such termination.

127.  On information and belief, Defendants, with full knowledge of JBT's ownership of and rights in its trade secrets, are using or are threatening to use JBT's trade secrets to design, market and/or sale products competing with JBT's products.

128.  Upon information and belief, Defendants' theft and misappropriation of JBT's trade secrets have been conducted in a willful and malicious manner and for an improper purpose.

129.  Defendants' theft and misappropriation of JBT's trade secrets has directly and proximately caused damages to JBT and its businesses. JBT is, therefore, entitled to an aware of actual damages in an amount to be proven at trial.

130.  Because Defendants' misappropriation of JBT's trade secrets has been conducted in a willful and malicious manner, JBT is entitled to exemplary damages under 18 U.S.C. § 1836(b)(3)(C) in an amount not exceeding two times the award of damages as well as its attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

131. At all material times, the above-described actions have caused and are continuing to cause irreparable injury to JBT, for which JBT has not adequate remedy at law, and will continue to offend unless enjoined.

132. JBT is entitled to an injunction under 18 U.S.C. § 1836(b)(3)(A) to prevent any actual or threatened misappropriation of JBT's trade secrets.

**Second Cause of Action**
**State Misappropriation of Trade Secrets - Utah Code Ann. §§ 13-24-1 *et seq.***
**(*against Bullerdick and BGSE*)**

133. JBT repeats and realleges each and every allegation set forth in paragraphs 1 through 132 above as if fully set forth herein.

134. For all the same reasons as set forth above in relation to the First Cause of Action, Defendants have misappropriated JBT's trade secrets under Utah state law.

135. Defendants' misappropriation of JBT's trade secrets has directly and proximately caused damages to JBT and its business. JBT is therefore entitled to an award of actual damages in an amount to be proven at trial.

136. Because Defendants' misappropriation of JBT's trade secrets has been conducted in a willful and malicious manner, JBT is therefore entitled to exemplary damages under Utah Code Ann. § 13-24-4(2) in an amount not exceeding twice the award of damages as well as its attorneys' fees under Utah Code Ann. § 13-24-5.

137. At all material times, the above-described actions have caused and are continuing to cause irreparable injury to JBT, for which JBT has no adequate remedy at law, and will continue to offend unless enjoined.

138. JBT is entitled to injunctive relief against Defendants to prevent further damage and harm to JBT.

**Third Cause of Action**
**Federal Unfair Competition and False Designation of Origin - 15 U.S.C. § 1125(a)**
***(against BGSE)***

139. JBT repeats and realleges each and every allegations set forth in paragraphs 1 through 138 above as if fully set forth herein.

140. BGSE has deliberately and willfully attempted to trade on JBT's long-standing and hard-earned goodwill in its name and marks and the reputation established by JBT in connection with its products and services, as well as in order to confuse consumers as to the origin and sponsorship of BGSE's goods and to pass off their products and services in commerce as those of JBT.

141. BGSE's unauthorized and tortious conduct has also deprived and will continue to deprive JBT of the ability to control the perception of its products and services offered under JBT's name and marks, placing the valuable reputation and goodwill of JBT in the hands of BGSE.

142. BGSE's conduct is likely to cause confusion, mistake or deception as to the affiliation, connection or associate of BGSE's products with JBT, and as to the origin, sponsorship or approval of BGSE and its products and services, in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1).

143. BGSE's activities as described above constitute the use of false designations of origin in commerce, and false and misleading descriptions and representations of fact, all in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

144. BGSE had direct and full knowledge of JBT's prior use of and rights in its marks before the acts complained of herein. The knowing, intention and willful nature of the acts set forth herein renders this an exceptional case under 15 U.S.C. § 1117.

145. As a result of BGSE's above-mentioned conduct, JBT has suffered commercial damages, as well as the continuing loss of goodwill and reputation established by JBT in its name, marks and products. This continuing loss of goodwill cannot be properly calculated and thus constitutes irreparable harm and an injury for which JBT has no adequate remedy at law. JBT will continue to suffer irreparable harm unless this Court enjoins BGSE's conduct.

### Fourth Cause of Action
### Federal Unfair Competition and False Advertising- 15 U.S.C. § 1125(a)
### *(against BGSE)*

146. JBT repeats and realleges each and every allegations set forth in paragraphs 1 through 145 above as if fully set forth herein.

147. BGSE's actions described above and specifically, without limitation, BGSE's use of JBT's marks, products and descriptions of prior JBT work in commerce to advertise, market, promote, and sell PC Air units and GPU systems throughout the United States including Utah; its use of forged test data and altered third-party certifications; its false and misleading representations regarding its design capabilities, its qualifications and the extent of its past work; and BGSE' knowledge, participation, and inducement thereof, constitute unfair competition and false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

148. The relevant purchasing public is likely to be misled and deceived by BGSE's dissemination of false and misleading documents, statements and misrepresentations.

