Patrick E. Johnson (10771)
Paul T. Moxley (2342)
COHNE KINGHORN, P.C.
111 East Broadway, 11th Floor
Salt Lake City, UT 84111
Telephone: (801) 363-4300
Facsimile: (801) 363-4378
pjohnson@cohnekinghorn.com
pmoxley@cohnekinghorn.com

Edward B. Davis (*admitted pro hac vice*)
Joshua B. Durham (*admitted pro hac vice*)
BELL, DAVIS & PITT, P.A.
227 West Trade Street, Suite 1800
Charlotte, NC 28202
Telephone: (704) 227-0400
Facsimile: (704) 227-0178
ward.davis@belldavispitt.com
jdurham@belldavispitt.com

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, NORTHERN DIVISION



JOHN BEAN TECHNOLOGIES
CORPORATION, a Delaware corporation,

      Plaintiff,

vs.

B GSE GROUP, LLC, a North Carolina
limited liability company, and BRYAN
BULLERDICK, an individual,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

**DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND
MEMORANDUM IN SUPPORT**

Case No. 1:17-cv-00142-RJS-EJF

Judge:  Robert J. Shelby

Magistrate Judge: Evelyn J. Furse

NOW COME Defendants, B GSE Group, LLC ("BGSE") and Bryan Bullerdick ("Bullerdick") (collectively, "Defendants"), by and through counsel, and move the Court pursuant to Rule 56 of the Federal Rules of Civil Procedure to dismiss all claims of Plaintiff, John Bean Technologies Corporation ("JBT"), for the reasons described herein.

## <u>TABLE OF CONTENTS</u>

INTRODUCTION AND STATEMENT OF RELIEF SOUGHT ..................................................3

STATEMENT OF UNDISPUTED MATERIAL FACTS .............................................................4

ARGUMENT ....................................................................................................................................11

I.     JBT'S TRADE SECRET CLAIMS FAIL AS A MATTER OF LAW ...........................13

       A.     The HPCF-3000 manual and schematics do not qualify as a trade secret ............14

       B.     The DTSA claim is barred by the date of the DTSA's enactment........................17

II.    JBT'S LANHAM ACT AND TRADEMARK INFRINGEMENT CLAIMS FAIL AS A
       MATTER OF LAW ........................................................................................................18

       A.     Federal Unfair Competition and False Designation of Origin – 15 U.S.C. §
              1125(a) ..................................................................................................................18

       B.     Federal Unfair Competition and False Advertising - 15 U.S.C. § 1125(a) ..........21

       C.     Federal Trademark Infringement – 15 U.S.C. § 1114 ...........................................23

III.   JBT'S CONTRACT CLAIMS FAIL AS A MATTER OF LAW ...................................24

IV.    JBT'S DEFAMATION CLAIM FAILS AS A MATTER OF LAW ...............................26

V.     JBT'S CLAIM FOR TORTIOUS INTERFERENCE FAILS AS A MATTER OF LAW
       ........................................................................................................................................29

CONCLUSION.................................................................................................................................31

## INTRODUCTION AND RELIEF SOUGHT

JBT asserts ten causes of action against BGSE and Bullerdick arising from the souring of a relationship in which JBT was a manufacturer, BGSE was its distributor, and Bullerdick (BGSE's principal) was a JBT employee.  The claims are as follows: misappropriation of trade secrets under federal law;[1] misappropriation of trade secrets under Utah law;[2] unfair competition and false designation of origin under the Lanham Act;[3] unfair competition and false advertising under the Lanham Act;[4] trademark infringement;[5] breach of a nondisclosure agreement between JBT and BGSE;[6] breach of a confidentiality agreement between JBT and Bullerdick;[7] breach of a confidentiality agreement contained in Bullerdick's employment agreement;[8] defamation;[9] and tortious interference with prospective economic relations.[10]  JBT's claims should be dismissed because:

(i)     With respect to JBT's trade secret claims, BGSE and Bullerdick are entitled to summary judgment because JBT's purported trade secret information does not qualify as a trade secret.

(ii)    With respect to JBT's claims under the Lanham Act and for trademark infringement, BGSE and Bullerdick are entitled to summary judgment because JBT is unable to sustain its burden of establishing consumer confusion.  BGSE and Bullerdick are also

---

[1] Am. Compl. ¶¶ 146–59, ECF No. 99.

[2] *Id.* at ¶¶ 160–65.

[3] *Id.* at ¶¶ 166–72.

[4] *Id.* at ¶¶ 173–78.

[5] *Id.* at ¶¶ 179–84.

[6] *Id.* at ¶¶ 185–89.

[7] *Id.* at ¶¶ 190–94.

[8] *Id.* at ¶¶ 195–99.

[9] *Id.* at ¶¶ 200–04.

[10] *Id.* at ¶¶ 205–12.

entitled to summary judgment on the false advertising claim because their materials do not constitute advertising or promotions.

(iii)    With respect to the breach of contract claims, BGSE and Bullerdick are entitled to summary judgment because JBT must be equitably estopped from pursuing its breach of contract claims.

(iv)    With respect to the defamation claim, BGSE and Bullerdick are entitled to summary judgment because many of the allegedly defamatory materials cited by JBT fail to even mention JBT, others are truthful, and others are merely matters of opinion.  JBT also cannot present evidence supporting any damages allegedly caused by BGSE's and Bullerdick's allegedly defamatory statements.

(v)    Finally, with respect to JBT's claim for tortious interference, BGSE and Bullerdick are entitled to summary judgment because their actions were for legitimate business purposes, and JBT is unable to show that any customer more likely than not would have entered a contract with JBT but for the actions of BGSE and Bullerdick.

## STATEMENT OF UNDISPUTED FACTS

### A.  Background of the Parties

1.     JBT, through its JBT AeroTech division, manufactures and sells ground support equipment and services for the air transportation industry, which includes the military.[11]

2.     JBT's products include fixed and mobile preconditioned air ("PC Air") units and fixed and mobile ground power units ("GPU").[12]

---

[11] Am. Compl, ¶ 2, ECF No. 99.
[12] *Id*.

3.      JBT is the owner of the following, registered marks:

| Registration Date | Trademark | U.S. Reg. No. |
|---|---|---|
| 01/29/2013 | JBT (and design) | 4,283,209 |
| 1/29/2013 | JBT | 4,283,208 |
| 8/16/1960 | Jetway | 703,033 |
| 1/19/1984 | Jetpower | 1,282,206 |
| 11/12/2002 | Jetaire | 2,649,668 [13] |

4.      Bullerdick's whole life has been spent in or around the aviation industry, and prior to working for JBT, Bullerdick worked for two different companies that sold ground support equipment.[14]

5.      Prior to working for JBT, Bullerdick even formed his own company, which eventually became BGSE.[15]

**B.  Contractual Dealings Between the Parties**

6.      JBT's hope was that Bullerdick would help grow JBT's market share for supplying ground support equipment for the new F-35 joint strike fighter, namely preconditioned air units and ground power units.[16]

7.      Bullerdick was more familiar with military hangar construction projects than JBT.[17]

8.      JBT hired Defendant Bullerdick in 2011 as a sales manager for its Aerotech division.[18]

9.      During his time with JBT, Bullerdick continued to own BGSE, and JBT regularly sold equipment to BGSE for ultimate incorporation into military projects.[19]

---

[13] *Id.* at ¶ 133.
[14] Bullerdick Aff. ¶¶ 4–7, **App'x Exhibit 1**.
[15] **Ex. 1**, Bullerdick Aff., ¶ 8.
[16] *Id.* at ¶¶ 9–10.
[17] DeRoche Dep. pp. 26:11–27:7, **App'x Exhibit 2**.
[18] **Ex. 1**, Bullerdick Aff., ¶ 9.
[19] *Id.* at ¶ 11.

