David P. Billings (UT # 11510)
Robert G. Crockett (UT # 12067)
**FABIAN VANCOTT**
215 South State Street, Suite 1200
Salt Lake City, UT 84111-2323
Telephone: (801) 531-8900
Facsimile: (801) 596-2814
rcrockett@fabianvancott.com
dbillings@fabianvancott.com

Edward S. Weil *(pro hac vice)*
Steven M. Zeller *(pro hac vice)*
Michael F. Derksen *(pro hac vice)*
**DYKEMA GOSSETT PLLC**
10 S. Wacker Drive, Suite 2300
Chicago, IL 60606
Telephone:   (312) 876-1700
Facsimile:  (312) 876-1155
eweil@dykema.com
szeller@dykema.com
mderksen@dykema.com

*Attorneys for John Bean Technologies Corporation*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

JOHN BEAN TECHNOLOGIES
CORPORATION, a Delaware
corporation,

        Plaintiff-Counterdefendant,

        v.

B GSE GROUP, LLC, a North Carolina
limited liability company, and BRYAN
BULLERDICK, an individual,

        Defendants-
        Counterclaimants.

Case No. 1:17-cv-001142-RJS-EJF

Judge: Robert J. Shelby

Magistrate Judge: Evelyn J. Furse

**PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
ON PLAINTIFF'S AFFIRMATIVE
CLAIMS**

# TABLE OF CONTENTS

**Page**

I.  Introduction and Relief Sought ........................................................... 1

II.  Background ........................................................................................ 2

III.  Statement of Undisputed Material Facts ........................................... 6

V.  Argument ......................................................................................... 20

    A.  Applicable Standard ...................................................................... 20

    B.  BGSE is Liable for Unfair Competition under Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) as a Matter of Law. [Third and Fourth Causes of Action against BGSE] ....................................... 20

        1.  BGSE's False and Misleading Statements and Representations ........................................................................ 21

            a.  BGSE's Phony Post-Award Government Project Submittals ......................................................... 22

            b.  BGSE's Fake Pre-Bid and other Marketing Materials .......................................................... 24

            c.  BGSE Creates a False Product History ........................... 25

        2.  Unfair Competition / False Designation of Origin .................... 31

            a.  BGSE Falsely Designated the Origin of Work Conceived and Built by JBT. ........................... 33

            b.  BGSE's Conduct Likely Caused Confusion. ..................... 37

            c.  JBT was Damaged by BGSE's Conduct. .......................... 38

        3.  False Advertising under the Lanham Act .................................. 39

            a.  BGSE Made False Representations in Advertising its Products. ...................................................... 40

            b.  *Likelihood of Confusion* ................................................. 43

            c.  JBT has been Injured by BGSE's False Advertising. ....... 43

    C.  Misappropriation of Trade Secrets - 18 U.S.C. § 1831 et seq. (Federal) & Utah Code Ann. §§ 13-24-1 et seq. (State) [First and Second Causes of Action against Bullerdick and BGSE] ..................... 44

        1.  JBT's Protectable Trade Secrets ................................................. 45

    D.  Federal Trademark Infringement - 15 U.S.C. § 1114 [Fifth Cause of Action against BGSE] ............................................................ 48

E.    Defamation [Ninth Cause of Action against Bullerdick and
      BGSE] ........................................................................................ 50

      1.    Defendants are Liable for Defamation Under Utah Law. ......... 51

      2.    Defendants also defamed JBT under North Carolina Law. ...... 53

F.    Tortious Interference [Tenth Cause of Action against Bullerdick
      and BGSE] ................................................................................... 54

      1.    The Defendants are Liable for Tortious Interference
            under North Carolina Law. ...................................................... 54

      2.    Alternatively, the Defendants are Liable for Tortious
            Interference as a Matter of Utah Law. ...................................... 56

G.    Breach of Contract(s) [Sixth, Seventh and Eighth Causes of
      Action against Bullerdick and BGSE] ........................................... 57

      1.    Bullerdick Breached the 2011 Confidentiality Agreement. ....... 57

      2.    BGSE Breached the 2011 NDA and the 2012
            Distributorship Agreement. ..................................................... 59

VI.    Conclusion ............................................................................................ 61

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*1-800 Contacts, Inc. v. Lens.Com, Inc.*,
  722 F.3d 1229 (10th Cir. 2013) ..................................................................................48

*Advanced Fluid Sys. v. Huber*
  28 F. Supp. 3d 306 (M.D. Pa. 2014) ...........................................................................36

*American Express Fin. Advisors, Inc. v. Topel*,
  38 F. Supp. 2d 1233 (D. Colo. 1999)...........................................................................47

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)......................................................................................................20

*Anselmi v. Denver Post, Inc.*,
  552 F.2d 316 (10th Cir. 1977) .....................................................................................50

*Arctic Energy Servs., LLC v. Neal*,
  No. 18-cv-00108-PAB-KLM, 2018 U.S. Dist. LEXIS 28625 (D. Colo. Feb.
  22, 2018) .......................................................................................................................44

*Boyce & Isley v. Cooper*,
  568 S.E.2d 893 (N.C. Ct. App. 2002)..........................................................................54

*Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*,
  174 F.3d 1036 (9th Cir. 1999) .....................................................................................49

*Cameron v. New Hanover Mem'l Hosp.*,
  293 S.E.2d 901 (N.C. Ct. App. 1982) ....................................................................54, 55

*Campbell v. Debry*,
  38 P.3d 984 (Utah Ct. App. 2001) ...............................................................................57

*Cannella v. Brennan*,
  No. 2:12-CV-1247, 2014 U.S. Dist. LEXIS 107944 (E.D. Pa. Aug. 4, 2014) .......................21

*CDC Restoration v Tradesmen Contractors*,
  369 P. 3d 452 (Utah Ct. App. 2016) ............................................................................45

*Clifton v. Craig*,
  924 F.2d 182 (10th Cir. 1991) .....................................................................................20

*Cocona, Inc. v. Singtex Indus. Co.*,
  No. 14-cv-01593-MJW, 2014 U.S. Dist. LEXIS 144184 (D. Colo. Oct. 9,
  2014) ...................................................................................................................43

*Cottrell, Ltd. v. Biotrol Int'l, Inc.*,
  191 F.3d 1248 (10th Cir. 1999) .........................................................................21

*Diamond Ranch Acad., Inc. v. Filer*,
  No. 2:14-CV-751-TC, 2016 U.S. Dist. LEXIS 19210 (D. Utah Feb. 17, 2016) ...................56

*Dixson v. Newsweek, Inc.*,
  562 F.2d 626 (10th Cir. 1977) ...........................................................................53

*Eldridge v. Johndrow*,
  345 P.3d 553 (Utah 2015) ..................................................................................56

*Farm Bureau Life Ins. Co. v. Am. Nat'l Ins. Co.*,
  505 F. Supp. 2d 1178 (D. Utah 2007) ................................................................51

*Gaedeke Holdings VII LTD v. Baker*,
  683 F. App'x 677 (10th Cir. 2017) ....................................................................31

*Gen. Steel Domestic Sales, LLC v. Chumley*,
  727 Fed. App'x. 682 (10th Cir. 2015) ...............................................................40

*Gordon v. Chipotle Mexican Grill, Inc.*,
  344 F. Supp. 3d 1231 (D. Colo. 2018) ...............................................................54

*Hopkins v. MWR Mgmt. Co.*,
  No. 15 CVS 697, 2017 NCBS LEXIS 47 (N.C. Ct. App. May 31, 2017) ............55

*Horphag Research Ltd. v. Pellegrini*,
  337 F.3d 1036 (9th Cir. 2003) ...........................................................................49

*Hutchinson v. Pfeil*,
  211 F.3d 515 (10th Cir. 2000) ...........................................................................44

*InnoSys, Inc. v. Mercer*,
  364 P.3d 1013 (Utah 2014) ...........................................................................44, 46

*Interstellar Starship Servs., Ltd. v. Epix, Inc.*,
  304 F.3d 936 (9th Cir. 2002) .............................................................................49

*Johnson v. Jones*,
  149 F.3d 494 (6th Cir. 1998) .........................................................................37, 38

v

*Keith v. Mountain Resorts Dev., L.L.C.*,
    337 P.3d 213 (Utah 2014) ........................................................................................56

*Larkin Grp, Inc. v. Aquatic Design Consultants, Inc.*,
    323 F. Supp. 2d 1121 (D. Kan. 2004) ......................................................................31

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ................................................................................................20

*Mionix, LLC v. ACS Technology*,
    No. 16-cv-02154-RBJ, 2018 U.S. Dist. LEXIS 144368 (D. Colo., Aug. 24,
    2018) ........................................................................................................................42

*Moose v. Nationwide Mut. Ins Co.*,
    No. 5:08CV77-RLV, 2011 U.S. Dist. LEXIS 10611 (W.D.N.C. Sept. 19,
    2011) ........................................................................................................................55

*Nunes v. Rushton*,
    299 F. Supp. 3d 1216 (D. Utah 2018) .....................................................................43

*Oman v. Davis Sch. Dist.*,
    194 P.3d 956 (Utah 2008) ........................................................................................51

*Peaceable Planet, Inc. v. Ty, Inc.*,
    362 F.3d 986 (7th Cir. 2004) ...................................................................................33

*Poor v. Hill*,
    530 S.E.2d 838 (N.C. Ct. App. 2000) ......................................................................57

*Proctor & Gamble Co. v. Haugen*,
    222 F.3d 1262 (10th Cir. 2000) ...............................................................................40

*Sally Beauty Co. v. Beautyco, Inc.*,
    304 F.3d 964 (10th Cir. 2002) .................................................................................39

*Sara Lee Corp. v. Kayser-Roth Corp.*,
    No. 6:92CV00460, 1995 U.S. Dist. LEXIS 6554 (M.D.N.C. Apr. 10, 1995) .........54

*Scotts Co. v. United Indus. Corp.*,
    315 F.3d 264 (4th Cir. 2002) ...................................................................................43

*Select Energy Servs. v. Mammoth Energy Servs.*,
    CIV-19-28-R, 2019 U.S. Dist. LEXIS 53633 (W.D. Okla. Mar. 29, 2019) .............47

*Sports Unlimited, Inc. v. Lankford Enters., Inc.*,
    275 F.3d 996 (10th Cir. 2002) .................................................................................40

*Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*,
  427 F. Supp. 2d 1032 (D. Kan. 2006) ...................................................................43

*Take It Away, Inc. v. Home Depot, Inc.*,
  No. 05-12484-DPW, 2009 U.S. Dist. LEXIS 14279 (D. Mass. Feb. 6, 2009) .......................45

*Thomson v. Salt Lake Cnty.*,
  584 F.3d 1304 (10th Cir. 2009) ...........................................................................20

*Tyson v. L'eggs Prods., Inc.*,
  351 S.E.2d 834 (1987) .....................................................................................53

*Ultradent Prods. v. Spectrum Sols., Ltd. Liab. Co.*,
  No. 2:17-CV-890, 2018 U.S. Dist. LEXIS 3858 (D. Utah Jan. 8, 2018)...............................45

*Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*,
  618 F.3d 417 (4th Cir. 2010) .............................................................32, 36, 37, 39

*Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*,
  No. 1:04CV00977, 2007 U.S. Dist. LEXIS 68345 (M.D.N.C. Sept. 14, 2007) ....................37

*Victor Stanley, Inc. v. Creative Pipe, Inc.*.
  No. 06-cv-2662, 2011 U.S. Dist. LEXIS 112846 (D. Md. Sept. 30, 2011).......................35, 36

*Waddoups v. Amalgamated Sugar Co.*,
  54 P.3d 1054 (Utah 2002) ...............................................................................50

*Wright v. Sw. Bell Tel. Co.*,
  925 F.2d 1288 (10th Cir. 1991) ........................................................................20

TREATISES

Restatement (Second) of Conflict of Laws ...........................................................50, 54

