---

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

---

| | |
|---|---|
| JOHN BEAN TECHNOLOGIES CORPORATION,<br><br>           Plaintiff,<br><br>v.<br><br>B GSE GROUP, LLC and BRYAN BULLERDICK,<br><br>           Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 1:17-cv-142-RJS-DAO<br><br>Chief District Judge Robert J. Shelby<br><br>Magistrate Judge Daphne A. Oberg |

Plaintiff John Bean Technologies (JBT) is a major player in the aviation industry for ground support equipment.  Ground support equipment refers to the array of equipment required to maintain commercial and military aircraft, ranging from cables and hoses to power converters and axle jacks.  Relevant here are preconditioned air (PC Air) units that cool aircraft and ground power units (GPUs) that power this equipment.

In 2011, JBT sought to enter the niche market to supply ground support equipment—primarily PC Air units and GPUs—for the United States military's latest fighter aircraft, the F-35.  Because F-35s utilize modern, advanced technology, they usually required construction of new hangars supplied with specialized PC Air Units and GPUs.  The military worked through general and sub-contractors to source this equipment from manufacturers like JBT.  To help it through the bidding process and to win these government contracts, JBT hired Defendant Bryan Bullerdick.  Bullerdick left JBT after about three years, however, to become the head and majority shareholder of Defendant B GSE Group, LLC (BGSE).  BGSE initially acted as JBT's designated distributor of ground support equipment for F-35 hangars.  After the parties' one-year

distributorship agreement ended, BGSE continued informally to source JBT's equipment for several years as a reseller.

Unbeknownst to JBT, while BGSE's and JBT's informal relationship was ongoing, Bullerdick began representing to industry contacts, primarily contractors and sub-contractors, that BGSE was the designer of several of JBT's products and that JBT was merely the manufacturer of BGSE's designs.  During the same period, Bullerdick transmitted some of JBT's proprietary information to one of its competitors, Twist, Inc. (Twist), to help Twist develop a competing PC Air unit.  BGSE later began competing directly with JBT to win F-35 projects by supplying products manufactured by Twist and others.

After learning of Bullerdick's conduct, JBT brought this action for, among other things, misappropriation of trade secrets, unfair competition and trademark violations under the Lanham Act, and breach of contract.[1]  Defendants assert several counterclaims, including tortious interference, negligent misrepresentation, and defamation.[2]  Defendants' claims stem primarily from JBT's efforts to inform industry contacts of its lawsuit against BGSE and Bullerdick. Before the court are the parties' cross-motions for summary judgment on JBT's affirmative claims[3] and JBT's Motion for Partial Summary Judgment on Defendants' Counterclaims.[4]  For the reasons given below, the court grants in part and denies in part JBT's First Motion, grants in

---

[1] *See generally* Dkt. 99.

[2] Dkt. 108.

[3] Dkt. 126; Dkt. 129.

[4] Dkt. 134.

part and denies in part Defendants' Motion, and grants in part and denies in part JBT's Second Motion.[5]

## BACKGROUND[6]

### I.   Factual Background

#### A.   The Parties and the Ground Support Equipment Industry

Both JBT and Defendants operate in the specialized ground support equipment industry.[7] Ground support equipment refers to the products and equipment needed to service and maintain commercial and military aircraft.[8]  Two essential components of ground support equipment are PC Air units and GPU systems.[9]  Since at least 2003, JBT has manufactured and sold PC Air units under its Jetaire brand and GPU systems under its Jetpower brand.[10]  JBT sells these products for commercial and military aircraft, both domestically and internationally.[11]

Among the products JBT sells is the Jetaire HPCF 3000 (the HPCF 3000), a fixed, high-pressure PC Air unit that JBT designed and manufactures.[12]  JBT also sells the Jetpower III 270VDC GPU (the 270VDC).[13]

---

[5] Defendants also move to exclude the testimony of JBT's expert, David Duski.  Dkt. 128.  However, Duski's testimony relates only to the amount of damages JBT will ultimately seek.  Those damages amounts are not at issue in the parties' current motions.  Accordingly, in view of the court's ruling here, the court denies Defendants' Motion to Exclude without prejudice to refile it in connection with future pre-trial proceedings.

[6] Because the parties filed cross-motions for summary judgment, the court "provides a neutral summary of the facts, which it will view 'in the light most favorable to the nonmoving party' and 'draw reasonable inferences therefrom' while evaluating the motions in turn."  *Stella v. Davis Cty.*, No. 1:18-CV-002, 2019 WL 4601611, at *1 n.1 (D. Utah Sept. 23, 2019) (quoting *Doe v. City of Albuquerque*, 667 F.3d 1111, 1122 (10th Cir. 2012)).  Except where otherwise noted, the facts that follow are not disputed.

[7] Dkt. 126 ¶¶ 1–2, 4, 14–20.

[8] Dkt. 99 ¶ 2.  All citations to the Amended Complaint are for context only.

[9] *See id.*

[10] *Id.* ¶¶ 2–3.

[11] *Id.* ¶ 2.

[12] Dkt. 129 ¶ 15.

[13] *Id.* ¶ 13(c)–(g).

In 2011, JBT began bidding on projects to supply ground support equipment for the United States Department of Defense's next generation strike aircraft deployed by the Navy, Air Force, and Marines.[14]  In most instances, this aircraft, the F-35, has required construction of new, specially designed maintenance hangars at military bases in the United States and abroad.[15]  These F-35 hangars require specialized PC Air units and GPU systems.[16]  JBT won several government contracts to supply ground support equipment for these hangars.[17]

In 2011, JBT hired Bullerdick as a sales manager to assist JBT in its efforts to win government contracts for F-35 hangar projects.[18]  Prior to joining JBT, Bullerdick had worked for two companies that sold ground support equipment,[19] and in 2010, Bullerdick formed his own company, Bullerdick GSE, LLC.[20]  JBT hoped Bullerdick could expand JBT's market share in the PC Air unit and GPU systems space.[21]  Bullerdick's primary responsibilities at JBT related to its efforts to sell equipment for F-35 hangars on United States and foreign military installations.[22]

As a condition of his employment, Bullerdick signed JBT's Confidential Information and Inventions Agreement (the 2011 Confidentiality Agreement).[23]  The 2011 Confidentiality

---

[14] Dkt. 99 ¶ 4.

[15] *Id.* ¶ 5.

[16] *Id.*

[17] *Id.* ¶ 4.

[18] Dkt. 126 ¶¶ 6, 8.

[19] *Id.* ¶ 4.

[20] Defs.' Ex. 1 ("Bullerdick Aff.") ¶ 8.  When Bullerdick joined JBT, he was the sole director, president, and shareholder of Bullerdick GSE, a separate entity from BGSE.  *See* Pl.'s Ex. 119 at 1 (sealed).  Prior to April 1, 2014, Bullerdick had no ownership interest in BGSE.  *Id.*  After Bullerdick resigned from JBT, Bullerdick GSE and BGSE eventually merged.  Dkt. 154 at 2 (citing Pl.'s Ex. 119) (sealed).

[21] Dkt. 126 ¶ 6.

[22] Dkt. 99 ¶¶ 28–29.

[23] Dkt. 129 ¶ 2; Pl.'s Ex. 109.

Agreement required that Bullerdick "agree to maintain in confidence all information pertaining to [JBT's] business" to which he had access, including "information related to [JBT's] products, inventions, trade secrets, know-how, systems, formulae, [and] processes."[24]  The Confidentiality Agreement further required that Bullerdick "agree not to use, communicate or disclose . . . such information orally, in writing or by publication either during [his] employment or thereafter."[25]

Bullerdick resigned from JBT in April 2014.[26]  Following his resignation, Bullerdick began running BGSE full-time.[27]

### B.  JBT and BGSE's Formal and Informal Business Relationship

Around the time it hired Bullerdick, JBT formed a business relationship with BGSE, a distributor focused on ground support equipment for military projects.[28]  On November 11, 2011, the two companies signed a Mutual Non-Disclosure Agreement (the NDA).[29]  The NDA required the party receiving "Confidential Information" to keep the information "in confidence."[30]  Additionally, the party receiving Confidential Information "agree[d] to refrain from the use of the Confidential Information for any purpose other than in furtherance of the Disclosure Purpose."[31]  The confidentiality provisions remained in force for five years from the time the receiving party obtained the Confidential Information.[32]

---

[24] Pl.'s Ex. 109 ¶ 5.

[25] *Id.*

[26] Dkt. 126 ¶ 12.  The parties dispute why Bullerdick resigned.  JBT alleges Bullerdick was given the choice to resign or be terminated for cause.  Dkt. 99 ¶ 26.  Bullerdick maintains he resigned only after Brian DeRoche "promised that if [Bullerdick] were to resign and focus [his] efforts on BGSE, JBT would enter into a new distributorship agreement with BGSE."  Bullerdick Aff. ¶ 14.

[27] *See* Pl.'s Ex. 119 at 1 (sealed) (showing Bullerdick obtained sixty percent ownership in BGSE "after April 2014").

[28] *See* Dkt. 126 ¶ 10.

[29] Dkt. 129 ¶ 6.

[30] Pl.'s Ex. 110 ¶ 2.

[31] *Id.*

[32] *Id*.

On January 18, 2012, JBT and BGSE entered into a one-year Distributorship Agreement (the 2012 Distributorship Agreement).[33] This agreement gave BGSE exclusive rights to distribute JBT products to United States military air bases for projects that had small business set aside requirements.[34] Under the 2012 Distributorship Agreement, BGSE was required to "retain [JBT confidential information] in confidence and not to use it, or disclose it, except as expressly agreed . . . ."[35] The 2012 Distributorship Agreement further required that "within thirty (30) days after the effective date of termination of [the] Agreement"—*i.e.*, on or around February 18, 2013—BGSE was required "to remove all reference" to JBT from its "letterhead, business forms, advertising literature and place of business," and to refrain from using "any name or trademark suggesting" BGSE "has any relationship" with JBT.[36]

JBT and BGSE attempted to negotiate an extension of the 2012 Distributorship Agreement in late 2012 before it expired, again in 2014 shortly after Bullerdick resigned, and yet again in 2015, but the companies could not reach an agreement.[37] Specifically, JBT refused to accept BGSE's primary demands—exclusivity beyond projects with small business set-aside requirements and a term for more than one year.[38] The 2012 Distributorship Agreement expired on January 18, 2013.[39]

---

[33] Pl.'s Ex. 111 at 9.

[34] *Id.* ¶ 2.

[35] *Id.* ¶ 6(B).

[36] *Id.* ¶ 12.

[37] Dkt. 134 ¶¶ 7–18; Dkt. 99 ¶¶ 45–46; Dkt. 108 at 22 ¶ 22.

[38] Dkt. 134 ¶ 8; Dkt. 99 ¶¶ 45–46; Dkt. 108 at 22 ¶ 22.

[39] Dkt. 108 at 22 ¶ 21.

After the contract expired, the parties continued to work together under the same terms.[40]

JBT continued to sell its products to BGSE for resale as late as March 2017.[41]  Over the course

of the parties' approximately five-year relationship, BGSE purchased around $7.7 million worth

of equipment from JBT.[42]

### C.   The Bidding Process and BGSE's Submittals Incorporating JBT Documents

To obtain contracts to supply equipment for U.S. military projects, manufacturers and

distributors generally submit quotes to contractors or sub-contractors, who in turn submit bids to

the government.[43]  Once a project is awarded, the prevailing manufacturer or distributor is

required to provide a "submittal."[44]  Project submittals—often referred to as "post-award

submittals"—are the "final technical documents to get approval from the government to proceed

to make [the proposed] product."[45]

At times, JBT—sometimes acting on its own and sometimes working through BGSE—

responded directly to military project solicitations.[46]  For instance, in September 2013, the U.S.

Navy solicited proposals for equipment for its Shipboard Mobile Electric Power Plant

(SMEPP).[47]  BGSE and JBT initially worked together to submit a qualifying proposal from

---

[40] *See* Dkt. 126 ¶ 11 ("The 2012 distributorship agreement expired after one year, though the parties continued to operate under it while they worked to create a new one.") (citing Bullerdick Aff. ¶ 13).  JBT does not deny BGSE's characterization of the parties' informal relationship, insisting only that it is "irrelevant to JBT's claims or BGSE's defenses whether or not there was an understanding that these products would continue to be sold under the terms of the expired 2012 distributorship agreement."  Dkt. 154 at 2.

[41] Dkt. 126 ¶ 36.

[42] *Id.* ¶ 35.

[43] *See, e.g.*, Dkt. 129 ¶¶ 19–22 (noting BGSE provided submittal packages for F-35 hangar projects to various sub-contractors, including Able Mechanical, Carothers Construction, and Prime Projects International).

[44] Pl.'s Ex. 20 at 103:17–25.  Sometimes, however, submittals must be provided before a contract is won.  *See* Pl.'s Ex. 12 at 127:17–19 ("Sometimes [BGSE had] to produce submittals before an award.  Sometimes it's after the purchase order or contract has been signed.").

[45] Pl.'s Ex. 20 at 103:23–25.

[46] *See* Dkt. 134 ¶¶ 19–48 (documenting JBT's successful efforts to win a government contract with the U.S. Navy).

[47] *Id.* ¶ 19.

BGSE, but the Navy ultimately rejected BGSE's SMEPP submittal in February 2014.[48]  The Navy cancelled the solicitation "due to the fact that no acceptable small business proposals were received."[49]

After the Navy reissued the SMEPP solicitation in March 2014, JBT submitted an independent proposal and also joined BGSE's proposal.[50]  In February 2015, the Navy awarded the SMEPP contract to JBT.[51]

From 2015 to 2017, BGSE independently submitted several bids to sub-contractors to supply PC Air units or GPU systems (or both) for F-35 maintenance hangars.[52]  In many of those submittals, BGSE included JBT documents and pictures of JBT products but with JBT identifiers removed and replaced with BGSE identifiers.[53]

For example, the following two images are of the same JBT PC Air Unit.[54]  In the second image—incorporated into one of BGSE's submittals—BGSE superimposed its logo over JBT's logo:

---

[48] *Id.* ¶¶ 25–28, 40.

[49] Pl.'s Countercl. Ex. 36 at 2 (sealed).  The parties dispute why the Navy rejected the proposal.  *See* Dkt. 134 ¶ 40; Dkt. 151 at 2.

[50] Dkt. 134 ¶¶ 43–44.

[51] *Id.* ¶ 46.

[52] *See* Dkt. 129 ¶¶ 19–23.

[53] *Id.* ¶ 19–28 (citing Pl.'s Exs. 2–12, 16, 21, 23, 25, 27, 62, 112, & 113).

[54] *Compare* Pl.'s Ex. 18 at 1 (sealed) *with* Pl.'s Ex. 8 at 30 (sealed).





The following chart catalogues BGSE's submittals that incorporated JBT documents stripped of JBT's identifying information and replaced with BGSE's logo:

| F-35 Hangar Project Submittal | Products | Sub-contractor Recipient | Date | Modified JBT Documents |
|---|---|---|---|---|
| Marine Corps Air Station Lemoore (Lemoore P-328)[55] | PC Air Units | Able Mechanical | September 8, 2015 | Excerpt of HPCF 3000 Operation & Maintenance Manual[56]<br><br>One page of Technical Specification for HPCF 3000[57] |
| Revised Lemoore P-328[58] | PC Air Units | Able Mechanical | December 1, 2015 | Excerpt of HPCF O&M Manual<br><br>HPCF Tech. Sheet |
| Kadena Air Base (Kadena P-803)[59] | PC Air Units GPU Systems | Prime Projects International | February 12, 2016 | Excerpt of HPCF O&M Manual<br><br>HPCF Tech. Sheet<br><br>Excerpt of 270VDC Operation & Maintenance Manual[60]<br><br>One page of Technical Specification for 270VDC[61] |

---

[55] Pl.'s Ex. 2 at 36–48 (sealed).

[56] Pl.'s Ex. 13 at 12–18 (sealed) (HPCF O&M Manual).

[57] Pl.'s Ex. 16 (HPCF Tech. Sheet).

[58] Pl.'s Ex. 112 at 30–46 (sealed).

[59] Pl.'s Ex. 6 at 93–105 (sealed).

[60] Pl.'s Ex. 21 (sealed) (270VDC O&M Manual).

[61] Pl.'s Ex. 23 (270VDC Tech. Sheet).

| Marine Corps Air Station Beaufort (Beaufort P-465)[62] | | Carothers Construction | February 23, 2016 | Excerpt of HPCF O&M Manual\n\nHPCF Tech. Sheet |
| Lemoore P-378(A)[63] | PC Air Units | Certified Air Conditioning Inc. | September 23, 2016 | Excerpt of HPCF O&M Manual\n\nHPCF Tech. Sheet |
| Lemoore P-378(B)[64] | GPU Systems | Berg Electric | February 13, 2017 | 270VDC Functional Checklist[65]\n\n270VDC Special Factory Test[66]\n\n"Certificate of Test," originally performed for JBT on a JBT product,[67] altered to appear as if performed for BGSE on a BGSE product[68]\n\nCounterfeit "Authorization to Mark" certificate[69] |

---

[62] Pl.'s Ex. 4 at 14–26 (sealed).

[63] Pl.'s Ex. 8 at 37–49 (sealed).

[64] Pl.'s Ex. 10 at 32–40 (sealed).

[65] Pl.'s Ex. 25 (sealed).

[66] Pl.'s Ex. 27 at 1–3 (sealed).

[67] *Id.* at 4 (sealed).

[68] Pl.'s Ex. 10 at 42 (sealed).

[69] *Id.* at 44 (sealed); Pl.'s Ex. 113.

