# EXHIBIT C

```
         IN THE UNITED STATES DISTRICT COURT
                   DISTRICT OF UTAH
                   CENTRAL DIVISION

----------------------------------------

JOHN BEAN TECHNOLOGIES CORPORATION,
a Delaware Corporation,

        Plaintiff,

vs.                                    CASE NUMBER:
                                       1:17-cv-00142-RJS
B GSE GROUP, LLC, a North Carolina
limited liability company, and
BRYAN BULLERDICK, an individual,

        Defendants.
----------------------------------------


                     DEPOSITION OF

            NICHOLAS HARRIS, CPA, CFA, CFE

                   March 26, 2019
```

Audra Smith, RPR, FCRR, Notary Number: 201329000033
449724

**BARKLEY**
Court Reporters
barkley.com

SINCE 1972

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco   (949) 955-0400 Irvine         (858) 455-5444 San Diego
(310) 207-8000 Century City   (408) 885-0550 San Jose        (760) 322-2240 Palm Springs   (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento     (800) 222-1231 Martinez        (702) 366-0500 Las Vegas      (800) 222-1231 Monterey
(951) 686-0606 Riverside      (818) 702-0202 Woodland Hills  (702) 366-0500 Henderson      (516) 277-9494 Garden City
(212) 808-8500 New York City  (347) 821-4611 Brooklyn        (518) 490-1910 Albany         (914) 510-9110 White Plains
(312) 379-5566 Chicago        00+1+800 222 1231 Paris        00+1+800 222 1231 Dubai       001+1+800 222 1231 Hong Kong

```
 1              IN THE UNITED STATES DISTRICT COURT
                         DISTRICT OF UTAH
 2                       CENTRAL DIVISION

 3     ---------------------------------------

 4     JOHN BEAN TECHNOLOGIES CORPORATION,
       a Delaware Corporation,
 5
             Plaintiff,
 6
       vs.                                      CASE NUMBER:
 7                                              1:17-cv-00142-RJS
       B GSE GROUP, LLC, a North Carolina
 8     limited liability company, and
       BRYAN BULLERDICK, an individual,
 9
             Defendants.
10     -----------------------------------------

11

12                        DEPOSITION OF

13              NICHOLAS HARRIS, CPA, CFA, CFE

14                       March 26, 2019

15                          9:34 a.m.

16                      Bell, Davis & Pitt

17            227 West Trade Street, Suite 1800

18                 Charlotte, North Carolina

19

20

21

22

23

24     Reported by:  Audra Smith, RPR, FCRR

25
```

2

NICHOLAS HARRIS, CPA, CFA, CFE

**BARKLEY**
Court Reporters

```
 1                    APPEARANCES OF COUNSEL

 2   ON BEHALF OF THE PLAINTIFF:

 3   DYKEMA GOSSETT, PLLC
     BY:  MICHAEL F. DERKSEN, ESQUIRE
 4   400 Renaissance Center
     Detroit, Michigan 48243
 5   Phone:  313.568.6885
     mderksen@dykema.com
 6


 7   ON BEHALF OF THE DEFENDANTS:

 8   BELL, DAVIS & PITT, P.A.
     BY:  JOSHUA B. DURHAM, ESQUIRE
 9   227 West Trade Street, Suite 1800
     Charlotte, North Carolina 28202
10   Phone:  704.227.0400
     jdurham@belldavispitt.com
11

12                      *  *  *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25


                            3
```

NICHOLAS HARRIS, CPA, CFA, CFE

BARKLEY
Court Reporters

Page 6

PROCEEDINGS

NICHOLAS HARRIS, CPA, CFA, CFE,
having been first duly sworn, was examined and testified
before me as follows:

EXAMINATION

BY MR. DERKSEN:

Q. Hi, Mr. Harris, my name is Mike Derksen. As I stated earlier -- actually, maybe I didn't state earlier, but I think as you know, I'm representing the plaintiff John Bean Technologies Corporation in this case against B GSE Group, LLC and Bryan Bullerdick. I'll probably refer to my client as JBT. Probably refer to Bryan Bullerdick as Mr. Bullerdick and refer to B GSE Group, LLC as B GSE. Does that sound okay to you?

A. Yes.

Q. I think I know the answer to this question, but have you been deposed before?

A. I have not.

Q. Okay. Great. We'll go over just a few rules. As you know, your testimony is under oath, just as if you were in a court of law. And these are pretty simple rules, but hard to follow, generally speaking, and so I ask that you let me finish my question before you start to answer, so

Page 7

it's clearer on the record. And I in turn will do my best to let you finish your answer before I ask another question.

