**EXHIBIT B**

SIXTH EDITION

VOLUME ONE

THE COMPREHENSIVE GUIDE TO

# ECONOMIC DAMAGES

Edited by

Nancy J. Fannon and Jonathan M. Dunitz

With Jimmy S. Pappas, William Scally, and Steven M. Veenema

BVR

What It's Worth

This digital edition was created exclusively for the use of Andy Barbee of Greerwalker.
For licensing options, please contact Business Valuation Resources at sales@bvresources.com.

This digital edition was created exclusively for the use of Andy Barbee of Greerwalker.
For licensing options, please contact Business Valuation Resources at sales@bvresources.com.


SIXTH EDITION

# The Comprehensive Guide to Economic Damages

VOLUME ONE

Edited by

Nancy J. Fannon and Jonathan M. Dunitz

With Jimmy S. Pappas, William Scally, and Steven M. Veenema

BVR
What It's Worth
111 SW Columbia Street, Suite 750, Portland, OR 97201
(503) 479-8200 • www.bvresources.com

This digital edition was created exclusively for the use of Andy Barbee of Greerwalker.
For licensing options, please contact Business Valuation Resources at sales@bvresources.com.


**What It's Worth**

Copyright © 2020 by Business Valuation Resources, LLC (BVR). All rights reserved. Printed in the United States of America.

No part of this publication may be reprinted, reproduced, stored in a retrieval system or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, scanning or otherwise, except as permitted under Sections 107 or 108 of the 1976 United States Copyright Act, without either the prior written permission of the Publisher or authorization through payment of the appropriate per copy fee to the Publisher. Requests for permission should be addressed to the Permissions Department, Business Valuation Resources, LLC, 111 SW Columbia Street, Suite 750 Portland, OR 97201-5814; (503) 479-8200; fax (503) 291-7955; permissions@bvresources.com.

Information contained in this book has been obtained by Business Valuation Resources from sources believed to be reliable. However, neither Business Valuation Resources nor its authors or editors guarantee the accuracy or completeness of any information published herein and neither Business Valuation Resources nor its authors or editors shall be responsible for any errors, omissions, or damages arising out of use of this information. This work is published with the understanding that Business Valuation Resources and its authors and editors are supplying information but are not attempting to render business valuation or other professional services. If such services are required, the assistance of an appropriate professional should be sought. In addition, such information is supplied within the thematic context or scope of a given chapter or topic. Readers should approach and interpret information within this context. Information may be subject to change when addressed within a different setting, context, or scope.

Please note that there are several hyperlinks to Internet links within this text and are included for your reference. However, due to the fluid nature of Internet links (i.e., the url can change at any time), some may not be accessed in the same location as they were when this guide was originally published.

Managing Editor/Desktop Editor: Monique Nijhout-Rowe

Senior Copy Editor: David Solomon

Chair and CEO: David Foster

President/Publisher: Lucretia Lyons

Chief Revenue Officer: Lisa McInturff

PRINT ISBN: 978-1-62150-207-4
PDF ISBN: 978-1-62150-208-1
EPUB ISBN: 978-1-62150-209-8
PRINT ISSN: 2694-4863
PDF ISSN: 2694-4871

This digital edition was created exclusively for the use of Andy Barbee of Greerwalker.
For licensing options, please contact Business Valuation Resources at sales@bvresources.com.


*With so much appreciation for Janine Talbot, who worked alongside me to ensure all six editions of this Guide were published.*

*NJF, 2020*

*To my parents, for their decades of support.*

*JMD, 2018*

*To my mother who always encourages me to reach higher.*

*JSP, 2020*

*To my parents, for their always unconditional love and support.*

*SMV, 2020*

*To Cin, Sawyer and my parents; and also GG and Lu —for your kindness and guidance.*

*WBS, 2020*

This digital edition was created exclusively for the use of Andy Barbee of Greerwalker.
For licensing options, please contact Business Valuation Resources at sales@bvresources.com.

This digital edition was created exclusively for the use of Andy Barbee of Greerwalker.
For licensing options, please contact Business Valuation Resources at sales@bvresources.com.


