EXHIBIT C

# LITIGATION SERVICES HANDBOOK

Sixth Edition

## The Role of the Financial Expert

Roman L. Weil

Daniel G. Lentz

Elizabeth A. Evans

Cover design: Wiley

Copyright © 2017 by John Wiley & Sons, Inc. All rights reserved.

Published by John Wiley & Sons, Inc., Hoboken, New Jersey.
Published simultaneously in Canada.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, scanning, or otherwise, except as permitted under Section 107 or 108 of the 1976 United States Copyright Act, without either the prior written permission of the Publisher, or authorization through payment of the appropriate per-copy fee to the Copyright Clearance Center, Inc., 222 Rosewood Drive, Danvers, MA 01923, (978) 750-8400, fax (978) 646-8600, or on the Web at www.copyright.com. Requests to the Publisher for permission should be addressed to the Permissions Department, John Wiley & Sons, Inc., 111 River Street, Hoboken, NJ 07030, (201) 748-6011, fax (201) 748-6008, or online at www.wiley.com/go/permissions.

Limit of Liability/Disclaimer of Warranty: While the publisher and author have used their best efforts in preparing this book, they make no representations or warranties with respect to the accuracy or completeness of the contents of this book and specifically disclaim any implied warranties of merchantability or fitness for a particular purpose. No warranty may be created or extended by sales representatives or written sales materials. The advice and strategies contained herein may not be suitable for your situation. You should consult with a professional where appropriate. Neither the publisher nor author shall be liable for any loss of profit or any other commercial damages, including but not limited to special, incidental, consequential, or other damages.

For general information on our other products and services or for technical support, please contact our Customer Care Department within the United States at (800) 762-2974, outside the United States at (317) 572-3993 or fax (317) 572-4002.

Wiley publishes in a variety of print and electronic formats and by print-on-demand. Some material included with standard print versions of this book may not be included in e-books or in print-on-demand. If this book refers to media such as a CD or DVD that is not included in the version you purchased, you may download this material at http://booksupport.wiley.com. For more information about Wiley products, visit www.wiley.com.

***Library of Congress Cataloging-in-Publication Data:***

ISBN 978-1-119-16632-0 (Hardcover)
ISBN 978-1-119-36316-3 (ePDF)
ISBN 978-1-119-36318-7 (ePub)

Printed in the United States of America

10 9 8 7 6 5 4 3 2 1

also help the expert account for other factors that could play a role in the company's financial performance and explain the nature and duration of any negative effects caused by factors other than the breach. Hence, the expert gathers this body of knowledge for application to the damages claim model.

- **Pre-breach budgets and forecasts.** Experts can review pre-breach budgets and forecasts to help them understand the company's expectations before the defendant's injurious acts occurred. These documents can provide a wealth of corroborative information about management's expectations concerning the operations of the business, its revenue plans, cost structure, and investment plans. Most lost profits models will employ more sophisticated analyses to establish lost revenues and cost ramifications of a breach. (Section 4.5(f) and Chapters 8 and 9 include discussions on regression analysis that we will not repeat here.)

  Certain matters involve loss models that derive from the underlying contract, such as business interruption insurance claims. In these cases, experts may use pre-breach budgets or forecasts as a basis for estimating but-for revenues and costs. To test and gain comfort on the forecasting accuracy previously achieved, an analyst could use a pre-loss budget as the basis for cost estimates by performing regression analysis of historical budgeted costs and actual results for the corresponding period. Aside from these relatively limited applications, budgets and forecasts are largely beneficial only as corroborating evidence; the expert will need to explain where they differ significantly from modeled lost profits.

- **Analysis of historical performance.** Most experts consider the historical financial performance of the subject company in validating estimates of but-for performance, regardless of the method used to develop that but-for estimate. Failure to do so will expose experts to criticism if their pro forma estimates materially diverge from actual past performance unless, of course, the parties intended the breached contract to have a material beneficial impact on that performance and the damages estimate reflects this gap. For example, suppose that the plaintiff sold 26,000 widgets per year for the two years preceding the damages period but the but-for analysis assumes that the plaintiff sells 25 percent more. The plaintiff's expert should explain why a 25 percent increase in sales was a reasonable assumption in the but-for world. The analysis of historical performance should include a comparison to other comparable market participants and to the industry at large. Trends in historical performance can also be corroborative or identify other factors that the expert must address in showing causal links. In short, an expert will find it perilous to prepare a damages claim in a vacuum, isolating the claimed losses from what the company accomplished in the past.