149. BGSE knew or should have known that its documents and statements were false or likely to mislead.

150. As an actual and proximate result of BGSE's willful and intentional actions, JBT has suffered damages in an amount to be determined at trial, and unless BGSE is enjoined, JBT will continue to suffer irreparable harm and damage to its business, reputation , and goodwill.

151. Pursuant to 15 U.S.C. § 1117, JBT is entitled to damages for BGSE's Lanham Act violations, an accounting for profits made by BGSE on sales of non-JBT PC Air units and GPU systems, as well as recovery of the costs of this action. Furthermore, JBT is informed and believes, and on that basis alleges, that BGSE's conduct was undertaken willfully and with the intention of causing confusion, mistake or deception, making this an exceptional case entitling JBT to recover additional damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

### Fifth Cause of Action
### Federal Trademark Infringement - 15 U.S.C. § 1114
### *(against BGSE)*

152. JBT repeats and realleges each and every allegation set forth in paragraphs 1 through 151 above as if fully set forth herein.

153. BGSE, without authorization from JBT and with knowledge that BGSE's use of the JBT Marks is likely to cause confusion, has used and is continuing to use the JBT Marks, and confusingly similar variations thereof, in commerce to advertise, promote, market, and sell PC Air units and GPU systems throughout the United States including Utah.

154. The foregoing acts of BGSE are intended to cause, have caused, and are likely to continue to cause confusion, mistake, and deception among the relevant consumers, the public,

and the trade as to whether BGSE's products originate from, or are affiliated with, sponsored by, or endorsed by JBT.

155. BGSE's activities as described above constitute infringement of the JBT Marks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

156. The actions of BGSE, if not enjoined, will continue. JBT has suffered and continues to suffer damages in an amount to be proven at trial consisting of, among other things, diminution in the value of and goodwill associated with the JBT Marks, and injury to JBT's business. JBT is therefore entitled to injunctive relief pursuant to 15 U.S.C. § 1116.

157. Pursuant to 15 U.S.C. § 1117, JBT is entitled to recover damages in an amount to be determined at trial, profits made by BGSE on sales of non-JBT PC Air units and GPU systems, and the costs of this action. Furthermore, JBT is informed and believes, and on that basis alleges, that the actions of BGSE were undertaken willfully and with the intention of causing confusion, mistake, or deception, making this an exceptional case entitling JBT to recover additional treble damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

**Sixth Cause of Action**
**Breach of Contract – The 2011 Confidentially Agreement**
***(against Bullerdick)***

158. JBT repeats and realleges each and every allegation set forth in paragraphs 1 through 157 above as if fully set forth herein.

159. A contract existed between JBT and Bullerdick, namely the 2011 Confidentiality Agreement.

160. Bullerdick breached the 2011 Confidentiality Agreement by:

4836-8233-0702, v. 1

a.   Retaining documents, files, records and/or other property of JBT after termination of his employment;

b.   Disclosing JBT's confidential information, including, but not limited to, internal Quality Control Inspection Reports;

c.   Using JBT's documents, files, records and other property for his own purposes;

d.   Facilitating and/or contributing to the disclosure of JBT's confidential information by others, including, but not limited to, BGSE.

161. JBT has been damaged by Bullerdick's breach.

162. JBT performed all conditions required of it under the 2011 Confidentiality Agreement.

**Seventh Cause of Action**
**Breach of Contract – The 2011 NDA**
*(against BGSE)*

163.   JBT repeats and realleges each and every allegation set forth in paragraphs 1 through 162 above as if fully set forth herein.

164.   A contract existed between JBT and BGSE, namely the 2011 NDA.

165.   BGSE breached the 2011 NDA by:

a.   Retaining documents, files, records and/or other property of JBT after termination of his employment;

b.   Disclosing JBT's confidential information, including, but not limited to, internal Quality Control Inspection Reports;

c.   Using JBT's documents, files, records and other property for his own purposes;

d.   Facilitating and/or contributing to the disclosure of JBT's confidential information by others, including, but not limited to, BGSE.

166. JBT has been damaged by BGSE's breach.

167. JBT performed all conditions required of it under the 2011 NDA.

**Eighth Cause of Action**
**Breach of Contract – The 2012 Distributorship Agreement**
*(against BGSE)*

168. JBT repeats and realleges each and every allegation set forth in paragraphs 1 through 167 above as if fully set forth herein.

169. A contract existed between JBT and BGSE, namely the 2012 Distribution Agreement.

170. BGSE breached the 2012 Distribution Agreement by:

a.   Retaining documents, files, records and/or other property of JBT after termination of his employment;

b.   Disclosing JBT's confidential information, including, but not limited to, internal Quality Control Inspection Reports;

c.   Using JBT's documents, files, records and other property for his own purposes;

d.   Facilitating and/or contributing to the disclosure of JBT's confidential information by others, including, but not limited to, BGSE.