10.    In January 2012, JBT and BGSE entered into a one-year distributorship agreement under which BGSE would be the exclusive supplier of JBT equipment for a specific subset of military projects.[20]

**C.  The End of the Distributorship and Employment Relationships, But Continuation of Dealings**

11.    The 2012 distributorship agreement expired after one year, though the parties continued to operate under it while they worked to create a new one.[21]

12.    In 2014, while their informal distributor relationship continued, Bullerdick's employment with JBT ended.[22]

13.    The parties differ as for the reasons Bullerdick's employment ended, but JBT continued to sell equipment to BGSE informally.[23]

14.    BGSE did not merely re-sell JBT's equipment to another contractor on a military project; rather, BGSE provided other services, too.[24]

15.    For example, military projects often called for equipment beyond that which JBT was capable of manufacturing and providing.[25]

16.    BGSE frequently proposed systems and solutions to contractors that ensured that all of the equipment provided would conform to the projects' requirements.[26]

17.    BGSE frequently touted its value-add to military projects.[27]

---

[20] *Id.* at ¶ 12; Distributorship Agreement, ECF No. 99-2.
[21] **Ex. 1**, Bullerdick Aff. ¶ 13.
[22] *Id.* at ¶ 14.
[23] **Ex. 1**, Bullerdick Aff. ¶ 15.
[24] *Id.* at ¶ 18.
[25] *Id.* at ¶ 19.
[26] *Id.*
[27] *Id.* at ¶ 20.

18.     In a presentation to one such contractor, Jacobs Engineering, BGSE represented that "Together, JBT and BGSE have developed, marketed, and tested power conversion, PCAir, and Aircraft Air Start products for the 21st century warfighters' needs."[28]

19.     BGSE described itself in the presentation as a "turn key distributor" of products from JBT and CombiBox USA (which manufactures pits).[29]

20.     BGSE, according to the presentation, can supply "a complete solution."[30]

21.     JBT's Brian DeRoche, the Vice Preseident and General Manager for the Jetway Systems business unit of JBT's Aerotech division, was present during BGSE's presentation.[31]

22.     JBT has described BGSE's value-add in similar terms.[32]

23.     JBT has admitted that most other contractors did not approach bids like BGSE and that BGSE's practice of bidding a turnkey solution "has worked well for us both . . . ."[33]

24.     As part of a number of military projects for which BGSE was awarded bids, BGSE was required to provide a "submittal" that set out the equipment BGSE intended to provide.[34]

25.     During BGSE's and JBT's long relationship, BGSE provided submittals to contractors that removed various references to JBT.[35]

26.     On at least on occasion, and in furtherance of BGSE's supplying a total solution on a military project, JBT urged BGSE to do this.[36]

---

[28] **Ex. 2**, DeRoche Dep. pp. 180:10–181:16; Deposition of Scott Dils, p. 30:2–18, **App'x Exhibit 3**; PowerPoint Presentation to Jacobs Engineering, p. 5., **App'x Exhibit** 4.

[29] **Ex. 4**, PowerPoint Presentation, p. 30.

[30] *Id*.

[31] **Ex. 3**, Dils Dep. p. 30:4–16.

[32] *See* April 2014 email chain between JBT and US Air Force Captain, **App'x Exhibit 5.**

[33] *See* April 2016 email chain between Mike Austin and Bullerdick, **App'x Exhibit 6.**

[34] Bullerdick Aff. ¶ 22, **Ex. 1**.

[35] Deposition of Bryan Bullerdick pp. 231:25–232:6, **App'x Exhibit 7**.

[36] DeRoche Dep. pp. 183:25–185:23, **Ex. 2**; Deposition of Scott Gwilliam pp. 101:21–103:13, **App'x Exhibit 8**.

27.     In its submittals and on its website, BGSE often included pictures of past projects with which it had been involved.[37]

28.     In these submittals, BGSE also included drawings, pictures, and rudimentary specifications of JBT equipment, which it received from JBT.[38]

**D.   JBT's Alleged Trade Secrets**

29.     JBT has specifically identified its allegedly misappropriated trade secrets as "JBT's Operational and Maintenance Manual for the Jetaire® HPCF-3000 and the designs and schematics, including the entire electrical schematics for the controls of the Jetaire® HPCF-3000 unit."[39]

30.     The purpose of the Operational and Maintenance Manual is to assist end-users of the HPCF-3000 in learning how to operate and maintain the machine.[40]

31.     End users of the HPCF-3000, and other JBT equipment, have the right to contract with third parties for service and maintenance work and may share the HPCF-3000 with those third parties.[41]

32.     In addition to its work in supplying and installing GSE, BGSE also pursues maintenance and service contracts with military bases, in particular those bases where BGSE has an established relationship as the company that provided the system.[42]

33.     Bullerdick did not consider any of those items as constituting trade secrets.[43]

---

[37] Bullerdick Aff., ¶ 23, **Ex. 1**.
[38] *See* Sept. 7, 2011 email and attachments from Steve Vaughn to Bullerdick, **App'x Exhibit 9**.
[39] JBT Responses to BGSE's Second Set of Interrogatories, Int. No. 5, **App'x Exhibit 10**.
[40] Rule 30(b)(6) Deposition of JBT, p. 28:5–13, **App'x Exhibit 11**.
[41] JBT 30(b)(6) Dep., p. 32:7–14, **Ex. 11**.
[42] Bullerdick Aff., ¶ 29, **Ex. 1**.
[43] *Id.* at ¶ 30.

E. **The Relationship Ends**

34.     The parties never reached a new distribution agreement.[44]

35.     Over the course of their long relationship, BGSE purchased approximately $7.7 million worth of equipment from JBT.[45]

36.     BGSE purchased JBT equipment for use in military projects as late as March, 2017, six months before this lawsuit.[46]

37.     BGSE, on military projects for which it was intending to use JBT and on some for which it did not use JBT, continued to incorporate pictures and diagrams from prior submittals.[47]

38.     JBT, on a project for which it was not supplying to BGSE, acted similarly, providing another manufacturer's diagrams, which JBT obtained from an older submittal on a different project.[48]

39.     While JBT takes issue with the ways BGSE has described itself and its offerings since their relationship ended, its sole expert, David Duski ("Duski"), did not opine as to any similarities of BGSE's equipment (or those of its suppliers) to equipment manufactured by JBT.[49]

40.     BGSE has been critical of JBT from time-to-time, and JBT has likewise been critical of BGSE.[50]

---

[44] *Id.* at ¶ 18.
[45] *Id.* at ¶ 16.
[46] *Id.* at ¶ 17.
[47] *See, e.g.*, Submittal Package for MCAS Beaufort P-465, **App'x Exhibit 12**.
[48] JBT 30(b)(6) Dep. pp. 58:3–65:18 (admitting that JBT was unprepared to bid for pits on an F-35 project and that JBT used another supplier's drawings in order to try to win a job), **Ex. 11**; August 2016 JBT email chain re Luke Air Force Base Hangar, **App'x Exhibit 13** (same); August 2016 JBT email chain Re: Revised Quote for Luke F-35, pp. 33–36, **App'x Exhibit 14** (same).
[49] Deposition of David Duski, pp. 19:22–20:16, **App'x Exhibit 15**.
[50] *See, e.g.*, August 8, 2016 email from Bullerdick, **App'x Exhibit 16**; Gwilliam Dep. pp. 140:2–144:25 (acknowledging that JBT's salesmen were sending out letters about BGSE into the marketplace with inaccurate wording), **Ex. 8**.