RULES

Fed. R. Civ. P. 56(c) .....................................................................................20

Federal Rules of Civil Procedure 7(b) and 56(a) .......................................................1

STATUTES

15 U.S.C. 1125(a) .........................................................................................20

15 U.S.C. § 1114 ........................................................................................1, 48

15 U.S.C. § 1125(a) ........................................................................................................1, 20, 21

18 U.S.C. § 1831 et seq...........................................................................................................1, 44

18 U.S.C. § 1839(6) ....................................................................................................................48

Utah Code Ann. §§ 13-24-1 et seq........................................................................................1, 44

## I.   INTRODUCTION AND RELIEF SOUGHT

Pursuant to Federal Rules of Civil Procedure 7(b) and 56(a), and DUCivRs 7-1 and 56-1, John Bean Technologies Corporation ("JBT"), by undersigned counsel, respectfully moves this Court for summary judgment as to liability on JBT's Ten Causes of Action (the "Motion").[1] JBT moves for summary judgment for: (1) False Designation of Origin under 15 U.S.C. § 1125(a) against Defendant B GSE Group, LLC ("BGSE"); (2) False Advertising under 15 U.S.C. § 1125(a) against BGSE; (3) Misappropriation of Trade Secrets under 18 U.S.C. § 1831 et seq. against BGSE and Defendant Bryan Bullerdick ("Bullerdick," and collectively with BGSE, "Defendants"); (4) Misappropriation of Trade Secrets under Utah Code Ann. §§ 13-24-1 et seq. against Defendants; (5) Federal Trademark Infringement under 15 U.S.C. § 1114 against BGSE; (6) Defamation against Defendants; (7) Tortious Interference against Defendants; (8) Breach of the 2011 Confidentiality Agreement against Bullerdick; (9) Breach of the 2011 NDA against BGSE; and (10) Breach of the 2012 Distributorship Agreement against BGSE. JBT is not seeking a determination of the quantum of damages at this time

---

[1] JBT is concurrently filing a separate motion for summary judgment dismissing as a matter of law all of Defendants' counterclaims (the "Counterclaim Motion"). JBT believes the issues and facts involved in this Motion and the Counterclaim Motion are sufficiently different to warrant filing two motions. See, DUCivR 56-1(b)(1).

## II.  BACKGROUND

Bryan Bullerdick started working for JBT in April 2011 and resigned in April 2014. While working for JBT, his company, BGSE, was a distributor of JBT's pre-conditioned air ("PC-Air" or "CAS") units and ground power units ("GPUs"), for both commercial and military aircraft. However, unbeknownst to JBT, Bullerdick desired to have BGSE sell its own products and not continue being a mere JBT distributor.

The segment of the industry Bullerdick focused on was ground support for new maintenance hangars for the military's newest aircraft, the F-35 Joint Strike Fighter ("F-35"). These projects required specialized PC-Air units and GPUs, as well as aircraft servicing pits ("PITS," essentially in-ground storage for hoses, cables and tools). Bullerdick fashioned BGSE as an "integrator" of these three components, suppling PC-Air units and GPUs made by JBT and PITS made by another company. But while still employed by JBT, Bullerdick was secretly communicating with at least one other company about the prospect of making PC-Air units—with the intent of exploiting JBT's proprietary know-how to his advantage.

After leaving JBT, Bullerdick went to great lengths to find ways to sell other companies' products under the BGSE brand. He eventually convinced Piller GmbH of Germany "(Piller") to manufacture GPUs and Twist, Inc. ("Twist") to manufacture PC-Air units for BGSE, but neither agreed to allow him to sell under the BGSE brand only. Moreover, neither Piller nor Twist made the specialty PC-Air units or GPUs for the F-35, placing Bullerdick in a bind because on F-35 projects, he

had to keep selling JBT products while waiting until Piller and Twist could design, test and manufacture acceptable units. But he could not let JBT know what he was doing, or, as he feared, they might "cut him off," jeopardizing his distribution business.

Thus, Bullerdick devised a scheme to mislead customers while selling JBT's products on F-35 hangar projects by altering the JBT documentation he provided customers. He scrubbed as many references to JBT as possible to mislead customers so that BGSE would be top of mind. Meantime, to expedite Twist and Piller's learning curve, Bullerdick improperly disclosed proprietary JBT trade secrets to which Defendants had been entrusted. BGSE also wrongfully claimed "ownership" of JBT equipment installed on past projects by falsely stating that all the earlier-installed JBT equipment was based on "BGSE designs." If any customer ever questioned why a Twist or Piller product was being sold, and not JBT equipment, Bullerdick would falsely claim there was continuity because both the old JBT and new Twist/Piller equipment were based on BGSE designs, rendering the manufacturer but a small detail. This was false.

Once JBT realized that BGSE was no longer promoting JBT products on F-35 projects—which Bullerdick went to great lengths to keep hidden —it understandably started selling directly to customers on these projects, causing Bullerdick to take even more drastic steps to keep JBT out. Bullerdick bashed JBT's products, its production capacity and delivery times, its pricing, and impugned its

3

integrity. Most egregiously, he falsely claimed JBT no longer had the rights to make the products that were installed on past projects *because such products were BGSE designs and JBT was no longer authorized to use them*. JBT, he told customers, was taking his experience as its own.

The depths to which Bullerdick sunk to dupe the industry were as extensive as they were astounding. Some actions displayed  garden-variety deception: using Photoshop to whitewash JBT's name and logos from its products in brochures, specification sheets and manuals (many of which should not have been in his and BGSE's possession and which he certainly was not allowed to alter); superimposing BGSE logos over JBT logos on photographs of JBT equipment; and placing BGSE headers on JBT documents. Other steps were even more brazen. For instance, one issue BGSE faced with using Pillar products was that they are German-made and many military projects have "Made-in-the-USA" requirements. To "solve" this problem, Bullerdick asked Pillar to simply remove the Pillar label from its products, keep the place of origin off manuals, remove any German language, and not ship directly to the job site. Worse, he took third-party test certificates for JBT GPUs— which tests JBT had commissioned and paid for—and doctored them to appear to apply to a BGSE product (because Pillar's products lacked the requisite certification). Bullerdick got caught red-handed, and BGSE eventually lost a project it had been awarded.

Getting exposed didn't stop Bullerdick, nor apparently slow down BGSE's business. Even after this case was filed, BGSE continued to funnel false and misleading information to potential customers about the products it sold and JBT's products. And Bullerdick continued disparaging JBT. JBT was required to sue to stop Defendants' unlawful conduct once and for all.

### III. STATEMENT OF UNDISPUTED MATERIAL FACTS

<u>Relationships Between the Parties.</u>

1.      Bryan Bullerdick was employed by JBT from April 1, 2011 until he resigned on April 1, 2014. **Exs. 115 – 117** .

2.      On or about March 28, 2011, as a condition of his employment, Bullerdick signed JBT's Confidential Information and Inventions Agreement (the "2011 Confidentiality Agreement"). **Ex. 109**; **Ex. 12**, 36:24-37:13.

3.      The 2011 Confidentiality Agreement required that Bullerdick "agree to maintain in confidence all information pertaining to [JBT's] business" to which he had access, including "information related to [JBT's] products, inventions, trade secrets, know-how, systems, formulae, processes." **Ex. 109**, ¶5.

4.      The 2011 Confidentiality Agreement required that Bullerdick "agree not to use, communicate or disclose … such information orally, in writing or by publication either during [his] employment or thereafter . . . " **Ex. 109**, ¶5.

5.      The 2011 Confidentiality Agreement required Bullerdick to return to JBT "all writings, documents, files, records, drawings, models, tools, and other property of [JBT] … upon termination of" his employment. **Ex. 109**, ¶5.

6.      JBT and BGSE entered into a Mutual Non-Disclosure Agreement (the "2011 NDA") on November 11, 2011. **Ex. 110**.

7.      The 2011 NDA required the party receiving Confidential Information to keep the information "in confidence…." Ex. **Ex. 110**, § 2.

8.      The 2011 NDA required that the party receiving Confidential Information "agree[] to refrain from the use of the Confidential Information for any purpose other than in furtherance of the Disclosure Purpose." **Ex. 110**, § 2.

9.      On or about January 18, 2012, JBT and BGSE entered into the 2012 Distributorship Agreement. **Ex. 111**.

10.     The 2012 Distributorship Agreement required that the Distributor, BGSE, "retain [JBT confidential information] in confidence and not to use it, or disclose it, except as expressly agreed . . . ." **Ex. 111**, at § 6.

11.     The 2012 Distributorship Agreement required that upon its expiration, BGSE "immediately stop using any of JBT Corporation's marks, names, or trade dress on printed materials and otherwise and any language stating or suggesting that [BGSE] is a distributor for the [JBT] Products." **Ex. 111**, at § 11(G).

12.     The 2012 Distributorship Agreement required that "within thirty (30) days after termination"—*i.e.*, on or around February 18, 2013—BGSE was required "to remove all reference" to JBT from its "letterhead, business forms, advertising literature and place of business," and to refrain from using "any name or trademark suggesting" BGSE "has any relationship" with JBT. **Ex. 111**, at § 12.

JBT Original Documents

13.     The following documents were created by JBT, are JBT original documents, and were in the possession of Defendants:

7

a. Operation and Maintenance Manual for the Jetaire® HPCF 3000, 18 GR Modification, June 2014 (the "HPCF O&M Manual"). **Ex. 13**, pp. 10-24; **Ex. 14**; **Ex. 12**, 144:17-148:19.

b. Technical Specification for Jetaire® HPCF 3000 (the "HPCF 3000 Tech. Sheet"). **Exs. 16 – 17**.

c. Operation and Maintenance Manual for the Jetpower® III 270VDC (the "270VDC O&M Manual"). **Exs. 21 – 22**.

d. Technical Specification Jetpower® III 270VDC Ground Power Unit (the "270VDC Tech. Sheet"). **Exs. 23 – 24**.

e. JBT's QCA Jet 4.10.04-179 functional test checklist for Jetpower® III 72kw 270VDC (the "270VDC Functional Checklist"). **Exs. 25 – 26**.

f. JBT's QCA Jet 4.10.04-179 Special Factory Test Report for Jetpower® III 72kw 270VDC, dated 6/6/2012 (the "270VDC Special Factory Test"). **Ex. 27**, pgs. 1-3; **Ex. 28**.

g. JBT's general specification for its Jetpower® III 270 VDC / 400 HZ COMBO Converter (the "270VDC Combo General Specifications"). **Exs. 31 – 32**.

h. JBT engineering document demonstrating the need for a 30-Ton PC Air Unit for a certain customer application (the "30-Ton HPCF Justifications"). **Exs. 33– 34**.

i. JBT engineering document containing mathematical calculations regarding the operation of the 30-Ton PC Air Unit (the "30-Ton HPCF Calculations"). **Exs. 35 – 36**.

<u>JBT's Trade Secrets</u>

14.     JBT expended considerable time, effort, resources and expense into the design and development of its Jetaire® HPCF 3000, a fixed, high-pressure PC-Air unit. Ex. A, ¶¶ 3-6.

15.     The Jetaire® HPCF 3000 unit was designed and is manufactured by JBT and is not a BGSE design. See, *e.g.*, **Ex. 48** (JBT R&D Cost Spreadsheet); **Ex. 49** (JBT Project Charter, dated January 3, 2011); **Ex. 50** (JBT Project Charter,

8

dated June 5, 2013); **Ex. 51** (JBT Project Charter, dated January 27, 2014).The

HPCF O&M Manual, issued in June, 2014, includes detailed technical information

about the components of the Jetaire® HPCF 3000, as well as the operation of the

PC-Air units, and includes a full set of the electrical schematics and wiring

diagrams for the Jetaire® HPCF 3000. **Ex. 13**.

16.     The HPCF O&M Manual has commercial value in that with the

manual and the schematics, a competitor would have a considerable head start in

trying to design a product that meets the specifications required for the F-35. Ex. A,

¶ 7.