D.  <u>Defendants' Communications with Third Parties Concerning JBT's Products and Technology</u>

1.  *Bullerdick's Transmission of JBT's Proprietary Information to Twist*

While preparing one submittal in August 2015, Bullerdick sent an email to representatives at one of JBT's competitors—Twist, Inc.—with "Lemoore" in the subject line.[70] The body of the email stated, "We have a lot of ground to make up. Attached is a library of confidential info to reference."[71]  A few days later, Bullerdick sent Twist another email in which the body of the email stated, "Confidential," and Bullerdick attached an electronic copy of JBT's HPCF O&M Manual.[72]

2.  *Bullerdick's Representations to Contractors About BGSE's Products*

From November 2015 to August 2016, Bullerdick represented to several contractors that, although JBT manufactured BGSE's PC Air unit and GPU products, BGSE was the creator and owner of the designs.[73]  For example, on March 9, 2016, Bullerdick told Bob Diez of Harris Mechanical Southwest:

> [BGSE] initially brought our designs for JBT AeroTech to build.  They built the power and air for us up until last summer. . . . We began to shar[e] BGSE designs with Twist last summer in confidence.  For 8 months now we have worked with Twist engineers quietly . . . The product made for BGSE with BGSE technology is call[ed] "Cool Jet."  It is not available anywhere else."[74]

Two days later, Bullerdick emailed Wayne Thomas of Carothers Construction and represented:

---

[70] Dkt. 129 ¶ 41.

[71] *Id.* (citing Pl.'s Ex. 54).

[72] *Id.* ¶ 42 (citing Pl.'s Exs. 13, 94).

[73] Dkt. 129 ¶¶ 50–52.  Defendants do not dispute that Bullerdick sent these emails to several contractors.  Rather, Defendants argue the statements were not false or were at least condoned by JBT.  *See* Dkt. 145 at 6–9.

[74] Pl.'s Ex. 39 at 2 (sealed).

> JBT AeroTech builds 270VDC and CAS as a **licensee** of BGSE Group design specifications.   The agreement has expired and JBT is not making the design supplied previously under BGSE licensee agreement at this time. . . .   Solution . . . Replace JBT with BGSE Group *since BGSE Group is the designer and owner of the technology.*[75]

Finally, Bullerdick emailed Neal Barton of Okland Construction in August 2016, telling him that "JBT has been our 'manufacturer' of a BGSE design for 2 generations of CAS units now. . . .   This is the BGSE Group design and not to be confused with who we contract to make the units."[76]

### E.   BGSE Marketing Materials Incorporating JBT Information

In August 2014, BGSE created a brochure (the F-35 Brochure)[77] that contained excerpts of several original JBT documents, with JBT identifying information removed and replaced with BGSE identifiers.   These excerpts were taken from the 270VDC General Specifications,[78] the HPCF O&M Manual,[79] the 30-Ton HPCF Justifications,[80] and the 30-Ton HPCF Calculations.[81] Between September 2014 and March 2017, BGSE emailed the F-35 Brochure to seventeen industry contacts.[82]

In March 2016, Bullerdick created another brochure (the Lemoore Brochure)[83] that contained a letter addressed to "bidders and designers."[84]   The Lemoore Brochure includes a list

---

[75] Pl.'s Ex. 40 at 2 (sealed) (emphasis altered).

[76] Pl.'s Ex. 41 at 2 (sealed).

[77] Pl.'s Ex. 30 (sealed).

[78] Pl.'s Ex. 31 (sealed).

[79] Pl.'s Ex. 13 at 12–37 (sealed).

[80] Pl.'s Ex. 33 (sealed).

[81] Pl.'s Ex. 35 (sealed).

[82] *See* Dkt. 129 ¶ 44(a)–(r) (citing Pl.'s Exs. 69–70, 72–87).   Though the F-35 brochure reached some military personnel, most of the recipients were contractors or sub-contractors.   *See id.*

[83] Pl.'s Ex. 38 (sealed).

[84] *Id.* at 3.

of thirteen F-35 hangar projects and states, "[t]he following F 35 specific projects all have BGSE Group equipment. All projects completed on this list have installed, commissioned and working 100% BGSE Group designs."[85]   The Lemoore Brochure also contains a technical specification substantially copied from the JBT HPCF Tech. Sheet and two pictures of JBT HPCF 3000 PC Air units with BGSE logos superimposed on them.[86]   In March 2016, BGSE emailed the Lemoore Brochure to four industry contacts.[87]

In November 2016, Bullerdick created a document to answer questions posed by a contractor who was working on a project at Eielson Air Force Base (the Eielson F-35 Letter).[88] The Eielson F-35 Letter contains the rhetorical question, "Who manufactured the BGSE Group Air Design?" along with the stated answer, "These are BGSE Group designs. We produce the bill of material and design and pay for the certifications."[89]   BGSE emailed the Eielson F-35 Letter to T. Karre of Burns & McDonald in November 2016[90] and two other industry contacts in April and June 2017.[91]

Finally, in March 2017 Bullerdick created a document titled "F-35 Equipment History."[92] That document represents that "BGSE Group with the help of JBT made the first combination 270VDC/400HZ power supplies."[93]   It also states that "BGSE Group worked 2 years on a second-generation [PC Air] unit. . . . to [achieve] a better F 35 air unit than what was installed in

---

[85] *Id.*

[86] *Id.* at 7–9.

[87] Dkt. 129 ¶ 45.

[88] *Id.* ¶ 36; Pl.'s Ex. 53 (sealed).

[89] Pl.'s Ex. 53 at 2 (sealed).

[90] Dkt. 129 ¶ 46.

[91] *Id.* ¶ 48.

[92] *Id.* ¶ 39; Pl.'s Ex. 58 (sealed).

[93] Pl.'s Ex. 58 at 1 (sealed).

2008."[94]  BGSE emailed the F-35 Equipment History to two industry contacts in March and June 2017.[95]

### F.   JBT Informs Industry Contacts of Its Lawsuit Against Bullerdick and BGSE

Shortly after JBT initiated this action, JBT sent the Complaint and a cover letter to some of the parties' mutual industry contacts.[96]  The cover letter reaffirmed that all JBT equipment sold through BGSE was designed and developed solely by JBT.[97]  The cover letter also contained the following representations:

- "During the time period beginning on January 10, 2012 through January 9, 2013, B GSE served as a distributor for the Jetway Systems business unit of JBT Corporation. . . . That distribution agreement was terminated on January 9, 2013, and only in-process sales at the time of the termination of the distribution agreement are being supported by JBT."[98]

- "In its support of its products, JBT does not require its customers to solve issues with JBT's suppliers, but instead serves as the sole point of contact for support."[99]

These statements, among other things, form the basis of many of Defendants' counterclaims.

## II.    Procedural History

On September 1, 2017, JBT filed its Complaint[100] and simultaneously moved for a preliminary injunction, asking the court to enjoin Defendants from engaging in any conduct that

---

[94] *Id.* at 2.

[95] Dkt. 129 ¶ 47.

[96] Dkt. 108 at 27 ¶¶ 54–55.

[97] Dkt. 49, Ex. D.

[98] *Id.*

[99] *Id.*

[100] Dkt. 2.

gave rise to the claims described in JBT's Complaint.[101]   The parties thereafter stipulated to the entry of a preliminary injunction.[102]

Defendants filed an Answer to JBT's Complaint[103] and an amended Answer that added six counterclaims.[104]   JBT filed an Answer to Defendants' counterclaims and moved to dismiss two of the claims.[105]   Before the court resolved JBT's Motion to Dismiss, JBT filed an Amended Complaint.[106]   Defendants filed a new Answer, reasserting the same counterclaims.[107]   As before, JBT answered the counterclaims and moved to dismiss two of the claims.[108]   After holding a hearing, the court granted JBT's Motion to Dismiss one of the counterclaims and concluded the other counterclaim was moot.[109]

On April 18, 2019, the parties filed cross-motions for summary judgment on JBT's affirmative claims.[110]   Defendants also moved to exclude JBT's damages expert.[111]   The next day JBT also moved for summary judgment on Defendants' counterclaims.[112]   On November 26, 2019, the court held a hearing on the parties' respective Motions for Summary Judgment.[113]   The Motions are now fully briefed and ripe for review.

---

[101] *See* Dkt. 3 at 1.

[102] *See* Dkt. 31; Dkt. 32.

[103] Dkt. 34.

[104] Dkt. 49.

[105] Dkt. 61; Dkt. 62.

[106] Dkt. 99.

[107] Dkt. 108.

[108] Dkt. 110; Dkt. 111.

[109] Dkt. 121.

[110] Dkt. 126; Dkt. 129.

[111] Dkt. 128.

[112] Dkt. 134.

[113] Dkt. 181.

**LEGAL STANDARD**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[114]  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[115]  A fact is material if, under the governing substantive law, it could "affect the outcome of the suit."[116]  When applying this standard, the court is to "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party."[117]

"Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." [118]  If the moving party does not have the ultimate burden of persuasion at trial—here, BGSE on JBT's affirmative claims and JBT on BGSE's counterclaims—that party "has both the initial burden of production . . . and the burden of establishing that summary judgment is appropriate as a matter of law."[119]  The moving party can meet its burden "either by producing affirmative evidence negating an essential element of the non-moving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial."[120]

"[A] more stringent summary judgment standard applies," however, when the moving party has the burden of proof at trial.[121]  In that instance, the moving party "cannot force the

---

[114] Fed. R. Civ. P. 56(a).

[115] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[116] *Id.*; *see also United States v. Simons*, 129 F.3d 1386, 1388 (10th Cir. 1997) ("The substantive law of the case determines which facts are material.").

[117] *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008) (citation omitted).

[118] *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) (citations omitted).

[119] *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (citation omitted).

[120] *Id.* (internal quotation marks and citation omitted).

[121] *Id.*

nonmoving party to come forward with specific facts showing there is a genuine issue for trial merely by pointing to parts of the record that it believes illustrate the absence of a genuine issue of material fact."[122]  Rather, "the moving party must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case."[123]

## ANALYSIS

The court first considers the parties' Cross-Motions for Summary Judgment on JBT's affirmative claims and then turns to JBT's Motion for Partial Summary Judgment on Defendants' Counterclaims.[124]

### I.    JBT's Affirmative Claims

JBT brings ten causes of action against Defendants: misappropriation of trade secrets under the Utah Uniform Trade Secrets Act and federal Defend Trade Secrets Act; three violations of the Lanham Act for False Designation of Origin, False Advertising, and Trademark Infringement; three breach of contract claims; defamation; and tortious interference.[125]  JBT and Defendants both move for summary judgment on each of JBT's claims.  The court addresses each claim in turn.

---

[122] *Id.*

[123] *Id.* (internal quotation marks and citations omitted).

[124] Several of JBT's claims and Defendants' counterclaims arise under state law.  A federal court exercising jurisdiction over state law claims "applies the substantive law, including choice of law rules, of the forum state." *BancOklahoma Mortg. Corp. v. Capital Title Co., Inc.*, 194 F.3d 1089, 1103 (10th Cir. 1999) (internal quotation marks and citations omitted).  Here, the parties agree Utah substantive law applies to JBT's claims for misappropriation under the Utah Uniform Trade Secrets Act, breach of contract, and defamation, and to Defendants' counterclaim for tortious interference.  The parties further agree North Carolina substantive law applies to Defendants' counterclaims for negligent misrepresentation, defamation, and unfair or deceptive trade practices.  Federal law applies to the remainder of JBT's claims.

[125] Dkt. 99 ¶¶ 146–212.

A.  Misappropriation of Trade Secrets (Counts One & Two)

JBT brings two causes of action against Defendants for misappropriation of its trade secrets—specifically, its HPCF O&M Manual (HPCF Manual or Manual) containing the schematics for its HPCF 3000 PC Air unit.  JBT argues Defendants violated the Utah Uniform Trade Secrets Act (UTSA)[126] and the federal Defend Trade Secrets Act (DTSA)[127] by emailing the Manual to JBT's competitor, Twist, Inc.[128]  Defendants dispute that the HPCF Manual qualifies as a trade secret and argue JBT's DTSA claim fails because the alleged cause of action accrued before the statute took effect.

1.  *Utah Uniform Trade Secrets Act*

To establish a misappropriation claim under the UTSA, JBT must show "two essential elements: [1] existence of a protectable 'trade secret' of a plaintiff and [2] demonstration of 'misappropriation' by a defendant."[129]  Defendants challenge only JBT's showing on the first prong, *i.e.*, that the HPCF Manual qualifies as a trade secret.[130]

The UTSA defines "trade secret" as:

---

[126] Utah Code Ann. § 13-24-1 et seq.

[127] 18 U.S.C. § 1832 et seq.

[128] Dkt. 129 at 46–48.

[129] *InnoSys, Inc. v. Mercer*, 2015 UT 80, ¶ 24, 364 P.3d 1013 (citing Utah Code Ann. § 13-24-2).

[130] Dkt. 126 at 14–17; Dkt. 145 at 24–25.  There is no genuine dispute of material fact on the misappropriation prong.  It is undisputed that Bullerdick sent an electronic copy of the HPCF Manual to Twist.  Dkt. 129 ¶ 42.  Because Bullerdick was obligated to maintain the confidentiality of the Manual, providing the Manual to Twist, one of JBT's competitors, constitutes misappropriation under the UTSA.  *See Mercer*, 2015 UT 80, ¶ 27 ("The definition of 'misappropriation' under [the UTSA] encompasses 'disclosure . . . of a trade secret of another without express or implied consent by a person who . . . knew or had reason to know that his knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.'") (quoting Utah Code Ann. § 13–24–2(2)(b)) (ellipses in original).

information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.[131]

Defendants assert the HPCF Manual was not subject to reasonable efforts to maintain its secrecy and lacks independent economic value.

### a. Reasonable Efforts to Maintain Secrecy

JBT points to a host of steps it takes to maintain the secrecy of the HPCF Manual. Nevertheless, Defendants maintain JBT's efforts are insufficient to sustain its UTSA claim. The court ultimately concludes Defendants failed to present evidence sufficient to create a genuine dispute concerning whether JBT's efforts to maintain the secrecy of the HPCF Manual were reasonable.

Under the UTSA, efforts to maintain the secrecy of a trade secret need only be "reasonable under the circumstances."[132] The court's review of the applicable caselaw reveals that Utah courts have yet to define what it means for a party's efforts to be reasonable under the circumstances. However, other courts interpreting nearly identical state trade secrets laws generally agree that reasonable efforts does not mean "all conceivable efforts,"[133] nor are

---

[131] *USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 45, 372 P.3d 629 (quoting Utah Code Ann. § 13-24-2(4)).

[132] Utah Code Ann. § 13-24-2(4)(b).

[133] *All W. Pet Supply Co. v. Hill's Pet Prods. Div.*, 840 F. Supp. 1433, 1438 (D. Kan. 1993) (discussing Uniform Trade Secrets Act and collecting cases).

"[h]eroic measures" required.[134]  Thus, a plaintiff can meet this requirement even though a

defendant "manage[s] to point out aspects of plaintiff's procedures that could have been

stronger."[135]

JBT takes several measures to maintain the secrecy of the HPCF Manual.  Brian

DeRoche, JBT's Rule 30(b)(6) representative, testified JBT requires confidentiality agreements

with distributors and agents, trains its project managers to limit to whom the Manuals are sent,

and employs proprietary wording and clauses on its documents.[136]  JBT also requires its

employees to sign confidentiality agreements and abide by a code of ethics.[137]

Aside from these measures, JBT's sales of the HPCF 3000 are subject to JBT's

Conditions of Sale.  This includes the following confidentiality provision:

> CONFIDENTIALITY: Buyer acknowledges that during the execution of this
> Agreement that Seller will provide confidential information to Buyer regarding the
> Equipment design.  Buyer agrees that such information is and will remain the
> property of Seller and that *Buyer will use the information only for the operation
> and maintenance of the Equipment and protect the confidential information from
> disclosure to other person, and entities.*[138]

And the Manual itself contains both a confidentiality disclaimer and a proprietary notice:

---

[134] *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 825 F. Supp. 340, 359 (D. Mass. 1993) (applying similar
Massachusetts trade secrets law); *see also Catalyst & Chem. Servs., Inc. v. Global Ground Support*, 350 F. Supp. 2d
1, 10 (D.D.C. 2004) (interpreting District of Columbia's nearly identical trade secrets law and concluding "[a]n
owner is not required to maintain absolute secrecy to retain trade secret protection"); *MicroStrategy Inc. v. Bus.
Objects, S.A.*, 331 F. Supp. 2d 396, 416 (E.D. Va. 2004) (interpreting identical language in Virginia's trade secrets
act and finding that because "only reasonable efforts must be taken to maintain secrecy," "[r]estricting access to
information, implementing confidentiality agreements, and providing physical barriers to access are all reasonable
efforts"); *Comput. Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 696 (N.D. Ill. 2004) ("[T]he [Illinois
Trade Secrets Act] requires only reasonable measures, not perfection.").

[135] *Quest Software, Inc.*, 333 F. Supp. 2d at 696 (granting plaintiff preliminary injunction related to trade secrets
claim).

[136] Pl.'s Ex. 98 at 12:4–13:5.

[137] *Id.* at 20:3–21:25.

[138] Pl.'s Ex. 121 at 9 (emphasis added).

PROPRIETARY NOTICE

This manual and any associated information, drawings, or amendments are proprietary and confidential to JBT AeroTech, Jetway Systems®. Acceptance of this manual constitutes agreement not to reproduce it in whole or in part and not to disclose it to any other party and not use it for any purpose beyond the limited license granted herein without prior written consent of JBT AeroTech, Jetway Systems®.[139]

Despite these considerable efforts, Defendants maintain they are insufficient because (1) JBT's confidentiality requirements did not apply to the end users of its product—the U.S. government,[140] (2) "JBT is aware that its end users periodically lose track of the hard copies of its manuals,"[141] and (3) "end users can further disperse the Manual to other third-party maintenance providers in the marketplace."[142]  None of Defendants' arguments has merit.

First, Defendants contend the confidentiality provisions in JBT's Conditions of Sale do not bind the government because JBT always sold its products through BGSE.[143]  Because BGSE was the purchaser, Defendants argue the Conditions of Sale would not obligate the government to protect JBT's trade secrets.[144]  But JBT submitted evidence that, beginning in 2012, BGSE included the same Conditions of Sale clause "in all of [BGSE's] quotes."[145]  Thus, the government was bound to guard JBT's confidential information.  And Defendants do not contest that a party asserting trade secret protection "may make partial or limited disclosure of the information without defeating its trade secret status[,]" including communicating the

---

[139] Pl.'s Ex. 13 at 3, 5.