Now, it's important that -- I often ask bad questions, so if I ask a question and you don't understand what I'm asking, feel free to ask me for clarification or to restate it or rephrase or whatever. But on the other hand, if you do answer my question, I'll assume that you understood it. Does that sound okay?

A. Yes.

Q. Okay. If you get tired, just need to take a break for whatever reason -- I don't need to know why -- just let me know. And I just ask that you don't ask for a break when a question is pending. And I think those are pretty much the ground rules.

So I want to mark the first exhibit, which I think should be 311.

MR. DURHAM: I meant to check. It probably sounds right.

MR. DERKSEN: I checked. I'm pretty confident, which means -- I'm going to hand this to the -- which is 311 -- I'm sorry. Take a look at it.

Page 8

(Exhibit Number 311 was marked.)

BY MR. DERKSEN:

Q. Mr. Harris, have you seen this document before?

A. Yes.

Q. Can you let me know what you understand it to be?

A. This is the subpoena that was sent to Bell Davis & Pitt for me to produce documents that are with requested in the rider.

Q. And also to appear here today; is that correct?

A. Yes.

Q. Sure. Okay. Are there any documents responsive to that request that you are going to be producing today, or not?

A. No.

Q. We might as well get this marked because we're going to be referring to it a lot, as you might imagine. It's your report. It's previously been marked as Exhibit 310. Once you receive it, I'd like you to just kind of take a look and confirm, the best you can, it is indeed your report.

(Exhibit Number 312 was marked.)

Page 9

A. This is my report.

BY MR. DERKSEN:

Q. Okay. Great. I just want to get into some background info. This is based on information listed in Appendix A, so feel free to reference it, if you'd like. But have you ever opined on damages under a Lanham Act claim before?

A. I don't know if it was a Lanham Act claim specifically, but I've opined on lost profits and related damages.

Q. In which -- in which case?

A. I was Y2 Yoga Cotswold versus BR King Construction.

Q. Right. Okay. And that was a -- I'm assuming by the name of the title it was a construction dispute?

A. Yes and no. It was related to a construction project, but it was -- it was lost profits related to loss of use.

Q. Okay. And so it's -- I see it's listed under Trial Court and Deposition Testimony. Did you testify in the trial in the Y2 Yoga case?

A. Yes.

Q. And who were you representing in that case?

Page 22

1  A. No.
2  Q. Are you familiar with Mr. Lester?
3  A. Yes.
4  Q. Did you speak with the defendants'
5  bookkeeper?
6  A. No.
7  Q. And it's also fair you didn't speak to
8  the defendants' accountant?
9  A. That's right. To the extent one exists,
10 I'm not even aware.
11 Q. Fair. Now, in a number of instances in
12 your report, the factual assertions that you make
13 are in reliance on your discussions with
14 Mr. Bullerdick; is that fair to say?
15 A. Could you repeat that? I just want to
16 make sure I understand.
17 Q. Yeah. Now in the number of instances in
18 your report, the factual assertions that you make
19 are based on your discussions with Mr. Bullerdick;
20 is that fair to say?
21 A. I relied on Mr. Bullerdick's --
22 information provided by Mr. Bullerdick for some
23 portion of my analysis, yes, and I've cited that
24 in my report.
25 Q. Okay. Do you know if it's common

Page 23

1  practice to rely on statements received from a
2  client in preparing a damages report?
3  A. It is common practice.
4  Q. Okay. Did you take any notes relating to
5  your conversation with Mr. Bullerdick?
6  A. I did.
7  Q. Okay. And did you produce them?
8  A. They have not been produced.
9  Q. Okay. Do you know why they haven't been
10 produced?
11 A. I believe they were requested.
12 Q. Okay. Did you not rely on them in
13 preparing your report, your notes?
14 A. I relied on -- I -- no, I would say I'm
15 relying on Mr. Bullerdick's -- the discussion with
16 Mr. Bullerdick.
17 Q. I just want to go back to the first
18 exhibit we marked today. Did you review your
19 notes in developing or preparing your opinions in
20 the report?
21 A. I'm not sure that I did.
22 Q. But you can't say either way?
23 A. I was writing my report at the same time
24 that I was -- that I had the discussion with
25 Mr. Bullerdick, so I would have ended that