# Table of Contents

## VOLUME ONE

**About the Editors** . . . . ix

**Acknowledgments** . . . . xi

**Author Bios** . . . . xv

**Foreword** . . . . 1

**PART I. EXPERT TESTIMONY IN THE U.S. COURTS** . . . . 3

**Chapter 1. Professional Standards for Experts** . . . . 5
*By Michael A. Crain, DBA, CPA/ABV, CFA, CFE*

**Chapter 2. The Process: A Brief Introduction to the U.S. Court Systems, From Filing to Appeal** . . . . 11
*By Jonathan M. Dunitz, Esq., and Clifton T. Hutchinson, Esq.*

**Chapter 3. Spoliation of Evidence** . . . . 33
*By David B. Chaffin, Esq., and Rachel J. Eisenhaure, Esq.*

**Chapter 4. A Guide to Electronic Discovery and Evidence** . . . . 59
*By Daniel K. Gelb, Esq., and Richard M. Gelb, Esq.*

**Chapter 5. Expert Depositions: Accountants, Economists, and Appraisers** . . . . 71
*By David L. Herzer Jr., Esq.*

**Chapter 6. The Reasonable Certainty Requirement in Lost Profits Litigation: What It Really Means** . . . . 85
*By Robert M. Lloyd, Esq.,*

**Chapter 7. Motions to Exclude Financial Experts** . . . . 115
*By Jonathan M. Dunitz, Esq., and Clifton T. Hutchinson, Esq.*

**Chapter 8. Motions to Exclude Expert Testimony** . . . . 165
*By Robert M. Lloyd, Esq.*

**PART II. LOST PROFITS DAMAGES** . . . . 199

**Chapter 9. Professional Liability Risk Management for Valuation Professionals** . . . . 201
*By Steven M. Platau, J.D., CPA*

**Chapter 10. Context of the Lost Profits Damages Claim** . . . . 223
*By Jonathan M. Dunitz, Esq., and Tyler L. Farmer, Esq.*

**Chapter 11. Planning Credible Lost Profits Analyses for Financial Experts** . . . . 235
*By Robert P. Gray, CPA/ABV/CFF/CGMA, CFE, Robert B. Kester, CPA/ABV/CFF, and Karl G. Dial, Esq., CPA*

**Chapter 12. Projecting But-For Profits** . . . . 267
*By Stacey Udell, CPA/ABV/CFF, CVA*

**Chapter 13. Establishing Evidence in Lost Profits Cases** . . . . 285
*By Tom Burrage, CPA/ABV, CVA, CFF, and Clifton T. Hutchinson, Esq.*

**Chapter 14. Lost Profits Versus Lost Business Value** . . . . 299
*By Tyler L. Farmer, Esq., and Neil J. Beaton, CPA/ABV/CFF, CFA, ASA*

**Chapter 15. Discounting Lost Profits in Damage Measurements** . . . . 315
*By Michael A. Crain, DBA, CPA/ABV, CFA, CFE*

Note: The title page for each chapter contains a detailed table of contents for that chapter.

This digital edition was created exclusively for the use of Andy Barbee of Greerwalker.
For licensing options, please contact Business Valuation Resources at sales@bvresources.com.


**Chapter 16. Discounting Damages: Case Law** .......... 325
*By Robert M. Lloyd, Esq.*

**Chapter 17. Use of Forensic Evidence in a Lost Profits Case** .......... 341
*By Michael Kaplan, CPA/ABV/CFF, CVA, CFFA, and Rebekah Smith, CPA/CFF, CVA, MAFF*

**PART III. DAMAGES IN SPECIFIC INDUSTRY SETTINGS** .......... 355

**Chapter 18. Calculating Damages for Early-Stage Companies** .......... 357
*By Neil J. Beaton, CPA/ABV/CFF, CFA, ASA, and Tyler L. Farmer, Esq.*

**Chapter 19. Lost Profits for Physician Practices and Violation of Noncompete Agreements** .......... 373
*By Mark O. Dietrich, CPA/ABV*