- **Industry research/guideline company analysis.** Another foundation of a damages claim is an analysis of the relative performance of guideline companies or industry averages. This approach is particularly useful for new entities lacking historical track records, but experts broadly use this approach to establish corroborating evidence, to challenge assumptions and estimates, or to establish the reasonableness of loss estimates for the subject company. While no specific requirements exist for guideline company selection, valuation literature contains widely accepted practices.[103] Such

The CAFC states, "Moreover, in a credible economic analysis, the patentee cannot show entitlement to a higher price divorced from the effect of that higher price on demand for the product. In other words, the patentee must also present evidence of the (presumably reduced) amount of product the patentee would have sold at the higher price."[29] Economists call this the *price elasticity of demand*. The analysis should also study noninfringing alternatives (i.e., substitute goods) and their ability to affect the patentee's price and quantity sold. If experts can obtain the appropriate data, they can use econometrics to measure the relation of price to quantity.

### (e) Accelerated Reentry Damages

A successful patent suit usually results in an injunction against the infringer's further use of the patented technology during the remaining life of the patent. Thus, lost profits damages in patent cases usually involve only past lost sales. Some infringements, however, can have lingering effects that lead to future lost profits post-expiration. Accelerated reentry damages (also called accelerated market entry damages) are a form of lost future profits in a patent infringement case. The theory behind these damages recognizes that the infringer gains a head start by obtaining some market share before the patent monopoly expires. As a result, instead of starting from a base of zero sales at the patent's expiration, the infringer starts from a base of established sales and customers. This will cause the patentee to have lower sales after the patent expires than if the infringer had not infringed during the patent's duration.

### (f) Estimating Costs

Cost calculations in a patent infringement case resemble those of most other litigations. Therefore, we refer the reader to Chapters 4 through 10 for a full discussion and will list here some issues that an expert should consider.

One should include only the incremental costs that arise from the incremental sales. The CAFC approved the incremental income approach in *Paper Converting Machine Co. v. Magna-Graphics Corp.*[30] This requires characterizing costs as fixed or variable and identifying the fixed and variable components of semi-variable costs. One often uses regression analyses (see Chapters 8 and 9), engineering studies (which scrutinize the actual relation between volume and costs), and account analyses (line-by-line categorization of chart of accounts) for this purpose. Generally, we would advise caution in using account analysis when the data can support a statistical derivation of incremental costs (see discussion in Chapters 8 and 9).[31] One must avoid naively analyzing a company's financial statements without first making adjustments. Most companies use absorption accounting, which allocates a portion of fixed manufacturing overhead to the cost of each unit produced, muddling the distinction between fixed and variable costs. Also, the company's time horizon (inherent in the financial reporting system) often lacks relevance to the litigation; differing time horizons affect the characterization of costs as fixed or variable.

Multiproduct companies often have substantial common costs to allocate to individual products, which usually require statistical analysis. The most important consideration in patent cases, however, relates to claims that involve increases in unit sales over long periods. For long enough time spans, all the costs—even corporate

ESTIGATIONS

Self-Cleaning Litter Boxes), 28, 2009, pp. 56–57.
*ize & Prods Containing Same* ize), Inv. No. 337-TA-605,
USITC Pub. 1022, Comm'n
*Software*, Inv. No. 337-TA-
il 23, 2009, pp. 13–16.