171. JBT has been damaged by BGSE's breach.

172. JBT performed all conditions required of it under the 2012 Distribution Agreement.

**<u>JURY DEMAND</u>**

173. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, JBT request a jury trial of all issues that may be tried to a jury in this action.

4836-8233-0702, v. 1

## PRAYER FOR RELIEF

WHEREFORE, JBT requests that this Court enter judgement in its favor on each and every claim for relief set forth above and award it relief, including, but not limited, the following:

A.     For a preliminary and permanent injunction restraining Bullerdick and BGSE, and anyone associated with either, from acquiring, using or disclosing JBT's trade secrets and other confidential documents, data or information;

B.     For a preliminary and permanent injunction requiring Bullerdick and BGSE, and anyone associated with either, to:

(i)     account for and return to JBT all JBT trade secrets and other confidential documents, data or information in their possession, custody or control, including any copies thereof;

(ii)     promptly remove all JBT trademarks and other intellectual property from the website www.bullerdickgse.com, and all other websites within their control, including from the metadata on such websites;

(iii)     promptly account for any and all modified, false or misleading JBT documents provided to any contractor, sub-contractor, military office or other government entity or agency;

(iv)     abide fully by the agreements they entered into with JBT, as described above;

(v)     refrain from committing any other act calculated or likely to cause the relevant customers to believe that either is in any manner connected, affiliated or associated with JBT, a distributor for or authorized seller of JBT products, and from otherwise competing unfairly with JBT;

(vi)     refrain from claiming proprietary ownership rights in JBT equipment and misrepresenting its ability to design, manufacture and directly supply such equipment; and

C.      For monetary damages, including exemplary and punitive damages as allowed

(and as identified above), in an amount to be proven at trial;

D.      For pre- and post-judgment interest at the maximum rate allowed by law;

E.      For reasonable attorneys' fees and costs as allowed by statutes; and

F.      For such other relief as the Court deems just and equitable.


Dated:  September 1, 2017


                                        By:    /s/ David P. Billings
                                               David P. Billings
                                               Robert G. Crockett
                                               Fabian VanCott
                                               215 South State Street, Suite 1200
                                               Salt Lake City, UT 84111-2323

                                               Edward S. Weil (*pro hac vice* to be filed)
                                               Steven McMahon Zeller (*pro hac vice* to be filed)
                                               Dykema Gossett PLLC
                                               10 S. Wacker Drive, Suite 2300
                                               Chicago, IL 60606

                                               *Attorneys for John Bean Technologies Corporation*

Plaintiff's Address:

John Bean Technology Corporation
c/o Steven McMahon Zeller
Dykema Gossett PLLC
10 S. Wacker Drive, Suite 2300
Chicago, IL 60606

## <u>VERIFICATION</u>

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

1.      My name is Brian DeRoche and I am employed by John Bean Technologies

Corporation ("JBT") as Vice President and General Manager for the Jetway Systems® business

unit of JBT AeroTech division.

2.      To the best of my knowledge, the information in the foregoing Complaint is true

and correct.

3.      I have the authority to make this declaration on behalf of John Bean Technologies

Corporation.

4.      I declare under penalty of perjury, that the foregoing is true and correct.

Signature:

Name: Brian DeRoche

**APPENDIX OF EXHIBITS TO COMPLAINT**

| EXHIBIT | DESCRIPTION |
|---|---|
| A. | Mutual Non-Disclosure Agreement, dated November 11, 2011 |
| B. | 2012 Distributorship Agreement, dated January 11, 2012 |
| C. | 2011 Confidential Information and Inventions Agreement |
| D. | John Bean Technologies Corporation's Commitment to Ethics (excerpt) |
| E. | DNB Certificate of Test, BGSE model BG-230VDC-72kw (forged) |
| F. | DNB Certificate of Test, JBTC Model JTP3 270VDC (original);Email from L. Payne to S. Gwilliam, dated July 27, 2017 |
| G. | Email from K. Letman to L. Payne, dated August 2, 2017 |
| H. | Email from H. De Vries to B. DeRoche, dated August 25, 2017 |
| I. | Screen print of https://www.bullerdickgse.com/pc-air-point-of-use, dated August 27, 2017 |
| J. | Press Release, BGSE Group, dated November 19, 2014 |
| K. | Screen print of https://www.airport-suppliers.com/supplier/bgse-group/, dated August 28, 2017 |
| L. | U.S. Trademark Registration Certificates for JBT, Jetway, Jetpower, Jetaire |
| M. | Screen print of www.bullerdickgse.com, dated August 28, 2017 |
| N. | Screen print of source file website www.bullerdickgse.com, dated August 22, 2017 |
| O. | Trademark application No. 87279604, dated December 23, 2016 |
| P. | Declaration of B. Bullerdick, dated May 15, 2017, in TM Appl. No. 87279604 |