41.     BGSE's opinions of JBT are based on real-life experience.  JBT has admitted that pricing, compliance with specifications, and its preparedness to handle F-35 projects have been questioned and have been issues.[51]

**F.  JBT's Damages**

42.     JBT has a asserted a number of claims against BGSE, but Duski offered expert damages opinions only for JBT's trade secret and Lanham Act claims.[52]

43.     Duski opined as to these damages in connection with only eight projects. [53]

44.     JBT's counsel instructed Duski to consider only these eight projects.[54]

45.     The projects are Lemoore P-328, Beaufort P-465, Kadena P-803, Lemoore P-378, Beaufort P-464, Eielson EIE-376, Burlington Vermont B-795, and Eielson EIE-378.[55]

46.     Duski offered lost profits opinions for only three of these projects, Lemoore P-328, Beaufort P-465, Kadena P-803.[56]

47.     In other words, Duski contends that JBT would have been awarded these three projects but for the actions of BGSE and Bullerdick.[57]

48.     For the remaining five projects, Duski opined only as to potential disgorgement amounts, either through the Lanham Act false designation of origin and false advertising claims or through the misappropriation of trade secrets claims.[58]

---

[51] *See, e.g.*, JBT 30(b)(6) Dep., pp. 53:21-54:9 (admitting others had expressed concerns about pricing and technical compliance), **Ex. 11**; Gwilliam Dep., pp. 70:13-71:12 (pricing was a common issue), **Ex. 8**; Gwilliam Dep., pp. 92:18-93:2 (inability to hold prices from price list "did cause problems for us"), **Ex. 8**; JBT 30(b)(6) Dep., pp. 58:3-65:18 (admitting that JBT was unprepared to bid for pits on an F-35 project and that JBT used another supplier's drawings in order to try win a job), **Ex. 11**; **Ex. 13**; **Ex. 14**.
[52] Expert Report of David R. Duski, generally, **App'x Exhibit 17**.
[53] *Id*.
[54] Duski Dep,. pp. 22:7–24, **Ex. 15**.
[55] Duski Report, generally, **Ex. 17**.
[56] *Id.* at pp. 23, 33–34, 39–40, 45–46, 69, Appendix A, **Ex. 17**.
[57] *Id.* at pp. 33, 39-40, 45, **Ex. 17**.
[58] *Id.* at pp. 23, 50, 53-54, 56-57, 61-62, 65-66, 69, Appendix A, **Ex. 17**.

49.     Duski did not opine on damages for trademark infringement, defamation, or any of JBT's other claims.[59]

50.     Duski undertook no analysis of whether customers have stopped buying JBT products as a result of anything BGSE or Bullerdick has done.[60]

51.     Duski undertook no analysis of JBT's supposed lost sales during the time period in which BGSE and Bullerdick are alleged to have acted wrongfully.[61]

52.     Duski has not had correspondence with any customer who was allegedly deceived or confused by any representation of BGSE.[62]

53.     Duski has not seen any correspondence from any customer indicating they made purchasing decisions based on a misrepresentation from BGSE.[63]

54.     JBT has not produced any statistical analysis of customers supposedly misled by BGSE's actions in relation to the number of customers in the relevant market.[64]

55.     BGSE and Bullerdick, while contesting the allegations against them, did consent to a limited preliminary injunction early in the case.[65]

56.     While JBT filed a series of motions in 2017 seeking to hold BGSE and Bullerdick in contempt for alleged violations of the injunction, the parties were able to avoid a hearing and have not had to bring such matters back before the Court.[66]

## ARGUMENT

Summary judgment is appropriate when a party fails to make a showing sufficient to

---

[59] Duski Report, generally, **Ex. 17**; Duski Dep. pp. 13:8-17:4, **Ex. 15**.
[60] Duski Dep. p. 21:15-21:22, **Ex. 15**.
[61] *Id.* at pp. 21:23-22:6, **Ex. 15**.
[62] *Id.* at pp. 39:18-40:21, **Ex. 15**.
[63] Duski Dep. pp. 40:4-40:21, 60:22-61:2, **Ex. 15**.

[65] *See* Order Entering Preliminary Injunction, ECF. No. 32.
[66] *See* Stipulated Order, ECF No. 91.

establish the existence of an element essential to that party's case on which that party will bear the burden of proof at trial.[67] In such a situation, there can be no issue of material facts because a failure of proof on an essential element of the non-moving party's case necessarily renders all other facts immaterial.[68] A party seeking summary judgment bears the responsibility of informing the district court of the basis for its motion, and the motion should be granted so long as what is before the district court demonstrates the standard set forth in Rule 56 is satisfied.[69]

To support summary judgment, the movant must point to evidence in the record that demonstrates an absence of a genuine issue of material fact, given the relevant substantive law.[70] "The substantive law of the case determines which facts are material."[71]

To defeat a motion for summary judgment, Plaintiff cannot merely rest on the allegations contained in the Complaint. Instead, Plaintiff "must, by affidavits or as otherwise provided in this rule, set out specific facts showing a genuine issue for trial."[72]

When a defendant moves for summary judgment, he is not required to present evidence supporting the defendant's theory of the case. The defendant need only demonstrate "that there is an absence of evidence to support the nonmoving party's case."[73] In other words, the burden shifts to the plaintiff, who "must present affirmative evidence in order to defeat the defendant's properly supported motion for summary judgment."[74] The plaintiff's evidence "must do more than simply

---

[67] Fed. R. Civ. P. 56(a).
[68] *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986).
[69] *Id.*
[70] *United States v. Simons,* 129 F.3d 1386, 1388 (10th Cir. 1997).
[71] *Id.; see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.").
[72] Fed. R. Civ. P. 56; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Anderson,* 477 U.S. at 256
[73] *Celotex Corp.,* 477 U.S. at 325.
[74] *Anderson,* 477 U.S. at 257.

show that there is some metaphysical doubt as to the material facts."[75]  Where the record taken as a whole could not lead a rational trier of fact to "find for the non-moving party, there is no genuine issue for trial."[76]

## I.     JBT'S TRADE SECRET CLAIMS FAIL AS A MATTER OF LAW

JBT brings claims under both federal law and Utah state law against Bullerdick and BGSE for alleged misappropriation of JBT's trade secrets.   JBT has identified its allegedly misappropriated trade secrets as "JBT's Operational and Maintenance Manual for the Jetaire® HPCF-3000 and the designs and schematics, including the entire electrical schematics for the controls of the Jetaire® HPCF-3000 unit."[77]  The essential elements are the same for claims of misappropriation under both the federal Defend Trade Secrets Act ("DTSA") and Utah's Uniform Trade Secrets Act.