17.     The design and operation of the Jetaire® HPCF 3000, as embodied in

the HPCF O&M Manual, is not generally known to others, as the unit has been

supplied to a limited number of customers and the HPCF O&M Manual is only

supplied to customers, with restrictions on its use. **Ex. 13**; Ex. A, ¶ 8.

18.     JBT has made reasonable efforts to maintain the secrecy of the HPCF

O&M Manual. **Ex. 13**, pp.12-13, 19-21; **Ex. 98**, 12-13; 19-21; **Ex. 99** at No. 6.

BGSE's Post-Award Submittals Containing JBT Masked Product Information

19.     BGSE created and submitted an initial post-award submittal package

for PC-Air units on the F-35 maintenance hangar P-328 at Marine Corps Air

Station ("MCAS") Lemoore (the "Lemoore P-328 Project") to Able Mechanical on

September 8, 2015 (the "Lemoore P-328 Initial Submittal"). **Exs. 2 – 3**.

20.     BGSE created and submitted a revised post-award submittal package for PC-Air on the Lemoore P-328 Project to Able Mechanical on December 1, 2015 (the "Lemoore P-328 Revised Submittal"). **Exs. 112; 62**.

21.     BGSE created and submitted a post-award submittal package for PC-Air units on the F-35 maintenance hangar P-465 at MCAS Beaufort (the "Beaufort P-465 Project") to Carothers Construction on February 23, 2016 (the "Beaufort P-465 Submittal"). **Exs. 4 –5**.

22.     BGSE created and submitted a post-award submittal package for PC-Air units and GPUs on the F-35 maintenance hangar P-803 at Kadena Air Base (Japan) (the "Kadena P-803 Project") to Prime Projects International on February 12, 2016 (the "Kadena P-803 Submittal"). **Exs. 6 – 7**.

23.     BGSE created and submitted two post-award submittal packages on the F-35 maintenance hangar P-378 at MCAS Lemoore (the "Lemoore P-378 Project"): (1) for PC-Air units, sent to Certified Air Conditioning Inc. on September 23, 2016 (the "Lemoore P-378 PC Air Submittal") (**Exs. 8 – 9**); and (2) for GPUs, sent to Berg Electric on February 13, 2017 (the "Lemoore P-378 GPU Submittal") (**Exs. 10 – 11**).

24.     BGSE included an excerpt of JBT's HPCF O&M Manual, with JBT identifying information removed and replaced with BGSE identifying information, in the Lemoore P-328 Initial Submittal (**Ex. 2**, pp. 37-49), the Lemoore P-328 Revised Submittal (**Ex. 112**), the Beaufort P-465 Submittal (**Ex. 4**, pp. 13-25), the

Kadena P-803 Submittal (**Ex. 6**, pp. 92-104), and the Lemoore P-378 PC Air Submittal (**Ex. 8** pp. 37-49). *See also* HPCF O&M Manual (**Ex. 13**, pp. 10-24); **Ex. 12**, at 225:24-229:4.

25.     BGSE included a page of the HPCF 3000 Tech. Sheet, with JBT identifying information removed and replaced with BGSE's, along with other small edits, in the Lemoore P-328 Initial Submittal (**Ex. 2**, p. 30), the Lemoore P-328 Revised Submittal (**Ex. 112**, p. 30), the Beaufort P-465 Submittal (**Ex. 4**, p. 7), the Kadena P-803 Submittal (**Ex. 6**, p. 86), and the Lemoore P-378 PC Air Submittal (**Ex. 8** p. 31). *See also* HPCF 3000 Tech. Sheet, **Ex. 16**.

26.     BGSE included an excerpt of the 270VDC O&M Manual (**Ex. 21** pp. 14-19, 26-27, 31), with JBT identifying information removed and replaced with BGSE's, in the Kadena P-803 Submittal (**Ex. 6**, pp. 27-40).

27.     BGSE included a page of the 270VDC Tech. Sheet (**Ex. 23**), with JBT identifying information removed and replaced with BGSE's, in the Kadena P-803 Submittal (**Ex. 6**, p. 26).

28.     The Lemoore P-378 GPU Submittal contains altered excerpts of the following original JBT documents, with JBT identifying information removed and replaced with BGSE's:

     a.  The 270VDC Functional Checklist (**Ex. 25**), *see* (**Ex. 10**, pp. 31-37); and

     b.  The 270VDC Special Factory Test (**Ex. 27**, pp. 1-3), *see* (**Ex. 10**, pp. 38-40).

29.     The Lemoore P-378 GPU Submittal contains an altered "Certificate of Test" from DNB, originally performed for JBT on a JBT product (**Ex. 27**, p. 4), altered to appear as if performed for BGSE on a BGSE product. (**Ex. 10** p. 41).

30.     The Lemoore P-378 GPU Submittal contains a counterfeit "Authorization to Mark" certificate derived from a legitimate Authorization to Mark certificate issued by Intertek (the "Counterfeit Intertek Authorization"). **Ex. 10**, p.43; **Ex. 113**.

<u>BGSE Marketing and other Materials Containing JBT Masked Information</u>

31.     In August 2014, BGSE created a brochure with the filename "F35 FINAL SPEC SHEET e-mail.pdf" (the "F35 Final Spec Sheet"). **Ex. 30**.

32.     The F35 Final Spec Sheet contains altered excerpts of the following original JBT documents, with JBT identifying information removed and replaced with BGSE's:

      a.  The 270VDC General Specifications (**Ex. 31**), *see* **Ex. 30**, pp. 10-19; .

      b.   The Jetaire® HPCF O&M Manual (**Ex. 13**, pp. 11-36), *see* **Ex. 30**, pp. 21-46.

      c.  The 30-Ton HPCF Justifications (**Ex. 33**), *see* **Ex. 30**, pp. 59-60.

      d.  The 30-Ton HPCF Calculations (**Ex. 35**), *see* **Ex. 30**, pp. 61-65.

*See also* **Ex. 12**, pp. 111:16-112:24, 140:18-143:12, 147:20-148:4.

33.     In March 2016, Bullerdick created a brochure with the filename "F 35 Hangar Design Package Luke and Lemoore 3.pdf" (the "Luke and Lemoore Package"). **Ex. 38**.

12

34.     The Luke and Lemoore Package contains a letter addressed to "bidders and designers," containing the false statement, "███████████████████████ ██████████████████████████████████████████████ ████████████████████████████ followed by a list of thirteen F-35 hangar projects. **Ex. 38**, p.2.

35.     The Luke and Lemoore Package also contains a technical specification sheet with information substantially copied from the HPCF 3000 Tech. Sheet (**Ex. 16**), along with two pictures of JBT Jetaire® HPCF 3000 PC-Air units. **Ex. 38**, pp. 8-9.

36.     In November 2016, Bullerdick created a document titled the "BGSE Group Question and Answer letter," to answer a number questions from a contractor working on a project at Eielson Air Force Base (the "BGSE Group Question and Answer Letter" or the "Eielson F-35 Letter"). **Ex. 52**; **Ex. 53**.

37.     The Eielson F-35 Letter contains the question, "█████████████ ███████████████████" along with the false answer, "███████████ ████████████████████████████████████████████████████" **Ex. 53**, p.1.



38.     The Eielson F-35 Letter contains numerous false and misleading descriptions of BGSE's involvement on each project, including false claims of BGSE's involvement in the design of the products as well as falsely claiming that it provided engineering services. *Id.* at pp. 2-5.

39.    In March 2017 Bullerdick created a document titled "F 35 Equipment History" with the filename "F 35 BGSE Group History.pdf" (the "F 35 Equipment History" document). **Ex. 58**.

40.    The F 35 Equipment History document includes the following false statements:



a.    "                                                                  **Ex. 58**, p.1 (emphasis added);

b.    "                                                                  **Ex. 58**, p.2.

<u>BGSE's Disclosure of JBT Proprietary Materials to Twist</u>

41.    On August 27, 2015, Bullerdick sent an email to Don Maynard and Scott Schrinner of Twist, BGSE's proposed supplier of PC-Air products in competition with JBT, having the subject of "Lemoore," and writing: "                                                                  ." **Ex. 54**.

42.    On August 31, 2015, Bullerdick sent an email to Twist, writing in the body of the email "Confidential," and attaching an electronic copy of the JBT Jetaire® HPCF O&M Manual. **Exs. 13; 94**.

43.     On September 3, 2015, Bullerdick sent an email to Twist, with the subject "Submittals," writing, "███████████████████████ ██████████" and attaching, among others, a file named "CAS Master Controller.pdf." **Exs. 97; 20**, 103:10-106:11.

BGSE's Dissemination of False Advertising

44.     BGSE emailed the F-35 Spec Sheet to at least the following individuals on the indicated dates:

    a.  September 3, 2014, to D. Rollins of Michael Baker International (**Ex. 69**);

    b.  November 9, 2014, to C. Sigredo of SG Engineering (**Ex. 70**);

    c.  February 17, 2015, to P. Jobson of Synergy Electric (**Ex. 72**);

    d.  March 2, 2015, to T.B. Penick (**Ex. 73**);

    e.  March 2, 2015, to J. Palmer of Balfour (**Ex. 74**);

    f.  March 3, 2015, to D. Youngdale of RQ Construction (**Ex. 75**);

    g.  March 18, 2015, to R. Gutierrez of W R Robbins (**Ex. 76**);

    h.  April 27, 2016, to B. Little of Coffman Engineers (**Ex. 77**);

    i.  March 3, 2017, to G. Keresi of Walbridge Southeast (**Ex. 78**);

    j.  June 24, 2015, to R. Shappell of the U.S. Air Force (**Ex. 79**);

    k.  August 6, 2015, to M. Boudah of the U.S. Joint Strike Fighter program (**Ex. 80**);

    l.  July 25, 2016, to W. Bell of the U.S. Air Force (**Ex. 81**);

    m.  September 5, 2014, to A. Cihan Oz of Akat Cevre (**Ex. 82**);

    n.  September 5, 2014, to U. Slusher of Aero Sekur (**Ex. 83**);

    o.  November 13, 2014, to J. Bodine of DBS Associates (**Ex. 84**);

    p.  January 29, 2015, to L. E. Kure of Asplan Viak (**Ex. 85**);

    q.  On May 7, 2015, to N. Knapp of the Canadian Department of National Defence (**Ex. 86**); and

  r. March 3, 2017, to G. Keresi of Walbridge Southeast (**Ex. 87**).

45. BGSE emailed the Luke and Lemoore Package to at least the following individuals on the indicated dates:

  a. March 17, 2016, to D. Rollins of Michael Baker International (**Ex. 88**);

  b. March 17, 2016, to W. Thomas of Carothers Construction (**Ex. 89**);

  c. March 18, 2016, to D. Golden of Harper Construction (**Ex. 90**); and

  d. March 18, 2016, to J. Smith of R.Q. Construction (**Ex. 91**).

46. BGSE emailed the Eielson F-35 Letter (a/k/a BGSE Group Question and Answer letter) to at least T. Karre of Burns & McDonald on November 7, 2016. **Ex. 55**.

47. BGSE emailed the F 35 BGSE Group History document to at least the following individuals on the indicated dates:

  e. March 28, 2017 to M. Bosman of Mortenson (**Ex. 92**); and

  f. June 23, 2017, A. Colak of İnform Elektronik San (**Ex. 93**).

48. BGSE emailed the Eielson F-35 Letter (a/k/a BGSE Group Question and Answer letter) and the F 35 BGSE Group History to at least the following individuals on the indicated dates:

  a. April 6, 2017, to V. Johnson of the U.S. Joint Strike Fighter Program (**Ex. 56**); and

  b. June 16, 2017, to Necak (**Ex. 57**).

<u>BGSE's Dissemination of Other False Statements.</u>

49. On November 2, 2015 Bullerdick emailed to B. Diez of Harris Mechanical Southwest, making the following false statements:

a. 