[140] Dkt. 159 at 10.

[141] Dkt. 126 at 16.

[142] *Id.*

[143] Dkt. 159 at 10.

[144] *See id.*

[145] Pl.'s Ex. 144 at 2, 7.

information to third parties who are "pledged to secrecy."[146]  Because BGSE and the government were under a confidentiality requirement not to disclose the HPCF Manual's contents, JBT's transmission of the Manual to those parties does not defeat the Manual's trade secret status.

　　Second, Defendants challenge the reasonableness of JBT's efforts because "it is apparently common for these manuals to go missing or not end up in the end user's hands."[147] But Defendants' representation is not supported by the evidence they cite.  Defendants point to a single email exchange between a JBT representative and a BGSE employee concerning a customer who could not locate an operating manual.[148]  The JBT representative stated that the manuals were located inside the units and that "[o]ft times we've found that whomever unpacks the units take the manuals out before passing them on to the users."[149]  But nowhere does the exchange evidence that manuals commonly go missing or fall into the hands of someone who would not be under the confidentiality obligations discussed above.

　　Third, Defendants maintain JBT's efforts are not reasonable because it acknowledges that end-users of the HPCF 3000 are permitted to hire third parties to perform maintenance on the units and to share the Manual with those maintenance providers.[150]  Defendants assert this shows

---

[146] *USA Power*, 2016 UT 20, ¶ 57 (internal quotation marks and citation omitted).  Other courts interpreting similar trade secret laws reach the same conclusion.  *See SyncSort Inc. v. Innovative Routines, Int'l, Inc.*, No. 04-3623 (WHW), 2011 WL 3651331, at *15 (D.N.J. Aug. 18, 2011) (citing *Fabkom, Inc. v. R.W. Smith & Assocs., Inc.*, Civ. No. 95–4552, 1996 WL 531873, at *7 (S.D.N.Y. Sept. 19, 1996)) ("That a trade secret owner distributes secret materials outside of his business, but only does so through agreements that require confidentiality, does not destroy the secrecy of those materials, but rather reinforces it."); *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg.*, 649 F. Supp. 2d 702, 715 (N.D. Ohio 2009) (holding that an owner's manual containing confidentiality disclaimers did not destroy trade secret despite being sent to customers).

[147] Dkt. 126 at 16.

[148] Defs.' Ex. 20.

[149] *Id.*

[150] Dkt. 126 at 15.

"JBT freely and willingly circulated its alleged[] trade secret documents to countless individuals who were under no obligation to protect them."[151]

Defendants' contention is flawed for several reasons.  As an initial matter, this argument requires the court to assume the government does not require maintenance providers to agree to maintain the confidentiality of any materials they receive through their work, a fact about which neither party has submitted evidence.  But even assuming the government shares the HPCF Manual without restriction, Defendants' argument still fails.  First, Defendants ignore that, in addition to the proprietary and confidentiality notices on pages three and five, the Manual also includes a disclaimer on every page that it is JBT's confidential and proprietary documentation.[152]  These notices would put maintenance providers on notice that they were prohibited from using the Manual for any purpose other than repairing an HPCF 3000.  Second, requiring end-users to enter into specific confidentiality agreements with maintenance providers would be superfluous.  As noted, end-users were already obligated to protect the proprietary information in the Manual.  If the end-users were careless, JBT could assert a claim against them based on the Conditions of Sale.[153]

At bottom, Defendants' arguments amount to claiming that JBT could have implemented stronger measures to protect the Manual's trade secrets.  But if a plaintiff were required to prove it could do nothing more to protect its trade secrets to establish it took reasonable efforts to maintain their secrecy, plaintiffs would rarely, if ever, prevail on a UTSA claim.  Here, the

---

[151] Dkt. 159 at 11.

[152] *See* Pl.'s Ex. 13.

[153] Nor is Bullerdick's deposition testimony that user manuals are not considered confidential in the industry enough to create a genuine dispute of material fact.  Dkt. 126 at 15 (citing Defs.' Ex. 7 at 157:5–23). "Vague, conclusory statements do not suffice to create a genuine issue of material fact." *Gen. Steel Domestic Sales, LLC v. Chumley*, 627 F. App'x 682, 689 n.2 (10th Cir. 2015) (quoting *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998)).  Besides, Bullerdick's testimony that the manuals are not considered confidential is contradicted by his own email to Twist providing the HPCF Manual and describing it as "confidential."  Pl.'s Ex. 94 (sealed).

undisputed evidence establishes that JBT took numerous, practical measures to maintain the secrecy of its trade secrets.  Indeed, because no rational jury could conclude JBT's efforts were not reasonable under the circumstances, the court finds JBT has satisfied this element of its UTSA claim.[154]

### b.   Independent Economic Value

JBT argues in its Motion that the Manual's trade secrets derive independent economic value from not being generally known or readily ascertainable by proper means.[155]  Defendants maintain that (1) JBT fails to provide evidence from which a fact finder could determine its trade secrets have independent economic value[156] and (2) the Manual was readily ascertainable to them.[157]  Defendants' arguments are unavailing, and the court finds that no reasonable jury could conclude JBT's trade secrets lack independent economic value.

"[T]o be a trade secret, information must 'derive[] independent economic value, actual or potential, from not being generally known' or 'readily ascertainable' to the defendant."[158]  Information is not generally known if it is "secret from at least some interested parties" and has not been fully disclosed without limitations.[159]  A trade secret is "readily" ascertainable "when it can be determined without much difficulty through proper means."[160]

---

[154] It appears Utah courts have yet to opine about whether a jury should ordinarily decide this issue.  But even assuming for the sake of argument that this question is usually one for a jury, Defendants have failed to submit evidence from which a reasonable trier of fact could find in their favor.  Accordingly, judgment as a matter of law is warranted.  *Cf., e.g.*, *CDC Restoration & Const., LC v. Tradesmen Contractors, LLC*, 2012 UT App 60, ¶ 27, 274 P.3d 317 (affirming trial court's ruling that, as a matter of law, information was not entitled to trade secret protection).

[155] Dkt. 129 at 46.

[156] Dkt. 145 at 24–25.

[157] Dkt. 126 at 17.

[158] *USA Power*, 2016 UT 20, ¶ 68 (quoting Utah Code Ann. § 13-24-2(4)(a)) (brackets in original).

[159] *Id.* ¶ 57 (internal quotation marks and citation omitted).

[160] *Id.* ¶ 67 (internal quotation marks omitted).

JBT directs the court to two pieces of evidence to establish the HPCF Manual derives independent economic value from not being generally known or readily ascertainable by proper means.  First, Scott Gwilliam, one of JBT's engineers, submitted a declaration stating as much.[161]  Second, JBT argues the Manual's economic value from being unknown to its competitors is evident from Bullerdick's transmission of the Manual to Twist.[162]  It is undisputed that in August and September of 2015, Bullerdick attempted to further Twist's efforts to design a PC Air unit that BGSE could source on F-35 hangar projects.[163]  Bullerdick included in one of the emails an electronic version of the Manual.[164]  JBT contends this shows the Manual derived economic value by not being generally known or readily ascertainable to others.  That is, Bullerdick would not have sent Twist the Manual—which contained internal schematics for JBT's HPCF 3000—unless he believed it would expedite Twist's ability to design and produce a competing PC Air unit.[165]

Defendants do not meaningfully refute this evidence.  Rather, they assert with little explanation that "JBT presents no evidence from which any finder of fact could conclude that [the Manual] derive[s] independent commercial value from not being generally known . . . ."[166]  But this simply ignores the evidence chronicled above.  Defendants do not address JBT's argument that Bullerdick's transmission of the Manual to Twist evinces its commercial value.

---

[161] Dkt. 129 at 46 (citing Pl.'s Ex. A ¶¶ 9–10).

[162] *See id.*

[163] Pl.'s Ex. 54 (sealed) (August 27, 2015 email from Bullerdick to Twist representatives Don Maynard and Scott Schrinner, explaining they "have a lot of ground to make up" and attaching "a library of confidential info to reference"); Pl.'s Ex. 94 (sealed) (August 31, 2015 email from Bullerdick to Twist attaching an electronic copy of the HPCF O&M Manual); Pl.'s Ex. 97 (sealed) (September 3, 2015 email to Twist telling Schrinner "[w]hat is designed will not meet spec[ifications]" and attaching a file named "CAS Master Controller.pdf").

[164] Pl.'s Ex. 94 (sealed).

[165] *See* Dkt. 129 at 46.

[166] Dkt. 145 at 24–25.

Nor do they substantially oppose Scott Gwilliam's declaration. Although not designated as an expert, Gwilliam is a mechanical engineer with more than thirty years of experience designing and manufacturing ground air conditioning equipment for aircraft.[167] Gwilliam stated that having the schematics of the HPCF 3000 would make it easier for a competitor to "achiev[e] the specific required humidity . . . of air at the required airflow, pressure and temperature required by the F-35 aircraft . . . ."[168] Indeed, "[w]ithout the information included in the schematics," Gwilliam testified "it is likely that a competitor would have taken a less efficient and more costly approach to achieving the performance requirements."[169]

Defendants do not challenge Gwilliam's credibility or expertise, nor did they submit competing testimony—expert or otherwise—demonstrating that the information in the Manual is generally known or readily ascertainable.[170] Instead, Defendants assert only that Gwilliam's testimony is merely "someone's subjective belief" that must be "discount[ed]."[171] But affidavits like Gwilliam's are exactly the kind of evidence Rule 56 identifies as a proper means to prove a factual assertion.[172] Because Defendants advance no credible opposition to Gwilliam's affidavit, his testimony is undisputed and provides factual support to establish the HPCF Manual derives economic value from not being generally known or readily ascertainable.

---

[167] Dkt. 154 at 16.

[168] Pl.'s Ex. A ¶ 8.

[169] *Id.* Additionally, Defendants contend the Manual lacks economic value because it is merely "an operational guide for the end user," and JBT has not introduced evidence that the Manual actually has value to assist a competitor develop a competing product. Dkt. 126 at 15, 17. These arguments are unavailing in light of Gwilliam's testimony.

[170] Defendants appear to suggest JBT cannot prevail on its trade secret claim without expert testimony. Dkt. 145 at 25. The Utah Supreme Court expressly rejected that assertion. *USA Power*, 2016 UT 20, ¶ 67 ("[W]e conclude that [Plaintiff] was not required to present expert testimony that this information was not readily ascertainable.").

[171] Dkt. 159 at 9.

[172] Fed. R. Civ. P. 56(c)(1)(A) (listing affidavits or declarations as materials in the record upon which a party may rely to support a factual assertion that no genuine dispute of material fact exists).

Nevertheless, the court addresses Defendants' contention that the HPCF Manual was readily ascertainable to them through proper means.[173]  BGSE regularly pursued maintenance contracts to service equipment on F-35 hangars.[174]  Because Bullerdick knew JBT's products well, BGSE was often awarded maintenance contracts at F-35 hangars where BGSE installed JBT equipment.[175]  Through that maintenance work, Defendants argue they could have received a copy of the HPCF Manual.[176]

Defendants' argument proves too much.  In the context of the UTSA's statutory framework, a trade secret is "readily ascertainable" if the defendant can easily obtain the relevant information to use it for the defendant's own purposes and benefit without restriction.  Thus, a trade secret is not "readily ascertainable" simply because a party could purchase the trade secret, for example, through a licensing agreement that places conditions on the scope of the buyer's use of the secret.  Under such an agreement, although the buyer gains access to the trade secret, the buyer is restricted in its use of the secret, and therefore it cannot be said that the secret was readily ascertainable.  That is the case here.  Although Defendants may have been able to obtain the Manual through a maintenance contract, their use of the Manual would have been restricted to servicing the equipment owner's air units.  Because Defendants would not have been free to use the information contained in the Manual however they saw fit, the trade secrets were not "readily ascertainable."

But in any event, Defendants have submitted no evidence—nor argued—that they in fact obtained an HPCF Manual through a maintenance contract for JBT equipment.  Their argument

---

[173] Dkt. 126 at 17.

[174] *Id.*

[175] *Id.* (citing Bullerdick Aff. ¶ 30).

[176] *Id.*

is purely hypothetical.  "To defeat a motion for summary judgment, evidence . . . must be based on more than mere speculation, conjecture, or surmise.  Unsubstantiated allegations carry no probative weight in summary judgment proceedings."[177]  Defendants' argument fails.

The undisputed evidence shows the Manual derives independent economic value from not being generally known or readily ascertainable.  Defendants fail to meaningfully refute JBT's evidence.  Accordingly, no reasonable jury could conclude JBT's trade secrets were readily ascertainable.[178]

In sum, the HPCF Manual is information that derives independent economic value from not being generally known or readily ascertainable and is the subject of reasonable efforts to maintain its secrecy.  It qualifies as a trade secret.  And Defendants do not challenge JBT's evidence on the UTSA's second prong, *i.e.*, that Bullerdick misappropriated JBT's trade secrets when he emailed the Manual to Twist.  Having proved both elements of its UTSA claim, JBT is entitled to summary judgment.

## 2. *Defend Trade Secrets Act*

No controlling decision in this Circuit identifies the specific elements of a federal DTSA claim.[179]  However, several district courts in the Circuit have held that a plaintiff must show: "(1) the existence of a trade secret; (2) the acquisition, use, or disclosure of the trade secret without consent; and (3) that the individual acquiring, using, or disclosing the trade secret knew or

---

[177] *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (internal quotation marks and citations omitted).

[178] Ordinarily, "[w]hether information is readily ascertainable is an issue for the jury . . . ."  *USA Power*, 2016 UT 20, ¶ 67.  But the court does not read *USA Power* to mean courts may never decide this issue as a matter of law.  Otherwise, the nonmoving party could avoid summary judgment merely by presenting nominal objections to the moving party's evidence.  Instead, the court reads *USA Power* as cautioning courts that granting summary judgment on this issue should be reserved for those cases, like here, where the undisputed evidence clearly establishes whether the plaintiff's trade secrets are readily ascertainable.

[179] *API Ams. Inc. v. Miller*, 380 F. Supp. 3d 1141, 1148 n.5 (D. Kan. 2019) ("[T]here does not appear to be any controlling decision regarding the elements required to establish a misappropriation claim under the recently-enacted DTSA.").

should have known the trade secret was acquired by improper means."[180]  A DTSA "trade secret includes all forms and types of information that [1] derives value from being secret and [2] that the owner took reasonable measures to keep secret."[181]

Defendants acknowledge the DTSA's definition of a trade secret mirrors the UTSA's definition, and they fail to advance any separate arguments about why JBT's Manual is not a trade secret under the DTSA.[182]  For the same reasons given above, the court concludes the HPCF Manual qualifies as a trade secret under the DTSA.

Defendants raise only one argument unique to the DTSA.  They contend JBT's DTSA claim must fail because the misappropriation allegations predate the DTSA's enactment on May 11, 2016.[183]  Because JBT alleges Defendants misappropriated JBT's trade secrets by sending the HPCF Manual to Twist in August and September of 2015, Defendants argue the DTSA does not cover their alleged misappropriation.[184]  But JBT also provides evidence Defendants used the HPCF Manual to create other documents they disclosed to multiple third parties as late as March 3, 2017.[185]  For example, Bullerdick incorporated into the F-35 brochure portions of the HPCF Manual that he sent to numerous industry contacts.[186]

---

[180] *Id.* at 1148 (citing *Video Gaming Techs., Inc. v. Castle Hill Studios LLC*, No. 17-CV-454-GKF-JFJ, 2018 WL 3437083, at *4 (N.D. Okla. July 17, 2018)); *Arctic Energy Servs., LLC v. Neal*, No. 18-cv-00108-PAB-KLM, 2018 WL 1010939, at *2 (D. Colo. Feb. 22, 2018)).

[181] *Ultradent Prods., Inc. v. Spectrum Sols. LLC*, No. 2:17-cv-890, 2018 WL 324868, at *2 (D. Utah Jan. 8, 2018) (internal quotation marks and citations omitted).

[182] *See* Dkt. 126 at 13.

[183] *Id.* at 17–18 (citing *Camick v. Holladay*, 758 F. App'x 640, 644 (10th Cir. 2018) (noting the DTSA applies to misappropriations that occurred "*on or after* the date of the enactment of the Act on May 11, 2016") (internal quotation marks and citations omitted)).

[184] Dkt. 126 at 18.

[185] Dkt. 154 at 16 (citing Pl.'s Exs. 78, 87).

[186] *See supra* notes 77–82 and accompanying text.

Defendants argue those subsequent disclosures cannot support a claim for misappropriation because the earlier disclosure to Twist defeated the Manual's trade secret status.[187]   Defendants rely on *Avago Technologies U.S. Inc. v. Nanoprecision Products, Inc.* for the proposition that "[o]nce the information is in the public domain and the element of secrecy is gone, the trade secret is extinguished and the patentee's only protection is that afforded under the patent law."[188]   But *Avago* involved a case in which the plaintiff's trade secrets were published in patents, which are publicly available.[189]   In contrast, Defendants' disclosure to a single Twist representative in 2015 did not render the Manual publicly available.   Accordingly, Defendants' subsequent disclosures to additional third parties of information contained in the Manual constitute distinct misappropriations of JBT's trade secrets.   The court grants JBT summary judgment on this claim.

### B.   Unfair Competition under the Lanham Act (Counts Three & Four)

JBT argues Defendants violated Section 43 of the Lanham Act by repeatedly misrepresenting Defendants' relationship to JBT's products in order to mislead buyers of F-35 hangar equipment.   Section 43(a) provides in relevant part,

> Any person who, on or in connection with any goods or services . . . uses . . . any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

---

[187] Dkt. 126 at 18.

[188] No. 16-cv-03737-JCS, 2017 WL 412524, at *9 (N.D. Cal. Jan. 31, 2017) (quoting *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355 (Fed. Cir. 2009)).

[189] *Id.* at *2.

> (A) is likely to cause confusion . . . as to the origin . . . of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristic, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.[190]

The Lanham Act "principally provides for two distinct causes of action: [1] false designation of origin or source . . . and [2] false description or representation, known as false advertising."[191]  JBT argues Defendants are liable for both.