Page 24

1  conversation and immediately gone to my report to
2  put most of those notes directly in my report.
3  Q. Okay. Is there a -- I'm not talking
4  about a draft report, but is there a separate
5  document where you have the notes?
6  A. Yes.
7  Q. Okay.
8     MR. DERKSEN: Counsel, I think we'd
9     requested they be produced. We can talk about
10    it later.
11    MR. DURHAM: We can talk about it later.
12    MR. DERKSEN: Yeah. I don't want to
13    argue about it right now, or anything like
14    that.
15 BY MR. DERKSEN:
16 Q. Okay. Let's go to your report, which was
17 approvals marked as Exhibit 310. Did you re-mark
18 it?
19    THE COURT REPORTER: Yes, I did. It's
20    312.
21    MR. DERKSEN: 312, okay.
22 BY MR. DERKSEN:
23 Q. If you could turn to page 4. You
24 reference right at the top that Mr. Duski
25 indicates that: Defendants must prove all

Page 25

1  elements of cost or deduction.
2     Do you see that?
3  A. Yes.
4  Q. Do you agree with that statement?
5  A. That defendants must prove all elements
6  of costs or deduction?
7  Q. Yeah. Let me rephrase that. Would you
8  agree that it is defendants' burden to prove the
9  costs or deductions that should be made from
10 Mr. Duski's calculation of damages in this case?
11 A. That's a legal opinion that I'm not
12 prepared to provide, I'm not providing.
13 Q. So you don't know one way or the other
14 whether or not it's defendants' burden?
15 A. I think that's a question of law that is
16 beyond my scope of work.
17 Q. Okay. Based -- I'm not asking as a
18 lawyer, I'm just saying as a layman, do you have
19 any understanding as to whether or not it is
20 defendants' burden?
21 A. It's my understanding in some instances
22 that may be the case. It depends on the venue,
23 the jurisdiction. Legal matters are beyond my
24 expertise.
25 Q. Okay.

Page 26

1   A.  So whether that applies in this case, I
2   think is probably not determined as far as I'm
3   concerned.
4   Q.  Okay.  So just to close that out -- so in
5   this case, you're not sure whether or not it's
6   defendants' burden to prove all elements of costs
7   or deductions; is that fair?
8   A.  These are some pretty broad terms, and I
9   don't know that I can say that one way or the
10  other.  I mean, elements of cost or deduction is a
11  very, very broad term, and there may be elements
12  of cost or deduction as described by one person
13  that are not elements of cost or deduction as
14  described by another person.  So I don't know that
15  I can really answer the question the way you're
16  presenting it to me.
17  Q.  Okay.  But throughout your report, you
18  then go on to -- at least in some instances -- try
19  to prove some elements of costs or deductions; is
20  that accurate?
21  A.  I've identified some elements of cost or
22  deduction, by my definition.
23  Q.  Okay.  And what's your definition?
24  A.  I think it has to be looked at on a
25  case-by-case basis.  Like I said, that's a very

Page 27

1   broad term.  I don't know that I can define it for
2   you.  And it's not -- I mean, that comes from a
3   statute.  I think that's subject to a legal
4   interpretation.
5   Q.  Okay.  If you look at the third paragraph
6   on the bottom, that starts with Table 1.  In the
7   second sentence it says:  As Table 1 shows, some
8   of these items could not be quantified at this
9   time.
10      What items are you referring to?
11  A.  Specifically in Table 1, if you look at
12  Table 1, there are a couple of lines that I've --
13  where I've filled in TBD for "to be determined."
14      Those two lines in this table are
15  actual/additional incremental costs, and profit
16  not earned or received by B GSE.
17  Q.  Okay.
18  A.  There may be additional elements or items
19  that could not be quantified at this time.
20  Q.  Why were you unable to quantify those?
21  A.  For the actual/additional incremental
22  cost, there are, I guess, a couple reasons.  The
23  first is that some of the projects in question are
24  not yet complete, so actual costs can't be
25  determined with 100 percent certainty at this

Page 28

1   time.
2      There may be additional incremental costs
3   that Mr. Duski did not include in his analysis.  I
4   cited some examples in my report.  One that comes
5   to mind is hurricane-related impacts that would
6   not have been factored into an estimate prepared
7   prior to even the start of work on that project.
8   And there may be other things, like time spent on
9   estimating, or items that are just not listed in
10  those estimates prepared that Mr. Duski relied
11  upon that should be included in this analysis.
12  Q.  Okay.  And did you ask for the material
13  that you would need to quantify those figures that
14  you could quantify?
15  A.  I did.  And I also asked whether JBT or
16  Mr. Duski or JBT's counsel had requested that
17  information.  And again, Mr. Duski's report is
18  dated after the close of discovery, so there's a
19  question as to whether those documents could now
20  come in.
21  Q.  So is it fair to say that there are
22  documents out there that would have helped you
23  quantify these items, but you just didn't receive
24  them?
25  A.  Yes.