**Chapter 20. Fair Market Value in Regulations Impacting Physician Practices and Healthcare-Related Government Enforcement Actions** .......... 393
*By Pamela Coyle Brecht, Esq., Alice G. Gosfield, Esq., David H. Glusman, CPA/CFF, FABFA, Cr.FA, CFS, and Thomas W. Reinke*

**Chapter 21. Lost Profits Issues Unique to the Government Contracts Industry** .......... 413
*By Patrick A. McGeehin, CPA, Daniel E. Johnson, Esq., and Evan Sherwood, Esq.*

**Chapter 22. Construction Claims** .......... 423
*By Greg A. McKinnon, CPA/CFF/CGMA, CMA*

**Chapter 23. Lost Profits for Automobile Dealerships** .......... 445
*By Timothy W. York, CPA/ABV, and Adam Lawyer, CPA/ABV/CFF*

**Chapter 24. Franchise and Dealership Litigation Damages** .......... 459
*By Mark M. Leitner, Esq., Joseph S. Goode, Esq., and Ted Stockton*

**Chapter 25. Lost Profits Analysis in Eating Establishments** .......... 505
*By Ron Seigneur, CPA/ABV, ASA, CVA*

**Chapter 26. Damages and Right of Publicity Infringements** .......... 517
*By Audrey Wessel, Esq., and Mark Roesler, Esq.*

**PART IV. INTELLECTUAL PROPERTY DAMAGES** .......... 531

**Chapter 27. Intellectual Property Overview** .......... 533
*By Michael A. Crain, DBA, CPA/ABV, CFA, CFE*

**Chapter 28. Patent Infringement Damages: Lost Profits and Royalties** .......... 541
*By Richard F. Bero, CPA/ABV, CVA, CLP, and Autumn N. Nero, Esq.*

**Chapter 29. Design Patent Damages** .......... 569
*By Richard F. Bero, CPA/ABV, CVA, CLP, and Christopher V. Carani, Esq.*

**Chapter 30. Trade Secret Damages** .......... 579
*By Richard F. Bero, CPA/ABV, CVA, CLP, and Jon Margolies, Esq.*

**Chapter 31. Lost Profits (and Other Damages) in Trademark and Copyright Cases** .......... 591
*By Rick Hoffman, CPA/ABV, and Milan Politi, J.D.*

**Chapter 32. Uses of Survey Research in Damages Estimation** .......... 605
*By Larry Chiagouris, Ph.D., and Leon Kaplan, Ph.D.*

**Chapter 33. Using Internet Analytic Tools for Valuation and Damages Calculations in Internet IP Infringement and Defamation Cases** .......... 621
*By Brian Buss, CFA, and Doug Bania, CLP*

**Chapter 34. Profit Apportionment in Intellectual Property Infringement Damages Calculations** .......... 639
*By Brian Buss, CFA, and Doug Bania, CLP*

This digital edition was created exclusively for the use of Andy Barbee of Greerwalker.
For licensing options, please contact Business Valuation Resources at sales@bvresources.com.


**PART V. THE UNJUST ENRICHMENT REMEDY** .......... 661

**Chapter 35. Introduction to Remedies in Equity** .......... 663
*By George P. Roach*

**Chapter 36. Counting the Beans: Unjust Enrichment and the Defendant's Overhead** .......... 673
*By George P. Roach*

**Chapter 37. Restitution Rollout: The Restatement (Third) of Restitution & Unjust Enrichment: Counter-Restitution for Monetary Remedies in Equity** .......... 747
*By George P. Roach*

**PART VI. PERSONAL INJURY/WRONGFUL DEATH** .......... 785

**Chapter 38. Economic Damages From Personal Injury and Wrongful Death** .......... 787
*By James A. (Jim) Koerber, CPA/ABV/CFF*

**Chapter 39. Damages in Common-Law Employment Cases** .......... 805
*By Joseph D. Garrison, Esq., and Joshua R. Goodbaum, Esq.*

**Chapter 40. Calculation of Damages in Common-Law Employment Cases** .......... 813
*By James A. (Jim) Koerber, CPA/ABV/CFF*