CHAPTER 22

# CALCULATING INFRINGER'S PROFITS IN "SOFT" INTELLECTUAL PROPERTY DISPUTES: TRADEMARK, COPYRIGHT, AND DESIGN PATENT CASES

**Christopher P. Gerardi**
**Dawn R. Hall**
**Juli Saitz**

## CONTENTS

22.1 Introduction 22.1
22.2 The Relevant Profit Component of Economic Damages 22.3
(a) Trademarks and Service Marks 22.3
(b) Copyrights 22.4
(c) Design Patents 22.4
22.3 Costs and Cost Behavior 22.5
(a) Costs 22.5
(b) Cost Behavior 22.7
22.4 Different Measures of Profit 22.8
(a) Incremental Profit 22.8
(b) Hybrid Profits 22.8
(c) Operating Profits 22.8
(d) Net Profit 22.8
22.5 Case Law Related to Profit Calculations 22.9
(a) Second Circuit 22.9
(b) Fourth Circuit 22.9
(c) Ninth Circuit 22.10
(d) Fifth Circuit 22.10
(e) Seventh Circuit 22.11
(f) Eleventh Circuit 22.11
22.6 Nexus Requirements 22.11
22.7 Conclusion 22.13

NOTES 22.13

## 22.1 INTRODUCTION

This chapter provides guidance in calculating an infringer's[1] (defendant's) profits in trademark, copyright, and design patent cases.[2] While an intellectual property owner (plaintiff) could seek other forms of economic damages such as statutory damages and actual damages (including lost profits and reasonable royalty), this chapter focuses on a damages measure based on the defendant's profits.[3]

Ample case precedent supports the idea that the expert should derive damages from incremental profits: relevant net sales the plaintiff (property holder) would have made but for the defendant's (infringer's) actions less the appropriate incremental costs that would have been incurred to make these but-for sales.[4]

Yet a plaintiff in trademark, copyright, and design patent cases can also claim additional damages in the form of the defendant's profits, as long as a double recovery does not occur.[5]

In calculating the defendant's profit, the law generally provides that the plaintiff bear the burden of proving only the defendant's revenue attributable to the alleged misappropriation or infringement. The defendant bears the burden of proving the specific costs[6] to deduct from its revenue and any other appropriate adjustments necessary to calculate the defendant's profit. As a result, this chapter focuses only on the costs and profits related to the defendant's revenues that the plaintiff has already proved.

But what level of defendant's profits is appropriate: gross profit, incremental profit, operating profit, net profit?

- Section 1117 of the Lanham Act, the statutory guidance for trademark infringement actions, states that "a plaintiff shall be able to recover defendant's profits . . . and in assessing profits, the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." Nowhere does the Lanham Act define "defendant's profits" or provide guidance as to the measure of recoverable profits.
- 17 U.S. Code § 504, Remedies for infringement: Damages and profits, the statutory guidance for copyright infringement, states:

  > The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

  Similar to trademarks, the measure of profits that is recoverable is not specifically addressed.
- 35 U.S. Code § 289, Additional remedy for infringement of design patent, statutory guidance for design patent cases, states

> Whoever during the term of a patent for a design, without license of the owner, (1) applies the patented design, or any colorable imitation thereof, to any article of manufacture for the purpose of sale, or (2) sells or exposes for sale any article of manufacture to which such design or colorable imitation has been applied shall be liable to the owner to the extent of his total profit, but not less than $250, recoverable in any United States district court having jurisdiction of the parties.

As shown above, no single, commonly accepted framework exists for calculating the defendant's profit or the appropriate connection between the costs and the revenues at issue. This leaves ample room for judgment, variability, and disagreement between the parties.

Some courts have ruled that plaintiffs and defendants can include costs with a "sufficient nexus" to the revenues at issue in the calculation of defendant's profits. The question then becomes "what constitutes a sufficient nexus?" Similar to the calculation of a plaintiff's lost profits, some courts have decided that the defendant establishes a nexus when it counts those costs that the defendant would have incurred to make the incremental infringing sales, while other courts adopt the full absorption approach, which provides for incremental costs plus an additional allocation of overhead. Still other courts fall somewhere in between or are silent on this issue.

This chapter discusses the different approaches used to identify relevant costs and profits, as well as the concepts and methods used to identify an appropriate "nexus."