The DTSA allows owners of trade secrets to bring civil claims for misappropriation "if the trade secret is related to products or services used in, or intended for use in, interstate or foreign commerce."[78]  18 U.S.C. § 1836(b)(1).  "Trade secrets" under federal law can be any form and type of "financial, business, scientific, technical, economic, or engineering information" provided that "the owner . . . has taken reasonable efforts to keep such information secret" and "the information derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."[79]  Misappropriation under the DTSA includes disclosure or use of another's trade secret without express or implied consent by a person who has

---

[75] *Matasushita,* 475 U.S. at 586.
[76] *Id.* at 587 (citations and quotations omitted).
[77] JBT Responses to BGSE's Second Set of Interrogatories, Int. No. 5, **Ex. 10**.
[78] 18 U.S.C. § 1836(b)(1).
[79] 18 U.S.C. § 1839(3).

a duty to maintain the secrecy of the trade secret or limit the use of the trade secret.[80]

Similarly, to establish a claim for misappropriation of trade secrets under the Utah Uniform Trade Secrets Act, a plaintiff must show "(1) the existence of a trade secret, (2) communication of the trade secret to [the defendant] under an express or implied agreement limiting disclosure of the secret, and (3) [defendant's] use of the secret that injures [plaintiff]."[81]  Utah's statute also requires that a trade secret be subject to reasonable efforts to maintain its secrecy and derive independent economic value from not being generally known.[82]

A.    The HPCF-3000 manual and schematics do not qualify as a trade secret

JBT's Amended Complaint alleges that the HPCF-3000 manual is the "secret sauce" that would allow a competitor to develop a "carbon copy of the Jetaire® HPCF-3000 unit.  The manual, however, reveals otherwise.  It is in essence an operations manual that (1) is not subject to reasonable efforts to maintain its secrecy and (2) does not derive value from not being generally known.

The cover page of the HPCF-3000 manual that JBT alleges Defendants misappropriated identifies itself as an "Operation and Maintenance Manual."[83]  The manual begins with disclaimers that further reveal the limited utility of this manual:

READ THIS FIRST – THEN OPERATE SAFELY

Before you use any of the equipment described in this operation and maintenance manual, read it carefully so that you are thoroughly familiar its content. **Familiarity with the controls, requirements, and procedures in this manual will help you operate and maintain the equipment safely.** JBT AeroTech, Jetway Systems® considers operational details and equipment that are not specifically included in this manual to be beyond its scope.

---

[80] 18 U.S.C. § 1839(5).
[81] *USA Power, LLC v. PacifiCorp*, 372 P.3d 629, 648 (Utah 2016) (citation and internal punctuation omitted).
[82] Utah Code Ann § 13-24-2(4).
[83] HPCF-3000 18 GR Modification, JBT00148061, **App'x Exhibit 18.**

WHEN USING THIS MANUAL

All information, specifications, and drawings in this manual are those in effect at the time of printing. JBT AeroTech, Jetway Systems® obligation. JBT AeroTech, Jetway Systems® is not liable for technical or editorial errors in or omissions from this manual nor for incidental or consequential damages resulting from the furnishing, performance, or use of this manual.[84]

The manual is clearly intended as a guide to the end user in how to operate and maintain the equipment.  It is also noteworthy that JBT disclaims any liability that may result from the end user's use of the manual to operate the equipment.  This is in line with the manuals' function, not as the "secret sauce" to its engineering but simply as a guide for the manual's primary audience— "the operators that operate the equipment day-to-day and those that are maintaining the equipment."[85]

The manual is an operational guide for the end user.  JBT does not control how the manual is used or with whom it is shared after selling an HPCF-3000 unit.  JBT acknowledged in its 30(b)(6) deposition that the end-user of an HPCF-3000 unit has the right and ability to hire third parties to perform maintenance on the units and share the manuals with those third-party maintenance providers.[86]  This testimony is consistent with Bullerdicks' testimony that manuals are not considered confidential in the industry because, among other things, they are copied and shared with third-party maintenance contractors.[87]  When an end user purchases an HPCF-3000 unit, JBT will also sometimes provide training to the end user's maintenance crew in how to operate and maintain the equipment.[88]  As part of this training, JBT prepares handout materials— "abridged handouts, cue cards if you will" that are a "[a] summary of how to maintain and operate

---

[84] *Id.* at JBT00148063 (emphasis added), **Ex. 18**.
[85] JBT 30(b)(6) Dep. pp. 28:5–13, **Ex. 11**.
[86] JBT 30(b)(6) Dep. pp. 32:7–14, **Ex. 11**.
[87] Bullerdick Dep. pp. 157:5–23, **Ex. 7**.
[88] *See* JBT 30(b)(6) Dep. pp. 34:1–41:15, **Ex. 11**; August 2015 email between JBT and Decker Mechanical, **App.'x Exhibit 19**.

the equipment."[89]

When JBT ships an HPCF-3000 unit to an end-user, it includes a copy of the manual inside the unit's control panel.[90]  At an end user's request, JBT will send electronic copies of the HPCF-3000 manual as well.[91]  JBT includes hard copies of its operations and maintenance manuals with all of its units, not just the HPCF-3000 manual, and it is apparently common for these manuals to go missing or not end up in the end user's hands.  For instance, in response to an inquiry in 2015 from BGSE on behalf of a customer who could not find the shipped hard copies, a JBT manager told BGSE that "[o]ft times, we've found that whomever unpacks the units take the manuals out before passing them on to the users."[92]

In light of the above, the HPCF-3000 manual is not a trade secret under federal or Utah law because it was not subject to reasonable efforts to maintain its secrecy.  It is JBT's burden to prove its trade secrets, and there is no presumption in JBT's favor.[93]  "It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated."[94]  The HPCF-3000 manual does contain a confidentiality disclaimer. and DeRoche stated previously in this case that JBT's manuals are only "distributed on the condition that the recipients will maintain their confidentiality,"[95]  However, the evidence shows—and JBT acknowledges—that its end users can further disperse the Manual to other third-party maintenance providers in the marketplace, and JBT is aware that its end users periodically lose track of the hard copies of its manuals.

---

[89] JBT 30(b)(6) Dep. p. 36:3–24, **Ex. 11**.

[90] *Id.* at pp. 38:20–39:7.

[91] JBT00149383–JBT00149386, **Ex. 19**.

[92] January 2015 email chain between BGSE and JBT, **App'x Exhibit 20**.

[93] *Microbiological Research Corp. v. Muna*, 625 P.2d 690, 696 (Utah 1981).

[94] *USA Power, LLC v. PacifiCorp*, 235 P.3d 749, 760 (Utah 2010) (quoting *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir.1992) (per curiam)).

[95] Declaration of Brian DeRoche in Support of Second Order to Show Cause, ECF No. 72 ¶ 5.