(**Ex. 37**).

50.     On March 9, 2016 Bullerdick emailed  B. Diez of Harris Mechanical

Southwest, making the following false statements:

a. 

**Ex. 38**.

51.     On March 11, 2016, Bullerdick emailed to W. Thomas of Carothers

Construction, making the following false statements:

a. 

**Ex. 40** (Emphasis in original). Ex. 12 at 187-88, 191-192.

52.     On August 6, 2016 and August 17, 2016, Bullerdick sent three e-mails

to Neal Barton of Okland Construction containing the following false statements:

a. 

b. 

**Ex. 41**.

f.

. (**Ex. 42**).

h.

**Ex. 43**.

53.     On September 5, 2017, Bullerdick emailed M. Napoli of American



Airlines, with the following false statements: "

**Ex. 108**.

JBT Trademarks

54.     JBT owns U.S. Trademark Reg. No. 4,283,209 for the mark JBT and design. **Ex. 102**.

55.     JBT owns U.S. Trademark Reg. No. 4,283,208 for the mark JBT. **Ex. 103**.

56.     JBT owns U.S. Trademark Reg. No. 703,033 for the mark JETWAY. **Ex. 104**.

57.     JBT owns U.S. Trademark Reg. No. 1,282,206 for the mark JETPOWER. **Ex. 105**.

58.     JBT owns U.S. Trademark Reg. No. 2,649,668 for the mark JETAIRE. **Ex. 106**.

59.     As of September 1, 2017, BGSE's website, located at the internet URL address of www.bullerdick.gse, included the marks "JBT," "Jetaire," and "Jetway" within the "keywords" of the websites html source file for its home page. **Ex. 107**; *see also* First Amended Complaint, ¶ 138 (Dkt. No. 99; Ex. O (Dkt. No. 99-15).

## V.  ARGUMENT

### A.  Applicable Standard

Summary judgment is proper if the moving party can demonstrate there is no genuine issue of material fact and it is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering whether a genuine issue of material fact exists, the Court determines whether a reasonable jury could return a verdict for the nonmoving parties in the face of all evidence presented. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986); *Clifton v. Craig,* 924 F.2d 182, 183 (10th Cir. 1991). The Court must construe all facts and reasonable inferences in the light most favorable to the nonmoving parties. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Wright v. Sw. Bell Tel. Co.,* 925 F.2d 1288, 1292 (10th Cir. 1991). However, the nonmoving party's version of the facts "must find support in the record." *Thomson v. Salt Lake Cnty.,* 584 F.3d 1304, 1312 (10th Cir. 2009).

### B.  BGSE is Liable for Unfair Competition under Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) as a Matter of Law. [Third and Fourth Causes of Action against BGSE]

Section 43(a) of the Lanham Act—codified as 15 U.S.C. 1125(a)[2]—"was enacted to promote honesty and fair play in the commercial context and 'to stop the

---

[2] The Act provides, in relevant part:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

kind of unfair competition that consists of lying about goods or services.'" *Cannella v. Brennan*, No. 2:12-CV-1247, 2014 U.S. Dist. LEXIS 107944, at *15 (E.D. Pa. Aug. 4, 2014) (*quoting Castrol Inc., v. Pennzoil Co.*, 987 F.2d 939, 941 (3d. Cir. 1993)). Courts have recognized that Section 43 "principally provides for two distinct causes of action: false designation of origin or source, known as 'product infringement,' and false description or representation, known as 'false advertising.'" *Cottrell, Ltd. v. Biotrol Int'l, Inc.*, 191 F.3d 1248, 1252 n.3 (10th Cir. 1999) (citations omitted).

BGSE has made an astonishing number of false statements about the nature, characteristics, affiliation, connection, origin, sponsorship and qualities of the products and services it supplies as well as the products, services and commercial activities of JBT. BGSE's motive is clear and was often confirmed by Defendants' own words.   BGSE misled consumers into believing that (1) BGSE had designed and made    the JBT products it previously distributed, (2) BGSE was the true source of information and knowledge of the products made by JBT, and (3) the products BGSE currently sells, although manufactured by others, are mere

---

A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

continuations of those previously-sold JBT products.[3] BGSE's actions amount to both false designation of origin and false advertising under the Lanham Act and summary judgment should be granted in JBT's favor on both claims.

### 1. BGSE's False Statements

BGSE used  various ploys to mask the identity of JBT as the manufacturer of the PC-Air units and GPUs BGSE sold, in order to create the false impression that BGSE had designed, engineered and manufactured the products actually made by JBT. In this way, BGSE created a false narrative of a connection, through its past role as JBT's distributor, with the non-JBT products it later began selling. BGSE's duplicity  ran through  the entire sales cycle, including in fabricated post-award  submittals before the new products had any established history, in BGSE's pre-bid marketing materials that used JBT data and product descriptions but masked all  references to JBT, in marketing materials that used false product histories, and in  direct communications with potential customers.

#### a.   BGSE's False Post-Award Government Project Submittals

Some of BGSE's most brazen actions occurred with its project submittals on several large F-35 hangar projects—specifically, Lemoore P-328, Beaufort P-465, Kadena P-803, and Lemoore P-378Project submittals are the "final technical documents to get approval from the government to proceed to make [the proposed]

---

[3] For example, in February 2016, Bullerdick wrote to Scott Schrinner of Twist, saying that he had to be careful about relying on past performance to assure the customer of future quality because the project was the first installed Twist unit. **Ex. 1** (emphasis added).

product." **Ex. 20**, 103:23-25. A submittal is a deliverable required by the contracts and purchase orders under which BGSE supplied products to these military projects. *See*, *e.g.,* **Ex. 114**.

Each of BGSE's submittals for these projects contained significant excerpts lifted from JBT documents with JBT-identifying information stripped out and replaced with BGSE's name. For example, BGSE included in all four submittals for these military projects for PC-Air units a multi-paged excerpt which it copied from the JBT Jetaire® HPCF O&M Manual. **Ex. 13**, pp. 10-24; **Ex. 2**, pp. 37-49; **Ex. 4**, pp. 13-25; **Ex. 6**, pp. 92-104; **Ex. 8**, pp. 37-49). ███████████████████

███████████████████████ **Ex. 12**, at 225:24-229:4.

BGSE removed all references to JBT, including its logo, document number, and proprietary notices, and superimposed BGSE's logo over JBT's. *Compare*, *e.g.,* **Ex. 13**, p. 13 *to* **Ex. 15**, p.36.

Not finished yet, each BGSE submittal also included a two-page technical specification sheet purportedly providing specifications for a BGSE-made PC-Air unit. *See, e.g.,* **Ex. 2**, pp.29-30. There was no such "BGSE" PC-Air unit, however, and the document BGSE inserted into its submittals was instead a copy of JBT's HPCF 3000 Tech. Sheet. **Ex. 16**. Not only did BGSE scrub all identifying JBT marks off the specification sheets, it included photographs of the Jetaire® HPCF 3000 PC-Air units with a BGSE logo superimposed over the JBT logo on the product. *Compare* **Ex. 8**, pp. 30-31 to **Ex. 18**, pp. 1-2. On each of these projects,

23

BGSE intended to and did supply PC-Air units manufactured by Twist, not JBT. **Ex. 19**; **Ex. 20**, 98:7-100:8.

As noted, the BGSE submittal for the Kadena P-803 project also involved GPUs. Thus, it included altered excerpts of JBT documents related to its Jetpower® GPUs. BGSE's Kadena P-803 submittal included several pages copied from JBT's 270VDC GPU O&M Manual together with a specification sheet for a BGSE-branded 270VDC GPU, copied from JBT's 270VDC Tech. Sheet. **Ex. 6**, pp. 27-40, 25-26; *compare to* **Ex. 21**, pp. 14-19, 26-27, 31 and **Ex. 23**. In both the operations manual excerpt and the specification sheet, BGSE stripped off JBT identifying information. BGSE also included in the specification sheet a photograph of a JBT Jetpower® GPU with BGSE's logo superimposed over the original JBT logo. *See,* **Ex. 6**, p. 25.

BGSE's submittal package for GPUs on the Lemoore P-378 project was particularly egregious in that it contained several documents which BGSE doctored to appear that the "BGSE" products carried the same qualifications as JBT products. Specifically, BGSE passed off as its own JBT's 270VDC Functional Checklist and JBT's 270VDC Special Factory Test. **Ex. 10**, pp. 31-40; **Exs. 25, 27**. In addition, BGSE included a doctored third-party Certificate of Test performed on a JBT Jetpower® product, and a forged "Authorization to Mark" certificate from Intertek. *Id.* at pp. 41, 43.[4] BGSE has admitted that these four documents did not relate to the BGSE products in the submittal. **Ex. 20**, 149:16-150:19, 153:1-154:15;

---

[4] Intertek sent a public notice confirming that the "Authorization to Mark" was counterfeit. **Ex. 113**.

*see also* **Ex. 29** (Defendants' First Sworn Certification of Compliance, Dkt. No. 57-1) at p. 2.

### b.  *BGSE's False Pre-Bid and other Marketing Materials*

BGSE's marketing documents are littered with false  statements. One particularly egregious brochure—the F35 Final Spec Sheet—contains multiple JBT documents and was created by BGSE in August 2014. **Ex. 30**. Among other things, the BGSE F35 Final Spec Sheet contains copies of or excerpts from four different JBT documents, including: (1) approximately ten pages taken from specifications for JBT's Jetpower® III 270 VDC/400 HZ COMBO Power Converter (**Ex. 31**); (2) more than 20 pages lifted from JBT's HPCF O&M Manual (**Ex. 13**]); (3) JBT's 30-Ton HPCF Justifications, created to explain the need for a 30-ton PC-Air unit (**Ex. 33**); and (4) JBT's 30-Ton HPCF Calculations, created by JBT to support the selection of a 30-ton PC-Air unit (**Ex. 35**,). *See, e.g.,* **Ex. 30**, pp. 10-19, 21-46, 59-60 and 61-65.

These were all documents relating to JBT products.  Bullerdick confirmed so his deposition. **Ex. 12**, pp. 111:16-112:24. Bullerdick admitted that he whitewashed references to JBT on JBT documents and substituted BGSE's name and logos . *See id*. at pp. 140:18-143:12. Regarding the HPCF O&M Manual, Bullerdick even admitted the he simply "placed it" into the F35 Final Spec Sheet. *Id*. at pp. 148:15-19. Bullerdick even included pictures  of the internal workings of JBT's Jetaire® HPCF 3000 unit. *Id*. at pp. 147:20-148:4.

### c.   *BGSE Creates a False Product History*

When BGSE couldn't hide that it was supplying not its own products but those made by others, and especially after JBT began to directly compete against it on F-35 hangar projects, BGSE resorted to creating a false history narrative in order to fabricate a link between the JBT products it had distributed for JBT and the products it was now selling made by other manufacturers. BGSE published this false history to the market through documents and other communications.

One of BGSE's earliest public acknowledgements that it was supplying PC-Air units made by Twist was in an email Bullerdick sent on November 2, 2015 to Bob Diez of Harris Mechanical Southwest, a mechanical subcontractor working on the design for the Luke AFB Squadron II project. **Ex. 37**. In arguing that FCX, another competitor, was not capable of supplying a compliant PC-Air unit to the project, Bullerdick wrote that Twist did not have the time to engineer an "F35 air unit" for FCX. *Id.* However, BGSE, having supplied "every F 35 hangar with a new designed PC Air unit," had "a proven design used for 15 F 35 hangars … [that] Twist will make for us." *Id.* Bullerdick further asserted that BGSE was "supplying all the design and engineering work to Twist" and that "Twist cannot sell our engineered product to FCX or anyone else." *Id.* This was false.