### 1. False Designation of Origin

JBT contends Defendants falsely designated the origin of the goods they were supplying for F-35 hangar projects by incorporating doctored JBT documents throughout their bid proposals.[192]  False designation of origin claims fall into two categories: "passing off," where a party represents his or her *own* goods or services as someone else's or "reverse passing off," where a party misrepresents *someone else*'s goods or services as his or her own.[193]  To illustrate, passing off could include Reebok removing its distinctive "vector" logo from its own shoes and replacing it with Nike's "swoosh."  Reverse passing off, on the other hand, would entail Reebok acquiring *Nike*'s shoes, replacing the swoosh with Reebok's vector logo, and selling the shoes as

---

[190] 15 U.S.C. § 1125(a)(1).

[191] *Cottrell, Ltd. v. Biotrol Int'l, Inc.*, 191 F.3d 1248, 1252 n.3 (10th Cir. 1999) (internal quotation marks and citations omitted).

[192] Dkt. 129 at 32 ("Defendants' own documents overwhelmingly establish BGSE: (a) falsely claimed responsibility for the JBT products installed on numerous projects, (b) improperly used images of JBT equipment, passing them off as if they were BGSE's, (c) stripped JBT's name and identifying marks from JBT's brochures, manuals, test reports and specification documents in order to pass off JBT's goods and services as its own, and (d) created the false impression that its new products—manufactured by unproven third parties—were simply new versions of the JBT products that BGSE previously distributed.").

[193] *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 27 n.1 (2003); *Gaedeke Holdings VII LTD v. Baker*, 683 F. App'x 677, 679 n.2 (10th Cir. 2017); *Larkin Grp, Inc. v. Aquatic Design Consultants, Inc.*, 323 F. Supp. 2d 1121, 1124 (D. Kan. 2004) (describing reverse passing off).

if Reebok produced them.  Here, JBT asserts a reverse passing off claim.  JBT contends

Defendants sold the products they were promoting—here, Twist's PC Air units—by creating a

false link with JBT's products.[194]

Because the Tenth Circuit has yet to rule substantively on a reverse passing off claim, it

has not established what elements a plaintiff need demonstrate to succeed on this kind of

Lanham Act violation.[195]  JBT directs the court to the test adopted by the Second, Fourth, and

Federal Circuits, and Defendants do not contest that framework.[196]  To prevail on a reverse

passing off claim under that test, a plaintiff must prove four elements: "(1) that the work at issue

originated with the plaintiff; (2) that origin of the work was falsely designated by the defendant;

(3) that the false designation of origin was likely to cause consumer confusion; and (4) that the

plaintiff was harmed by the defendant's false designation of origin."[197]  Following the parties'

lead and finding the proposed test helpful, the court assesses JBT's claim under this framework.

Before turning to the elements of the claim, however, the court addresses the threshold

issue of what goods Defendants allegedly reverse passed off: the post-award submittals

themselves or the PC Air units and GPUs contained therein.  Defendants argue several courts

have concluded that a bid proposal is not a good or service and that, even if it were, a reverse

---

[194] Dkt. 129 at 32, 35.

[195] In *Gaedeke Holdings VII LTD v. Baker*, the Tenth Circuit defined reverse passing off, but the merits of the claim were not at issue.  683 F. App'x at 679 n.2.

[196] Dkt. 129 at 31–32.

[197] *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 438 (4th Cir. 2010) (quoting *Syngenta Seeds, Inc. v. Delta Cotton Coop., Inc.*, 457 F.3d 1269, 1277 (Fed. Cir. 2006)); *Lipton v. Nature Co.*, 71 F.3d 464, 473 (2d Cir. 1995) (establishing the same four elements).

passing off claim does not lie where the defendant created the bid as BGSE did here.[198]  The

court agrees with Defendants that if JBT's false designation of origin claim were based on

Defendants' plagiarized submittals, the claim likely would fail.[199]  But JBT clarified that the

submittal documents "are not the goods at issue here."[200]  Rather, JBT asserts the relevant goods

are the equipment BGSE was promoting within the submittals, *i.e.*, the PC Air units and

GPUs.[201]  That is, "by obscuring that JBT was the originator of the material used in BGSE's

post-bid submittals," JBT argues "Defendants misrepresented the origin of the *equipment* they

proposed to supply by creating a connection to the JBT products that BGSE previously sold."[202]

Having concluded the tangible goods at issue are the equipment represented in BGSE's

submittals, the court turns to the elements JBT must prove to prevail on its claim.

            a.  The Work at Issue Originated with JBT and Defendants
                Falsely Designated Its Origin

        Defendants stake their opposition to JBT's Motion on a single legal argument—that the

Supreme Court's decision in *Dastar Corporation v. Twentieth Century Fox Film Corporation*

---

[198] *See Larkin*, 323 F. Supp. 2d at 1126–27 ("[T]he court is unpersuaded . . . that the proposals defendants submitted . . . constitute tangible goods [or services] that are offered for sale.  Even if those proposals are, however, considered goods or services offered for sale within the meaning of *Dastar*, in this case plaintiff does not allege that plaintiff actually produced those proposals.  Instead, plaintiff alleges that defendants took plaintiff's materials and incorporated them into defendants' proposals without attributing any credit to plaintiff.  Thus, the 'origin' of the proposals was actually defendants, not plaintiff. Even if plaintiff authored some of the ideas and concepts embodied in those proposals, the Lanham Act does not provide protection for such plagiarism.") (internal citation and quotation marks omitted); *Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*, 299 F. Supp. 2d 565, 572 (E.D. Va. 2004) (same).

[199] *See supra* note 198.

[200] Dkt. 164 at 4.

[201] *Id.*  For this reason, Defendants' reliance on *Larkin* is misplaced.  There, the plaintiff's false designation of origin claim was based on bid documents themselves and not, as here, the goods or services being offered.  *See Larkin*, 323 F. Supp. 2d at 1126 ("Plaintiff is essentially claiming that defendants took plaintiff's uncopyrighted and unpatented ideas and concepts, edited and repackaged them, and passed them off as their own without attributing any credit to plaintiff.").

[202] Dkt. 164 at 5.

forecloses JBT's theory.[203]  In *Dastar*, the Court considered whether Section 43 of the Lanham

Act "prevents the unaccredited copying of a work."[204]  There, the plaintiff acquired the rights to

a 1949 TV series called "Crusade in Europe."[205]  The plaintiff did not renew the copyright on the

series, and it entered the public domain in 1977.[206]  At issue was the defendant's creation and

sale of a video set entitled World War II Campaigns in Europe.[207]  To make Campaigns, the

defendant bought tapes of the original Crusade television series, made various edits, and then

repackaged and sold the tapes as a new product.[208]  The plaintiff argued the defendant's sale of

Campaigns without proper credit to the Crusade television series constituted reverse passing

off.[209]

> The Supreme Court disagreed:
>
> [R]eading the phrase "origin of goods" in the Lanham Act in accordance with the Act's common-law foundations (which were not designed to protect originality or creativity), and in light of the copyright and patent laws (which were), we conclude that the phrase refers to *the producer of the tangible goods that are offered for sale,* and not to the author of any idea, concept, or communication embodied in those goods.[210]

Recognizing that the defendant was the producer of the tangible goods it offered for sale—the

Campaign tapes—the Court concluded the defendant could not be liable for reverse passing off

even though it had copied the plaintiff's idea.[211]

---

[203] Dkt. 145 at 17–21.  In their own Motion for Summary Judgment, Defendants argue JBT fails to provide evidence any consumers were confused by Defendants' conduct.  Dkt. 126 at 19–21.  The court takes up this argument below.

[204] 593 U.S. at 25.

[205] *Id.* at 26.

[206] *Id.*

[207] *Id.*

[208] *Id.* at 26–27.

[209] *Id.* at 27.

[210] *Id.* at 37 (emphasis altered).

[211] *Id.* at 38.

Defendants rely on *Dastar* and district court cases interpreting that decision to argue JBT's claim must fail because they never actually sold any of JBT's products repackaged as Defendants' or Twist's product.[212]  In other words, because Twist—not JBT—manufactured the PC Air units Defendants ultimately supplied for the relevant F-35 hangars, Defendants assert BGSE, or Twist, is the origin of the goods at issue.  As such, Defendants contend they did not reverse pass off JBT's products.

It is true that in the typical case, the focus of the inquiry in a reverse passing off claim is on the *defendant's* goods.[213]  If the defendant supplies a product it manufactured, even if copied from a competitor, a reverse passing off claim generally will not attach.[214]  For example, in *Tao of Systems Integration, Inc. v. Analytical Services & Materials, Inc.*, the district court dismissed plaintiff's reverse passing off claim where plaintiff argued defendant was able to win a contract with NASA only by misrepresenting plaintiff's work as defendant's.[215]  The court held that "[t]o state a claim for reverse passing off, [Plaintiff] must allege that the actual goods provided to NASA by [Defendant] were in fact produced by [Plaintiff.]"[216]  Because the defendant there produced the goods supplied to NASA, the court concluded the plaintiff's claim must fail.[217]

---

[212] Dkt. 145 at 20 ("JBT has failed to show that BGSE has made any false designation of origin *as to any actual air or power unit supplied and sold by BGSE*.") (emphasis added).

[213] *See, e.g.*, *Kehoe Component Sales Inc. v. Best Lighting Prods., Inc.*, 796 F.3d 576, 587 (6th Cir. 2015) ("In this case, it is undisputed that [the defendant] manufactured the tangible cloned objects that it represented as having manufactured.  The undisputed facts thus show that [the defendant] never made a false designation of the products' 'origin' within the meaning of § 43(a).  [The defendant] represented that the cloned products originated with [the defendant]; and even though the ideas and initial design may well have originated with [the plaintiff], the tangible products themselves did not."); *Tao of Sys. Integration*, 299 F. Supp. 2d at 572 ("The goods or services which are examined for a false designation of origin under a reverse-passing-off claim are those of the defendant.") (citation omitted).

[214] *See supra* note 213.

[215] 299 F. Supp. 2d at 569.

[216] *Id.* at 572.

[217] *Id.*

But the *Tao* court's holding is called into question by a subsequent decision from the Fourth Circuit declining to impose such a brightline rule.  In *Universal Furniture International, Inc. v. Collezione Europa USA, Inc.*, the Fourth Circuit upheld a district court's finding of liability on plaintiff's false designation of origin claim even though the defendant never sold any of the plaintiff's products as if they were produced by the defendant.[218]  In that case, the defendant intentionally mimicked several of the plaintiff's furniture designs and sold cheaper versions of two of the plaintiff's most popular furniture lines.[219]  At one point, the defendant displayed in its showroom some of the plaintiff's actual pieces.[220]  The court concluded that "[b]ecause [the defendant] displayed actual pieces from [the plaintiff's furniture line] and marketed them as belonging to [the defendant's] 20200 collection, [the defendant] falsely designated the origin of such furniture."[221]  In short, there are at least some instances in which a defendant may be liable for reverse passing off even where the product the defendant sells was not manufactured by the plaintiff.

In this court's judgment, this case presents one such scenario.  As noted above, the Court in *Dastar* held that the phrase "origin of goods" as used in § 1125(a)(1)(A) "refers to the producer of tangible goods that are *offered for sale*, and not to the author of any idea, concept or communication embodied in those goods."[222]  Here, JBT was the producer of the tangible goods Defendants were offering for sale in the post-submittal documents.  In the project submittals for Lemoore P-328, Beaufort P-465, Kadena P-803, and Lemoore P-378(A), BGSE included a

---

[218] 618 F.3d at 438–39.

[219] *Id.* at 425–26.

[220] *Id.* at 438.

[221] *Id.*

[222] 539 U.S. at 37 (emphasis added).

lengthy excerpt copied from the JBT HPCF O&M Manual.[223]  BGSE removed all references to JBT and superimposed BGSE's logo over JBT's.[224]  Further, the submittals contained JBT's HPCF 3000 Tech. Sheet, stripped of its JBT identifiers and replaced with BGSE's.[225]  The two-page technical specification purported to provide engineering details for a BGSE PC Air unit, even though no such unit existed.[226]  Thus, although BGSE represented that it was offering for sale a BGSE product to be manufactured by Twist, the substance of the submittal revealed the product being offered for sale was actually produced by JBT.

In sum, the court concludes the equipment represented in BGSE's project submittals originated with JBT and that BGSE falsely designated the origin of the work.

### b. The False Designation of Origin Was Likely to Cause Consumer Confusion

To determine whether a false designation of origin is likely to cause confusion, the Tenth Circuit typically applies a six-factor test.[227]  "As a general matter, however, courts have concluded that a party's attempt to pass off another party's product as its own satisfies the confusion requirement of the Lanham Act for an obvious reason—it represents a direct attempt to confuse a consumer about the origin of a product."[228]  This is because "when a 'defendant has taken the plaintiff's product and has represented it to be his own work,' it is 'difficult to imagine how a designation of origin of a product could be more false, or could be more likely to cause

---

[223] Dkt. 129 at 22–23 (citing Pl.'s Ex. 13 at 10–24; Pl.'s Ex. 2 at 37–49; Pl.'s Ex. 4 at 13–25; Pl.'s Ex. 6 at 92–104; Pl.'s Ex. 8 at 37–49).

[224] *Id.* at 23.

[225] *Id.*

[226] *Id.*; *see also* Pl.'s Ex. 96 at 2 (sealed) (containing Bullerdick's explanation in a May 2015 email that JBT's HPCF 3000 was "the only [PC Air unit] to currently meet the specification" for an F-35 hangar project).

[227] *See Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 972–76 (10th Cir. 2002).

[228] *Laura Laaman & Assocs., LLC v. Davis*, No. 3:16-CV-00594 (MPS), 2017 WL 5711393, at *6 (D. Conn. Nov. 27, 2017) (collecting cases).

confusion or mistake as to the actual origin of the product.'"[229]  Accordingly, courts that would otherwise apply multi-factor tests in considering this element generally eschew that mode of analysis when assessing reverse passing off claims.[230]

Instead, for the reasons expressed above, where a court concludes a defendant has falsely designated the origin of its product, likelihood of confusion may be presumed.  Because Defendants failed to rebut the presumption that their false designation of origin likely caused substantial consumer confusion, the court concludes JBT satisfied this element.

### c.   The Plaintiff Was Harmed by Defendants' False Designation of Origin

Although Defendants assert BGSE's conduct did not actually confuse any contractors, Defendants never directly refute JBT's arguments on the harm element.  JBT contends "BGSE's deception allowed BGSE to create the false impression that it was the most experienced designer and supplier of PC-Air units and GPUs for F-35 hangar project" and allowed BGSE "to sell other suppliers' products at a time when even Bullerdick conceded that only JBT made compliant products."[231]  The court concludes JBT has met its burden of establishing this final element.

One of the Lanham Act's purposes is to "assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product."[232]  BGSE's deception prevented JBT from reaping both the financial and reputational rewards associated with its products.  The harm JBT suffered is the same harm identified by the court in *Universal Furniture*.  There, the court expressly rejected the defendant's contention the

---

[229] *Universal Furniture*, 618 F.3d at 438–39 (quoting *Johnson v. Jones*, 149 F.3d 494, 503 (6th Cir. 1998)).

[230] *See, e.g.*, *Suntree Techs., Inc. v. Ecosense, Int'l, Inc.*, 693 F.3d 1338, 1348 (11th Cir. 2012) (noting "the first five factors of the likelihood of confusion test are irrelevant") (citing *Johnson*, 149 F.3d at 503).

[231] Dkt. 129 at 39.

[232] *Dastar*, 539 U.S. at 34 (internal citation and quotation marks omitted).

plaintiff was not harmed because the defendant "did not actually sell" the plaintiff's furniture.[233] Rather, the court held that "[b]y displaying [Plaintiff's] furniture as its own for a lower price, [Defendant] appears to have retained customers that would have otherwise purchased from [Plaintiff], even if it did not actually sell the [furniture] pieces in question."[234]

The same is true here.  Defendants often were able to fulfill the requirements of the bids they won only by representing a product JBT produced.  Just a few days before BGSE submitted its bid for the Lemoore P-328 hangar, Bullerdick sent an email to Twist's Scott Schrinner explaining they had "a lot of work to do" because "[w]hat is designed will not meet the spec[ifications]."[235]  Lacking a compliant PC Air unit designed by Twist, BGSE chose to include the technical specifications of a product that would fulfill the project requirements: JBT's HPCF 3000.  If BGSE declined to represent JBT's PC Air unit as its own, it likely would have lost the project or been forced to source JBT's product rather than Twist's.  Indeed, in May 2015 Bullerdick told another industry contact that "the jetAire JBT product" was "the only one to currently meet the specification" for the Luke Air Force Base F-35 hangar.[236]  Like the plaintiff in *Universal Furniture*, even though Defendants never sold JBT equipment under BGSE's brand, JBT nevertheless lost contracts on which it would have otherwise been the supplier.  BGSE's false designation harmed JBT.

At bottom, "Section 43(a) of the Lanham Act prohibits actions like trademark infringement that deceive consumers and impair a producer's goodwill."[237]  BGSE's actions did

---

[233] *Universal Furniture*, 618 F.3d at 439.

[234] *Id.*

[235] Pl.'s Ex. 97 at 2 (sealed).

[236] Pl.'s Ex. 96 at 2 (sealed).

[237] *Dastar*, 539 U.S. at 32.

both of those things.  Despite ultimately supplying a PC Air unit Twist manufactured, JBT was materially harmed by BGSE's false designation of origin in the post-submittal documents.  In those submittals, the tangible product BGSE was offering for sale was manufactured by JBT, but BGSE represented it was a BGSE design that would be manufactured by Twist.  Absent BGSE's deception, BGSE likely would have been forced to source JBT PC Air units.  JBT is entitled to summary judgment on its false designation of origin claim.