Page 29

1      MR. DURHAM:  Objection.
2   BY MR. DERKSEN:
3   Q.  If you could turn to page 12 of your
4   report, please.  Now, in the second box, the first
5   full paragraph, you state:  Mr. Duski's
6   calculation of JBT's alleged damages for trade
7   secret misappropriation and unfair competition
8   should be reduced by approximately $200,000 and
9   $1.1 million, respectively.
10      Do you see that?
11  A.  Yes.
12  Q.  Okay.  Is it fair to say this assumes
13  that B GSE would have been awarded all eight of
14  the projects discussed in your report irrespective
15  of its wrongful acts?
16  A.  I don't -- I don't know if I agree with
17  that.
18  Q.  What don't you agree with?
19  A.  If B GSE would not have been awarded the
20  eight projects, setting aside the alleged wrongful
21  acts, then it seems possible, likely -- I don't
22  know what degree -- that JBT would not have
23  performed any work or supplied any materials for
24  those projects.  And so lost profits, for example,
25  would not exist.

Page 34

1 instance, that the bid documents the defendants
2 submitted contained JBT's information, trade
3 secrets, and specifications at a time that Twist
4 did not have a compliant PCAir product?
5   A.  The bid documents or the submittal
6 documents?
7   Q.  Submittal documents.
8   A.  I'm aware of that allegation related to
9 the submittal documents.
10   Q.  Okay.  In formulating your opinion, did
11 you assume that allegation to be true or not?
12   A.  It depends on which -- I mean, yes.  So I
13 have assumed that B GSE is found liable for the
14 causes of action that Mr. Duski is pointing to in
15 his analysis.
16   Q.  Just as Mr. Duski did?
17   A.  Correct.
18   Q.  Okay.  Great.  I want to go to page 13 of
19 your report.
20   A.  Okay.
21   Q.  So in the first paragraph below the table
22 you say:  However, I understand from discussions
23 with Mr. Bullerdick that all of the documents
24 listed in Table 2 above are estimates prepared
25 prior to the start of work.

Page 35

1       Did I read that correctly?
2   A.  Yes.
3   Q.  And you say you understand it based on
4 discussions with Mr. Bullerdick.  Is there any
5 other basis for that understanding?
6   A.  I believe some of these documents are
7 dated prior to even the bid submission or when
8 work could have started.  So that's additional
9 basis for that statement.
10   Q.  So I think the -- the word I want to
11 focus on is "all."  So you say "all the documents
12 listed."
13   A.  That is a statement that Mr. Bullerdick
14 made to me, that all of the these alleged profit
15 and loss statements were estimates and don't
16 reflect actual costs or revenue.
17   Q.  And it's also your understanding from
18 Mr. Bullerdick that all the documents were
19 prepared prior to the start of work on each
20 project; is that correct?
21   A.  Yes.  That's my understanding from
22 Mr. Bullerdick.
23   Q.  And again, do you have any -- aside from
24 your discussion with Mr. Bullerdick, do you
25 have -- is there any basis for your statement that

Page 36

1 all of the documents were prepared prior to the
2 start of work?
3   A.  I have not gone through and analyzed the
4 date of all of these documents and when work
5 started.
6   Q.  Okay.  So for instance, do you know --
7 turning back to page 12.  Do you know when work
8 started on Lemoore P-328?
9   A.  Not as I sit here right now.  I'd have to
10 go back to the documents produced or in
11 Mr. Duski's report.
12   Q.  Okay.  You think you could figure that
13 out based on -- or strike that.
14       Do you think that's something that you
15 were aware of but you just can't recall today?
16   A.  Like I said, I didn't do that analysis.
17 I certainly looked at the timing for certain
18 projects just to see if that -- if these, what I
19 call project estimates, could have been revised or
20 updated or edited after the completion of work,
21 and do recall seeing that the dates associated
22 with some of these documents preceded other dates
23 provided by Mr. Duski in his report that would
24 have logically preceded the start of work, like
25 the date when the submittal package was submitted