**PART VII. OTHER DAMAGES ANALYSES** .......... 821

**Chapter 41. Financial Forensic Services for Internal Investigations** .......... 823
*By Peter Resnick, CPA, CFF, CFE, and Greg Naviloff, CPA/ABV, CFF, CFE*

**Chapter 42. An Overview of Accounting and Financial Analysis in Fraudulent Transfer Matters** .......... 859
*By Jeffrey L. Baliban, MA Econ, CPA/ABV/CFF, CDBV*

**Chapter 43. Piercing the Corporate Veil: An Alternative Strategy to Collect Damages** .......... 881
*By Elizabeth S. Fenton, Esq., and Kyle Anne Midkiff, CPA, CFE, CFF*

**Chapter 44. Business Interruption and Damage Claims** .......... 895
*By John Garaffa, Esq.*

**Chapter 45. Compensation Forfeiture: Stacking Remedies Against Disloyal Agents and Employees** .......... 935
*By George P. Roach*

**Chapter 46. Post-Acquisition Disputes and Related Damages** .......... 997
*By Kenneth Mathieu, CPA/ABV/CFF, Jared Bourgeois, CPA/ABV, CFE, CAMS, and Jonathan Dunitz, Esq.*

**Chapter 47. Event Studies in Securities Litigation** .......... 1017
*By Adrian M. Cowan, Ph.D., Paul J. Seguin, Ph.D., and Sean T. Malone, Ph.D.*

**Chapter 48. Use of Statistical Analysis to Measure Damages** .......... 1043
*By Charles D. Cowan, Ph.D.*

**Chapter 49. Representations and Warranties Insurance** .......... 1063
*By Kenneth Mathieu, CPA/ABV/CFF, Christian W. Fabian, Esq., Jennifer Drake Esq., Vipul Patel Esq., Stephen Davidson Esq., Jeffrey Buzen, Thomas K. Cauley Jr., Esq., and Renee McMahon*

**PART VIII. INDEX** .......... 1101

**Index** .......... 1103

**Index of Cases in Volume One** .......... 1133

This digital edition was created exclusively for the use of Andy Barbee of Greerwalker.
For licensing options, please contact Business Valuation Resources at sales@bvresources.com.


# VOLUME TWO: CASE LAW DERIVED FROM BUSINESS VALUATION RESOURCES

**Introduction** . . . xi

**PART VII. CASE DIGESTS** . . . 1

**Court Case Summary Table** . . . 3

**Court Case Digests** . . . 17

**PART VIII. APPENDICES** . . . 795

**Appendix A. Links to Ethical Guidelines Published by Member Organizations** . . . 797

**Appendix B. Links to Requirements for Certifications, by Organization** . . . 798

**Appendix C. Comparison of AICPA Professional Standards and Federal Rule of Evidence 702** . . . 800

**Appendix D. Federal Rules of Evidence Pertaining to Expert Testimony** . . . 801

**Appendix E. Federal Rules of Civil Procedure Pertaining to Expert Testimony** . . . 806

**Appendix F. Reference Manual on Scientific Evidence: 3rd Edition (2011), Selected Sections** . . . 808

This digital edition was created exclusively for the use of Andy Barbee of Greerwalker.
For licensing options, please contact Business Valuation Resources at sales@bvresources.com.


qualified, he would have been excluded because there was no evidence that the expert's method was generally accepted by accountants or that it was subject to peer review.[104] In fact, the evidence demonstrated the client's complete control over the expert's methods, including giving the expert the parameters and, if the results did not produce the desired results, changing the parameters.[105] Ultimately, the expert provided twelve (12) different results with a spread of almost $1.6 million depending on the position his client was taking—this despite his deposition testimony that he did not have an opinion on losses under a provision of the subject contract.[106]

### 6.1.5 5th Circuit

"In the Fifth Circuit, to be qualified as an expert a witness must possess 'such knowledge or experience in [his or her] filed or calling as to make it appear that his opinion will probably aid the trier in his search for the truth.'"[107] It is notable that the expert need possess "only general rather than specific experience with the subject matter."[108] Thus, an expert who is "a certified public accountant and certified fraud examiner, with experience in calculation and review of financial damages models for litigation purposes" was qualified to testify in the insurance field despite his lack of experience or licensing in that field—a matter that goes to weight not admissibility.[109]