Section 22.2 presents an overview of relevant sections of U.S. trademark, copyright, and design patent law, particularly as the law relates to remedies and economic damages. Section 22.3 discusses costs and their behavior.

Section 22.4 defines different types of profits—gross profit, incremental profit, and net profit—and illustrates how one can calculate each type. Section 22.5 presents examples of the methods and procedures accepted (and rejected) by U.S. courts in the calculation of profits. Section 22.6 discusses how to evaluate a sufficient nexus. Despite the differences between the courts as to the deductibility of certain costs, they all require that such costs have a connection to the production and sale of the infringing products.[8]

## 22.2 THE RELEVANT PROFIT COMPONENT OF ECONOMIC DAMAGES

This section discusses relevant sections of U.S. trademark, copyright, and design patent laws as they relate to remedies and the profit component of economic damages in trademark, copyright, and design patent cases.

### (a) Trademarks and Service Marks

The U.S. Patent and Trademark Office (USPTO) defines trademarks and service marks as follows:

> A trademark is a word, phrase, symbol, and/or design that identifies and distinguishes the source of the goods of one party from those of others. A service mark is a word, phrase, symbol, and/or design that identifies and distinguishes the source of a service rather than goods. Think brand names, slogans, and logos. The term "trademark" is often used to refer to both trademarks and service marks. Unlike patents and copyrights, trademarks do not expire after a set term of years. Instead, a trademark can last forever, so long as the owner continues to use the mark in commerce to indicate the source of goods and services.

There are two types of trademark rights: (1) those governed by common law, which arise from the trademark's use in commerce and (2) those obtained through federal registration, which the USTPO grants after an official review. Trademark owners need not register with the USPTO; however, doing so provides the owner with certain notice rights exclusivity in the marketplace. Common law trademarks are designated with ™ while registered trademarks are designated with ®.[9]

The Lanham Act, enacted on July 5, 1946, and codified at 15 U.S.C. § 1051, governs federal trademark law. Individuals or entities can also register trademarks at the state level, typically with the relevant secretary of state's office. While this type of registration provides less protection to a trademark owner and is not useful if the trademark is used in interstate commerce, trademark owners using their marks in only one state often register only at the local state level.

Trademark infringement is the unauthorized use of a trademark (or substantially similar trademark) on competing or similar goods and services. Courts generally rule that infringement exists if the unauthorized use of the trademark will likely cause confusion in the marketplace.

Cost from Accounting Data, and Chapter 9, Econometric Analysis, discuss how an expert should estimate costs.

## 22.4 DIFFERENT MEASURES OF PROFIT

Courts have used a variety of methods to calculate defendant's profits. This section summarizes the calculation of these various profit measures.

### (a) Incremental Profit

Incremental profit equals revenues minus incremental costs related to the infringing units. Many companies track what they call the "contribution margin" for a particular product or line of business. The contribution margin should be close to incremental profit for the particular product or line of business measured in that it captures costs that directly relate to the sales or production of a product. However, the contribution margin or incremental profit for a particular product or line of business is not the same as the incremental profit related to the infringing products unless the infringing products are the same as the "particular product or line of business." For example, the contribution margin or incremental profits for a line of business may include 100 different product lines and only one product line may have contained infringing products.

### (b) Hybrid Profits

While not a technical term used in the accounting and finance world, many courts allow a deduction of incremental costs along with some deduction for fixed costs deemed to have a sufficient nexus to the infringing sales at issue.

### (c) Operating Profits

Operating profit equals revenues less cost of goods sold and operating costs (fixed operating expenses and SG&A). Operating profit provides a picture of the company's operational performance for all product lines or services.

### (d) Net Profit

Net profit equals operating profit less interest and taxes. Most courts do not recognize this measure of defendant's profits, given the tax implications after an award is granted.[17] An expert may include interest, however, as an incremental income or expense item if the cash flow generated by infringing sales generated interest or if debt was incurred in financing the production and sale of infringing goods.