The HPCF-3000 manual also lacks independent economic value because it could have been readily ascertained by Defendants through permissible means.  Part of BGSE's business is pursuing maintenance contracts for F-35 hangars.[96]  Because of Bullerdick's extensive experience with JBT, BGSE is often awarded maintenance contracts at facilities and F-35 hangars where BGSE has installed JBT equipment.[97]  BGSE is therefore precisely the sort of third-party contractor whom JBT acknowledges could receive copies of JBT manuals from the equipment's owner.  In determining whether information derives value from not being generally known, "th[e] standard cannot be viewed as whether the information is generally known and readily ascertainable to the general public, but, based on the defendants' knowledge and experience, whether the information was known or ascertainable to them."[98]

Furthermore, JBT has presented no evidence that the HPCF-3000 manual actually had value for the alleged purpose of assisting Twist in developing a competing product.  The manual on its face is designed to guide the user in operating and maintaining the equipment.  JBT has not put forth evidence that the manual could have been used to create a competitive product, nor has it produced any evidence showing that Twist did in fact use the manual to create a competing product.

The HPCF-3000 manual does not rise to the level of a trade secret, and JBT's claims for misappropriation of trade secrets under Utah's Uniform Trade Secrets Act and the DTSA must fail.

B.    The DTSA claim is barred by the date of the DTSA's enactment.

In addition to the grounds cited above, JBT's claim under the DTSA must fail for an

---

[96] Bullerdick Aff. ¶ 30, **Ex. 1**.
[97] *Id.*
[98] *Utah Med. Products, Inc. v. Clinical Innovations Associates, Inc.,* 79 F. Supp. 2d 1290, 1312 (D. Utah 1999), *aff'd*, 251 F.3d 171 (Fed. Cir. 2000) (applying Utah law).

additional reason:  because JBT's allegations of misappropriation predate the enactment of the DTSA.  The DTSA only applies to misappropriations that occurred "on or after the date of the enactment [of the DTSA] on May 11, 2016."[99]  Allegations that trade secret information disclosed prior to the DTSA's enactment was disclosed again after enactment cannot support a claim for misappropriation because "'disclosure,' by definition, implies that the information was previously secret."[100]  JBT, however, alleges that Defendants misappropriated its trade secrets by sending the entirety of the HPCF-3000 Manual and its schematics to Twist, a competitor of JBT, in August and September of 2015.[101]  Thus, JBT contends that the entirety of their trade secrets were disclosed prior to the enactment of the DTSA, and the claim must fail.

## II.   JBT'S LANHAM ACT AND TRADEMARK INFRINGEMENT CLAIMS FAIL AS A MATTER OF LAW.

### A.   Federal Unfair Competition and False Designation of Origin – 15 U.S.C. § 1125(a).

JBT seeks injunctive relief and damages against Defendant BGSE for its alleged misuse of JBT's marks to mispresent, purportedly, BGSE's connection with JBT and to pass off BGSE's products and services as those of JBT's.  These include pictures on BGSE's website and in materials submitted to potential contractors showing JBT equipment.[102]  JBT also appears to fault BGSE for not clearly depicting JBT's logo in some pictures, showing instead equipment with BGSE's logo on it.[103]  *Id*. at para. 119, 121.  JBT appears to contend that any use or inclusion of its equipment, designs, name, or marks in any form (even in truthful pictures of completed projects) constitutes a misrepresentation as to the affiliation of the parties and/or a misrepresentation of the

---

[99] *Camick v. Holladay*, -- Fed. Appx. --, 2018 WL 6658053, at *3 (10th Cir. Dec. 18, 2018).

[100] *Avago Techs. U.S. Inc. v. Nanoprecision Products, Inc.*, No. 16-CV-03737-JCS, 2017 WL 412524, at *9 (N.D. Cal. Jan. 31, 2017) (citing *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355 (Fed. Cir. 2009)).

[101] Am. Compl. ¶¶ 58–61, ECF No. 99.

[102] *See*, *e.g.*, *Id.* at ¶ 119.  *See also* July 31, 2017 email from Bullerdick, **App'x Exhibit 21**.

[103] Am. Compl. ¶¶ 119, 121, ECF No. 99.

origin of BGSE's goods and services.  JBT makes these contentions despite the fact that it sold equipment to BGSE just six months before filing this litigation.[104]

The Lanham Act imposes liability on any company that uses, in connection with goods or services, a term or symbol or false designation of origin that is likely to cause confusion regarding another company.[105]  The United States Supreme Court has made clear, however, that the Lanham Act "does not have boundless application as a remedy for unfair trade practices"[106]  The Act applies only to specific practices prohibited by the express text; it is not meant to codify any overall law of unfair competition.[107]  Put differently, "[a]s a remedial statute, it is to be broadly construed to effect its primary propose: to protect the public from confusion; it is not however a catchall for all alleged unfair business practices or conduct by a competitor."[108]  "To prove money damages on these claims, a claimant must show that customers were actually confused as to the affiliation of the alleged infringer with the trademark owner."[109]

Summary judgment is appropriate for BGSE on this claim because JBT is unable to offer any evidence that anyone, much less highly sophisticated contracting entities involved in complex F-35 military hangar projects, was confused or deceived by any of BGSE's alleged acts.  Duski, JBT's expert who opined that JBT would have been awarded various projects were it not for the actions of BGSE and Bullerdick, was not aware of any such confusion.[110]  The failure to offer evidence concerning consumer confusion has been deemed a fatal defect in claims under § 1125(a).

---

[104] Countercl. ¶¶ 31, ECF No. 108; Countercl. Ex. B., ECF No. 49-2.
[105] 15 U.S.C. § 1125(a).
[106] *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 29, 123 S. Ct. 2041, 2045, 156 L. Ed. 2d 18 (2003) (quoting *Alfred Dunhill, Ltd. v. Interstate Cigar Co.,* 499 F.2d 232, 237 (C.A.2 1974)).
[107] *Id.*
[108] *Micro Consulting, Inc. v. Zubeldia*, 813 F. Supp. 1514, 1531 (W.D. Okla. 1990), *aff'd*, 959 F.2d 245 (10th Cir. 1992).
[109] *Brunswick Corp. v. Spinit Reel Co.,* 832 F.2d 513, 521 (10th Cir.1987).
[110] Duski Dep. pp. 39:18–40:21, **Ex. 15**.

For example, in *Systemcare v. Wang Laboratories, Inc.*, a computer hardware and software provider asserted claims under § 1125(a) against a competitor that used various of the plaintiff's forms without its consent.[111]   Copies of these forms were given to customers.[112]   However, the plaintiff tendered no evidence that any customer was confused.[113]   Absent such evidence, summary judgment was appropriate for the defendant.[114]

The absence of such evidence was also critical in *Micro Consulting, Inc. v. Zubeldia*. Micro Consulting asserted claims under § 1125(a) against its founder, who, after departing the company, marketed and sold a competitive software product.[115]   Micro Consulting claimed Zubeldia violated the Act by falsely representing that his product was independently created and that Micro Consulting would be unable to survive without him.[116]   In addressing Zubeldia's motion for summary judgment, the Western District of Oklahoma said Micro Consulting must show a "likelihood of confusion among customers and potential customers."[117]

One particular factor in this analysis is the similarity between the two goods or services at issue.[118]   There is nothing in the record about the similarities between what JBT offers and what BGSE has ultimately provided, other than accomplishing the same task.[119]   Of particular interest to the court in *Micro Consulting* was the fact that buyers of the software would be much more discerning in their purchases given the price of the computers and software and "the important nature of the tasks the software was designed to accomplish."[120]   The court also dismissed Micro

---

[111] *Systemcare v. Wang Laboratories, Inc.*, 787 F. Supp. 179, 183 (D. Colo. 1992),
[112] *Id*.
[113] *Id*.
[114] *Id*.
[115] *Micro Consulting, Inc. v. Zubeldia*, 813 F. Supp. 1514, 1518-19 (W.D. Okla. 1990).
[116] *Id*. at 1531.
[117] *Id*. at 1531.
[118] *Id*. at 1532.
[119] See Duski Dep. pp. 19:22–20:16, **Ex. 15**.
[120] *Micro Consulting*, 813 F. Supp. at 1533.