In March 2016, BGSE created the Luke and Lemoore Package brochure. **Ex. 38**. BGSE included in the brochure a letter addressed to "bidders and designers," purporting to provide a history of BGSE's experience. *Id.*, p. 2. The letter contains a

list of thirteen F-35 hangar projects and states that "[t]he following F 35 specific projects all have BGSE Group equipment. All projects completed on this list have installed, commissioned and working 100% BGSE Group designs." *Id.* These assertions were false. All of the completed projects were in fact supplied with JBT equipment based on JBT designs.

Bullerdick again wrote Bob Diez about the same Luke AFB project in March 2016. **Ex. 39**. This time he justified BGSE's use of Twist products  by stating that BGSE "initially brought ***our designs*** for JBT AeroTech to build," but "[w]e began to sharing [sic] BGSE designs with Twist last summer in confidence. … For 8 months now we have worked with Twist engineers quietly." *Id.* (emphasis added.)

Also in March 2016, Bullerdick wrote to Wayne Thomas of Carothers Construction about the Luke AFB Squadron III project. **Ex. 40**. Bullerdick requested that JBT be removed from the list of pre-approved suppliers for the project and replaced with BGSE. Bullerdick falsely stated that "JBT AeroTech builds 240VDC and CAS for the GPUs and PC-Air units as a **licensee** of BGSE Group design specifications. The agreement has expired and JBT is not making the design supplied previously under BGSE licensee agreement at this time." *Id.* (emphasis in original)[5] This statement was fabricated, and Bullerdick admitted as much under oath. Ex. 12 at 187-88.

---

[5] CAS, an acronym for "conditioned air system," is another name for the PC-Air units for aircraft cooling.

Later in 2016, in a series of emails to Neil Barton of Okland Construction, the general contractor on the Luke AFB Squadron II project, Bullerdick made a number of similarly false statements about JBT's involvement in the products BGSE had previously sold, and their connection with his then-current products:



(Ex. 41);

(Ex. 42);

(Id.); and

(Ex. 43).

Bullerdick made these claims despite the fact that no BGSE employee even has an engineering degree. **Ex. 12**, 15:21-23, 131:4-132:6. And when asked to describe BGSE's contributions to the Jetaire® HPCF 3000 unit, now  under oath, Bullerdick made  no mention of, among other things, BGSE designing the 18 grain

specification[6] or the Jetaire® HPCF 3000 being a "BGSE design." Instead, he stated:



**Ex. 12**, 131:3-11. When asked for evidence of BGSE's contributions, Bullerdick drew a blank. In desperation, all Bullerdick did was predict that Scott Gwilliam, Kris Kubica, Steve Nestel and Steve Maughan would testify to this effect. *Id.* at 133-134. However, Defendants chose not to depose Messrs. Kubica, Nestel or Maughan, and Mr. Gwilliam most certainly did not testify that BGSE contributed to solving the 18-grain problem or otherwise helping design the Jetaire® HPCF 3000 unit. Bullerdick also testified that he has "written evidence of emails to Kris Kubica concerning the controls, to Steve Nestel concerning the performance and to Scott Gwilliam concerning the initial design and modifications required of the product after it was installed." *Id.* at 135. In response to a follow-up interrogatory seeking these communications, Bullerdick . answered by, among other things, directing JBT to three documents: BGSE_00386794 (**Ex. 45**), BGSE_00395529 (**Ex. 46**), and BGSE_00371062 (**Ex. 47**). **Ex. 44** (Bullerdick's Response to JBT's First Set of Interrogatories) at No. 4. One of these emails actually post-dates completion of the

---

[6] As explained in the Declaration of Scott Gwilliam, the 18-grain requirement refers to the maximum humidity of the air being supplied to the aircraft.

Jetaire® HPCF 3000 (BGSE_00395529, **Ex. 46**);, neither of the others remotely supports the claims of ownership Defendants have made. By contrast, JBT has submitted a trove of evidence that the Jetaire® HPCF 3000 was designed and manufactured by JBT. *See, e.g.,* **Exs. 48 – 51**. The unrebutted evidence has thus shown that JBT's HPCF 3000 PC-Air units are not a "BGSE design."

With the facts against him, Bullerdick nonetheless kept digging a deeper hole. In November 2016, a contractor working on a project at Eielson Air Force Base sent a series of questions to Bullerdick to try to clear up some confusion about BGSE's role in past projects. **Ex. 52**. In response, Bullerdick created a document with all the questions listed along with his detailed answers, titling the document the "BGSE Group Question and Answer letter." **Ex. 53**. One of the questions asked Bullerdick to "[c]larify what product/manufacturer is installed" on past projects. **Ex. 52**. In his answer, Bullerdick deflected, writing instead: ████████████████
████████████████████████████████████████████████
*Id.*; **Ex. 53** (emphasis added.) Bullerdick then included a list of eighteen projects, listing "JBT-first generation" next to five of them, "JBT-second generation" next to four of them, and "Twist-third generation" next to nine of them. *Id.* at pp. 1-2. Bullerdick also included false descriptions of BGSE's involvement on each project, including of BGSE's design and engineering of the products, when in fact the products were designed and manufactured by JBT. *Id.* at pp. 2-5. BGSE later

renamed this document the "Eielson F-35 Letter," and sent it out to multiple interested individuals. *See, e.g.*, **Exs. 55 – 57**.

In 2017, BGSE created a similar document to perpetuate its false history narrative, titled "F 35 Equipment History." **Ex. 58**. The document presents a fabricated history of BGSE's experience for F-35 projects, divided into three alleged "areas of expertise:" "F 35 Power," "F 35 High Pressure Conditioners," and "F 35 Service PITS." *Id.* Under both the F-35 Power and F-35 High Pressure Conditioners sections, BGSE falsely stated that it brought its designs and expertise to JBT to make the "second generation" units. *Id.*

## 2.   False Designation of Origin under the Lanham Act

False designation generally occurs either where a party engages in "passing off"—*i.e.,* when it misrepresents its own products or services as those of a competitor—or "reverse passing off"—*i.e.,* when a company removes the name or information from another's products without consent, and then resells the product as its own. *Larkin Grp, Inc. v. Aquatic Design Consultants, Inc.*, 323 F. Supp. 2d 1121, 1124 (D. Kan. 2004); *see also Gaedeke Holdings VII LTD v. Baker,* 683 F. App'x 677, 679 n.2 (10th Cir. 2017) (citing *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 27 n. 1 (2003)) ("Reverse passing off occurs when someone misrepresents owning goods or services belonging to another.").

A reverse passing off claim requires the plaintiff to prove four elements: "(1) that the work at issue originated with the plaintiff; (2) that the origin of the work

was falsely designated by the defendant; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false designation of origin." *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 438 (4th Cir. 2010).

Defendants' own documents overwhelmingly establish BGSE: (a) falsely claimed responsibility for the JBT products installed on numerous projects, (b) improperly used images of JBT equipment, passing them off as if they were BGSE's, (c) stripped JBT's name and identifying marks from JBT's brochures, manuals, test reports and specification documents in order to pass off JBT's goods and services as its own, and (d) created the false impression that its new products—manufactured by unproven third parties—were simply new versions of the JBT products that BGSE previously distributed.

BGSE's actions were not only likely to cause confusion, they were done precisely to cause confusion.[7] BGSE's scheme gave it the credibility to introduce new suppliers to the market and eventually create an unfair playing field when JBT sought to directly sell into the market for F-35 hangar projects. Judge Posner, in pondering why one would engage in "reverse passing off," appears to have predicted the Defendants' motivations:

> Why would anyone want to do such a thing? One reason might be to obliterate the plaintiff's corporate identity and prevent him

---

[7] In April 2015, Bullerdick exposed this purpose to Piller: "About 18 months ago we started making the BGSE product offerings anonymous to the design firms. This is when we started to consider buying companies." **Ex. 59**.

> from entering new markets, where the defendant, having
> appropriated the plaintiff's trademark, would claim that the
> plaintiff was the infringer.

*Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 987 (7th Cir. 2004).

> a. *BGSE Falsely Designated the Origin of Work Conceived and Built by JBT.*

As above chronicled , BGSE made countless false statements  about work that originated with JBT, including in its project submittals, marketing material and direct communications. Indeed, for many of the  acts discussed, Defendants have  admitted that the work came from JBT.

BGSE's post-award submittals are particularly damning because without co-opting JBT's material, BGSE would not have been able to perform the contracts or meet the projects' requirements. Upon being awarded the contract for PC-Air units on the Lemoore P-328 project, for example, Bullerdick asked Twist to provide documentation on its PC-Air unit for inclusion in its submittal package, emphasizing that they had a tight schedule. However, what Twist provided was woefully inadequate, Bullerdick responding flatly that ██████████████████████ ████████████" **Ex. 97**; *see also* **Ex. 20**, 104:20-105:11. BGSE was thus faced with a choice: miss the submittal deadline (and thus, lose the project) or include altered JBT documents and hope no one would notice. It chose the latter course, causing the

general contractor on the project to unwittingly make a false certification to the government. **Exs. 60 – 61**.[8]

Defendants acknowledged the inappropriateness of including fabricated JBT documents in BGSE submittals while promoting non-JBT products. Bullerdick testified that it would be wrong to use JBT information if selling products manufactured by a different company. **Ex. 12**, 155:18-22. He attempted to excuse his inclusion of JBT material in the Lemoore P-328 submittal by implying that it was just an innocent mistake and that he " ███████████████████ ███████████████████████████████████ **Ex. 12**, 156: 9-12. The excuse, however, is unavailing. BGSE was required to submit a revision to the Lemoore P-328 submittal several months after the first submission, providing an opportunity to remove the JBT information. **Ex. 62**. However, BGSE made no such corrections in the revised submittal, compounding the deception. **Ex. 112**, pp. 37-49. Furthermore, BGSE tendered submittals for Beaufort P-465, Kadena P-803 and Lemoore P-378 (PC-Air) months after the revised Lemoore P-328 submittal, and yet continued to include JBT material when it was not selling JBT products.[9]

---

[8] The certification section states: "It is certified that the [X] Equipment … shown and marked in this submittal is that proposed to be incorporated into contract …., is in compliance with the contract drawings and specifications, and can be installed in the allowcated [sic] spaces.") **Ex. 61**.

[9] Related to BGSE's Kadena P-803 submittal, Bullerdick even expressed how important it was to hide the fact that BGSE had changed suppliers. **Ex. 1**.

Utilizing JBT material, and creating the false link to past JBT installations, gave BGSE the added benefit of allowing it to claim that it met the requirement of having a history of satisfactory installations on F-35 hangar projects. For instance, on the Kadena P-803 project, the specifications required all proposed PC-Air unit models to have been in satisfactory use for two years before the bids were opened. *See, e.g.,* **Ex. 63**, p.10. However, the untested Twist product BGSE supplied lacked such a history, so BGSE used JBT documents and specifications to misrepresent prior JBT installations as its own in order to create the perception that BGSE had the requisite two-year track record when it in fact did not. *See, e.g.,* **Ex. 1**.

In addition to its deceptive use of JBT materials, specifications and provenance in its post-award submittal packages, BGSE passed off JBT products as its own in BGSE's pre-bid brochures and marketing materials, beginning even before Bullerdick resigned from JBT. **Ex. 64** ("I am trying to get all the JBT brochures made into BGSE brochures before the GSE Show."). As Bullerdick admitted several times, the purpose of this effort was to get BGSE's name, not that of the manufacturer of the equipment, JBT, in front of the decision makers. **Exs. 65 – 66**. Scrubbing JBT material allowed BGSE to become the sole face before its customers.