## 2. *False Advertising*

JBT's false advertising claim principally relies on four promotional documents Bullerdick created and disseminated from August 2014 to March 2017: the F-35 Brochure, the Lemoore Brochure, the Eielson F-35 Letter, and the F-35 Equipment History document.[238]  JBT argues these marketing materials contained literally false representations that hindered JBT's ability to sell its PC Air and GPU products.[239]  To succeed on a false advertising claim, a plaintiff must demonstrate:

> (1) that defendant made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in commerce; (3) that are either likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and (4) injure the plaintiff.[240]

---

[238] Dkt. 129 at 41.  Although the central thrust of JBT's arguments revolves around these four documents, JBT also cites "the materials described above [in connection with JBT's false designation of origin claim] which contain false representations."  *Id.*  JBT appears to be referring to (1) BGSE's submittals containing JBT's information and (2) allegedly false statements Bullerdick communicated to various contractors over the years.  *See id.* at 22–30 (cataloguing Bullerdick and BGSE's allegedly false representations).  Besides this passing reference, however, JBT never explains how those documents and statements satisfy the elements required to prove a false advertising claim.  Accordingly, the court does not consider them in assessing this claim.  And even if the court evaluated these additional materials, JBT's claim would fail for the same reasons discussed below.

[239] *Id.* at 40–44.

[240] *Sally Beauty Co., Inc.*, 304 F.3d at 980 (quoting *Cottrell, Ltd.*, 191 F.3d at 1252).

Defendants argue JBT cannot meet its burden on the first prong.  Specifically, Defendants argue JBT cannot establish the statements it complains about are false[241] and that, even if they are, they were not sufficiently disseminated to constitute advertising or promotion under the Lanham Act.[242]  The court takes up each argument in turn.

a.   Some of Defendants' Statements Are Literally False

To satisfy the first prong of a false advertising claim, JBT must establish that Defendants' statements were "either (1) literally false or (2) literally true or ambiguous but implicitly false, misleading in context, or likely to deceive."[243]  JBT points to four statements in particular as evidence of Defendants' false representations: (1) the F-35 Brochure's inclusion of excerpts of two JBT product manuals and two engineering documents that have been stripped of JBT identifiers and replaced with BGSE's logo; (2) the Lemoore Brochure's statement that "[t]he following F 35 specific projects all have BGSE Group Equipment.  All projects completed on this list have installed, commissioned and working 100% BGSE Group Designs"; (3) a similar statement in the Eielson F-35 Letter that "These are BGSE Group Designs.  We produce the bill of material and design and pay for the certifications"; and (4) the statement in the F-35 Equipment History document claiming BGSE brought its designs and expertise to JBT to make "second generation" PC Air units.[244]

---

[241] Dkt. 145 at 21–22.

[242] Dkt. 126 at 22–23.  Defendants also advance in passing an argument that JBT cannot establish the likelihood-of-confusion element.  *See id.* at 21 ("Claims for false advertising . . . must meet the same likelihood of confusion requirements discussed [in opposing JBT's false designation of origin claim]. . . . JBT is unable to meet this requirement, and summary judgment is appropriate.").  But likelihood of confusion is presumed when the offending statements are literally false.  *See Zoller Labs., LLC v. NBTY, Inc.*, 111 F. App'x 978, 982 (10th Cir. 2004) (citation omitted) ("Where the advertisement is literally false, a violation may be established without evidence of consumer deception."); *Nunes v. Rushton*, 299 F. Supp. 3d 1216, 1239 (D. Utah 2018) (same).  Thus, because the court concludes some of Defendants' statements were literally false, JBT satisfies the likelihood of confusion element.

[243] *Chumley*, 627 F. App'x at 684 (citing *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999) and *Cottrell, Ltd.*, 191 F.3d at 1252).

[244] Dkt. 129 at 41.

Defendants never address the statements individually, instead declaring that "the evidence suggests that the representations are indeed true or, at the very least, that they were encouraged and condoned by JBT."[245]  Defendants develop only the second half of their argument—that BGSE should not be liable for the statements because JBT endorsed them.  They cite to their Exhibit 59, a PowerPoint presentation with a slide stating, "Together JBT and BGSE have developed, marketed, and tested power conversion, PC Air, and Aircraft Air Start products for the 21st century warfighters' needs."[246]  Defendants argue this shows "BGSE did indeed have some role in the development of JBT products."[247]  The court is not persuaded.

Defendants overstate the significance of this isolated slide.  The slide merely expresses general sentiments about working together—it does not represent an official endorsement by JBT of BGSE's role in developing any specific products.  Even Bullerdick acknowledged in deposition testimony that BGSE lacks any ownership in JBT's products.[248]

Moreover, Defendants did not dispute JBT's Statement of Fact 15, which asserts the "Jetaire® HPCF 3000 was designed and is manufactured by JBT and is not a BGSE design."[249]  So, whatever BGSE may have contributed to the development of some of JBT's products, it is undisputed that JBT designed and builds the HPCF 3000.  By including portions of the HPCF O&M Manual affixed with the BGSE logo in the F-35 Brochure, Defendants unambiguously represented that the HPCF 3000 is a BGSE product.  That is literally false.  So is Defendants' representation in the Eielson F-35 Letter that the JBT PC Air units incorporated into several F-35

---

[245] Dkt. 145 at 21.

[246] *Id.*

[247] *Id.*

[248] Pl.'s Ex. 12 at 191:22–192:1 (sealed).

[249] Dkt. 129 at 8.

hangars "are BGSE Group designs."[250]  BGSE's assertion that JBT was merely a manufacturer of BGSE's PC Air unit designs finds no support in the record and is contradicted by JBT's evidence.[251]

The challenged statements in the Lemoore Brochure and the F-35 Equipment History document are more vague.  But while perhaps not literally false, these statements are at least "ambiguous but implicitly false, misleading in context, or likely to deceive."[252]  They obscure JBT's role as the designer of the PC Air units supplied to some of the F-35 hangars and overstate BGSE's involvement.  Thus, JBT has met its burden of showing many of Defendants' statements were either literally false or likely to deceive.

<blockquote>

b. JBT Fails to Establish Defendants Sufficiently Disseminated the Materials to Constitute Advertising or Promotion
</blockquote>

Notwithstanding JBT has proved the falsity of Defendants' statements, its claim nonetheless fails because JBT cannot establish Defendants' promotional materials were sufficiently disseminated to support a false advertising claim.  For representations to constitute "commercial advertising or promotion," they must be "(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services . . . [and] (4) must be disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion within that industry."[253]

---

[250] Pl.'s Ex. 53 at 2 (sealed).

[251] *See, e.g.*, Pl.'s Ex. 48 (sealed) (JBT R&D cost spreadsheet for HPCF 3000); Pl.'s Exs. 49–51 (sealed) (JBT project charters for HPCF 3000).

[252] *Chumley*, 627 F. App'x at 684.

[253] *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1273–74 (10th Cir. 2000) (citations and internal quotation marks omitted).

Defendants argue JBT cannot satisfy the final element because none of the materials on which JBT bases its claim were sufficiently disseminated to the relevant purchasing public.  To determine whether marketing materials have been sufficiently disseminated, courts typically "compar[e] the number of instances [of dissemination] to the market size as a whole."[254]  "[T]he extent of distribution necessary to constitute commercial advertising or promotion in a particular case may be an elastic factor, so that a relatively modest amount of activity may be sufficient in the context of a particular case." [255]  For instance, in *Sports Unlimited, Inc. v. Lankford Enterprises, Inc.*, the Tenth Circuit upheld the district court's conclusion that sending a document containing allegedly false statements to two industry contacts was insufficient to constitute advertising where the plaintiff submitted at least 150 bids per year.[256]  Similarly, in *Vivint, Inc. v. NorthStar Alarm Servs., LLC*, the court decided the dissemination question by comparing how many times the false statements were communicated in relation to the market as a whole.[257]  In that case, the plaintiff alleged 216 customers had been subjected to false or misleading statements by the defendant's sales force.[258]  After first identifying the relevant

---

[254] *Vivint, Inc. v. NorthStar Alarm Servs., LLC*, No. 2:16-cv-00106-JNP-EJF, 2019 WL 1098986, at *8 (D. Utah Mar. 8, 2019) (discussing *Vitamins Online, Inc. v. HeartWise, Inc.*, 207 F. Supp. 3d 1233, 1242 (D. Utah 2016)).

[255] *Sports Unlimited, Inc. v. Lankford Enters., Inc.*, 275 F.3d 996, 1005 (10th Cir. 2002) (citation omitted).

[256] *Id.* at 1003–04.

[257] 2019 WL 1098986, at *8–9.

[258] *Id.* at *8.

market as the plaintiff's one million clients, the court concluded that "216 incidents do not rise to the level of widespread dissemination of false statements."[259]

Here, the court is unable to compare the amount of dissemination against the market as a whole because neither party has submitted any evidence from which the court can determine the size of the relevant market.  Defendants maintain JBT's failure to present such evidence is fatal to its claim.  JBT responds that the relevant purchasing public is exceptionally narrow, limited to the design firms, the contractors working with the military, and the military itself.[260]  Given the niche industry, JBT argues it has presented ample evidence for the court to infer the small size of the market.[261]

JBT has submitted evidence, unrefuted by Defendants and accepted by the court, that the relevant market is small.  Bullerdick has acknowledged that the market for PC Air units and GPU systems installed on military bases in F-35 hangars is a "very small industry."[262]  But it remains unclear to the court how small is small.  By JBT's own assessment, the market consists of military designers, contractors (including sub-contractors), and military personnel.  But JBT has introduced no evidence concerning the actual size of that cohort.  The court lacks any basis to assess how many designers, contractors, and sub-contractors the military hires to construct an F-35 hangar, or whether that number varies depending on the individual project.  Nor can the

---

[259] *Id.* at *9.  Defendants suggest JBT was required to submit expert testimony to prove Defendants' advertising was sufficiently widespread.  Dkt. 126 at 23 ("JBT has not presented, and cannot present, given the passing of the expert disclosure deadline, any statistical analysis of the alleged incidents in comparison to the relevant market.").  The court disagrees.  Defendants' argument relies on a misreading of *Vivint*.  There, the court stated that "there must be *some* statistical analysis of the number of alleged incidents in comparison to the relevant market." *Vivint, Inc.*, 2019 WL 1098986, at *9.  But the court was referring only to an analysis akin to the Tenth Circuit's comparison in *Sports Unlimited* of the two incidents of dissemination against the market of 150 bids.  No expert testimony is needed to conduct such a simple comparison.

[260] Dkt. 154 at 26.

[261] *See id.*

[262] Pl.'s Ex. 126 (sealed); *see also* Pl.'s Ex. 127 (sealed) (describing the industry as being "too small . . . like being a resident of a small hometown where everyone knows everyone and everyone knows everyone's business").

court determine how many military contacts between the Navy, Air Force, and Marines should be included in the relevant market.  In other words, the court cannot on its own come up with the appropriate denominator to evaluate the extent of Defendants' dissemination.

JBT advances two arguments to make up for this deficiency.  First, JBT cites *Larkin Group, Inc. v. Aquatic Design Consultants, Inc.*,[263] for the proposition that a court may infer that the size of the relevant purchasing public is "limited to only several customers."[264]  In *Larkin*, the plaintiff alleged the defendant sent false advertising to three members of the relevant purchasing public.[265]  Although the court acknowledged the complaint failed to "provide enough information for the court to ascertain the extent and nature of the relevant purchasing public for the aquatic design services industry," it denied the defendant's motion to dismiss because it could "reasonably infer that the customer base for aquatic design services may very well be limited to only several customers . . . ."[266]  *Larkin*, however, concerned a motion to dismiss.  JBT's allegations in its Complaint about the extent of Defendants' dissemination and the size of the market would be enough to survive a motion to dismiss.  But facing Defendants' Motion for Summary Judgment, JBT needed to submit evidence about the size of the market.  JBT failed to do so and asking the court to draw inferences in its favor is insufficient to create a genuine dispute of material fact.[267]

---

[263] 323 F. Supp. 2d 1121 (D. Kan. 2004).

[264] Dkt. 154 at 25–26.

[265] 323 F. Supp. 2d at 1128.

[266] *Id.*

[267] *See Chumley*, 627 F. App'x at 688 ("The Supreme Court long ago established that a defendant may support its motion for summary judgment on an issue on which the plaintiff bears the burden of proof by arguing that the record lacks any evidence in the plaintiff's favor.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986).  Rule 56 doesn't require that 'the moving party support its motion with affidavits or other similar materials negating the opponent's claim'—so long as it explains why the record doesn't support the opponent's position.  *Id.* at 323.").

Second, JBT points to evidence that BGSE sent a promotional email to 38 individuals involved with F-35 maintenance hangars at military bases.[268] JBT suggests the court should use that number as a reference point to conclude Defendants' dissemination was sufficiently widespread.[269] But the court doubts the underlying assumption in JBT's argument. That on one occasion Bullerdick sent a promotional email to 38 individuals does not establish that those recipients comprise the entirety—or even a rough approximation—of the relevant market. Defendants may have chosen to limit that email's recipients to those with which Defendants had an existing relationship. Conversely, the email may have targeted those contacts with which Defendants had never worked with before but hoped to do so in the future. There are numerous plausible explanations for the number of recipients. Ultimately, the record provides the court no meaningful way to extrapolate the relevant market from the email.

The market for ground support equipment for F-35 hangars is undoubtedly small. But JBT was required to do more to allow the court to gauge how widely Defendants disseminated the challenged statements. Because JBT failed to submit adequate evidence of the size of the market, the court grants Defendants summary judgment on JBT's false advertising claim.

## C.  Trademark Infringement under the Lanham Act (Count Five)

JBT argues Defendants violated the Lanham Act both by displaying its trademarks on BGSE's website and incorporating them into the website's metatags.[270] Because its trademarks are federally registered, JBT brings its trademark infringement claim under Section 32 of the

---

[268] Dkt. 154 at 26 (citing Pl.'s Ex. 125).

[269] *See id.*

[270] Dkt. 154 at 27; Dkt. 129 at 49.  "A metatag is a part of a Web site that is not seen by the public, but is read by search engine web browsers and later used by the browsers to classify the Web site.  Metatags are used to increase the probability that a Web site will be seen by a customer who has typed a particular search query into his or her search engine."  *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1233 n.3 (10th Cir. 2006) (citing Deborah F. Buckman, Annotation, *Initial Interest Confusion Doctrine under Lanham Trademark Act*, 183 A.L.R. Fed. 553).

Lanham Act, 15 U.S.C. § 1114.[271]  To establish its claim for trademark infringement, JBT must show: "(1) that the plaintiff has a protectable interest in the mark; (2) that the defendant has used an identical or similar mark in commerce; and (3) that the defendant's use is likely to confuse consumers."[272]

Defendants contest only the third element—whether their use of JBT's trademarks was likely to confuse consumers.  But the court's ability to determine whether either party is entitled to summary judgment is impeded by the parties' minimal briefing and failure to identify and apply the applicable standard.  The Tenth Circuit has repeatedly identified six factors that should be considered when assessing whether a likelihood of confusion exists:

> (a) the degree of similarity between the marks;
>
> (b) the intent of the alleged infringer in adopting its mark;
>
> (c) evidence of actual confusion;
>
> (d) the relation in use and the manner of marketing between the goods or services marketed by the competing parties;
>
> (e) the degree of care likely to be exercised by purchasers; and
>
> (f) the strength or weakness of the marks.[273]

"Likelihood of confusion is ordinarily a question of fact for the jury, but summary judgment is appropriate if no reasonable juror could find that such a likelihood exists."[274]

---

[271] While Section 32 of the Lanham Act protects owners of registered marks, Section 43 protects owners of valid marks regardless of whether they are registered.  *See* 15 U.S.C. §§ 1114(1)(a), 1125(a).

[272] *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1238 (10th Cir. 2013) (internal quotation marks and citations omitted).  Although the Circuit Court was listing the elements for infringement of Section 43 of the Lanham Act, it acknowledged the elements for a violation of Section 32 are "nearly identical," with the only difference being the presumption of the mark's validity when asserting a Section 32 claim.  *Id.*

[273] *Id.* at 1239 (citing *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089–90 (10th Cir. 1999)).

[274] *Id.* at 1242 (citations omitted).

JBT never discusses these factors, and Defendants do so only in passing.[275]  This oversight is puzzling, particularly because "[t]he *central* question in a typical infringement action under either § 32 or § 43(a) is whether the defendant's use of the plaintiff's mark is likely to cause consumer confusion."[276]  The court is left to assess the relevant evidence in light of these factors notwithstanding the parties' failure to do so in the first instance.

In its Motion, JBT asserts likelihood of confusion under a distinct theory known as initial-interest confusion.[277]  "Initial-interest confusion 'results when a consumer seeks a particular trademark holder's product and instead is lured to the product of a competitor by the competitor's use of the same or a similar mark.'"[278]  Thus, "the improper confusion occurs even if the consumer becomes aware of the defendant's actual identity before purchasing the product."[279]  In the internet context, initial interest confusion "derives from the unauthorized use of trademarks to divert internet traffic, thereby capitalizing on a trademark holder's goodwill."[280]

Here, initial-interest confusion could arise as follows.  A consumer, likely a contractor preparing a bid, types "Jetaire PC Air unit" into an internet search engine.  A link to JBT's website would invariably appear in the search results.  However, because Defendants incorporated that same trademark into BGSE's metatags, a link to BGSE's website would also appear.  The contractor may click on the BGSE link, believing she could learn more about or obtain Jetaire equipment through BGSE.  Although the contractor would eventually learn that

---

[275] Dkt. 159 at 9.

[276] *1-800 Contacts*, 722 F.3d at 1238 (emphasis added).

[277] Dkt. 129 at 49.

[278] *1-800 Contacts*, 722 F.3d at 1239 (quoting *Australian Gold*, 436 F.3d at 1238).

[279] *Id.* (citing *Australian Gold*, 436 F.3d at 1238–39).

[280] *Australian Gold*, 436 F.3d at 1239 (citing *Nissan Motor Co. v. Nissan Comput. Corp.*, 378 F.3d 1002, 1018 (9th Cir. 2004)).

was not the case, Bullerdick or some other BGSE representative may be able to convince the contractor to incorporate a competitor's equipment into the bid in place of JBT's.[281]

This theory of likelihood of confusion is evaluated under the same six-prong test laid out above.[282]  Eschewing the test the court is required to apply, JBT instead cites several cases from the Ninth Circuit suggesting it is enough to show initial interest confusion where the defendant has used the plaintiff's trademarks in the metatags of the defendant's website.[283]  Because it is undisputed Defendants used JBT's trademarks in the metatags of BGSE's website, JBT argues it is entitled to summary judgment.[284]  The court disagrees.