Page 37

1 or when RFPs were issued or bids were prepared, or
2 quotes were prepared, purchase orders were
3 prepared.
4   Q.  Does that apply to all eight projects,
5 your previous statement?
6   A.  No.  Like I said, I did not do that for
7 every project.
8   Q.  Okay.  So I won't waste anybody's time.
9 But if we were to go through each project and I
10 ask you the date work started or the date that it
11 was completed, just as you sit here today, is it
12 fair to say you wouldn't be able to provide me an
13 answer?
14   A.  I wouldn't.  And I don't know -- look, I
15 said that I relied on Mr. Bullerdick for that, and
16 I did.  He is the person I would expect to know
17 that answer.  And if I went through -- even if I
18 went through and compared the date of these
19 documents to other milestones in the bidding or
20 estimating or construction process, I don't know
21 if that was just a date when that document was
22 saved again or moved from one location to another.
23 I don't think that is as valuable an analysis as
24 asking Mr. Bullerdick if these reflect final
25 numbers.

Page 58

1  MR. DURHAM: Your guy said "Kadenia," so
2  that's what threw me.
3  MR. DERKSEN: Yeah. We'll get -- I'm not
4  on videotape, so --
5  (Simultaneous crosstalk.)
6  MR. DERKSEN: Next we're going to mark
7  the P&L that Mr. Duski relied on for this
8  Kadena P-803.
9  (Exhibit Number 318 was marked.)
10 BY MR. DERKSEN:
11  Q. You know what, I don't have any questions
12 on that one. I don't know if we want -- it's fine
13 to have it marked, but I don't have any questions
14 on that document.
15  A. That's fine with me.
16  Q. Yeah. As I said, I was going to try to
17 short-circuit some of my questions, and I think we
18 have.
19      We're going to skip ahead and talk about
20 Beaufort P-464. If you can go to page 13 of your
21 report. You actually made a passing reference to
22 this earlier. But your report states that you
23 were informed -- and this is in the last sentence
24 on page 13. Your report says that this project
25 was disrupted by a hurricane.

Page 59

1      Do you see that?
2  A. Yes.
3  Q. And it says, you know, I understand --
4 I'm sorry. It says you obtained that
5 understanding from Mr. Bullerdick. Do you see
6 that?
7  A. Yes.
8  Q. Okay. And I assume you obtained that
9 information during your telephone call?
10 A. Yes.
11 Q. Okay. Do you know what hurricane it was?
12 A. I don't.
13 Q. Okay. Do you know the year that
14 hurricane took place?
15 A. I don't.
16 Q. What did Mr. Bullerdick say to you about
17 the hurricane? Did he just generally say --
18 **A. It was in the context of discussing the**
19 **project estimates or, as Mr. Duski calls them, the**
20 **P&Ls. He used that as an example in the context**
21 **of saying there are additional costs that are not**
22 **reflected on these.**
23 Q. Okay. Is it fair to say that this
24 hurricane was before September of 2017?
25 A. I would -- I don't know, actually. I

Page 60

1 don't know.
2  Q. Okay. The reason I ask that is because
3 the -- this document, I'm representing to you, was
4 attached to an email dated September 23 of 2017.
5  A. Which document?
6  Q. The P&L. I'm sorry. The P&L we're
7 discussing that Mr. Duski relied on.
8  A. Okay.
9  Q. And then I want you to turn to -- please
10 turn to page 14. I was looking for the word, and
11 it's the first sentence.
12     So if you look back at 13, again, the
13 last sentence on 13, it's about the hurricane.
14 And the first sentence on page 14 says that caused
15 actual costs to exceed estimates.
16     Did I read that correctly?
17 A. Yes.
18 Q. Okay. And again, we're talking about
19 Beaufort P-464, right?
20 A. Yes.
21 Q. By how much?
22 A. I don't know.
23 Q. Did you ask Mr. Bullerdick how much?
24 **A. No. I wouldn't have expected him to know**
25 **the exact number just over the phone.**

Page 61

1  Q. Did you ask for any documents to support
2 his statement that the hurricane costs -- costs to
3 exceed estimates?
4  **A. Yes. I requested actual profit and loss**
5  **statements or actual cost records for all of the**
6  **projects, as I've said many times already.**
7  Q. Sure.
8  **A. I would have expected that those costs**
9  **related to the hurricane would be included in**
10 **that.**
11 Q. Okay. So did he provide any elaboration
12 or did he just simply say, "Hey, there was this
13 hurricane, and that caused actual costs to exceed
14 estimates," just basically?
15 **A. That's it, yeah.**
16 Q. So is it fair to say that the only
17 support you have for that statement is what
18 Mr. Bullerdick told you?
19 A. Yes.
20 Q. Okay. Also on page 14, it states that,
21 the 270 VDC/400 hertz combo units were not
22 provided by B GSE. Do you see that? It's in the
23 paragraph starts with "Third."
24 **A. Could you repeat that --**
25 Q. Absolutely.