In addition, "[t]he trial court's role as gatekeeper 'is not intended to serve as a replacement for the adversary system.'"[110] In *Walker v. Yellow Freight Systems, Inc.*, an economist testified as to loss of support damages for the plaintiff mother whose son had died.[111] The expert assumed that the son would go to college and continue to support his mother for some years to come.[112] In admitting the expert's testimony, the court concluded that it was not "overly speculative" because there was some evidence on the record to support these assumptions, though a bit confusing; ultimately these assumptions could be attacked on cross-examination and accepted or disregarded by the jury.[113]

The factual underpinnings for an expert opinion are typically a question of weight, not admissibility.[114] Even so, "the source of the information relied upon can be of 'such little weight that the jury should not be permitted to receive" the expert's opinion.[115] For example, in *Diabetes Centers of America, Inc. v. Healthpia America, Inc.*, the court found that the Federal Rules of Evidence and the requirements of *Daubert* are not met where the expert does not provide a basis for simply believing someone else's projections.[116] Of course it probably did not help that the plaintiff's expert relied solely upon the plaintiff's projection that its patients would increase from 7,000 in 2006 to 284,000 in 2007.[117]

### 6.1.6 6th Circuit

"Perceived flaws in an expert's opinion go to weight only if they fall within the accepted norms of the discipline and have a non-speculative basis in fact."[118] Thus, trial courts properly exclude "expert testimony whose flaws stem in part from the expert's efforts to do the best job he could with the limited data his client would provide."[119] Consequently, in *Multimatic, Inc. v. Faurecia Interior Systems USA, Inc.,* the court of appeals held that the expert's reliance on "yet to be

104 Ibid.
105 568 F. Supp. 2d at 634-35.
106 Ibid., 568 A.2d at 634-35.
107 *In re: Texans Cuso Ins. Group, LLC*, 2010 Bankr. LEXIS 515, * 41 (Bankr. N.D. Tex. 2010) (quoting *U.S. v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004)).
108 *In re: Texan Cuso Ins. Group,* 2010 Bankr LEXIS 515 at *41-42 (citations omitted).
109 Ibid.
110 *Walker v. Yellow Freight Systems, Inc.*, 1999 WL 757022 at * 8 (E.D. La. 1999) (citing *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996)).
111 *Walker,* 1999 WL 757022 at * 6.
112 Id. at * 7.
113 Id. at * 8.
114 *Diabetes Centers of America, Inc. v. Healthpia America, Inc.*, 2008 U.S. Dist. LEXIS 10052, * 6 (S.D. Tex. 2008).
115 Ibid.
116 Id. at * 7.
117 Ibid.
118 *Multimatic, Inc. v. Faurecia Interior Systems USA, Inc.*, 2009 U.S. App. LEXIS 28156, *29 (6th Cir. 2009).
119 Ibid.

This digital edition was created exclusively for the use of Andy Barbee of Greerwalker.
For licensing options, please contact Business Valuation Resources at sales@bvresources.com.



signed contracts years into the future … without analyzing [the plaintiff's] historical profit margins or typical industry profit margins" was too speculative to be admissible.[120] This is particularly true where the opinion is also based upon the plaintiff's "say-so" on its sales and its ability to continue sales at the same level because "[e]xperts may not assume facts without some support for those assumptions in their expert report or elsewhere in the record."[121]

Unfortunately for the plaintiff in *Multimatic*, the flaws in its expert report did not end there. The court also found that his "lost profit calculations fall short of the level of rigor professional economists normally exercise."[122] In this regard, the court found that professional economists would not find reliable a 10-year future economic projection "if no historical data backed up the projection and the economist made no effort to test his model against historical data to confirm its predictive power."[123] The expert's failure to identify or control for factors that might impact the plaintiff's profits beyond the misconduct of the defendant further eroded the reliability of the model.[124]