## 22.5 CASE LAW RELATED TO PROFIT CALCULATIONS

The rules differ among the federal circuit courts as to which measure of defendant's profits to use. The Fifth, Seventh, and Eleventh Circuits generally follow the incremental approach (i.e., the expert subtracts incremental costs from revenue). The Second and Ninth Circuits, on the other hand, generally permit the defendant

greater latitude to deduct additional costs that are not strictly incremental. We will refer to this second approach as the "full absorption" approach and this approach will include hybrid, operating, and net profit calculations.[18] We use the word "generally" because we have noted exceptions to these rules. Other Circuits (e.g., the Fourth) do not yet have definable standards.

As noted previously, once the plaintiff has proved the infringing sales, the defendant (and, as a rebuttal to defendant's evidence, the plaintiff) proves the amount of profit. Hence, this chapter does not describe the methods for proving infringing revenue but focuses only on the profit calculation. In practice, many damages experts working on behalf of a plaintiff will perform their own assessment of allowable deductions to arrive at the defendant's profit in an effort to present the court with their view of infringer's profits. To do this, the expert should work closely with counsel to assist in discovery requests and the drafting of deposition questions to gain sufficient information in order to evaluate the nature of all of the defendant's costs.

### (a) Second Circuit

In *Sheldon v. Metro-Goldwyn Pictures Corp.*,[19] the court ruled that the defendants could be credited with only "such factors as they bought and paid for; the actors, the scenery, the producers, the directors, ***and the general overhead***"[20] (emphasis added). The court further held that overhead not assisting in the production of infringing goods should not be deducted from revenues in determining profits.[21]

The Second Circuit has generally followed a "two-step procedure for deducting overhead expenses from an infringer's profits" as initially outlined in *Sheldon*.

- First, the expert must provide a nexus between the overhead category and the infringing product. Once the expert shows a sufficient nexus, the court will not scrutinize particular items within the overhead category.[22]
- Second, the expert must allocate the overhead using "a fair, accurate, and practical method." The burden of establishing this formula belongs to the infringer.[23]

For example, in *Hamil America Inc., v. GFI, et al.*, the appellate court disagreed with the district court's exclusion of all overhead deductions by the defendant. The appellate court stated that each overhead category must demonstrate a direct and valid nexus between it and the production of GFI Pattern No. 330 and the defendant must propose "a fair and acceptable formula for allocating a portion of overhead to the pattern's production."[24]

### (b) Fourth Circuit

One cannot yet determine whether the Fourth Circuit approves of the "incremental" or "full absorption" methods. In *Polo Fashions, Inc., v. Craftex, Inc.*,[25] the Fourth Circuit allowed the defendant to deduct overhead costs because Polo Fashions (the plaintiff) was already receiving treble damages. In response to Polo's request that the court exclude overhead costs from total cost, the Court said, "In a different context, we might find some merit in this contention, but the district court, as fact finder, was called upon to assess the plaintiff's damages, not just the defendants' profits, and the damages found were to be trebled."[26] This demonstrates the broad

discretion afforded to a court when interpreting how to calculate damages. In different circumstances, the Fourth Circuit might be inclined to exclude fixed and/or overhead costs from profit calculations.

Similarly, in *Carter Products, Inc., v. Colgate-Palmolive Company*,[27] which involved trade secrets, the court excluded fixed costs from recoverable damages and disallowed deductions for "overhead, advertising, selling, warehousing, shipping, administrative expenses and for income taxes." While this case involves a federal district court, not an appellate court, it again shows that courts within the Fourth Circuit might be inclined to reject the deduction of overhead costs from recoverable damages.

**(c) Ninth Circuit**

Similar to the Second Circuit, the Ninth Circuit has adopted a "full absorption approach." In *Kamar International, Inc., v. Russ Berrie & Co.*,[28] the defendant's controller testified that total overhead consisted of five distinct categories, two of which had no relation to the infringing goods at issue. The court ruled that the defendant could deduct overhead, so long as the defendant could prove that each category "actually contributed to the production, distribution or sales of infringing goods."[29] In addition, the Ninth Circuit Model Civil Jury Instructions give guidance for calculating defendants' profits in trademark infringement matters: "Expenses are all [operating,] [overhead,] and production costs incurred in producing the gross revenue."[30]

**(d) Fifth Circuit**

The Fifth Circuit approaches the question of the deductibility of overhead expenses by considering the extent to which infringing sales likely increase such expenses, the "incremental" approach. In *Maltina Corp. v. Cawy Bottling Co.*,[31] the court did not allow a deduction for overhead, noting that "a proportionate share of overhead is not deductible when the sales of an infringing product constitute only a small percentage of total sales."[32] The infringing sales constituted just over 6 percent of total sales, which leaves an expert to wonder what exact percentage the court deems as a "small percentage" of total sales.