Consulting's claim for false representations, as it found no "facially false or affirmatively misleading material representations regarding Micro Consulting that did, or were likely to, influence a customer's purchasing decision."[121]

The same result must be reached here.

B.   Federal Unfair Competition and False Advertising - 15 U.S.C. § 1125(a)

JBT seeks injunctive relief and damages against Defendant BGSE for its alleged misrepresentations made in connection with BGSE's attempts to secure and/or retain certain projects, which include alleged misrepresentations concerning BGSE's past experience with preconditioned air and ground power units, the nature of its relationship with JBT, and JBT's abilities concerning air and ground power units.[122]

By its express terms, 15 U.S.C. § 1125(a)(1) contemplates two types of claims:

(A) claims arising from 'false representations concerning the origin or endorsement of goods (false association or product infringement claims)' and (B) claims arising from 'false representation in advertising concerning the qualities of goods (false advertising claims).[123]

By this cause of action, JBT asserts claims under (B) above.  Claims for false advertising under § 1125(a), however, must meet the same likelihood of confusion requirements discussed above.[124] For the reasons discussed above, JBT is unable to meet this requirement, and summary judgment is appropriate.

---

[121] *Id.  See also Heartsprings, Inc. v. Heartspring, Inc.*, 949 F. Supp. 1539, 1544 (D. Kan. 1996), *aff'd*, 143 F.3d 550 (10th Cir. 1998) (dismissing plaintiff's Lanham Act claims for, among other reasons, there only being evidence of de minimis confusion).

[122] JBT appears to rely on documents such as BGSE_00429720, **App'x Exhibit 22** (and purported attachment at BGSE_00243222, **Ex. 12**); BGSE_00246422, **App'x Exhibit 23**; **Ex. 16**; BGSE_00346265, **App'x Exhibit 24**.

[123] *Vivint, Inc. v. NorthStar Alarm Services, LLC*, 2019 WL 1098986 at *6 (D. Utah Mar. 8, 2019).

[124] *See, e.g., Resource Developers, Inc. v. Statute of Liberty–Ellis Island Foundation, Inc.,* 926 F.2d 134, 139 (2d Cir.1991).

Another significant ground exists for granting summary judgment in favor of BGSE on JBT's false advertising claim. JBT claims damages from BGSE's actions in connection with eight military projects.[125] JBT, however, has a "portfolio of military equipment" which it sells to "the U.S. Air Force, the U.S. Navy, international military forces, airframe manufacturers and defense contractors."[126] These sales accounted for 13% of JBT AeroTech's total revenue—in other words, approximately $55 million of JBT AeroTech's $422.5 million in revenue—in 2016.[127] JBT is unable to offer any evidence that BGSE's alleged misrepresentations on the eight projects, which include submissions <u>after</u> a bid was already awarded to JBT, were sufficiently pervasive in the military and "Aerotech" space to constitute advertising or promotion under the Lanham Act.

The leading case in this jurisdiction on this issue is *Vivint*, *supra*. Vivint, a national provider of electronic home automation and security systems, alleged that its competitor, NorthStar Alarm Services, committed false advertising violations of the Lanham Act.[128] Vivint even identified 216 customers allegedly subjected to NorthStar's false advertising.[129] In seeking summary judgement, NorthStar argued that these customers represented only a small portion of Vivint's actual or potential customers.[130] Therefore, according to NorthStar, its alleged conduct was not "disseminated sufficiently to the relevant purchasing public to constitute commercial advertising or promotion" within the Lanham Act.[131]

---

[125] Duski Dep. p. 22:7–24, **Ex. 15**.
[126] JBT 2017 10-K, pp. 7, **App'x Exhibit 25**.
[127] *Id*. at pp 7, 28.
[128] *Vivint*, 2019 WL 1098986 at *1.
[129] *Id*. at *8.
[130] *Id.*
[131] *Id.* at *7.

In granting summary judgment for NorthStar, the District of Utah held "there must be *some* statistical analysis of the number of alleged incidents in comparison to the relevant market."[132] Vivint presented no such evidence, thereby rendering summary judgment appropriate.[133]

The same is true here.  JBT has offered evidence of allegedly false statements that were made in connection with eight projects, and, even then, representations that were made to only a small subset of those persons involved in the projects.[134]  JBT has not presented, and cannot present, given the passing of the expert disclosure deadline, any statistical analysis of the alleged incidents in comparison to the relevant market.

Summary judgment in favor of BGSE is appropriate.

C.    Federal Trademark Infringement – 15 U.S.C. § 1114.

JBT seeks injunctive relief and damages for BGSE's alleged use of its marks in connection with BGSE's efforts to sell its goods and services.  It appears JBT faults BGSE, which for years was an authorized distributor for JBT products, for making use of JBT's marks in pictures on its website and in other materials.  JBT also faults BGSE for using JBT's marks in the keywords for BGSE's website.[135]

As with the other of JBT's claims under the Lanham Act, to proceed for infringement of JBT's trademarks, it must satisfy the same likelihood of confusion elements.  The "same likelihood of confusion test applies to a claim of false designation of origin under this section as to a claim

---

[132] *Id.* at *9 (emphasis in original).
[133] *Id.  See also Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2nd Cir. 2002) ("Proof of widespread dissemination within the relevant industry is a normal concomitant of meeting this requirement. Thus, businesses harmed by isolated disparaging statements do not have redress under the Lanham Act . . . .").
[134] *See* Duski Report, generally, **Ex. 17**.
[135] Am. Compl., ¶¶ 132–40, ECF No. 99.

for infringement of a registered trademark under 15 U.S.C. § 1114(a)."[136]  For the same reasons

discussed above, JBT's claim for trademark infringement fails as a matter of law, and summary

judgment is appropriate.

## III.    JBT'S CONTRACT CLAIMS FAIL AS A MATTER OF LAW.

In its contract claims, JBT alleges that Bullerdick breached the 2011 Confidentiality

Agreement, and that BGSE breached the 2011 Non-Disclosure Agreement and the 2012

Distributorship Agreement  For each of these claims, JBT alleges, without further detail, that

Bullerdick or BGSE has breached their contractual obligations by retaining JBT documents after

Bullerdick's termination, disclosing JBT's confidential information, using JBT's documents for

their own purposes, and contributing to the disclosure of JBT's confidential information by others,

including BGSE.[137]  JBT's contract claims generally suffer from the parties' long relationship,

during the course of which their formal relationship continued to evolve and the parties' relied on

their regular dealings rather than the terms of the contracts themselves.