In light of this overwhelming evidence, BGSE is liable for false designation of origin as a matter of law. This case is strikingly similar to *Victor Stanley, Inc. v. Creative Pipe, Inc.*. No. 06-cv-2662, 2011 U.S. Dist. LEXIS 112846 (D. Md. Sept. 30,

2011). There, the plaintiff was a manufacturer of furnishings that maintained an online product library containing "CAD drawings, specifications, and product images, accessible by customers, architects, and designers, for specific use in project design and purchasing activities such as presentations and bid documents." *Id.* at *3-4. The defendant accessed the plaintiff's technical drawings, removed the plaintiff's source information and replaced it with defendant's identifying information, and used the altered drawings in bid documents for the sale of defendant's goods. *Id.* at *7, 35. The court held that the defendant's actions in presenting the altered drawings to consumers as its own drawings for its own products, where consumers were likely to be misled into believing that defendant was the source of the drawings, was "the essence of a false designation of origin claim." *Id.* at *37. *See also, Advanced Fluid Sys. v. Huber* 28 F. Supp. 3d 306, 313 (M.D. Pa. 2014) (finding plaintiff had viable claims for false advertising and false designation of origin after defendant, a former employee, used plaintiff's proprietary information on his new company's website to falsely attribute to defendant company the design, manufacture and installation of plaintiff's systems).

Both the Fourth and Sixth Circuits have also found liability for reverse passing off in situations similar to this case. *See Universal Furniture*, , 618 F.3d at 439 (finding reverse passing off where the defendant removed the competitor's indicia of ownership from the products and displayed them as defendant's own, even though it did not actually sell the displayed products but fulfilled sales with its own

manufactured products); *Johnson v. Jones*, 149 F.3d 494, 497-99 (6th Cir. 1998) (finding reverse passing off where an architect took plaintiff architect's plans, removed plaintiff's identifiers and replaced with its own, then used the plans as though they were his own).

The facts in this case are much more egregious, involving a wide ranging scheme spanning many years. In the scores of examples described above, BGSE has removed JBT's identifiers, replaced them with its own, and used the altered documents as if they related to its own products.

### b.   *BGSE's Conduct Likely Caused Confusion.*

It is undisputed that BGSE's actions likely caused confusion. Indeed, as mentioned above, sowing the seeds of confusion with its customers was BGSE's very purpose. The likelihood of confusion test is easily met in this case. As the district court in *Universal Furniture* observed:

> When a case involves a situation where "the defendant has taken the plaintiff's product and has represented it to be his own work[,] [i]t is difficult to imagine how a designation of origin of a product could be more false, or could be more likely to cause confusion or mistake as to the actual origin of the product.

*Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, No. 1:04CV00977, 2007 U.S. Dist. LEXIS 68345, at *42 (M.D.N.C. Sept. 14, 2007) (quoting Johnson, 149 F.3d at 503).

In affirming the defendant's liability under the Lanham Act, the Sixth Circuit observed that where the defendant directly takes the plaintiff's product and

markets it as his own, the analysis of consumer confusion is "much simpler" because there are few cases "demonstrating a more obvious and imminent likelihood of confusion." *Johnson*, 149 F.3d at 503.

This Court, too, is confronted with a rare but "obvious" case of false designation of origin and likewise should have no trouble finding a likelihood of confusion. Indeed, with respect to the F35 Final Spec Sheet alone, Mr. Bullerdick admitted that he substituted the name "BGSE" for JBT in front of JBT's product names to sell BGSE's system—*i.e.*, to confuse the customer as to the source of the products that made up "BGSE's system." **Ex. 12**, 123:19-24. Moreover, Bullerdick admitted that the F35 Final Spec Sheet was made from material for JBT's PC-Air Units and GPUs. **Ex. 30**; **Ex. 12**,111:23-112:24.

Indeed, that at least two contractors questioned who manufactured those products is evidence that Bullerdick and BGSE were successful in creating confusion. **Ex. 39**; 52. In sum, no reasonable juror could doubt that BGSE's actions were likely to confuse consumers as to the origins of BGSE's materials and products.

### c. *JBT was Damaged by BGSE's Conduct.*

It is indisputable that JBT was damaged by BGSE's actions. "A significant harm of reverse passing off is that the 'originator of the misidentified product is involuntarily deprived of the advertising value of its name and of the goodwill that otherwise would stem from public knowledge of the true source of the satisfactory

product.'" *Universal Furniture,* 618 F.3d at 439 (*quoting Smith v. Montoro,* 648 F.2d 602, 607 (9th Cir. 1981)).

By weaving an elaborate web of lies, BGSE was able to sell other suppliers' products at a time when even Bullerdick conceded that only JBT made compliant products. **Ex. 96**. BGSE's deception allowed BGSE to create the false impression that it was the most experienced designer and supplier of PC-Air units and GPUs for F-35 hangar projects, which in turn hindered JBT's ability to trade on its own reputation and experience as the actual designer and manufacturer of much of the equipment that BGSE sold.

### 3.   False Advertising under the Lanham Act

A successful claim for false advertising under § 43(a) of the Lanham Act requires a party to show: (1) the defendant made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in commerce; (3) that are either likely to cause confusion or mistake as to either (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and (4) that injured the plaintiff. *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 980 (10th Cir. 2002). As set forth below, and for many of the reasons stated above, the indisputable facts establish that BGSE made material false representations in connection with

commercial advertising, that are likely to cause confusion or mistake, and that caused injury to JBT.[10] Thus, JBT has proven this claim as a matter of law.

a. *BGSE Made False Representations in Advertising its Products.*

A statement is false or misleading if it is either (a) literally false, or (b) literally true or ambiguous but implicitly false, misleading in context or likely to deceive. *Gen. Steel Domestic Sales, LLC v. Chumley*, 727 Fed. App'x. 682, 685 (10th Cir. 2015).[11] Representations constitute "commercial advertising or promotion" if they are: (1) commercial speech; (2) by a defendant who is in commercial competition with the plaintiff; (3) for the purpose of influencing consumers to buy the defendant's goods or services; and (4) disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion within that industry. *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1273-74 (10th Cir. 2000). The "representations need not be made in a 'classic advertising campaign,' but may consist instead of more informal types of 'promotion.'" *Sports Unlimited, Inc. v. Lankford Enters., Inc.*, 275 F.3d 996, 1004-05 (10th Cir. 2002).

---

[10] It is beyond dispute that BGSE's activities described herein have been "in commerce" as that is defined under the Lanham Act.

[11] Whether a false representation must be material, *i.e.,* "likely to influence the purchasing decision," and, if so, what standard of proof applies, has not been decided by the Tenth Circuit. *Id*. However, either the literally false nature of BGSE's statements creates a presumption of materiality, or BGSE's own statements that it intended to hide suppliers from its customers or "take ownership" of past projects, confirms the materiality of its statements. **Exs. 1; 59**.

It is undisputed that BGSE's advertising and promotional material contained various false representations of fact. In addition to the materials described above which contain false representations, the following specific statements are literally, indisputably, false:

1. BGSE's F35 Final Spec Sheet falsely represents BGSE's goods and services by removing JBT identifiers from original JBT product manuals and two different engineering documents, and affixing BGSE's identifiers thereto (*see, e.g.*, **Ex. 30**);

2. BGSE's Luke and Lemoore Package brochure falsely states, ███████████████████████████████████████████████████████████████████████████ and then lists thirteen F-35 hangar projects, many of which have JBT equipment installed (**Ex. 38**; **Ex. 53**) (identifying the equipment manufacturers);

3. The BGSE Group Question and Answer letter lists eighteen projects and falsely states that "████████████████████████████████████████████████████████████ (**Ex. 53**); and

4. In the F 35 Equipment History document, BGSE falsely states ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ **Ex. 58**.

There is also no dispute that BGSE distributed its brochures and other documents as part of its commercial speech for the purpose of influencing contractors to buy the products it was offering. Nor is there any question that BGSE disseminated its brochures to contractors, interested bidders, and other decision makers, more than sufficiently to constitute promotion within the industry. BGSE disseminated the

F35 Final Spec Sheet to multiple contractors, subcontractors, engineers and military personnel over thirty times from when it was created to at least March 2017.[12] Likewise, BGSE fanned out its Luke and Lemoore Package to contractors involved in a variety of projects.[13] BGSE sent both the BGSE Group Question and Answer letter and F-35 Equipment History to multiple decision makers in the industry.[14]

*Mionix, LLC v. ACS Technology* is strikingly similar to this case. There, the defendant was a licensed distributor of plaintiff's acidic calcium sulfate products, but abandoned the license before it expired. No. 16-cv-02154-RBJ, 2018 U.S. Dist. LEXIS 144368, at *23 (D. Colo., Aug. 24, 2018). Instead, the defendant began marketing a new formulation of the product, falsely representing that it was backed by the research studies and tests that plaintiff in fact had conducted on its products, and that defendant's products had obtained the regulatory approvals that were actually granted to plaintiff's products. *Id.* at *23-24. Describing the defendant as a "copycat who was willing to continue to milk the work conducted by and for [plaintiff]," the court found the defendant liable for false advertising under the Lanham Act. *Id.* at *32-*36.

Here too, BGSE falsely portrayed its products as having the history of successful installation and third-party test certification that was actually enjoyed

---

[12] *See, e.g.,* **Exs. 68 – 87**.

[13] *See, e.g.,* **Exs. 88 – 91**.

[14] *See, e.g.,* **Exs. 55 - 57; 92-93**.

by JBT's products. Like the defendant in *Mionix*, BGSE is a copycat trying to continue to milk the work conducted by JBT on its own products.

### b. *Likelihood of Confusion*

For a false advertising claim, a likelihood of confusion is presumed when the defendant's representations are literally false. *Cocona, Inc. v. Singtex Indus. Co.*, No. 14-cv-01593-MJW, 2014 U.S. Dist. LEXIS 144184, at *21 (D. Colo. Oct. 9, 2014); *see also Nunes v. Rushton*, 299 F. Supp. 3d 1216, 1239 (D. Utah 2018) (quoting *Zoller Labs., Ltd. Liab. Co. v. NBTY, Inc.*, 111 F. App'x 978, 982 (10th Cir. 2004) ("A literally false advertising claim 'may be established without evidence of consumer deception.'")). The presumption also applies when the defendant intended to deceive customers, *Scotts Co. v. United Indus. Corp.,* 315 F.3d 264, 281 (4th Cir. 2002).

The undisputed evidence establishes that BGSE's statements are literally false such that the presumption of a likelihood of confusion applies. Additionally, BGSE's internal communications indisputably reveal BGSE's intention to create a false narrative about the connection between the JBT products it previously sold and the products made by others it wanted to sell. **Exs. 1; 59**. Accordingly, the presumption of a likelihood of confusion is appropriate for this additional reason.

### c. *JBT has been Injured by BGSE's False Advertising.*

There is a presumption that false advertising has caused injury when the defendant's statements are "literally false or demonstrably deceptive," and "the plaintiff is an obvious competitor with respect to the misrepresented product." *Sunlight Saunas, Inc. v. Sundance Sauna, Inc.,* 427 F. Supp. 2d 1032, 1061 (D. Kan.

2006) (*quoting Hutchinson v. Pfeil,* 211 F.3d 515, 522 (10th Cir. 2000). There is no dispute that BGSE and JBT are obvious competitors for GPUs and PC-Air unit sales on F-35 hangar projects. And as shown above, BGSE's statements are literally false. Moreover, proof that BGSE's statements were literally false gives rise to a further presumption of irreparable injury for purposes of injunctive relief. *See Hutchinson v. Pfeil,* 211 F.3d 515, 522 (10th Cir. 2000). Accordingly, JBT satisfies all elements of this claim and summary judgment should be granted in its favor.

### C. <u>Misappropriation of Trade Secrets - 18 U.S.C. § 1831 et seq. (Federal) & Utah Code Ann. §§ 13-24-1 et seq. (State) [First and Second Causes of Action against Bullerdick and BGSE]</u>

Under the Utah Uniform Trade Secret Act (the "UTSA"), a party must prove the existence of a protectable trade secret of a plaintiff, and misappropriation by a defendant. *InnoSys, Inc. v. Mercer*, 364 P.3d 1013, 1018 (Utah 2014) (citing Utah Code § 13-24-2). Similarly, under the federal Defend Trade Secret Act (the "DTSA") a plaintiff must prove: (1) the existence of a trade secret that relates to a product or service used in, or intended for use in, interstate or foreign commerce; (2) the acquisition of the trade secret, or the use or disclosure of the trade secret without consent; and (3) that the person acquiring, using, or disclosing the trade secret knew or had reason to know that the trade secret was acquired by improper means. *Arctic Energy Servs., LLC v. Neal*, No. 18-cv-00108-PAB-KLM, 2018 U.S. Dist. LEXIS 28625, at *4-5 (D. Colo. Feb. 22, 2018) The evidence adduced in this case leaves no question that BGSE misappropriated JBT's trade secrets under state and federal law.