Although the first two factors—similarity between the marks and the intent of the alleged infringer—weigh in JBT's favor, it has presented no evidence concerning the remaining four factors.  This deficiency is most notable regarding evidence of actual confusion, which "is often considered the best evidence of a likelihood of confusion."[285]  And weighing perhaps heaviest against likelihood of confusion is the fifth factor, the degree of care likely to be exercised by purchasers.  Buyers of expensive, sophisticated military equipment for use with F-35 hangars are unlikely to make such purchases on a whim.  Unlike the purchasers of tanning lotions in *Australian Gold, Inc. v. Hatfield*, contractors do not casually place PC Air units and GPUs into their digital shopping carts.  Indeed, from the parties' papers it appears buyers do not purchase

---

[281] *See 1-800 Contacts*, 722 F.3d at 1243–44 (quoting *Vail Assocs., Inc. v. Vend–Tel–Co., Ltd.*, 516 F.3d 853, 872 (10th Cir. 2008)) ("Initial interest confusion is a 'bait and switch' tactic that permits a competitor to *lure* consumers away from a service provider by passing off services as those of the provider, notwithstanding that the confusion is dispelled by the time of sale.").

[282] *Australian Gold*, 436 F.3d at 1239.

[283] Dkt. 129 at 49.

[284] *Id.* at 49–50.

[285] *Hornady Mfg. Co., Inc. v. Doubletap, Inc.*, 746 F.3d 995, 1004 (10th Cir. 2014) (citing *Water Pik, Inc. v. Med–Sys., Inc.*, 726 F.3d 1136, 1144 (10th Cir. 2013)).

the ground support equipment at issue here directly from a website.[286]  The fourth factor, the similarity of products and manner of marketing, is largely inapplicable here as Defendants acted as a distributor of JBT's products and do not manufacture their own products.  Finally, neither party has submitted any evidence concerning the strength of JBT's trademarks.  The court considers this final factor neutral.

Weighing these factors together, the court concludes a reasonable jury could return a verdict for Defendants on the likelihood of confusion element.  Accordingly, JBT is not entitled to summary judgment.

Defendants' Motion for Summary Judgment fares no better.  Although Defendants assert JBT failed to prove likelihood of confusion, Defendants acknowledge JBT submitted evidence related to the first two factors of the likelihood of confusion test.[287]  As discussed above, JBT submitted evidence Defendants used its trademarks exactly and did so with the intent to lure customers away from JBT.  No one factor is dispositive, "[b]ut the degree of similarity is the most important factor."[288]  Where a defendant uses its competitor's mark exactly, the degree of similarity factor weighs heavily in the plaintiff's favor.[289]  Thus, even though Defendants are correct that JBT failed to submit evidence pertaining to four of the six relevant factors, the court nevertheless concludes a reasonable jury could return a verdict for JBT on the likelihood of confusion element.  In short, a genuine dispute of material fact exists concerning whether

---

[286] *See, e.g.*, Dkt. 126 ¶¶ 14–25 (explaining JBT and BGSE would work with contractors to submit bids for government contracts).

[287] *See* Dkt. 159 at 9 n.28 ("Defendants find nothing in the record that could support four of the six factors generally considered when evaluating a trademark claim . . . .").  By negative implication, Defendants concede there is evidence in the record supporting two of the six factors.

[288] *Affliction Holdings, LLC v. Utah Vap or Smoke, LLC*, 935 F.3d 1112, 1115 (10th Cir. 2019) (citing *Hornady*, 746 F.3d at 1001 and *King of the Mountain Sports, Inc.*, 185 F.3d at 1090).

[289] *Australian Gold*, 436 F.3d at 1240 ("In this case, the degree of similarity of the marks weighed heavily in favor of Plaintiffs, since the trademarked terms were identical to the terms used by Defendants.").

Defendants' use of JBT's trademarks was likely to cause confusion, and the court denies both parties' Motions on JBT's trademark infringement claim.

### D.  Breach of Contract (Counts Six, Seven, & Eight)

JBT contends Defendants breached three agreements—the 2011 Confidentiality Agreement between JBT and Bullerdick, the 2011 NDA between JBT and BGSE, and the 2012 Distributorship Agreement between JBT and BGSE.[290]  To prevail on its breach of contract claims, JBT must prove: (1) existence of a contract, (2) performance by JBT, (3) breach of the contract by the other party, and (4) damages.[291]  In both their Motion for Summary Judgment and Opposition to JBT's Motion, Defendants dispute only the third element, contending they did not breach the relevant contracts or that their breach was excusable.[292]  Thus, the court confines its analysis to that issue.[293]

### 1.  *2011 Confidentiality Agreement (Against Bullerdick)*

JBT argues Bullerdick breached the 2011 Confidentiality Agreement by "(1) failing to maintain in confidence all confidential and proprietary information related to JBT's business

---

[290] Dkt. 129 at 57–60.

[291] *See Am. W. Bank Members, L.C. v. Utah*, 2014 UT 49, ¶ 15, 342 P.3d 224.

[292] *See* Dkt. 126 at 24–26; Dkt. 145 at 29–30.

[293] At the summary judgment hearing, the court queried whether JBT had presented evidence it suffered damages from Defendants' breaches.  JBT contended that it had throughout its briefing (though perhaps not specifically in the contract section of its brief) and that, regardless, Defendants waived the issue by failing to raise it either in their opposition to JBT's Motion or in their own Motion.  Defendants conceded they had not addressed the damages issue in their papers but argued this failure was irrelevant as to JBT's Motion because, as the party who will carry the burden of persuasion at trial, JBT had an affirmative burden to establish each element of its claims.  JBT has the better argument here.  "[A] party forfeits any issue so sparsely presented, as '[courts] need not . . . manufacture' arguments for the litigants before [them]."  *Clark v. Colbert*, 895 F.3d 1258, 1267 (10th Cir. 2018) (quoting *Eateries, Inc. v. J.R. Simplot Co.*, 346 F.3d 1225, 1232 (10th Cir. 2003)).  Here, Defendants' argument concerning the sufficiency of JBT's evidence of damages was not sparsely presented—it was never made at all until the court raised the issue at the hearing.  Moreover, JBT argued throughout its Motion that it had been damaged by Defendants' serial contractual breaches.  *See* Dkt. 129 at 59–60.  By never disputing that assertion, Defendants conceded that point.  *See Sykes v. Dudas*, 573 F. Supp. 2d 191, 202 (D.D.C. 2008) ("[W]hen a party responds to some but not all arguments raised on a Motion for Summary Judgment, a court may fairly view the unacknowledged arguments as conceded.").  And notwithstanding JBT's poor organization on this issue, there is ample evidence in the record demonstrating that Defendants' breaches damaged JBT.

during his employment and after; and (2) failing to return JBT's information upon termination of his employment in April 2014."[294]

The 2011 Confidentiality Agreement required that Bullerdick "agree to maintain in confidence all information pertaining to [JBT's] business" to which he had access, including "information related to [JBT's] products, inventions, trade secrets, know-how, systems, formulae, [and] processes."[295]  Further, Bullerdick "agree[d] not to use, communicate or disclose . . . such information orally, in writing or by publication either during [his] employment *or thereafter* . . . ."[296]  Finally, the 2011 Confidentiality Agreement required Bullerdick to return to JBT "all writings, documents, files, records, drawings, models, tools, and other property of [JBT] . . . upon termination of" his employment.[297]

In addition to retaining JBT's confidential information long after Bullerdick was terminated, JBT asserts "Defendants went on to use, communicate and disclose much of the wrongfully-maintained JBT information, in further direct violation of the 2011 Confidentiality Agreement."[298]  For example, it is undisputed that in August and September of 2015, Bullerdick emailed Twist representatives to provide them with portions of JBT's proprietary information.[299]

Defendants never directly confront JBT's arguments related to the 2011 Confidentiality Agreement.  In addressing JBT's contract claims generally, Defendants instead explain that JBT

---

[294] Dkt. 129 at 57.

[295] Pl.'s Ex. 109 ¶ 5.

[296] *Id.* (emphasis added).

[297] *Id.*

[298] Dkt. 129 at 58–59.

[299] Pl.'s Ex. 54 (sealed) (August 27, 2015 email from Bullerdick to Twist representatives Don Maynard and Scott Schrinner, explaining they "have a lot of ground to make up" and attaching "a library of confidential info to reference"); Pl.'s Ex. 94 (sealed) (August 31, 2015 email from Bullerdick to Twist attaching an electronic copy of the HPCF O&M Manual); Pl.'s Ex. 97 (sealed) (September 3, 2015 email to Twist attaching a file named "CAS Master Controller.pdf"); Pl.'s Ex. 20 at 103:10–106:11.

continued to provide Bullerdick documents and information as he continued to promote and sell JBT's products for several years after he was terminated.[300]  Although Defendants never explicitly explain why this fact absolved Bullerdick of his contractual obligations, they imply that Bullerdick and JBT's continued business relationship empowered Bullerdick to use JBT's information as he saw fit in promoting JBT's products.[301]  However, Defendants do not cite any legal authority to support their argument, and their attempted defense presents no cognizable legal theory that excuses Bullerdick's clear breaches of the 2011 Confidentiality Agreement. Nor do Defendants dispute that Bullerdick disclosed JBT's proprietary information to Twist.[302] That disclosure indisputably breached the 2011 Confidentiality Agreement's requirement that Bullerdick "maintain in confidence all information pertaining to [JBT's] business" to which he had access, including "information related to [JBT's] products, inventions, trade secrets, know-how, systems, formulae, processes."[303]  JBT is entitled to summary judgment as to the 2011 Confidentiality Agreement.[304]

### 2. *2011 NDA (Against BGSE)*

JBT's claim that BGSE breached the 2011 NDA is premised on the same facts underlying its contract claim against Bullerdick—"BGSE's . . . extensive unauthorized use of JBT's material for its own benefit."[305]  Under the 2011 NDA, BGSE was required to maintain "in confidence"

---

[300] Dkt. 145 at 29.

[301] *See id.* at 29–30.

[302] Although Bullerdick's employment with JBT ended before he disclosed this information, Bullerdick's obligation under the 2011 Confidentiality Agreement to maintain JBT's information in confidence continued after his termination.  Pl.'s Ex. 109 ¶ 5.

[303] *Id.*

[304] To the extent Defendants assert an equitable estoppel defense to the 2011 Confidentiality Agreement, the court rejects this theory for the same reasons discussed below concerning the 2011 NDA.

[305] Dkt. 129 at 60.

the confidential information it received from JBT and agreed "to refrain from the use of the Confidential Information for any purpose other than in furtherance of the Disclosure purpose."[306] "Confidential Information" is defined broadly and includes "trade secrets, know-how, designs, and proprietary commercial and technical information, methods, practices, procedures, processes and formulas . . . ."[307]   The 2011 NDA bound the parties "for a period of five (5) years from the date of last receipt of the Confidential Information."[308]

Defendants advance three theories to excuse BGSE's transmission of JBT's confidential information to third parties.

First, Defendants argue two contractual exceptions apply.  The NDA did not apply to any confidential information that "(b) was already known to the receiving party at the time of disclosure hereunder as demonstrated by the receiving party's prior written records; . . . or (e) is approved for release in writing by an authorized representative of the disclosing party."[309] Defendants assert that at the time the NDA was signed, Bullerdick had already been an employee of JBT for several months and was also a member of BGSE.[310]  Therefore, Defendants argue, exception (b) applies here because JBT's confidential information was already known to BGSE through Bullerdick.[311]

Defendants' argument is unavailing.  To satisfy its own internal ethical concerns, JBT insisted that Bullerdick could not be both a JBT employee and an owner of BGSE.[312]  Thus, at

---

[306] Pl.'s Ex. 110 ¶ 2.

[307] *Id.* ¶ 1.

[308] *Id.* ¶ 2.

[309] *Id.* ¶ 5.

[310] Dkt. 126 at 25.

[311] *Id.*

[312] Dkt. 154 at 28 (citing Pl.'s Ex. 119) (sealed).

the time JBT and BGSE executed the 2011 NDA, BGSE did not have access to JBT's confidential information through Bullerdick.  And even if it had, exception (b) still would not apply because Defendants have submitted no evidence showing they complied with exception (b)'s requirement that the receiving party allegedly already in possession of the confidential information must demonstrate its prior knowledge in its written records.

Defendants contend exception (e) of the NDA also applies here because "BGSE often received written permission to use or release JBT documents or information."[313]  It is unclear why Defendants believe this fact absolves BGSE of liability for breach of the NDA.  That is, JBT does not dispute that it gave Defendants specific permission at times to disclose particular documents to third parties.  But Defendants make no attempt to show they were given written permission to disclose the confidential information and documents that JBT complains about—for example, "altering [JBT's] documents to make them appear to be BGSE work product, and then using such altered material as a marketing tool to sell non-JBT products."[314]  Accordingly, exception (e) does not apply.

Second, Defendants argue JBT cannot prevail on any of its contract claims because they are barred by the doctrine of equitable estoppel.[315]  To prove equitable estoppel, Defendants must establish:

> (1) a statement, admission, act, or failure to act by one party inconsistent with a claim later asserted; (2) reasonable action or inaction by the other party taken on the basis of the first party's statement, admission, act, or failure to act; and (3) injury to the second party that would result from allowing the first party to contradict or repudiate such statement, admission, act, or failure to act.[316]

---

[313] Dkt. 126 at 25.

[314] Dkt. 154 at 28–29 (citing Pl.'s Exs. 30, 38, 53, 58).

[315] Dkt. 126 at 25.  In arguing equitable estoppel, Defendants do not explain how the defense applies to each contract individually.  Rather, Defendants made a blanket assertion that equitable estoppel precludes the enforcement of all three of the relevant contracts.

[316] *Whitaker v. Utah State Ret. Bd.*, 2008 UT App 282, ¶ 22, 191 P.3d 814.

Defendants' equitable estoppel defense is wholly inapplicable to their breaches of the 2011 NDA.  Though unclear, Defendants appear to argue JBT should be estopped from enforcing the confidentiality provisions of the 2011 NDA because "JBT regularly provided documents and information to BGSE, and on occasion explicitly instructed Bullerdick and BGSE to send information on to customers or to remove references to JBT."[317]  But that is not evidence of a statement or failure to act that demonstrates JBT would not enforce the NDA's requirement that BGSE maintain JBT's information in confidence.  JBT introduced evidence that Defendants "routinely stripped JBT's name, logo, confidentiality notices and other identifying information from JBT original documents, and passed these original documents off as BGSE's own documents" to sell non-JBT equipment.[318]  No reasonable jury could conclude Defendants' conduct was reasonably based on JBT's prior actions simply because JBT at times gave BGSE specific permission to alter JBT documents to help sell JBT equipment.  Equitable estoppel is inapplicable to Defendants' violations of the 2011 NDA.

Finally, Defendants argue JBT's failure to identify the specific dates on which it supplied various documents to Defendants is fatal to its contract claims.[319]  The court disagrees.  Under the 2011 NDA, BGSE was required to maintain in confidence JBT's confidential information for five years after BGSE received it.  JBT likely disclosed pieces of its confidential information to BGSE over time.  But even if JBT disclosed all the relevant confidential information on November 11, 2011—the day the 2011 NDA was signed—BGSE's confidentiality obligations extended until at least November 11, 2016.  Because most of the improper disclosures JBT

---

[317] Dkt. 126 at 26.

[318] Dkt. 154 at 29.

[319] *See* Dkt. 159 at 14–15.

complains of occurred before that date, it is irrelevant when the confidential information was provided to BGSE.[320]

Bullerdick's and BGSE's improper uses and disclosures of JBT's confidential information clearly breached the 2011 NDA.  None of Defendants' asserted defenses excuses those serial breaches.  Accordingly, the court grants JBT summary judgment on its 2011 NDA breach of contract claim.

### 3. *2012 Distributorship Agreement (Against BGSE)*

JBT argues BGSE breached the 2012 Distributorship Agreement by "BGSE's failure to return JBT's material" after the Agreement terminated.[321]  Under Paragraph 12, within thirty days of termination of the Agreement, BGSE was required to return "all price lists, catalogs, operating and service manuals, advertising literature and display material relating to the Products . . . ."[322]

Here, it is undisputed that BGSE retained JBT materials beyond the thirty days within which the 2012 Distributorship Agreement required BGSE to return them.[323]  Thus, absent a valid defense, BGSE breached that contract.

---

[320] *See supra* note 299.

[321] Dkt. 129 at 60.  JBT appears to argue that BGSE's "extensive unauthorized use of JBT's material for its own benefit" also constitutes an independent breach of the 2012 Distributorship Agreement.  *See id.*  It is true that the 2012 Distributorship Agreement contained confidentiality requirements requiring BGSE to retain JBT's confidential information "in confidence" and forbidding BGSE from using JBT's information "except as expressly agreed."  Pl.'s Ex. 111 ¶ 6(B). But the confidentiality requirements under the 2012 Distributorship Agreement appear to have expired when the contract terminated in 2013.  *See id.* ¶ 3 ("This Agreement . . . shall remain effective for one year."); ¶ 12 ("[BGSE's] obligations under Paragraphs 4(G), 4(H) and 8(A) shall survive the termination of this Agreement.").  BGSE's confidentiality obligations are located in Paragraph 6(B), indicating they did not continue after the Agreement was terminated.  Thus, because all JBT's allegations of BGSE's improper disclosure and use of JBT information occurred after the 2012 Distributorship Agreement terminated, any claim for breach of the 2012 Distributorship Agreement must stem from BGSE's failure to return JBT's materials.

[322] *Id.* ¶ 12.

[323] Dkt. 129 at 58.