Page 62

1    A.  -- phrase or sentence that you're
2    referring to.
3    Q.  Yeah.  So if you look on page 14, do you
4    see the paragraph that starts with "Third"?
5    A.  Yes.
6    Q.  And then in the second paragraph -- or
7    the second sentence you say:  For example, while
8    Mr. Duski's calculation of B GSE's alleged unjust
9    enrichment includes profit on 270 VDC/400 hertz
10   combination units for the Beaufort P-464 project,
11   I understand from Mr. Bullerdick that B GSE never
12   provided those units for that project.
13       Do you see that?
14   A.  Yes.
15   Q.  And aside from the final P&L that you
16   asked for on this project, did you ask for any
17   other documents to support that?
18   **A.  No.  Again, I would expect a final P&L**
19   **would include that information.**
20   Q.  So it's fair to conclude that the
21   basis -- the only basis for that statement is what
22   Mr. Bullerdick told you?
23   A.  Yes.
24   Q.  Stay on page 14 of your report.  I think
25   that's where we were, the second paragraph that

Page 63

1    says Second, do you see where it says:  Many costs
2    are not reflected in the project estimates at all?
3    A.  Yes.
4    Q.  It says:  Examples may include warranty
5    coverage work and significant time dedicated to
6    preparing bids and submittals.
7        Do you see that as well?
8    A.  Yes.
9    Q.  But you've not seen necessary B GSE
10   accounting records to calculate?
11   A.  No.
12   Q.  And you haven't seen those records for
13   the reasons we discussed earlier?
14   A.  Yes.
15   Q.  I may have asked this already, but did
16   Mr. Bullerdick tell you if any of the P&Ls for any
17   of the projects had been finalized when you spoke
18   to him?
19   A.  I don't recall.
20   Q.  I'm going to turn to page 15 of your
21   report.  We discussed this earlier.  At the top
22   you state:  I understand some of the projects are
23   not yet complete.
24       Do you see that?
25   A.  Yes.

Page 64

1    Q.  And that's based on your -- per your
2    report in Footnote 64, that's based on your
3    discussion with Mr. Bullerdick?
4    A.  Yes.
5    Q.  And I believe you testified earlier,
6    you're not aware of which projects are not --
7    A.  Correct, I'm not aware.
8    Q.  Okay.  Do you know if you ever were
9    aware?
10   **A.  I don't know.  Mr. Bullerdick may have**
11   **cited specific projects, but --**
12   Q.  Okay.
13   **A.  -- it was more in the context of the,**
14   **quote/unquote, P&Ls are not final.  You know,**
15   **just -- for example, some of the projects aren't**
16   **even done.**
17   Q.  Now, you then say:  As such, a corporate
18   accounting of B GSE's incremental costs cannot be
19   determined at this time.  However, it is possible
20   and likely that such an accounting would further
21   reduce JBT's alleged damages.
22       Did I read that correctly?
23   **A.  Yeah.  I think you said "corporate**
24   **accounting."  It says "complete accounting," but**
25   **otherwise it's correct.**

Page 65

1    Q.  Thanks for the clarification.  Again, I'm
2    note an English major like Josh, so I have an
3    excuse.
4        What is the basis for assuming that it's
5    likely that such an accounting would further
6    reduce JBT's alleged damages?
7    **A.  Everything that I state in that section**
8    **of my report prior to that statement that there**
9    **are costs not included in the project estimates,**
10   **such as a hurricane, that, you know, these are**
11   **estimates based on my discussion with**
12   **Mr. Bullerdick; they reflect a best-case scenario;**
13   **and that actual costs, in their experience,**
14   **B GSE's experience, typically will exceed**
15   **estimates.**
16   Q.  Okay.  So I want to go back to what you
17   just said.  You said that based on your discussion
18   with Mr. Bullerdick, they reflect a best-case
19   scenario.
20       Can you elaborate on what Mr. Bullerdick
21   said with regard to a best-case scenario?
22   **A.  Yeah.  He said something along the lines**
23   **of:  We target a certain profit margin -- gross**
24   **profit margin, I should say -- and in actuality,**
25   **gross profit margins are lower than that.**