Courts must consider the factual basis of an expert's testimony when considering its reliability.[125] In *Ellipsis, Inc. v. The Color Works, Inc.*, the Tennessee federal district court excluded the expert's testimony as unreliable, when the expert: (i) relied exclusively on data the plaintiff provided; (ii) made an estimate of growth rate without any basis; (iii) made an assumption of a comparable market; and (iv) failed to analyze other factors regarding the sale of the product in question.[126]

In a case involving expert testimony on hedonic damages, the court adopted the defendant's argument that the "willingness-to-pay" model the expert used was unreliable, unhelpful, and, therefore, inadmissible.[127] Similarly, in *In re Wallace's Bookstores, Inc., v. Wells*, the court excluded several experts' testimonies regarding the debtor's insolvency in a bankruptcy proceeding because their opinions were not supported by sufficient evidence in the record.[128] In particular, the experts failed to investigate the information on which the debtor based her conclusions and accepted her values for inventory and goodwill without conducting an independent testing; they also ignored the bankrupt's contingent liabilities.[129]

### *6.1.7 7th Circuit*

In a pre-*Daubert* case, the 7th Circuit held that courts may exclude expert testimony when the expert failed to consider other causes for the lost profits such as market saturation and reduced prices of alternate products.[130] Following *Daubert*, the 7th Circuit established a two-step inquiry that requires the expert testimony to meet both steps to be admissible.[131] Under the 7th Circuit's test, the trial court is first required to:

> [D]etermine whether the expert's testimony pertains to scientific knowledge. This task requires that the district court consider whether the testimony has been subjected to the scientific method; it must rule out "subjective belief or unsupported speculation."[132]

The second step:

120 Id. at * 27
121 Id. at *27-28.
122 *Multimatic*, 2009 U.S. App. LEXIS 28156 at *28.
123 Ibid.
124 Ibid.
125 *Ellipsis, Inc. v. The Color Works, Inc.*, 428 F. Supp. 2d 752, 760 (W.D. Tenn. 2006).
126 Id. at 761.
127 *Brereton v. United States*, 973 F.Supp. 752, 757 (E.D. Mich. 1997).
128 316 B.R. 254, 262-63 (E.D. Kan. 2004).
129 Id. at 260-63.
130 *See Isaksen v. Vt. Castings, Inc.* 825 F.2d 1158, 1165 (7th Cir. 1987).
131 *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002); *see also Otis v. Doctor's Associates, Inc.*, 1998 U.S. Dist. LEXIS 15414, *9 (N.D. Ill. 1998) (citations omitted).
132 *Otis*, 1998 U.S. Dist. LEXIS 15414, *9.

This digital edition was created exclusively for the use of Andy Barbee of Greerwalker.
For licensing options, please contact Business Valuation Resources at sales@bvresources.com.


The starting point for the cost structure analyses generally is the determination of fixed versus variable costs. Many courts distinguish between fixed and variable costs in the analyses of lost profits. As the Delaware Chancery Court explained, "A key aspect of a lost profits analysis is to determine what portion of total costs are fixed—i.e., will be expended regardless of sales volume—and what costs are variable—i.e., will be spent only to generate additional sales volume. Only the latter are required to be subtracted from [the projected] lost revenues in determining lost profits, because only the latter are saved as a result of the breach."[103]

Accordingly, attorneys and their financial experts should ideally confer prior to the case (or, for defense experts, as early in the proceedings as possible) to discuss the applicable rules regarding treatment of fixed and variable costs in the lost profits analyses in their particular jurisdiction and make sure the financial expert's damages model(s) follow the applicable rules (and critique the opponents model for the same). In some cases, the attorney may want to include the owner as a claimant if the owner has a separate claim to ensure any losses that flow through to the owner are considered in the claim.

To determine the amount of avoided costs, the financial expert should consider performing analyses of the cost structure to determine the relationship between the projected lost revenues and the costs related to generating those lost revenues. Depending on the nature and/or size of the plaintiff, the degree of detail contained in the plaintiff's financial/accounting records varies considerably from business to business. The complex nature and/or specificity contained in the financial books and records may require additional estimating techniques to determine the appropriate level of avoided costs. Performing such analyses will normally require analyzing the financial records to identify the cost drivers and other factors that impact costs directly relating to the projected lost revenues related to the alleged dispute.