The issue of overhead deductibility in the Fifth Circuit also arose in the design patent case of *Henry Hanger & Display Fixture Corporation of America et al. v. Sel-o-rak Corporation*.[33] The court found that "while apportionment of some overhead and general business costs between the infringing and the non-infringing operations of a business enterprise will usually be made, this should not be done unless it is shown that the particular overhead classifications are such that an apportionment is proper. It is not enough merely to say that the overall overhead for income tax purposes was a stated percentage of overall sales." Hence, in this case, the Fifth Circuit concludes that any apportionment of overhead costs should bear some relation to infringing product.

**(e) Seventh Circuit**

The Seventh Circuit favors the incremental approach and does not deduct from profit any fixed costs occurring in the normal course of business that do not fluctuate with the production of infringing goods. See *Ruolo v. Russ Berrie & Co.*[34]

(Defendant's expert witness "improperly deducted certain administrative expenses without demonstrating they were variable costs. Fixed costs are not deducted from the profit calculation.") and *Taylor v. Meirick*[35] ("Costs that would be incurred anyway should not be subtracted, because by definition they cannot be avoided by curtailing the profitmaking activity.")

### (f) Eleventh Circuit

The Eleventh Circuit does not appear to favor the deduction of overhead and fixed costs from damages calculations. In *Abbott Labs. v. Unlimited Beverages, Inc.*,[36] the Eleventh Circuit addressed the deductibility of costs that are not specifically associated with the sale of the product at the center of the dispute relating to a trade dress. The court stated, "UBI argues that the district court's calculation of its profits was deficient in failing to deduct costs from UBI's gross profits from the sale of the offending solutions . . . . The district court refused to deduct those costs, concluding that they would have been incurred even without the sale of the prohibited product."[37] The Eleventh Circuit sided with the district court's rationale that the calculation of defendant's profits should not deduct from recoverable damages the costs that would have occurred without the sale of the prohibited product.

## 22.6 NEXUS REQUIREMENTS

Despite the inconsistency among the federal circuit courts as to the deductibility of indirect costs or overhead, one theme emerges: deductible costs should have some connection or nexus to the production and sale of the infringing products. The question left to trademark, copyright, and patent design owners, infringers, and their experts is what constitutes "sufficient nexus"? When evaluating whether to deduct a cost, an expert should ask the following questions.

First, does the cost change in relation to sales? If so, the cost is variable and directly related to the infringing sales and the expert should deduct such costs under either the full absorption or incremental approach.

Second, does the cost directly relate to the production, sale, or both the production and sale of the infringing goods? Such costs might include semi-variable or fixed costs. Consider a national print advertisement featuring the infringing product. If the advertisement was part of the defendant's normal annual advertising budget, the costs of which would not change whether it featured the infringing products, the incremental approach would not permit a deduction for this advertising cost. The full absorption approach, however, would consider this cost as an acceptable deduction, assuming the defendant could provide records to satisfy the court.

Third, is the cost indirectly related to the infringing sales? Indirect expenses or overhead items pose the most ambiguity as to their deductible nature. For example, can the defendant deduct payroll expenses for employees in a retail store where it sold infringing goods? What about warehouse rent? Costs incurred by the accounting department related to the collection of revenue for infringing sales? Plaintiffs could argue that such costs are too far removed from the sale of infringing goods and thus the profit calculation should not include them. Further, the plaintiff may assert that the infringers would incur such costs in the normal course of business regardless of whether they produced the infringing goods; thus,