As an initial matter, The Non-Disclosure Agreement was entered into on November

11, 2011 by JBT and BGSE.[138]  It provides that the confidentiality restrictions shall not

apply to any Confidential Information which:

"(a) is or becomes known publicly through no wrongful act of the receiving party

or any of its Representatives . . . (b) was already known to the receiving party at the

time of disclosure hereunder as demonstrated by the receiving party's prior written

---

[136] *Amoco Oil Co. v. Rainbow Snow,* 748 F.2d 556, 558 (10th Cir.1984).  *See also 1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229 (10th Cir. 2013).
[137] Am Compl. ¶¶ 187, 192, and 197, ECF No. 99.
[138] Am. Compl. Ex. A, p 5, ECF No. 99-1.

records; . . . or (e) is approved for release in writing by an authorized representative

of the disclosing party."[139]

At the time, Bullerdick was already an employee of JBT and a member of BGSE. Bullerdick

would thus have already known or received JBT's Confidential Information through his

employment prior to its disclosure to BGSE and the exceptions above would apply. Likewise,

BGSE often received written permission to use or release JBT documents or information pursuant

to exception (e) above. For instance, one of the documents that JBT has alleged BGSE wrongfully

used is a document prepared by JBT explaining why a 30-ton rather than a 20-ton cooling unit was

needed on a specific project.[140] JBT's Global Business Manager of the JASE division, Scott

Gwilliam, specifically directed Bullerdick, after he left JBT's employment, to "look it over" and

send it to a third-party engineering firm.[141]

In addition to the above, JBT cannot prevail on its contract claims on the basis of equitable

estoppel. In order to establish equitable estoppel, a party must prove:

> (1) a statement, admission, act, or failure to act by one party inconsistent with a
> claim later asserted; (2) reasonable action or inaction by the other party taken on
> the basis of the first party's statement, admission, act, or failure to act; and (3) injury
> to the second party that would result from allowing the first party to contradict or
> repudiate such statement, admission, act, or failure to act.[142]

JBT elicited these contracts with BGSE and Bullerdick in 2011 and 2012 based on the promise of

a fruitful employment relationship with Bullerdick and a fruitful distributorship relationship with

BGSE. At the time when the one-year distributorship agreement expired, JBT continued to make

sales to BGSE and discuss a renewed distributorship agreement; in fact one JBT Aerotech

Regional Sales Manager even stated in a June 2015 email, well after the date the 2012 agreement

---

[139] *Id.* at ¶ 5.
[140] Answer Customer's Question, **App'x Exhibit 26.**
[141] June 2014 email chain between Gwilliams and Bullerdick, **App'x Exhibit 27.**
[142] Whitaker v. Utah State Ret. Bd., 191 P.3d 814 (Utah Ct. App. 2012).

expired, that BGSE was a distributor entitled to more favorable treatment than other purchasers.[143] Likewise, at the time Bullerdick left employment with BGSE, it was with the understanding that JBT would increase BGSE's role as a distributor of JBT equipment.[144]  JBT benefitted greatly from BGSE's sales of JBT equipment, making over $7 million in sales to BGSE in total.[145]  During that time, JBT regularly provided documents and information to BGSE, and on occasion explicitly instructed Bullerdick and BGSE to send information on to customers or to remove references to JBT.[146]  After the expiration of the distributorship agreement and Bullerdick's termination of his employment, Defendants relied on JBT's failure to strictly enforce the contract terms limiting Defendants' use of JBT documents and information.  Allowing JBT to now claim that Defendants' actions are a breach of these contracts would be inequitable, as JBT has already profited from the years it continued to sell to BGSE following the expiration of these agreements.  JBT's contract claims must fail.[147]

## IV.    JBT'S DEFAMATION CLAIM FAILS AS A MATTER OF LAW.

To prevail on a defamation claim, JBT must prove: "(1) that Defendants published the statements in question; (2) that the statements were false; (3) that the statements were not subject to any privilege; (4) that the statements were published with the requisite degree of fault; and (5) that the statements resulted in damages."[148]  In JBT's discovery responses, it identified forty-three documents in which defamatory statements by BGSE or Bullerdick allegedly appear, rather than

---

[143] JBT00034092, **App'x Exhibit 39.**
[144] Bullerdick Aff. ¶ 14, **Ex. 1**.
[145] *Id.* at ¶ 16.
[146] *See, e.g.*, BGSE_00398495, **App'x Exhibit 40.**
[147] *See generally Bahr v. Imus*, 211 P.3d 987, 992 (Utah Ct. App. 2009), *aff'd on other grounds*, 250 P.3d 56 (Utah 2011) (granting summary judgment for defendants on equitable estoppel defense); *Shaw Res. Ltd., L.L.C. v. Pruitt, Gushee & Bachtell, P.C.*, 142 P.3d 560, 572 (Utah Ct. App. 2006) (same);
[148] *Davidson v. Baird*, 2019 WL 150669 (Utah Ct. App. Jan. 10, 2019).

specifying in its interrogatory response what the defamatory statements were.[149]  With its non-specific response, JBT essentially left BGSE to engage in a game of "find the defamation."  The game is particularly challenging since many of the documents do not even mention JBT or make any allegation about it.[150]  Summary judgment should immediately be granted as to these documents.

The remaining documents are not actionable either.  Again, it's not entirely clear what JBT finds objectionable in these documents, but the clear tone from them is that BGSE is merely trumpeting its own experience and stating that it is better than JBT.  Statements critical of JBT are not actionable,[151] particularly when they are in fact consistent with undisputed testimony in the case.[152]

What JBT has seemed more upset about than anything, though, appear to be BGSE's assertions that JBT needed BGSE, that jobs for which BGSE provided goods and services were "BGSE jobs," and other representations that tend to minimize JBT's involvement.[153]  For such

---

[149] *See* JBT Responses to BGSE's Second Set of Interrogatories, Int. No. 3., **Ex. 10**.

[150] *See, e.g.,* BGSE_00455578, **App'x Exhibit 28**; BGSE_00246422, **Ex. 23**; BGSE_00226551, **App'x Exhibit 29**; BGSE_00330403, **App'x Exhibit 30**; BGSE_00344813, **App'x Exhibit 31**; BGSE_00208810, **App'x Exhibit 32**; BGSE_00339470–BGSE_00339471, **App'x Exhibit 33**; and BGSE_00312539, **App'x Exhibit 34**.  Within this group of allegedly defamatory statements, JBT included identical or nearly identical versions of the same documents, and in order not to overburden the Court, Defendants have not included those duplicates as separate exhibits.  Specifically BGSE_00246418, BGSE_00246429, and BGSE_00246420 are identical or nearly identical to BGSE_00246422 (**Ex. 23**).  BGSE_00335276 is identical or nearly identical to BGSE_00455578 (**Ex. 28**).  BGSE_00246412 is identical or nearly identical to BGSE_00246422 (**Ex. 23**).

[151] *See., e.g.*, *Westmont Residential LLC v. Buttars*, 340 P.3d 183, 189 (Utah Ct. App. 2014) (exaggerated, rhetorical hyperbole labeling someone as a crook, traitor, blackmailer are not actionable).

[152] *See, e.g.,* JBT 30(b)(6) Dep. pp. 53:21-54:9 (admitting others had expressed concerns about pricing and technical compliance), **Ex. 11**; Gwilliam Dep. pp. 70:13-71:12 (pricing was a common issue), **Ex. 8**; Gwilliam Dep. pp. 92:18-93:2 (inability to hold prices from price list "did cause problems for us"), **Ex. 8**; JBT 30(b)(6) Dep. pp. 58:3-65:18 (admitting that JBT was unprepared to bid for pits on an F-35 project and that JBT used another supplier's drawings in order to try to win a job), **Ex. 11**; **Ex. 13** (same); **Ex. 14** (same).