### 1. JBT's Protectable Trade Secrets

It is beyond dispute JBT's HPCF O&M Manual (**Ex. 13**) and the schematics for JBT's Jetaire® HPCF 3000 unit included therein constitute protectable trade secrets. Although a trade secret determination is a question for the jury where evidence is in conflict, whether certain information qualifies as a trade secret is a question of law where, as here, there are no disputed material facts. *Take It Away, Inc. v. Home Depot, Inc.*, No. 05-12484-DPW, 2009 U.S. Dist. LEXIS 14279, at *12 (D. Mass. Feb. 6, 2009).

> Under the UTSA, a trade secret is information that:
>
> (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*CDC Restoration v Tradesmen Contractors,* 369 P. 3d 452, 457 (Utah Ct. App. 2016).[15]

Here, there is no genuine dispute that JBT's Jetaire® HPCF O&M Manual and the schematics for the Jetaire® HPCF 3000 qualify as trade secrets under both the UTSA and DTSA.

---

[15] A trade secret under the DTSA similarly includes "all forms and types" of information that derives value from being secret and that the owner took reasonable measures to keep secret. *Ultradent Prods. v. Spectrum Sols., Ltd. Liab. Co.*, No. 2:17-CV-890, 2018 U.S. Dist. LEXIS 3858, at *4-5 (D. Utah Jan. 8, 2018) (quoting 18 U.S.C. § 1839(3)(A), (B)).

Second, these trade secrets derive independent economic value from not being generally known to or readily ascertainable by proper means by other persons. Ex. A, ¶¶ 9-10. As explained above, because Twist could not design or manufacture a compliant PC-Air unit for the Lemoore P-328 project, Defendants needed to get Twist ███████████ to provide a winning submittal and therefore, they gave Twist JBT's HPCF O&M Manual, including the schematics for the Jetaire® HPCF 3000. **Exs. 94; 13**. Indeed, Bullerdick (a) admitted to the United States Government on May 22, 2015, that JBT's PC-Air unit was the "only one to currently meet the specification" for the F-35 project at Luke, (**Ex. 96** ); (b) stated that BGSE began to share designs of PC-Air units with Twist in the summer of 2015 "in confidence" (**Ex. 39**); and (c) after receiving Twist's proposed specification for the PC-Air unit, acknowledged to Twist, that they had ████████████████████████ ███████████████████████████████████████████ **Ex. 97**. There can be no dispute that BGSE derived independent economic value by having JBT's trade secrets in hand – and by wrongfully disclosing them. Furthermore, "[a] long-settled principle of trade secret law recognizes a presumption of harm upon proof of misappropriation." *InnoSys,* 364 P.3d at 1020. Defendants are unable to rebut that presumption.

The uncontroverted evidence shows JBT took reasonable measures to protect its trade secrets. Mr. DeRoche, JBT's corporate representative, testified that with respect to the Jetaire® HPCF 3000, JBT takes "a number of steps to keep that

information confidential," including requiring confidentiality agreements with distributors and agents, enforcing internal computer controls, conducting training of project managers, employing proprietary wording and clauses on documents, and through its standard sales practices. **Ex. 98**, 12-13; 19-21. Additionally, JBT requires its employees to sign confidentiality agreements, *id.* at 19:14-16, and JBT utilizes its Code of Ethics to protect its trade secrets. *Id.* at 20-21*; See also* **Ex. 99** (JBT Answer to Second Set of Interrogatories, No. 6). While the question of whether a party has taken reasonable steps to protect its trade secrets is often one of fact, it can be decided as a matter of law. *See, e.g., American Express Fin. Advisors, Inc. v. Topel*, 38 F. Supp. 2d 1233, 1244 (D. Colo. 1999) (use of agreement containing obligations and limitations for financial planners' use of trade secrets constituted reasonable efforts as a matter of law). Importantly, "[r]easonable efforts to maintain secrecy need not be overly extravagant, and absolute secrecy is not required." *Select Energy Servs. v. Mammoth Energy Servs.*, CIV-19-28-R, 2019 U.S. Dist. LEXIS 53633, at *14 (W.D. Okla. Mar. 29, 2019) (citing *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 974 (8th Cir. 2011)). Here, where the unrebutted evidence is that JBT took at least reasonable, it not more, measures to safeguard the HPCF O&M Manual and the schematics for the Jetaire® HPCF 3000.

And finally, while not required under the Utah UTSA, for purposes of the DTSA claim JBT has proven that Defendants acquired JBT's trade secrets through improper means. Improper means includes, among other things, misrepresentation

47

and breach of a duty to maintain secrecy. 18 U.S.C. § 1839(6). Here, Bullerdick admitted that BGSE obtained the electronic version of the Jetaire® HPCF O&M Manual from JBT in connection with the "Harper projects," and that the HPCF O&M Manual provides a clear notice of its proprietary and confidential nature and restrictions on its use. **Ex. 12**, 146:24-147:19. Shortly after Bullerdick received the manual from JBT, he created an excerpt and asked Dils if he thought they could make a specification out of the excerpt. **Exs. 100; 101**. By, among other things, reproducing the HPCF O&M Manual in its various materials and giving it to Twist and others, BGSE breached its duty to maintain the secrecy of those documents. As such, JBT is entitled to summary judgment on its claims for misappropriation of trade secrets under federal and state law.

### D.  Federal Trademark Infringement - 15 U.S.C. § 1114 [Fifth Cause of Action against BGSE]

A claim for infringement of a registered trademark under Section 32 of the Lanham Act—15 U.S.C. § 1114)—requires that plaintiff show: (1) possession of a protectable interest in the mark; (2) the defendant has used an identical or similar mark in commerce, and (3) the defendant's use is likely to confuse consumers. *1-800 Contacts, Inc. v. Lens.Com, Inc.*, 722 F.3d 1229, 1238 (10th Cir. 2013). The registration of a mark is *prima facie* evidence of both the mark's validity and the registrant's exclusive right to use it in commerce. *Id.*

JBT has used, continues to use, and owns registrations for the marks JBT, JETWAY, JETPOWER and JETAIRE (collectively, the "JBT Marks"). **Exs. 102 –**

**106**. Thus, JBT's possession of protectable interests in the JBT Marks is undisputed.

When this lawsuit was filed on September 1, 2017, BGSE's website, located at the internet URL address of www.bullerdick.gse, included the marks "JBT," "Jetaire," and "Jetway" within the "keywords" of the website's html source file for its home page. **Ex. 107**; Dkt. No. 2-15. Defendants acknowledged in Defendants' First Certification of Compliance with Preliminary Injunction (**Ex. 29**, ¶ 3(a)) that the JBT Marks were located in the metadata of the BGSE website by certifying that the marks were removed "from the html source file."

The use of "a competitor's trademarks in the metatags of [a] web site is likely to cause … initial interest confusion." *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.,* 174 F.3d 1036, 1046 n.8 (9th Cir. 1999). "Initial interest confusion occurs when the defendant uses the plaintiff's trademark in a manner calculated to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion." *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 941 (9th Cir. 2002). Consequently, where the defendant uses the plaintiff's trademark "in the meta-tags for his websites, his use satisfies the terms of trademark infringement in the first instance." *Horphag Research Ltd. v. Pellegrini*, 337 F.3d 1036, 1040 (9th Cir. 2003).

BGSE included JBT's trademarks in the metatags of its website to help drive traffic when potential customers searched for JBT equipment. Accordingly, summary judgment on this cause of action is warranted.

### E.  Defamation [Ninth Cause of Action against Bullerdick and BGSE]

For claims sounding in tort, courts sitting in Utah apply the "most significant relationship" approach described in the Restatement (Second) of Conflict of Laws when determining which state's laws should apply. *Waddoups v. Amalgamated Sugar Co.*, 54 P.3d 1054, 1059-60 (Utah 2002). This Court should apply the law of Utah—JBT AeroTech's principal place of business—to JBT's defamation claim, as the Restatement (and courts applying it) give great weight to the place of injury. *See Anselmi v. Denver Post, Inc.*, 552 F.2d 316, 321-22 (10th Cir. 1977) (The Restatement "declares that rights and liabilities from defamatory material are determined by the local law of the state which has the most significant relationship to the occurrence, and subsection (2) declares that a significant relationship will be the state where the party was domiciled at the time that the matter complained of was published in that state"). In this case, both the place of injury and the location of the injured party are the same–Utah. However, this Court need not decide which law to apply, as JBT prevails under either Utah or North Carolina law.[16]

---

[16] BGSE and Bullerdick are both located in North Carolina.

### 1. **Defendants are Liable for Defamation Under Utah Law.**

To prevail on its defamation claim, JBT must prove that: (a) Defendants published statements about JBT, (b) the statements were false, defamatory, and not subject to any privilege, (c) the statements were published with the requisite degree of fault, and (d) JBT was damaged as a result. *Farm Bureau Life Ins. Co. v. Am. Nat'l Ins. Co.*, 505 F. Supp. 2d 1178, 1191 (D. Utah 2007) (citation omitted). Where the plaintiff is a non-public figure, the requisite degree of fault is mere negligence. *Oman v. Davis Sch. Dist.*, 194 P.3d 956, 972 (Utah 2008). As set forth above, Defendants published an overwhelming number of false statements to numerous third parties about JBT. For instance, Bullerdick emailed Wayne Thomas of Carothers Construction about removing JBT from a list of pre-approved suppliers of PC-Air units, falsely stating that ███████████████████████████ ██████████████████████████████████████████████████████████ ███████████████████████████████████████████ ██████████" **Ex. 40** (emphasis in original). Later in the email, Bullerdick proposed as a "solution" that they █████████████████████████████ ██████████████████████ *Id.* (emphasis added.) At his deposition, Bullerdick admitted that ████████████████████████████████████ █████████████████████████████████████████ (**Ex. 12**, 187:8-188:8) ██████████████████████████████████████ ██████████████████████

██████████████████████████████████████████████

██████████████████████████████████

*Id.* at 191:22-192:1. Defendants' numerous similar false statements detailed in

Section 0 above, to contrive BGSE's false product history narrative, disparaged JBT

with the intent of driving it out of the market. Defendants' false statements

included (a) misrepresentations as to the origin and ownership of the designs of

JBT's products, (b) false claims of responsibility for research and development of

JBT's products, (c) false assertions of ownership of engineering documents, (d) false

claims of having provided the engineering work underlying JBT's technical reports

and other documents, (e) misrepresentations regarding the nature of the

relationship between JBT and BGSE on past projects, and (f) false claims that JBT

does not respect the intellectual property of others. Bullerdick has admitted, both

generally and specifically, that these statements were false.

In a particularly egregious incident, Bullerdick discussed this lawsuit with

Mike Napoli of American Airlines. **Ex. 108**. Bullerdick said he wanted to let Mr.

Napoli know about the lawsuit ████████████████████████████

██████ █ ████████████████████████████████

███████████████████████████ *Id.*

As to the third element—requisite degree of fault—there is no question that

Defendants acted negligently (at a minimum) as a matter of law in making these

statements. For instance, when Bullerdick stated to Wayne Thomas that JBT builds

52

products as a licensee of a "BGSE Design," that the license had expired and that JBT was no longer making the design supplied by BGSE, Bullerdick knew there was no such license agreement. Bullerdick admitted under oath that those assertions were literally false:



**Ex. 12**, 187:25-188:8.

Finally, Defendants' statements have damaged JBT's business as a matter of law, at a minimum in all the time and resources that have been expended to counter the numerous false perceptions existing in the industry as a result of those statements, but also to JBT's reputation and brand. *See, e.g., Dixson v. Newsweek, Inc.,* 562 F.2d 626, 631 (10th Cir. 1977) (observing that damages caused by defamation include "impairment of reputation….")