Defendants argue equitable estoppel excuses their conduct, insisting JBT should be barred from now enforcing Paragraph 12 because "[a]fter the expiration of the distributorship agreement . . . Defendants relied on JBT's failure to strictly enforce the contract terms limiting Defendants' use of JBT documents and information."[324]  Presumably, Defendants mean they did not return JBT's materials in accordance with Paragraph 12 because they believed JBT wanted them to continue using those documents to sell JBT equipment.  As noted above, Defendants must prove three elements to prevail on their estoppel argument: (1) a statement, admission, act, or failure to act by JBT inconsistent with a later-asserted claim; (2) reasonable action or inaction by BGSE taken on the basis of JBT's statement, admission, act, or failure to act; and (3) injury to BGSE that would result from allowing JBT to contradict its statement, admission, act, or failure to act.[325]

As an initial matter, it is unclear to the court as a matter of Utah law that equitable estoppel applies in this context, where one party seeks to modify the terms of a contract negotiated at arms' length by two sophisticated commercial parties.  Defendants do not direct the court to any legal authority applying equitable estoppel in a comparable case, nor has the court's own research revealed such a decision.

In any event, because equitable estoppel is an affirmative defense, Defendants bear the burden of proving each element.[326]  Defendants have failed to carry their burden.  Defendants do not explain, for instance, why JBT was required to make a formal request of Defendants to trigger BGSE's obligation to return JBT's materials.  Paragraph 12 of the 2012 Distributorship

---

[324] Dkt. 126 at 26.

[325] *See Whitaker*, 2008 UT App 282, ¶ 22.

[326] *State v. Hamilton*, 2003 UT 22, ¶ 35, 70 P.3d 111 ("Since estoppel is an affirmative defense, [Defendant] bore the burden of proving reliance.").

Agreement states that within 30 days after the termination of the Agreement, BGSE "shall return" JBT's materials.[327]  BGSE's contractual obligation was not conditional on JBT asking for its materials back.  Thus, there was no inaction on the part of JBT on which BGSE could have relied to excuse its duty to return JBT's documents and information.  Indeed, JBT initiated this lawsuit in part to enforce BGSE's failure to return its materials.  Having failed to establish a necessary element of its defense, Defendants' equitable estoppel argument fails.  Because Defendants raise no other defenses excusing their breach, JBT is entitled to summary judgment.

In sum, Bullerdick's and BGSE's improper uses and disclosures of JBT's confidential information clearly breached Bullerdick's 2011 Confidentiality Agreement and the 2011 NDA, and the court grants JBT summary judgment on those claims.  And because Defendants advance no valid defense for their breach of the 2012 Distributorship Agreement, the court similarly grants JBT summary judgment on that claim.

### E.  Defamation (Count Nine)

JBT alleges Defendants published numerous false statements that defame JBT and its products.[328]  Defendants argue the relevant one-year statute of limitations bars JBT's claim, JBT cannot present any evidence it was damaged by the allegedly defamatory statements, and "critical" statements Defendants made about JBT are not actionable.[329]

The court need not take up Defendants' argument vis-à-vis the statute of limitations because it concludes that, even if the discovery rule saves JBT's claim,[330] Defendants are entitled to judgment as a matter of law on the merits.  Defendants argue JBT's claim fails

---

[327] Pl.'s Ex. 111.

[328] Dkt. 129 at 51–53.

[329] Dkt. 126 at 27, 29.

[330] *See Williams v. Howard*, 970 P.2d 1282, 1284 (Utah 1998) ("The discovery rule functions as an exception to the normal application of a statute of limitation.") (citations omitted).

because it cannot point to any evidence it was damaged by any of their allegedly defamatory statements.[331]  Tacitly conceding it has not submitted any evidence of damages, JBT responds only that "a showing of special damages is not required because Defendants' actions amount to slander *per se* and entitle JBT to general damages."[332]

To prevail on a defamation claim, JBT must prove Defendants "[1] published the statements concerning [the plaintiff], [2] that the statements were false, defamatory, and not subject to any privilege, [3] that the statements were published with the requisite degree of fault, and [4] that their publication resulted in damage."[333]  A statement is defamatory if it "impeaches an individual's honesty, integrity, virtue, or reputation and thereby exposes the individual to public hatred, contempt, or ridicule."[334]  However, a publication is not defamatory "simply because it is nettlesome or embarrassing to a plaintiff, or even because it makes a false statement about the plaintiff."[335]

Claims of defamation per se face an even more stringent standard.  Defamatory statements that are slander per se fall into one of four categories: "(1) charge of criminal conduct, (2) charge of a loathsome disease, (3) charge of conduct that is incompatible with the exercise of a lawful business, trade, profession, or office; and (4) charge of the unchastity of a woman."[336]  Further, "[w]hether defamatory words constitute slander per se depends on their injurious

---

[331] Dkt. 126 at 29.

[332] Dkt. 154 at 32.  *See Macris v. Sevea Int'l, Inc.*, 2013 UT App 176, ¶ 44, 307 P.3d 625 (citing *Allred v. Cook*, 590 P.2d 318, 321 (Utah 1979)) ("[S]lander per se does not require a showing of special damage because damages and malice are implied.").

[333] *West v. Thomson Newspapers*, 872 P.2d 999, 1007–08 (Utah 1994).  Where the plaintiff is not a public figure, negligence is the requisite degree of fault.  *Oman v. Davis Sch. Dist.*, 2008 UT 70, ¶ 69, 194 P.3d 956.

[334] *West*, 872 P.2d at 1008.

[335] *Id.* at 1009 (internal quotation marks and citation omitted).

[336] *Allred*, 590 P.2d at 320 (citation omitted).

character.  That is, the words must be of such common notoriety that the injury can be presumed from the words alone."[337]  The standard for libel per se is similar: "[l]ibel is classified per se if it contains defamatory words specifically directed at the person claiming injury, which words must, on their face, and without the aid of intrinsic proof, be unmistakably recognized as injurious."[338]

JBT includes in its Motion numerous examples of Defendants' allegedly false statements.[339]  For example, JBT emphasizes Bullerdick's representation to contractors that "JBT AeroTech builds 270VDC and CAS as a **licensee** of BGSE Group design specifications" and that "BGSE Group is the designer and owner of the technology."[340]  However, in opposing Defendants' Motion, JBT highlights three statements in particular to support its argument that Defendants' actions constitute defamation per se:

- "You have to remember [JBT was] our supplier and BGSE experience they steal very easily as their experience . . .  What JBT can't come up with themselves they lie and steel [sic] and just recently in Israel they told the customer they would buy and resell USS PITs.  A complete lie but they said this so they could fool the customer into the order and then build themselves. . . .  They are familiar with these designs and like everything else they steal from their partner companies they are clearly ready to steal some more."[341]

- "JBT takes my experience as their experience. The only orders JBT has ever had are from BGSE for JBT to make our designs."[342]

- "[JBT] wanted to exploit our technology as their own and for a lot of reasons I can't discuss we have taken a step back from JBT."[343]

---

[337] *Id.* at 321 (citation omitted).

[338] *Seegmiller v. KSL, Inc.*, 626 P.2d 968, 977 n.7 (Utah 1981) (internal quotation marks and citation omitted).

[339] Dkt. 129 at 51–53.

[340] *Id.* at 51 (citing Pl.'s Ex. 40 (sealed)).

[341] Pl.'s Ex. 146 (sealed) (e-mail from Bullerdick to Jason Bodine of DBS HVAC).

[342] Pl.'s Ex. 42 at 3 (sealed) (e-mail from Bullerdick to Neil Barton of Oakland Construction).

[343] Pl.'s Ex. 39 at 2 (sealed) (e-mail from Bullerdick to Bob Diez of Harris Construction).

Some of these statements are defamatory.  Indeed, there can be no question the first statement impeaches JBT's honesty, integrity, and reputation.  But "rhetorical hyperbole" vaguely accusing a business of wrongdoing does not rise to the level of defamation per se.[344]  In *Westmont Residential LLC v. Buttars*, an apartment complex sued a former tenant for defamation per se because the tenant posted an online review describing the complex as "crooks" that "will take full advantage of you!"[345]  While acknowledging that the term "crooks" could carry a criminal connotation, the Utah Court of Appeals held that "in the context of Defendants' online review, the term is clearly not being used in this manner."[346]  Similarly, Bullerdick's allegations of JBT lying and stealing does not actually accuse JBT of unlawful conduct.[347]  At bottom, though inappropriate, Defendants' statements are not of such common notoriety or unmistakably injurious to relieve JBT of its burden to prove it was damaged.  Because the court determines Defendants' statements are not defamatory per se and JBT has not introduced evidence of special damages, the court grants Defendants summary judgment on this claim.

### F.  Tortious Interference (Count Ten)

JBT argues Defendants tortiously interfered with JBT's prospective economic advantage by employing misrepresentations to try to convince contractors not to source JBT equipment.[348]  To prevail on its claim for tortious interference with prospective economic advantage, JBT must show that Defendants "[1] acted without justification [2] in 'inducing a third party to refrain

---

[344] *See Westmont Residential LLC v. Buttars*, 2014 UT App 291, ¶ 24, 340 P.3d 183 (quoting *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 14 (1970)).

[345] *Id.* ¶ 5.

[346] *Id.* ¶ 24.

[347] *See Nunes*, 299 F. Supp. 3d at 1231 (holding the defendant had not defamed the plaintiff despite describing the plaintiff's litigation fundraising as a "fraud," "hoax," and "scam" because there was no indication the defendant "imputed specific criminal conduct" to the plaintiff).

[348] Dkt. 129 at 55.

from entering into a contract with them [3] which contract would have ensued but for the interference.'"[349]

JBT asserts Bullerdick interfered with two prospective projects related to the Luke Air Force Base.[350]  Specifically, Bullerdick told key contacts on those projects that JBT's past products were built "as a licensee of BGSE Group designs," JBT was no longer making "the design supplied previously under BGSE license agreement," and JBT had not been forthcoming with that information.[351]  Even if JBT has entered sufficient evidence to succeed on the first two elements of its claim, Defendants correctly contend JBT failed to present evidence it would have won the respective contracts but for Bullerdick's misrepresentations.[352]  And Defendants present evidence JBT acknowledged it may have lost contracts, including the Luke Air Force Base projects, because it had not taken a bundled approach in its bids, and its unit price was too high.[353]

JBT responds the evidence is "overwhelming" it would have obtained multiple PC Air and GPU equipment contracts but for Defendants' tortious interference.[354]  But while JBT's Motion relies solely on lost contracts for projects at Luke Air Force Base, its Reply emphasizes evidence that Defendants were the but-for cause of its losing contracts on the Lemoore P-328, Beaufort P-465, and Kadena P-803 projects.[355]  Because JBT argued why Defendants were the

---

[349] *Walker v. Sloan*, 529 S.E.2d 236, 242 (N.C. Ct. App. 2000) (quoting *Cameron v. New Hanover Mem'l Hosp.*, 293 S.E.2d 901, 916–17 (N.C. Ct. App. 1982)).

[350] Dkt. 129 at 55.

[351] *Id.* (quoting Pl.'s Ex. 40).

[352] Dkt. 145 at 28.  At the summary judgment hearing, JBT conceded it had not addressed this element in its opening Motion.

[353] *Id.* (citing Defs.' Ex. 68) ("We have lost a few of these nice Project jobs recently (Lemoore, Luke and others) but possibly due to either 'approach' (meaning lack of bundling with the Pits) or due to unit price??").

[354] Dkt. 164 at 18.

[355] *Id.*

"but for" cause of its lost contracts on those projects for the first time in Reply, Defendants were deprived of the opportunity to respond.  Thus, the court will not consider those arguments.[356] Having failed to submit evidence concerning an essential element of its claim, JBT is not entitled to judgment as a matter of law.

But neither are Defendants entitled to summary judgment.  Defendants' Motion relies on the same argument just discussed, *i.e.*, that JBT cannot show it would have won contracts "but for" Defendants' actions.[357]  In opposing Defendants' Motion, however, JBT introduced evidence it would have won contracts to supply PC Air for the Lemoore P-328, Beaufort P-465, and the Kadena P-803 projects were it not for Defendants' fraudulent conduct.[358]  That is, JBT argues it was the only PC Air unit supplier whose products met the required specifications for these projects.  If Bullerdick had not submitted fraudulent bids representing that Twist also had compliant products, JBT contends it would have won the contracts.[359]  Based on the evidence JBT submitted, a reasonable jury could return a verdict in JBT's favor.  Accordingly, summary judgment for Defendants is inappropriate.

To recap, the court grants JBT summary judgment on its federal and state misappropriation of trade secrets claims, its false designation of origin claim, and each of its breach of contract claims.  The court grants Defendants summary judgment on JBT's claims for false advertising and defamation.  Both parties' motions are denied as to JBT's trademark infringement and tortious interference claims.  Having resolved the parties' cross-motions related to JBT's affirmative claims, the court turns to Defendants' counterclaims.

---

[356] "[A] party waives issues and arguments raised for the first time in a reply brief."  *Gutierrez v. Cobos*, 841 F.3d 895, 902 (10th Cir. 2016) (quoting *Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011)).

[357] Dkt. 126 at 30.

[358] Dkt. 154 at 37–38.

[359] *Id.*

## II.  Defendants' Counterclaims

Defendants initially asserted six counterclaims.[360]  On JBT's Motion, the court dismissed Defendants' sixth counterclaim concerning the Utah Truth in Advertising Act.[361]  In Defendants' first counterclaim, they sought a declaratory judgment that "they are not prohibited from disclosing their past relationship with JBT, that they have the right to install and service JBT-manufactured equipment currently in their possession and that they have the right to pursue future service contracts over JBT-manufactured equipment."[362]  After JBT represented at an earlier hearing it was not disputing Defendants' ability to make the relevant representations, the court concluded "the relief sought in the declaratory judgment counterclaim is moot."[363]  The parties' summary judgment briefing suggests the issues raised in Defendants' first counterclaim remain moot.  Accordingly, the court dismisses without prejudice Defendants' counterclaim for declaratory judgment.

In the four remaining counterclaims, Defendants allege JBT is liable for negligent misrepresentation, defamation, tortious interference, and unfair or deceptive trade practices for conduct stemming from the parties' business relationship as well as JBT's actions after it filed this lawsuit.[364]  JBT moves for summary judgment on all four counts.[365]  The court addresses each counterclaim in turn.

---

[360] Dkt. 108 at 29–34.

[361] *See* Dkt. 121.

[362] Dkt. 108 at 30 ¶ 67.

[363] Dkt. 123 at 28:17–18.

[364] *See* Dkt. 108.

[365] Dkt. 134.

## A.  Negligent Misrepresentation (Count Three)

Defendants ground their claim for negligent misrepresentation in JBT's statements that it would (1) enter into a renewed distribution agreement with Defendants and (2) assist Defendants with their bid on the Lakehurst SMEPP deal.[366]  JBT maintains Defendants' claim fails as a matter of law because JBT owed Defendants no duty of care, and it did not make any negligent misrepresentations.  The court agrees.

"[T]he tort of negligent misrepresentation occurs when a party [1] justifiably relies [2] to his detriment [3] on information prepared without reasonable care [4] by one who owed the relying party a duty of care."[367]  Whether a duty is owed to the plaintiff is "of paramount importance." [368]  A party's "obligation or duty to act may flow from explicit requirements, *i.e.*, statutory or contractual, or may be implied from attendant circumstances."[369]

Defendants' claim fails because JBT owed them no duty of care when either of the alleged negligent misrepresentations were made.  As to the possible renewal of the distributorship agreement, Defendants assert Bullerdick left his employment with JBT only because DeRoche promised him JBT would enter into a new agreement with BGSE following Bullerdick's resignation.[370]  Even if DeRoche made that representation, however, an employer-employee relationship does not create a duty of care under North Carolina law.[371]

---

[366] *See* Dkt. 108 at 31 ¶ 77.

[367] *Bob Timberlake Collection, Inc. v. Edwards*, 626 S.E.2d 315, 321–22 (N.C. Ct. App. 2006) (quoting *Raritan River Steel Co. v. Cherry, Bekaert & Holland,* 367 S.E.2d 609, 612 (N.C. 1988)).

[368] *Id.* at 322 (quoting *Marcus Bros. Textiles, Inc. v. Price Waterhouse, L.L.P.*, 513 S.E.2d 320, 325 (N.C. 1999)).

[369] *Oberlin Capital, L.P. v. Slavin*, 554 S.E.2d 840, 846 (N.C. Ct. App. 2001) (quoting *In re Huyck Corp. v. Mangum, Inc.*, 309 S.E.2d 183, 187 (N.C. 1983)).

[370] Dkt. 151 at 6.

[371] *See Jordan v. Earthgrains Cos., Inc.*, 576 S.E.2d 336, 339 (N.C. Ct. App. 2003) (holding that a CEO "owed a duty of care to the corporation and not to individual employees").

Defendants' arguments concerning the SMEPP project fare no better.  Without citing to any authority, Defendants claim JBT owed a duty of care to BGSE "based on the parties' prior course of conduct and agreement to submit a bid together."[372]  But JBT and BGSE were two commercial parties engaged in arm's-length transactions.  North Carolina courts have not found a fiduciary relationship to arise from this type of business relationship.[373]  In short, because JBT owed Defendants no duty of care, Defendants cannot sustain their claim for negligent misrepresentation as a matter of law.  The court grants JBT summary judgment on this claim.

## B.  Defamation (Count Four)

Defendants assert JBT defamed them by sending the Complaint to numerous industry contacts, along with a cover letter containing allegedly false and defamatory statements.[374]  Two statements in particular in the cover letter form the basis of Defendants' defamation claim:[375]

- "During the time period beginning on January 10, 2012 through January 9, 2013, B GSE served as a distributor for the Jetway Systems business unit of JBT Corporation. . . . That distribution agreement was terminated on January 9, 2013, and only in-process sales at the time of the termination of the distribution agreement are being supported by JBT."[376]

---

[372] Dkt. 151 at 7.

[373] *See USA Trouser, S.A. de C.V. v. Int'l Legwear Grp., Inc.*, No. 1:11-cv-00244-MR-DLH, 2014 WL 1230507, at *9 (W.D.N.C. Mar. 25, 2014) ("At best, [the parties] were mutually interdependent businesses engaged in arms'-length transactions.  North Carolina courts have held that this type of business relationship does not give rise to a fiduciary duty.") (citation omitted).