The analyses of the cost structure are essential to determine how particular costs relate to the selling process and whether those costs are fixed, variable, or semivariable. Unless the damages period at issue is very short, it is unlikely that all costs will be purely fixed or variable. The analyses of the subject entity's costs typically begin with the profit and loss statements or trial balance of the subject business, with the expert typically recording actual expenses into the following categories:

- Cost of goods sold;
- Direct costs;
- Indirect costs;
- Overhead costs; and
- Other expenses.

Every subject business has its own methodology for tracking costs as well as the level of detail that is attributed to creating the financial books and records (including financial statements internally and externally). Financial experts have successfully relied on statistical and/or nonstatistical methods to estimate costs for lost profit analyses.

In some cases, the financial expert might need to employ *detailed account analyses (or specific-cost line-item analyses)* to gain an understanding of the composition of the general ledgers and/or chart of accounts. The financial expert determines whether costs are fixed, variable, or semivariable and then determines their respective impact and relativity of the

103 *Honeywell Internat'l Inc. v. Air Products & Chemicals, Inc.*, 858 A.2d 392,421 (Del Chan. 2004).

This digital edition was created exclusively for the use of Andy Barbee of Greerwalker.
For licensing options, please contact Business Valuation Resources at sales@bvresources.com.



avoided costs in the economic damages analyses.[104] The detailed account analyses should also consider the existence of nonrecurring, seasonal, and other case-specific items. This process has drawbacks because of the level of detail financial experts must consider and document to support their conclusions. Employees who have responsibilities related to documenting and controlling these costs can also be helpful in providing the necessary materials for the analyses.

The financial records are another useful tool the financial expert should use to determine the cost structure of a product or service. Using *prior experience* from the financial expert's knowledge of the subject industry is another valuable resource for estimating costs with similar products (this would be an example of using the "before" portion of the "before-and-after" method—in this instance, to estimate costs). *Standard costs* offer another valuable resource that is available for some elements of the product cost. The expert should consider whether and/or how much impact the cost accounting allocations have on the cost estimates. Cost accounting records and allocations may not be specific enough to a product, project, or activity. In some cases, the allocation may be based on some objective measure, including revenues, labor hours, or units sold. It is important for financial experts to document and understand the methodologies and to consider whether to include or exclude certain items. Financial experts should also consider the types of cost included in any sort of corporate or administrative overhead allocation and how it relates to specific cost accounts being utilized in the lost profits analyses.

Historically, financial experts have also used *ratio analyses* and/or engineering applications to address other costs to determine how those costs vary with sales or, in some situations, the expert might use survey data to measure certain factors. In addition, a variety of *statistical methods* can be used for cost estimates, including:

- *Regression analyses.* This is a technique for identifying relationships between a cost and one or more variables, such as sales or production levels;[105] and

- *Attribute sampling.* This is used to estimate a characteristic of a population.[106]

When attempting to quantify the amount of incremental costs associated with the projected lost revenues using these methods, the financial expert should consider documenting the decisions and processes of the allocation theory. The financial expert also should consider items such as seasonality, the quick popularity of new products, and other factors that may affect the analyses. As with any estimation, the reasonableness of the analyses considering historical, industry, or economic data can provide an important check on the resulting lost profits claimed.[107]

For more information on the preparation of forecasts, see Chapter 12 of this guide.

104 *Jack Tyler Eng'g Co. v. Colfax, No. 10-02373* (W.D. Tenn. 2013)—Plaintiff's expert projected lost profits for 15 years and into perpetuity. "Because the plaintiff's owner and CEO told him that there were no variable costs in connection with the sale of the defendant's products, he did not include them in his analysis. But in his deposition, he acknowledged that these costs could exist." While the defendant argued this was improper, the court noted that the defendant failed to identify any specific costs. Several other issues were disputed in the expert's analysis, but, in the end, the *Daubert* motion was denied.

105 "*Regression* is a specific type of statistical analysis, quantifying the relationship between two variables (for example, food expense and revenue[s]). It is typically performed by using a software package such as Microsoft Excel, SAS, Stata, or SPSS. In a regression, there is a dependent variable (for example, food expense) and one or more independent or explanatory variables. A regression with multiple independent or explanatory variables is referred to as a *multiple regression*." *Lost Profits Practice Aid*, pg. 49.