[153] *See, e.g.*, BGSE_00344810, **App'x Exhibit 35**.

claims it is important to remember that JBT's primary role was as a seller of products to BGSE.[154]

BGSE's role, however, has never been to simply resell such products.[155]  BGSE has always had

more responsibilities.[156]  This included ensuring that products like JBT's air and power units,

together with pits and other products that JBT did not provide, were all incorporated into an overall

system in such a way that the military was provided what it needed.[157]  The reason JBT engaged

Bullerdick and BGSE in the first place was because Bullerdick had far more experience in these

hangar projects.[158]  Moreover, JBT's DeRoche even attended a presentation with Jacobs

Engineering (a general contractor) in which BGSE's Scott Dils described all this.[159]  In that

presentation, Dils represented that "Together, JBT and BGSE have developed, marketed, and

tested power conversion, PCAir, and Aircraft Air Start products for the 21st century warfighters'

needs."[160]  Dils described BGSE as a "turn key distributor" of products from JBT and CombiBox

USA (which manufactures pits).[161]  BGSE, according to the presentation, can supply "a complete

solution."[162]  DeRoche even recalls that Dils did a good job during his presentations.[163]

JBT's claim that an email sent by Bullerdick to Jason Bodine of DBS Associates on August

3, 2017, is somehow defamatory is equally problematic.[164]  In this email, BGSE gives Bodine its

view of why BGSE should be awarded a contract for a project in Korea.[165]  However, BGSE had

already been working with Bodine for over a year at that point.[166]  Bodine was already aware of

---

[154] *See* Am. Compl. ¶ 8, ECF. No. 99.
[155] Bulldedick Aff., ¶ 19, **Ex. 1**.
[156] *Id*. at ¶ 20.
[157] *Id*. at ¶ 20.
[158] DeRoche Dep. pp. 26:11–27:7, **Ex. 2**.
[159] Dils Dep. p. 30:9–16.
[160] DeRoche Dep. pp. 180:10–181:16, **Ex. 2**; Dils Dep. p. 30:2-18, **Ex. 3**; PowerPoint, **Ex. 4**.
[161] *Id*.
[162] *Id*.
[163] DeRoche Dep., p. 181:4-16, **Ex. 2**.
[164] BGSE_00459036, **App'x Exhibit 36.**
[165] *Id*.
[166] *See, e.g.*, BGSE_00429231, **App'x Exhibit 37.**

issues with JBT prior to the August 3, 2017 email.[167]   Additionally, JBT was sending similar communications to its own Korean distributor for the same project about its view of the relationship between BGSE and JBT.[168]

This leads to the other great flaw in JBT's defamation claim: it is unable to present any evidence that it was damaged by any of the allegedly defamatory statements.   JBT's expert did not opine as to any damages allegedly sustained by JBT.[169]   That a supposedly defamatory statement caused damage is a required element of any defamation claim.[170]

Finally, JBT's claim for defamation to the extent the allegedly defamatory statements fall outside of Utah's one year statute of limitations for defamation.[171]

For all of the above reasons, JBT's defamation claims must be dismissed as a matter of law.

## V.   JBT'S CLAIM FOR TORTIOUS INTEFERENCE FAILS AS A MATTER OF LAW.

JBT seeks damages for BGSE's alleged interference with contracts JBT would have received but for BGSE's wrongful actions, including publishing allegedly false and misleading information about JBT.

To be clear, JBT does not allege that it had existing contracts with which BGSE interfered. Rather, JBT claims that, but for BGSE's actions, including publishing allegedly false and misleading information about JBT, it "would have entered into valid contractual relationships with" various third parties.[172]   Because JBT's expert identified only three projects for which it is

---

[167]   *See*, *e.g.*, BGSE_00455337 (Bodine informing BGSE that he'd discussed JBT's shortcomings with contracting officials), **App'x Exhibit 38**.
[168]   Gwilliam Dep. pp. 133:9–139:11, **Ex. 8.**
[169]   Duski Dep. pp. 13:23–14:3, **App'x Exhibit 15**.
[170]   *Davidson*, 2019 WL 150669.
[171]   Utah Code Ann. § 78B-2-302.
[172]   Am. Compl. ¶ 210, ECF. No. 99.

claiming lost profits, BGSE and Bullerdick assume JBT's tortious interference claim relates to these three projects.

To prevail on a claim for tortious interference with prospective economic relations, JBT must prove "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff. Utah has recently abandoned the improper purpose doctrine, and requires that a plaintiff must prove interference by improper means.[173] The reason for this change was to affirm that legitimate competition is not alone actionable and that every commonplace expression of anger and malice should not be actionable.[174]

Summary judgment is appropriate on this claim for a number of reasons. First, the record establishes as a matter of law that BGSE was attempting to sell its products and services on F-35 hangar projects.[175] This is lawful competition. Second, to the extent the claim is based on allegedly defamatory material, the claim must fail because JBT's defamation claims fail.[176]

Another reason summary judgment is proper on this claim is that JBT is unable to forecast that it would have entered into any project were it not for BGSE. JBT clearly intended to be a manufacturer below someone like BGSE on the three projects, rather than a competitor.[177] "Utah courts have held that summary judgment on the issue of causation is appropriate, notwithstanding the general rule that causation is a jury issue, when the plaintiff cannot show that a jury could conclude, without speculation, that the injury would not have occurred but for the defendant's

---

[173] *Eldridge v. Johndrow*, 345 P.3d 553, 565 (Utah 2015).
[174] *Id*. at 561.
[175] Bullerdick Aff. ¶¶ 20, 26–27, **Ex. 1**.
[176] *See, e.g., Davidson v. Bird*, 2019 WL 150669 (Utah Ct. App. Jan. 10, 2019) (dismissing tortious interference claim based on defamation when defamation claim failed as a matter of law).
[177] Duski Report, pp. 33, 39–40, 45, **Ex. 17.**

breach."[178] JBT would have the Court believe that merely because BGSE was awarded projects and JBT was not, that BGSE's actions caused JBT's alleged loss.  As noted in *Triesault*, such minimal evidence "would require a jury to engage in rank speculation to reach a verdict."[179]

Finally, to the extent JBT relies on BGSE's alleged misuse of any of JBT's trade secrets to establish improper conduct, such a claim is preempted by its trade secrets claim.[180]

For all of the above reasons, JBT's final cause of action, for tortious interference, must be dismissed.

## **CONCLUSION**

For the reasons stated above, BGSE and Bullerdick respectfully request that the Court enter summary judgment in their favor on all claims.

This the 18th day of April, 2019.

/s/ Edward B. Davis
Edward B. Davis
BELL, DAVIS & PITT, P.A.

*Counsel for Defendants*

---

[178] *Triesault v. Greater Salt Lake Bus. Dist.*, 126 P.3d 781, 785 (Utah Ct. App. 2005).
[179] *Id.*
[180] *See, e.g.*, *CDC Restoration & Const., LC v. Tradesmen Contractors, LLC*, 274 P.3d 317, 333 (Utah Ct. App. 2012).

### CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification to all counsel of record in the system.

Date:  April 18, 2019

/s/ Edward B. Davis