### 2. <u>Defendants also defamed JBT under North Carolina Law.</u>

Likewise, North Carolina requires a party to prove that (a) the defendant made false, defamatory statements of or concerning the plaintiff, which (b) were published to a third person, and (c) caused injury to the plaintiff's reputation. *Tyson v. L'eggs Prods., Inc.,* 351 S.E.2d 834, 840 (1987). When examining allegedly

defamatory statements, courts must view the words within their full context and interpret them as ordinary people would understand them. *Boyce & Isley v. Cooper*, 568 S.E.2d 893, 899 (N.C. Ct. App. 2002) (quotation omitted). Under the facts recited and discussed above in the context of Utah law, Defendants are likewise liable in the event the Court were to apply similar North Carolina law.

### F.   Tortious Interference [Tenth Cause of Action against Bullerdick and BGSE]

As noted above, Utah employs the Restatement (Second) of Conflict of Laws in analyzing choice-of-law questions. Because the place of the defendant's wrongdoing (here, North Carolina in most instances) is afforded the most weight for tortious interference choice-of-law considerations, the Court should apply North Carolina law to this claim. *See CRST Van Expedited, Inc.*, 2006 U.S. Dist. LEXIS 17319, at \*32; *see also Gordon v. Chipotle Mexican Grill, Inc.*, 344 F. Supp. 3d 1231, 1245 (D. Colo. 2018) Because, however, JBT would prevail on its tortious interference claim under either North Carolina or Utah law, the Court need not decide which law to apply. *Sara Lee Corp. v. Kayser-Roth Corp.*, No. 6:92CV00460, 1995 U.S. Dist. LEXIS 6554, at \*39 (M.D.N.C. Apr. 10, 1995).

### 1.   The Defendants are Liable for Tortious Interference under North Carolina Law.

To maintain an action for tortious interference with prospective advantage, JBT must show that Defendants induced a third party to refrain from entering into a contract without justification. *Cameron v. New Hanover Mem'l Hosp.*, 293 S.E.2d

54

901, 916-917 (N.C. Ct. App. 1982). Additionally, JBT must show that the contract would have ensued but for the interference, resulting in damage to JBT. *Id.*

JBT has satisfied these elements. As described in detail above, Bullerdick sought to have JBT removed from a list of pre-approved PC-Air suppliers on the Luke AFB Squadron III project, falsely telling Wayne Thomas that JBT's past products were built ███████████████████████ nd that JBT was no longer making ██████████████████████████████████████ " **Ex. 40**. Similarly, Bullerdick tried to convince Neil Barton not to use JBT for PC-Air units on the Luke AFB Squadron II project, falsely stating that JBT was a sub-manufacturer of a BGSE design, and that JBT had not been forthcoming that it was BGSE Group that designed the PC-Air unit. **Ex. 42**; 43.[17]

Furthermore, there was no valid justification for Defendants' conduct. Specifically, interference is not "justified" when it "is done, not in the legitimate exercise of the defendant's own rights, but with design to injure the plaintiff, or gaining some advantage at [its] expense." *Moose v. Nationwide Mut. Ins Co.*, No. 5:08CV77-RLV, 2011 U.S. Dist. LEXIS 10611, at *34 (W.D.N.C. Sept. 19, 2011). Moreover, even if there was an inference that BGSE's interference was justified, the inference "is lost if exercised for a wrong purpose … where the act is done other than as a reasonable and *bona fide* attempt to protect the interest of the defendant which is involved." *Hopkins v. MWR Mgmt. Co.*, No. 15 CVS 697, 2017 NCBS LEXIS

[17] There is no dispute that Defendants were aware of these potential contracts.

47, at *51 (N.C. Ct. App. May 31, 2017) (denying dismissal of claim for tortious interference on summary judgment).

### 2. Alternatively, the Defendants are Liable for Tortious Interference as a Matter of Utah Law.

Defendants fare no better under Utah law. To support a claim for tortious interference, a plaintiff must similarly prove: (1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) by improper means, (3) causing harm to the plaintiff. *Eldridge v. Johndrow*, 345 P.3d 553, 556 (Utah 2015). "Improper means include … deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood." *Keith v. Mountain Resorts Dev., L.L.C.*, 337 P.3d 213, 227 (Utah 2014); *see also Diamond Ranch Acad., Inc. v. Filer*, No. 2:14-CV-751-TC, 2016 U.S. Dist. LEXIS 19210, at *55-56 (D. Utah Feb. 17, 2016) (recognizing defamation as an improper means that can support a tortious interference claim). As set forth herein, there can be absolutely no question that Defendants used improper means to interfere with JBT's business relations. They are guilty of, *inter alia*, misrepresentation, defamation, and disparaging falsehood, satisfying the "improper means" requirement. *Keith*, 337 P.3d at 227.

Thus, under either North Carolina or Utah law, Defendants are liable for tortious interference as a matter of law.

### G. **Breach of Contract(s) [Sixth, Seventh and Eighth Causes of Action against Bullerdick and BGSE]**

Defendants entered into three contracts with JBT. To prevail on its claims for breach of contract under Utah law, JBT must prove the following: (1) a contract; (2) performance by JBT; (3) breach of the contract by the other party; and (4) damages. *Campbell v. Debry,* 38 P.3d 984, 991 (Utah Ct. App. 2001) (granting summary judgment on breach-of-contract claim) (citation omitted).[18] Defendants committed serial violations of the contracts as a matter of law.

#### 1. **Bullerdick Breached the 2011 Confidentiality Agreement.**

There is no dispute that Bullerdick and JBT had a valid contract, that JBT performed its obligations thereunder (i.e., to continue to compensate Bullerdick for his employment), and that Bullerdick breached the contract by, among other things, failing to return a vast trove of JBT documents, using the documents for unauthorized purposes, and disclosing the documents without permission. Bullerdick's actions harmed JBT.

Specifically, Bullerdick breached the 2011 Confidentiality Agreement by, among other things: (1) failing to maintain in confidence all confidential and proprietary information related to JBT's business during his employment and after; and (2) failing to return JBT's information upon termination of his employment in April 2014.

---

[18] Similarly, under North Carolina law, the elements of a claim for breach of contract are: (1) the existence of a valid contract and (2) breach of the terms of the contract. *Poor v. Hill*, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000).

Bullerdick testified that he complied with the requirement to return all JBT information by returning his JBT-issued computer and phone. **Ex. 12**, 39:12-40:13. In performing its review, JBT's counsel discovered that Bullerdick forwarded at least 1,100 JBT documents he received in his JBT email account to his BGSE email accounts. Ex. B, ¶ 4. ███████████████████████████████████ ███████████████████████████████████████████ **Ex. 12**, 47:1-4. Regardless of Bullerdick's convenient memory lapse, simple logic dictates that because these documents were still located on Mr. Bullerdick's hard drive nearly four years after Bullerdick's employ with JBT ended, Bullerdick breached his obligation to return the JBT information.

Furthermore, Bullerdick admitted possessing JBT documents and materials in his sworn certification submitted to comply with the preliminary injunction in this matter. In their Second Certification required by the preliminary injunction, Defendants identified as responsive JBT documents in their possession, among other items, (a) Product Manuals; (b) Brochures and Cut Sheets; (c) Certifications, Reports, and Records of Inspection; and (d) Specification Sheets, as well as over 4.8 gigabytes of emails with or about JBT. **Ex. 118**. In all, Defendants produced almost 3,600 electronic files, measuring over 10 GBs of data. *Id.*

What makes Bullerdick's breach of the 2011 Confidentiality Agreement all the more egregious is that Defendants went on to use, communicate and disclose much of the wrongfully-maintained JBT information, in further direct violation of

the 2011 Confidentiality Agreement. The evidence abounds with examples of BGSE altered documents, including countless copies that were stripped of JBT-identifying information, which surely was not an approved use.

In contrast to Bullerdick's copious breaches, there is no dispute that JBT performed its obligations under the contract—specifically, by continuing to compensate Bullerdick for his at-will employment. **Ex. 109**, p. 1.

Finally, based on the foregoing, there can be no dispute that JBT suffered damages as a result of Bullerdick's serial breaches of the 2011 Confidentiality Agreement.

### 2. BGSE Breached the 2011 NDA and the 2012 Distributorship Agreement.

There is similarly no dispute that BGSE and JBT had valid contracts in their 2011 NDA and their 2012 Distributorship Agreement. **Exs. 110 – 111**.[19] There is also no dispute that JBT performed its obligations under both contracts.

The 2011 NDA required both parties to maintain the confidence of Confidential Information of the other party, to refrain from using the Confidential Information for any purpose outside the purpose of the NDA, and to return all Confidential Information upon written request of the other party. **Ex. 110**. Under the 2012 Distributorship Agreement, JBT granted BGSE the right to distribute certain products in a specified Territory for a set period of time (January 2012—

---

[19] Both the 2011 NDA and the 2012 Distributorship Agreement have Utah choice-of-law provisions. **Ex. 110**, at ¶ 12; **Ex. 111** at § 13.

January 2013). *Id.* at §§1-2. In exchange, BGSE agreed to "maintain in confidence" and not to use or disclose information disclosed to it and designated by JBT as confidential, except as expressly agreed by JBT. *Id.* at §6.B. Additionally, all orders made by BGSE under the agreement were subject to JBT's standard terms and conditions in effect at the time the order was placed, *id.* at §7.C. Furthermore, upon termination of the agreement, BGSE was required to "immediately stop" using any of JBT's marks, names, or trade dress on printed materials and otherwise and stope using any language stating or suggesting that BGSE is a distributor for the JBT products. **Ex. 11**, at §11.G. Finally, within 30 days of termination, BGSE covenanted to (a) return to JBT "all price lists, catalogs, operating and service manuals, advertising literature and display material," (b) "remove all reference to JBT CORPORATION from [BGSE's] letterhead, business forms, advertising literature and place of business," and (c) refrain from using "any name or trademark suggesting that [BGSE] has any relationship with JBT CORPORATION." *Id.*, §12.

The evidence catalogued above of BGSE's failure to return JBT's material and its extensive unauthorized use of JBT's material for its own benefit is overwhelming and unrebutted, and confirms BGSE's breach of both agreements.

As a result of the foregoing breaches, JBT suffered damages.

## VI. CONCLUSION

Based on the foregoing, there is no issue of fact regarding JBT's claims

against Defendants. JBT is entitled to summary judgment establishing that the

Defendants are liable as a matter of law for each of JBT's causes of action.

Dated:  April 19, 2019                                Respectfully submitted,


                                                      By:/s/  Steven McMahon Zeller
                                                         One of the Attorneys for Plaintiff-
                                                         Counterdefendant

                                                         David P. Billings
                                                         Robert G. Crockett
                                                         FABIAN VANCOTT

                                                         Edward S. Weil
                                                         Steven McMahon Zeller
                                                         Michael F. Derksen
                                                         DYKEMA GOSSETT PLLC
                                                         *Counsel for Plaintiff-*
                                                         *Counterdefendant*

## <u>CERTIFICATION OF WORD COUNT</u>

I certify that the word count of this motion and memorandum, not including the face sheet, table of contents, table of authorities, signature block, certificate of service or the appendix, does not exceed 15,000 words, as measured by the word processing software.[20]

By:/s/  Steven McMahon Zeller

4820-7999-3234.19

---

[20] On April 18, 2019, Plaintiff JBT filed a Motion for Leave to File Overlength Motion for Partial Summary Judgment. Dkt. No. 125. Plaintiff files this Motion in anticipation that its Motion for Leave will be granted by the Court.