[374] Dkt. 108 at 32 ¶¶ 83–88.  Although Defendants mention the Complaint as part of their defamation claim, Defendants limit their arguments to the statements made in the cover letter.  *See* Dkt. 151 at 8–15.  In any event, North Carolina law is clear that "defamatory statements made in the course of a judicial proceeding are absolutely privileged and will not support a civil action for defamation, even if made with malice."  *Harris v. NCNB Nat'l Bank of N.C.*, 355 S.E.2d 838, 841 (N.C. Ct. App. 1987) (citations omitted).  This judicial proceeding privilege unquestionably applies to statements made in the Complaint, which qualify as "statements made in pleadings."  *Id.* at 842.  Accordingly, even if the court determined that some of the statements in the Complaint are defamatory, they could not support Defendants' defamation claim.

[375] Though there were some variations, the court understands that each cover letter JBT sent with the Complaint contained essentially the same content.  *See* Dkt. 151 at 8.

[376] Dkt. 49, Ex. D.

- "In its support of its products, JBT does not require its customers to solve issues with JBT's suppliers, but instead serves as the sole point of contact for support."[377]

To recover for defamation under North Carolina law, "a plaintiff must allege that the defendant caused injury to the plaintiff by making [1] false, [2] defamatory statements [3] of or concerning the plaintiff, [4] which were published to a third person."[378]  A statement's falsity does not automatically render it defamatory.  To wit, "[a]lthough every defamation must be false, not every falsehood is defamatory."[379]  Whether a statement is defamatory is a matter of law.[380]

North Carolina recognizes three categories of libel defamation: "(1) publications obviously defamatory which are called libel *per se*; (2) publications susceptible of two interpretations one of which is defamatory and the other not; and (3) publications not obviously defamatory but when considered with innuendo, colloquium, and explanatory circumstances become libelous, which are termed libels *per quod*."[381]  Damages are presumed in cases of libel *per se*, but a party alleging libel *per quod* must allege and prove special damages.[382]

Defendants have not advanced evidence of special damages (precluding a claim for libel *per quod*), nor have they alleged the supposedly defamatory statements are susceptible to two meanings.  Accordingly, although Defendants do not specify which class of defamation they are pursuing, the court construes their claim as one for libel *per se*.[383]  Libel *per se* is a publication

---

[377] *Id.*

[378] *Boyce & Isley, PLLC v. Cooper*, 568 S.E.2d 893, 897 (N.C. Ct. App. 2002) (citation omitted).

[379] *Renwick v. News & Observer Pub. Co.*, 312 S.E.2d 405, 410 (N.C. Ct. App. 1984).

[380] *Id.* at 409.

[381] *Id.* at 408 (quoting *Arnold v. Sharpe*, 251 S.E.2d 452, 455 (N.C. 1979)).

[382] *Id.*

[383] *See id.* ("The plaintiff's complaints in these cases failed to bring the editorial complained of within the second class of libel, since it was not alleged that the editorial is susceptible of two meanings . . . and . . . [t]he complaints failed to bring the editorial within the third class—libel *per quod* —since it was not alleged that the plaintiff suffered special damages.").

by writing that "(1) charges that a person has committed an infamous crime; (2) charges a person with having an infectious disease; (3) tends to impeach a person in that person's trade or profession; or (4) otherwise tends to subject one to ridicule, contempt or disgrace."[384]

The two statements in the cover letter Defendants rely on do not rise to the level of libel *per se*. Even assuming the statements are false, this alone is insufficient to render them defamatory. Indeed, the second statement Defendants complain of does not mention Defendants at all. While it arguably overstates JBT's ability to service its products without the help of third-party providers, it does not demean Defendants' skill or capability in the profession.

As to the first allegedly false statement—that Defendants were not authorized to sell JBT equipment after 2013—Defendants contend this statement "strike[s] at the very heart of Bullerdick and BGSE's business reputation."[385] But even if the statement may have caused confusion among BGSE's clients who had purchased JBT equipment from BGSE after 2013, it hardly subjected Defendants to ridicule, contempt, or disgrace. Because the court concludes as a matter of law that JBT's statements in the cover letter are not defamatory, the court grants JBT summary judgment on this claim.[386]

## C. Tortious Interference (Count Two)

Defendants base their tortious interference claim on the same allegedly false and misleading statements contained in the Cover Letter JBT sent to mutual industry contacts.[387] By

---

[384] *Id.* at 408–09 (citation omitted).

[385] Dkt. 151 at 10.

[386] Having concluded that JBT's statements were not defamatory, the court need not address the parties' arguments concerning whether the cover letters' content is privileged.

[387] Dkt. 108 at 31 ¶ 73. Defendants allege in their Answer "JBT's wrongful acts that prevented BGSE from winning the Lakehurst contract" also supports their tortious interference claim. *Id.* But Defendants fail to contest JBT's arguments that it did not employ improper means to win the Lakehurst contract. *See* Dkt. 134 at 17–18; Dkt. 151 at 15–17. The court therefore considers only Defendants' contention that the alleged false statements in the Cover Letter are sufficient to establish its tortious interference claim.

sending the Cover Letter "throughout the industry," Defendants allege JBT interfered with Bullerdick and BGSE's expected business relationships.[388]

To succeed on a claim for tortious interference under Utah law, Defendants must show "(1) that [JBT] intentionally interfered with [Defendants'] existing or potential economic relations, (2) . . . by improper means, (3) causing injury to [Defendants]."[389]  JBT asserts the Cover Letter does not contain false statements, and even if it does, false statements alone are not enough to prevail on a tortious interference claim.[390]  Because Defendants cannot show JBT employed improper means to interfere with Defendants' business relationships, JBT contends their claim fails.[391]  The court agrees.

Improper means includes "only those actions that are contrary to law, such as violations of statutes, regulations, or recognized common-law rules, or actions that violate an established standard of a trade or profession."[392]  This element encompasses violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehoods.[393]  These acts constitute improper means because they are "illegal or

---

[388] Dkt. 151 at 15.

[389] *SIRQ, Inc. v. Layton Cos., Inc.*, 2016 UT 30, ¶ 27, 379 P.3d 1237 (quoting *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 302 (Utah 1982)).  Utah has explicitly abandoned the improper purpose rule.  *See Eldridge v. Johndrow*, 2015 UT 21, ¶ 14, 345 P.3d 553 ("[W]e hereby reject the improper-purpose rule. . . . [W]e hold that a claim for tortious interference may only succeed where the defendant has employed an improper means.").

[390] Dkt. 160 at 16–17.

[391] *Id.*

[392] *C.R. England v. Swift Transp. Co.*, 2019 UT 8, ¶ 42, 437 P.3d 343 (internal quotation marks and citation omitted).

[393] *See id.*

tortious in themselves."[394]  Conduct that is not independently tortious or wrongful is insufficient to establish the improper means prong of a tortious interference claim.[395]

Defendants raise two arguments in response.  First, Defendants assert the allegedly false and misleading statements in the Cover Letter rise to the level of defamation,[396] which qualifies as improper means under Utah law.  But the court previously concluded JBT is entitled to summary judgment on Defendants' defamation claim.

Second, Defendants cite *Anderson Development Company v. Tobias*[397] for the proposition that false and misleading statements alone are enough to satisfy the improper means element.  But *Anderson* makes no such declaration.  In *Anderson*, the plaintiff presented evidence the defendants misrepresented that they obtained a written offer to purchase a piece of property around which the dispute centered.[398]  The court held that the sworn statements introduced to evince that misrepresentation were sufficient to create a genuine dispute of material fact about the improper means element of the plaintiff's tortious interference claim.[399]  In other words, *Anderson* is consistent with *C.R. England*'s confirmation that the conduct allegedly constituting

---

[394] *Id.* (internal quotation marks and citation omitted).

[395] *See id.* ¶ 45 ("[W]e have been careful to limit the scope of actionable conduct within the tortious interference context to those situations where a defendant employs a means that is independently tortious or wrongful."); *see also First Am. Title Ins. Co. v. Nw. Title Ins. Agency, LLC*, No. 2:15-cv-229-DN, 2016 WL 6956603, at *1 (D. Utah Nov. 27, 2016) ("The improper means must be independently actionable conduct.") (internal quotation marks and citation omitted).

[396] *See* Dkt. 151 at 16.

[397] 2005 UT 36, 116 P.3d 323.

[398] *Id.* ¶ 32.

[399] *Id.*

improper means must be independently actionable.[400]   In *Anderson*, the underlying conduct was misrepresentation, which is an independently actionable tort.[401]

Defendants conflate the making of a false statement with the tort of misrepresentation. Although making a false statement is a component of misrepresentation, a party who makes a false statement is not necessarily liable for misrepresentation.  For liability to attach, for example, the false statement must concern "a presently existing material fact" and must induce reliance upon the statement.[402]   In short, false statements of fact alone cannot satisfy the improper means element because they are not independently actionable.[403]   Accordingly, even if the Cover Letter contained false statements, the act of sending those letters to industry contacts does not itself constitute improper means.  Defendants' claim therefore fails, and the court grants JBT summary judgment.

### D.  Unfair or Deceptive Trade Practices (Count Five)

Here again, Defendants' unfair or deceptive trade practices claim stems from (1) JBT's alleged misrepresentation that it would enter into a renewed distribution agreement with Defendants and (2) the alleged falsehoods in the Cover Letter.[404]   Defendants argue their claims for negligent misrepresentation and defamation are sufficient to support their statutory trade practices claim as well.[405]   Defendants assert that the same evidence they advanced in support of their other claims also precludes the court from granting JBT summary judgment on Defendants'

---

[400] 2019 UT 8, ¶ 45.

[401] *See State v. Apotex Corp.*, 2012 UT 36, ¶ 58, 282 P.3d 66 (reciting elements of fraudulent misrepresentation claim).

[402] *See id.*

[403] *See C.R. England*, 2019 UT 8, ¶ 45; *see also Nunes*, 299 F. Supp. 3d at 1232–33 (holding the plaintiff could not satisfy the improper means element despite finding the defendant had published several false statements of fact).

[404] *See* Dkt. 108 at 32–33 ¶¶ 90–94.

[405] Dkt. 151 at 17–19.

deceptive trade practices claim.[406]  But the court has granted JBT summary judgment on Defendants' negligent misrepresentation and defamation claims.  Accordingly, those claims cannot provide the basis for Defendants' Section 75-1.1 claim.

Defendants advance one additional argument to support the present claim.  They contend their claim stands regardless of the fate of their negligent misrepresentation and defamation claims because "it is enough that [Defendants] have forecast evidence that JBT made knowingly false statements for the purpose of driving business away from BGSE, its competitor[.]"[407]  JBT fails to respond to this point, arguing in its Reply only that Defendants' claim fails because its negligent misrepresentation and defamation claims fail.[408]

Viewing the evidence and drawing reasonable inferences in Defendants' favor, the court denies JBT's Motion on this claim.  To establish a claim for unfair or deceptive trade practices under N.C. Gen Stat. § 75-1.1, "the plaintiff must show: (1) the defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff."[409]  The only relevant question here is whether JBT committed an unfair or deceptive act by sending the Cover Letter to industry contacts.[410]

---

[406] *Id.*

[407] *Id.* at 19.

[408] Dkt. 160 at 19.

[409] *Pleasant Valley Promenade v. Lechmere, Inc.*, 464 S.E.2d 47, 58 (N.C. Ct. App. 1995) (citations omitted).

[410] JBT does not dispute that its actions were "in or affecting commerce."  *See* Dkt. 134 at 31–32.  As to the injury prong, JBT argues Defendants fail to show they were injured by JBT's negotiations with BGSE concerning a renewed distribution agreement "because BGSE was actively pursuing other business options during the pendency of such negotiations."  *Id.* at 32.  But JBT does not cite to any evidence—or even argue—that Defendants fail to show they were injured by JBT sending the Cover Letter to relevant business contacts.  Because the moving party bears the initial burden of showing the absence of a genuine dispute of material fact, JBT has failed to contest the injury prong of the present claim.  *See Celotex Corp.*, 477 U.S. at 323.  In any event, Defendants have forecast circumstantial evidence that they lost a contract because of the Cover Letter, which is sufficient to create a genuine dispute of material fact about injury.  *See* Dkt. 151 at 17.

North Carolina courts have recognized that Section 75-1.1 "creates a cause of action broader than traditional common law actions."[411]  Consistent with that understanding, North Carolina courts have given an expansive definition of a deceptive practice.  "A practice is deceptive if it has the capacity or tendency to deceive; proof of actual deception is not required. . . . The consumer need only show that an act or practice possessed the tendency or capacity to mislead, or created the likelihood of deception."[412]  Further, "[n]either the actor's intent nor good faith are relevant."[413]

The court concludes as a matter of law that sending the Cover Letter qualifies as a deceptive act under Section 75-1.1.[414]  As discussed above, Defendants contend two statements in the Cover Letter were false and misleading:

- "During the time period beginning on January 10, 2012 through January 9, 2013, B GSE served as a distributor for the Jetway Systems business unit of JBT Corporation. . . . That distribution agreement was terminated on January 9, 2013, and only in-process sales at the time of the termination of the distribution agreement are being supported by JBT."[415]

- "In its support of its products, JBT does not require its customers to solve issues with JBT's suppliers, but instead serves as the sole point of contact for support."[416]

---

[411] *Media Network, Inc. v. Long Haymes Carr, Inc.*, 678 S.E.2d 671, 684 (N.C. Ct. App. 2009) (quoting *Winston Realty Co. v. G.H.G., Inc.*, 331 S.E.2d 677, 680 (N.C. 1985)); *see also id.* at 683 (noting that although tort actions for deceit or fraud "require showing intent to deceive or scienter," a deceptive trade practices claimant "need not establish the defendant's bad faith, intent willfulness, or knowledge").

[412] *Love v. Keith*, 383 S.E.2d 674, 677 (N.C. Ct. App. 1989), *disapproved of on other grounds*, *Custom Molders, Inc. v. Am. Yard Prods., Inc.*, 463 S.E.2d 199, 201–02 (N.C. 1995) (quoting *Marshall v. Miller*, 276 S.E.2d 397, 403 (N.C. 1981)).

[413] *Id.*

[414] *Id.* ("It is a question for the jury as to whether the defendants committed the alleged acts, and then it is a question of law for the court as to whether these proven facts constitute an unfair or deceptive trade practice.") (internal quotation marks and citation omitted).

[415] Dkt. 49, Ex. D.

[416] *Id.*

Brian DeRoche explicitly admitted the first statement was untrue because JBT accepted multiple sales after January 9, 2013, that it knew about, authorized, and supported.[417] While DeRoche attempted to walk back that admission in his 30(b)(6) deposition a month later,[418] he did not deny JBT sold equipment to BGSE after January 9, 2013.[419] In any event, there can be no question the statement had the capacity or tendency to deceive recipients of the Cover Letter that JBT had cut off its sales relationship with BGSE in January 2013.

Considering the second statement, the second half of the statement is false. JBT argues the statement is accurate because JBT would respond to end user's repair needs even if a call came in under a warranty BGSE offered.[420] But this ignores the statement's use of the word "sole." That is, Defendants are not disputing that JBT would service or repair one of its products if a customer sought help. Rather, Defendants take issue with the statement's suggestion that *only* JBT performed maintenance on its equipment and therefore that BGSE was unauthorized to do so.[421]

The court recognizes the uphill battle Defendants will face to prove these relatively benign misstatements proximately caused Defendants' alleged injuries. But JBT's Motion depends on its argument that it did not commit a deceptive act within the meaning of § 75-1.1. The court disagrees. Accordingly, a genuine dispute of material fact exists concerning whether JBT's actions proximately caused Defendants' alleged injuries. JBT's Motion is denied as to Defendants' deceptive practices act claim.

---

[417] Defs.' Ex. 83 at 123:17–124:8 (sealed).

[418] Dkt. 160 at 4–5.

[419] Pl.'s Ex. 133 at 71:14–16 (sealed).

[420] Dkt. 160 at 5.

[421] Dkt. 151 at 10.

## CONCLUSION

For the reasons explained above:

1. JBT's Motion for Partial Summary Judgment on its affirmative claims[422] is GRANTED IN PART and DENIED IN PART as follows:

   a. The court GRANTS summary judgment in JBT's favor on JBT's federal and state misappropriation of trade secrets claims (Counts One & Two);

   b. The court GRANTS summary judgment in JBT's favor on JBT's false designation of origin claim (Count Three);

   c. The court GRANTS summary judgment in JBT's favor on each of JBT's breach of contract claims (Counts Six, Seven, and Eight);

   d. The court DENIES JBT's Motion in all other respects.

2. Defendants' Motion for Summary Judgment[423] is GRANTED IN PART and DENIED IN PART as follows:

   a. The court GRANTS summary judgment in Defendants' favor on JBT's false advertising claim (Count Four);

   b. The court GRANTS summary judgment in Defendants' favor on JBT's defamation claim (Count Nine);

   c. The court DENIES Defendants' Motion in all other respects.

---

[422] Dkt. 129.

[423] Dkt. 126.

3. JBT's Motion for Summary Judgment on Defendants' counterclaims[424] is GRANTED IN PART as follows:

    a. The court GRANTS summary judgment in JBT's favor on Defendants' tortious interference counterclaim (Count Two);

    b. The court GRANTS summary judgment in JBT's favor on Defendants' negligent misrepresentation counterclaim (Count Three);

    c. The court GRANTS summary judgment in JBT's favor on Defendants' defamation counterclaim (Count Four);

    d. The court DENIES JBT's Motion in all other respects.

4. Defendants' Motion to Exclude JBT's expert is denied without prejudice to refile it in connection with pre-trial proceedings.[425]

In addition to the amount of damages JBT seeks, the issues that remain for trial are (1) whether Defendants' use of JBT's trademarks in BGSE's website metatags was likely to cause confusion, (2) whether Defendants tortiously interfered with JBT's business relationships, and (3) whether JBT proximately caused Defendants' alleged injuries on their claim for unfair or deceptive trade practices.

SO ORDERED this 13th day of August 2020.

BY THE COURT:

_____

ROBERT J. SHELBY
United States Chief District Judge

---

[424] Dkt. 134.

[425] Dkt. 128.