106 See Chapter 41, "Financial Forensic Services for Internal Investigations," of this guide for more discussion on attribute sampling and other sampling types.

107 For a discussion of one financial expert's use of this method—in particular, "his attempt to determine the incremental profit rate by 'drilling down' to determine which costs were fixed and which were variable," especially in comparison to the opposing expert, who used less credible methods—*see Honeywell Int'l, Inc. v. Air Products & Chemicals, Inc.*, 858 A.2d 392, 427 (Del Chan. 2004).

This digital edition was created exclusively for the use of Andy Barbee of Greerwalker.
For licensing options, please contact Business Valuation Resources at sales@bvresources.com.


the revenues a given physician generated. All revenues, for example, from imaging services—MRI, CT, ultrasound, mammography, PET, fluoroscopy, and radiography—may be recorded in a single department. Some, but not necessarily all, of the expenses of those services may be tracked directly to that department, but other expenses are commonly pooled in a shared overhead department and then allocated back to the various hospital departments. This can make the calculation of but-for earnings and historical earnings for the hospital challenging at best.

Much of the overhead of a hospital department—and the hospital itself, for that matter—is fixed, meaning it does not vary based upon the volume of services provided in the department or hospital. Smaller hospitals tend to have significantly more of their overhead fixed than do larger hospitals. Fixed expenses such as occupancy costs, administrative personnel, and equipment maintenance costs will not decline because a physician leaves and is alleged to have violated a noncompete agreement. It is wise to consider a contribution margin approach to the measurement of damages in this instance. The contribution margin is defined as the difference between the revenue received for a given service and the variable (or marginal) cost of providing that service.[33] The term "contribution" is used because each service provided contributes to the payment of the fixed costs of the hospital and the department; when those fixed cost are covered, a "profit" is earned. A lost profits analysis should not consider only the actual "profits" lost, but the contribution margin lost because the latter will typically best measure the damages actually suffered.

*Tip:* Many hospitals have sophisticated information systems that should be able to identify all of the orders a given physician wrote for services throughout the hospital and its departments including imaging, lab, inpatient and outpatient surgical services, chemotherapy, physical therapy, cardiac rehab therapy, and a myriad of other services. These data should be exported to Excel or some other computer-readable format with all patient-identifying data redacted due to the HIPAA[34] statute.

Hospitals use a variety of codes to bill for hospital-based services, not the CPT codes described elsewhere herein that are used for physicians' services. Hospital inpatient admissions are billed using diagnosis-related groups (DRGs); most hospital outpatient department services are billed using ambulatory payment classifications[35] (APCs) under the hospital outpatient prospective payment system (HOPPS); there are also systems for paying clinical laboratory services and for some durable medical equipment.

### 3.3 Growth Rates in But-For and Future Earnings Calculations

In the author's experience, this is the single most common and most serious error that occurs in physician damages calculations. In general, there are a variety of broad economic and Medicare-specific limitations on physician incomes.

#### *3.3.1 General Price Per Unit of Service for Physicians[36]*

What about increases in fees per unit of service? From 1999 to 2016—or for 17 years—the compound rate of increase for all physician services was only 1.65%, based on data from the Bureau of Labor Statistics' Producer Price Index for Offices of Physicians in Exhibit 4.

#### *3.3.2 Medicare Price per Unit of Service[37]*

Clearly, there is no evidence that per-unit reimbursement rates for physicians are growing at the gross domestic product (GDP) rate or the Consumer Price Index rate, and the capacity to provide units of service in a small practice is limited.

33 The definition of contribution margin is referred to as the incremental margin elsewhere in this guide. For a discussion of incremental margins, see Chapter 27.
34 See Glossary.
35 These are, however, based upon an aggregation of CPT codes.
36 Mark Dietrich, "Choosing and Using the Right Valuation Methods for Physician Practices," *BVR/AHLA Guide to Healthcare Industry Finance and Valuation*.
37 Ibid.