IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

NORTHERN DIVISION

JOHN BEAN TECHNOLOGIES CORPORATION, a Delaware corporation,

Plaintiff,

vs. Case No. 1:17-CV-142RJS

B GSE GROUP, LLC, a North Carolina limited liability company, et al.,

Defendants.

BEFORE THE HONORABLE ROBERT J. SHELBY

September 27, 2022

Jury Trial

Volume I

A P P E A R A N C E S

For Plaintiff: HARRY N. ARGER
STEVEN McMAHON ZELLER
10 South Wacker Drive
Suite 2300
Chicago, Illinois

For Defendants: EDWARD B. DAVIS
JOSHUA B. DURHAM
227 West Trade Street
Suite 1800
Charlotte, North Carolina

Court Reporter: Ed Young
351 South West Temple
Room 3.302
Salt Lake City, Utah 84101-2180
801-328-3202
ed_young@utd.uscourts.gov

I N D E X


| Witness | Examination By | Page |
|---|---|---|
| Brian DeRoche | Mr. Zeller (Direct) | 5 |
| Brian DeRoche | Mr. Durham (Cross) | 67 |
| Brian DeRoche | Mr. Zeller (Redirect) | 143 |
| Brian DeRoche | Mr. Durham (Recross) | 148 |
| Marshall Scott Dils | (Video deposition) | 151 |

| Exhibit | Received |
|---|---|
| Plaintiff's Exhibit 51 | 17 |
| Plaintiff's Exhibit 52 | 20 |
| Plaintiff's Exhibit 53 | 23 |
| Plaintiff's Exhibit 50 | 26 |
| Plaintiff's Exhibit 4 | 32 |
| Plaintiff's Exhibit 5 | 35 |
| Plaintiff's Exhibit 6 | 36 |
| Defendant's Exhibit 1162 | 48 |
| Plaintiff's Exhibit 470 | 50 |
| Defendant's Exhibit 1111 | 58 |
| Defendant's Exhibit 1036 | 59 |
| Defendant's Exhibit 1161 | 76 |
| Defendant's Exhibit 1041 | 81 |
| Defendant's Exhibit 1002 | 84 |
| Defendant's Exhibits 1014 and 1015 | 87 |
| Defendant's Exhibit 1001 | 90 |
| Defendant's Exhibits 1017 and 1018 | 93 |
| Defendant's Exhibits 1016 and 1019 | 105 |
| Defendant's Exhibit 1043 | 110 |
| Defendant's Exhibit 1873 | 114 |
| Defendant's Exhibit 1060 | 116 |
| Defendant's Exhibit 1053 | 118 |
| Defendant's Exhibit 1113 | 120 |
| Defendant's Exhibit 1102 | 134 |
| Plaintiff's Exhibit 18 | 137 |
| Plaintiff's Exhibit 1872 | 138 |
| Plaintiff's Exhibit 113 | 146 |

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | | |
|---|---|---|
| JOHN BEAN TECHNOLOGIES CORPORATION, a Delaware corporation, | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No: 1:17-cv-142RJS |
| B GSE GROUP, LLC, a North Carolina limited liability company, et al., | ) | |
| Defendant. | ) | |

BEFORE THE HONORABLE ROBERT J. SHELBY

September 28, 2022

JURY TRIAL

VOLUME II

Pages 155-240

Reported by:
KELLY BROWN HICKEN, RPR, RMR

801-521-7238

APPEARANCES OF COUNSEL

FOR THE PLAINTIFF: HARRY N. ARGER
STEVEN McMAHON ZELLER
Attorneys at Law
10 SOUTH WACKER DRIVE
SUITE 2300
CHICAGO, ILLINOIS

FOR THE DEFENDANTS: EDWARD B. DAVIS
JOSHUA B. DURHAM
Attorneys at Law
227 WEST TRADE STREET
SUITE 1800
CHARLOTTE, NORTH CAROLINA

# I N D E X


| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| MARSHAL SCOTT DILS | DEPOSITION PLAYED | 159 |
| PATRICK LESTER | DEPOSITION PLAYED | 160 |
| SCOTT B. GWILLIAM | DIRECT BY ZELLER | 163 |


## EXHIBITS RECEIVED INTO EVIDENCE


| PLAINTIFF'S | PAGE | DEFENDANT'S | PAGE |
|---|---|---|---|
| 138B | 188 | 1073 | 232 |
| 19A | 188 | | |
| 19B | 190 | | |
| 22B | 204 | | |
| 32B | 210 | | |
| 25C | 222 | | |
| 145 | 223 | | |
| 22C | 227 | | |
| 440 | 234 | | |

the product from JBT for the F-35?
A. Yes.
Q. What exactly was your involvement, just to make sure?
A. Well, I was at that point working in JASE so I didn't have direct responsibility for managing the engineers, but I did have the liaison responsibility to make sure they were hitting these new requirements so that we had a product that would be satisfactory to the market.
Q. Actually let's just go -- I'm going to go to Exhibit 138B, so pull your the binder that 138 would be in.
A. You say 138B?
Q. Yeah. I'm just waiting for it to come up on the screen.
A. Okay.
Q. Can you tell us what the document is in front of you?
A. This is the operating and maintenance manual for Jetaire 30-ton high pressure preconditioned air unit, stand mounted.
Q. Can you tell the date? Do you know when this was made?
A. I don't see a date on the document.
Q. Okay. I can help you. We can go about five pages in, I think.

A. Okay.

The date on this document is November 2011.

Q. Okay. Do you know what product this is applicable to?

A. Yes. It's our HPC Electric version in a stand mounted, which means that it was suitable for the F-35 aircraft.

Q. And does the fact that it's dated in 2011 indicate anything to you?

A. I'm not sure what you're asking.

Q. Was this the first JBT unit that met the specs for the F-35?

A. Yes, it was.

Q. How much research and development went into creating this product?

A. A significant amount of effort. We had to find a suitable blower, which was a challenge to find the right one that could deliver the airflow and pressure across the right range. That was one of the big challenges. Because of the additional horsepower to the higher pressure we needed to make sure we also had adequate cooling to meet the requirements. And then we also needed to make sure we could meet the humidity requirements of the aircraft.

MR. ZELLER: Your Honor, I would like to admit 138B into evidence.

Customer Driven. What does that mean?
A. That means that this was feedback from a customer of a request or a change or an upgrade that they wanted to the product that they had already been using or buying.
Q. And also the Product Enhancement is checked?
A. Yes.
Q. What does that mean?
A. Well, that means something that you've done to improve the product, make it -- it could be more efficient, lower cost, it could make it easier to use.
Q. What product would this have been an enhancement to?
A. It would have been an enhancement to the very first HPC-E use for the F-35.
Q. Would that have been the one applicable for the manual that we just saw, Exhibit 138B?
A. Yes.
Q. Now there's a product description. Would you mind just summarizing what this project was all about?
A. Yes. So one of the things that it identifies is to include an upstream. And when it uses the word DX coil, that's the evaporator coil. It was looking to change the discharge humidity to a level of 18 grains, which is very low humidity; an active hot gas defrost using a portion of the first row of the downstream evaporative coil for defrosting

the coil; and then to move the inlet damper to the outlet of the unit; and then to convert that outlet to a flange as opposed to a sleeve, which it was prior to that.

Q. I feel like I need an explanation every time we hear the phrase 18 grain. So could you explain it to us?

A. I'll try my best.

So there are 7,000 grains of water in one pound of air. If you weighed out a pound of air there's 7,000 grains of water. Now, if you introduce into one pound of dry air 18 grains of that water, that is what we call the humidity or the amount of moisture in the air. And it's not a lot. 18 grains, if you divide a pound of water into 7,000 pieces you can imagine it's a few droppers full of water into the air.

Q. Okay. How does that relate to an air conditioner in this case, anyway?

A. Yeah. An air conditioner when it's cooling the air at some point will reach a point where the air can't hold any more moisture, and it's now at what we call 100-percent relative humidity. Once it wants to cool it below that, then you have to evaporate the moisture out of the air, and then it will leave the air conditioner as water. Our air conditioner units have a little drain, and some of us may have seen that that water runs out of that drain.

And to get down to 18 grains is a task that means

you have to actually cool the air below the freezing point of water to get to that level of humidity. And then depending upon your application you may actually reheat the air before you deliver it to the aircraft.

Q. Okay. I think that's good. I was just going to tell you there's water there.

A. Thank you.

Q. Under the project description there's a column or a table called, Sales Analysis. One of the columns is, Last year, and it says, 12. Can you -- what does that mean here?

A. That means that we sold 12 of these similar units, although not this one because it isn't developed yet; and then the other columns would be the expected future sales as a result of developing the product.

Q. So by the date of the charter, which we said dated June 3rd, 5th, 2013, JBT had already sold 12 Jetaire units for the F-35?

A. Yes.

Q. Okay. We go to the next page. That's fine.

At the bottom there's some signatures. Can you tell us who signed these?

A. Yeah. The product manager, that's my signature. The engineering manager is Steve Nestel, and then the general manager was Bryce Mannen.

Q. Is Steve Nestel still an employee of JBT?

their work so that they can either issue the right drawings or if they have to modify or update drawings, going through to where it's entered into our system. They will assist all of the way through that process making sure if there's questions or problems. Customers often have changes that come in after the order is made where they want to change the color or change, you know, something in the product that we're delivering.

Then they deal closely with shipments and participate in meetings often with the customer that wants to know how their project is going along. They will follow through the installation, if we have installation responsibilities, providing them with O&M manuals, operating and maintenance manuals, providing them submittal packages for the project and dealing with even problems in all of those processes.

Q. I'm sure this is a complete oversimplification, but essentially order fulfillment?

A. Sure.

Q. Okay. First, have you ever seen this e-mail before?

A. Yes, I have.

Q. And what context did you see it?

A. Well, I don't remember if I recall it from the original date of 2014 there, but I do know that Debbie would

Q. Okay. Can you look at the attachment -- sorry, I meant the e-mail on the line of the attachments.
A. Oh, yeah.
Q. Can you read that?
A. Yes. It's TP100128A Jetaire HPCF 3000 18GR mod.pdf.
Q. And do all those words mean anything to you?
A. Yes. I mean, the technical publication document number is that first number. Jetaire is the product name. HPCF was an indication -- and 3000 were all an indication of the model. 18GR means it's an 18-grain unit, and Mod means it was modified from a prior version.
Q. Just to be clear this as you said was an 18-grain unit. How does that relate to the two research -- the research and development programs that we saw?
A. Well, I believe that the first project charter that showed an 18 grain, we achieved the 18 grain in a different way than we did on the final version. And that's probably the biggest difference in Mod of this project.
Q. So let's go to the attachment. We can do it. It's going to be Exhibit 19B. Can you first identify what Exhibit 19B is?
A. It's Operating and Maintenance Manual for the HPCF 3000. And it says it's the 18-grain modification.
MR. ZELLER: Your Honor, I'd like to offer

Exhibit 19B into evidence.

MR. DAVIS: No objection.

THE COURT: 19B is received.

(Plaintiff's Exhibit 19B was received.)

Q. BY MR. ZELLER: So we saw two project charters dealing with the 18 grain.

A. (Witness indicates by nodding head up and down.)

Q. Does this unit apply to either one of those?

A. This would apply to the second charter that referenced 18 grain.

Q. Okay. What is the purpose of an O&M manual?

A. Well, it's for the customer to be able to operate it, maintain it, troubleshoot it, buy spare parts for it. That's a good summary.

Q. And what kind of material is contained within it?

A. It would include descriptions of the components, some explanation of their operation. It would include schematics, electrical schematics, and wiring diagrams. It would include an illustrated parts manual with usually exploded view drawings with identification of the parts and then a table below them with part numbers and quantities. It would also include a troubleshooting section for customers to troubleshoot typical or problems that might occur.

Q. Let's go to the second page. Do you see the third paragraph it's -- or fourth paragraph. It's under the heading

Proprietary Notice?
A. Yes.
Q. What's the purpose of that?
A. Well, our operating and maintenance manuals we consider proprietary. And this is one method of helping maintain that they are proprietary.
Q. First, is this particular model sold anywhere except for military?
A. No.
Q. If you're given an operation and maintenance manual to customers -- I'll take that back. If we could go to Page 11.
This section is called Description and Operation. Can you tell us what is contained within this section?
A. Well, this would be the description and operation of the unit that's shown in this illustration, which is the HPCF, 18-grain unit.
Q. Figure 1 that's here, what's that a figure of?
A. That is the HPCF unit mounted on a stand.
Q. Is that a photograph?
A. No. That's a 3D generated image from it from the model that we have in our CAS system.
Q. Okay. And if we go to Page 13.
What is it the figure that's on Page 13?
A. This is showing some of the refrigeration

components and how they're configured in the system with piping and connections. You can see the compressors, piping and the ends of evaporator coils in this drawing. It's not a complete illustration of the refrigeration system, but part of it.

Q. At the time that Miss Larsen sent this to Mr. Bullerdick, was this figure publicly available anywhere else? Anywhere, I should say.

A. Well, in our engineering documentation. But no, it wouldn't be in the public domain, if that's what you're asking.

Q. Right. Publicly available.

A. Oh, no.

Q. Can you look at the next page, Page 14?

And what is the Figure 3 there?

A. Well, that is a photograph of the open section of the HPCF unit that shows the same piping and ends of the evaporator coil that were in that prior image, illustration.

Q. So this is an actual photograph of an HPCF unit?

A. Yes.

Q. Would this photograph have been publicly available at the time that Debbie Larsen sent this to Brian Bullerdick?

A. I don't believe so. No.

Q. All right. Can we go to the next page? 15, then.

Can you just tell me what Figure 4 is?

A. Yes.
Q. What is it?
A. Oh, well, this is a refrigeration and airflow schematic, although it's just labeled as a refrigeration components for its use here in the manual.
Q. Okay. Now I want to go pretty much all the way to the end. If you haven't switched yet, if you're still on the Page 15, that we're looking at --
A. Yes.
Q. -- can you read the bottom of the page, the notice?
A. Confidential and proprietary documentation. Copyright 2014 JBT Corporation.
Q. And if you need to confirm, that's on the bottom of every page; right?
A. Yes.
Q. Almost every page.
A. Yes.
Q. Okay. Page 128 at the tail end. Between?
A. 128 is a blank page on mine.
Q. 129, okay.
A. Okay.
Q. Sorry. So 129 through 132 it looks like sheets 1, 2, 3 and 4 are of an electrical schematic. Can you tell me what the electrical schematics are?
A. This schematic shows the wiring, both control

wiring and power supplying wiring between components and controls and power sources, motors, compressors, et cetera. It shows how they are all connected through circuit breakers, through overload protection devices, and then through other control devices.

Q. Did JBT make these electrical schematics publicly available at all?

A. No.

Q. What benefit could a competitor have having this manual in 2014?

A. If they were interested in making a product similar to it, it would give them a large head start and save a lot of time, a lot of money by having this detail of the technical aspects of the product.

THE COURT: If this is a convenient breaking point in your examination we're at lunch time, so why don't we do that now. Thank you, Mr. Zeller.

Members of the jury, we'll take our afternoon recess for about 45 minutes and come back a little bit after 1 o'clock. Thank you. Just a reminder, of course, not to talk about the case.

THE CLERK: All rise for the jury, please.

(The jury left the court proceedings.)

THE COURT: Mr. Gwilliam, I'll just instruct you, sir, not to discuss your testimony with anyone during the

Base.

Q. And Hill is the Hill Air Force Base; right?

A. Yes. In Ogden.

Q. Wouldn't JBT in general be able to protect G BSE's bidding during this time period while you were negotiating the distribution agreement?

A. Yes.

Q. Did you take the same the same steps with F-35 projects?

A. Yes.

Q. Do you recall JBT ever being approached from an F-35 project to bid during this time period?

A. We probably were, yes. I don't recall details.

Q. Can you look at Exhibit 440?

At the top is an e-mail from Mike Austin to you dated November 4, 2015. Do you recognize this?

A. Yes.

MR. ZELLER: Your Honor, I would like to admit Plaintiff's Exhibit 440.

MR. DAVIS: No objection.

THE COURT: It's received.

(Plaintiff's Exhibit 440 was received.)

Q. BY MR. ZELLER: If you go to the first e-mail on the chain, it's on the second page. Do you recall receiving this e-mail from a Mr. Jake Imsland on October 30th, 2015?

A. I don't recall. The way it is listed here it came into a website e-mail address so it didn't come directly to me.
Q. I see that now. Do you recall this issue of what the subject matter of the e-mail, October 20th?
A. Yes, I do remember. It's the Kadena Air Force Base project, which is in Japan.
Q. In the middle you talked to Mike Austin. Why did you inquire about Bryan Bullerdick when you were talking to Mike Austin about the project?
A. Again, same thing. Wanting to work in good faith to give him an opportunity to work with us on this project.
Q. In November of 2015, were you still in negotiations with Mr. Bullerdick on a distribution agreement?
A. I would think so, yes.
Q. Do you know if -- forget that.
Did JBT itself ever bid for any project at the Kadena Air Force Base for an F-35 hangar?
A. No, I don't believe we did.
Q. Do you know if Mike Austin talked to Mr. Bullerdick about this?
A. I don't remember for sure, no. Just what it says in the e-mails here.
Q. Did you ever visit Mr. Bullerdick in person?
A. Yes.

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

NORTHERN DIVISION

| | | |
|---|---|---|
| JOHN BEAN TECHNOLOGIES CORPORATION, a Delaware corporation, | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No. 1:17-CV-142RJS |
| B GSE GROUP, LLC, a North Carolina limited liability company, et al., | ) | |
| Defendants. | ) | |

BEFORE THE HONORABLE ROBERT J. SHELBY

September 29, 2012

Jury Trial

Volume III

A P P E A R A N C E S

For Plaintiff:

HARRY N. ARGER
STEVEN McMAHON ZELLER
10 South Wacker Drive
Suite 2300
Chicago, Illinois

For Defendants:

EDWARD B. DAVIS
JOSHUA B. DURHAM
227 West Trade Street
Suite 1800
Charlotte, North Carolina

Court Reporter:

Ed Young
351 South West Temple
Room 3.302
Salt Lake City, Utah 84101-2180
801-328-3202
ed_young@utd.uscourts.gov

I N D E X


| Witness | Examination By | Page |
|---|---|---|
| Scott Gwilliam | Mr. Zeller (Direct Cont.) | 146 |
| Scott Gwilliam | Mr. Davis (Cross) | 352 |

| Exhibit | Received |
|---|---|
| Plaintiff's Exhibits 8, 24, 60-B, 89-A, 89-B, 89-C, 99-A, 124, 126, 134-A, 134-B, 134-C, 136, 137, 140, 141, 142, 143-A, 144, 145, 146-A, 146-B, 147-A, 148, 149, 179 and 337. | 245 |
| Defendant's Exhibit 1121 | 245 |
| Plaintiff's Exhibit 28-B | 251 |
| Plaintiff's Exhibit 28-C | 254 |
| Plaintiff's Exhibit 28-D | 257 |
| Plaintiff's Exhibit 29 | 261 |
| Plaintiff's Exhibit 35-B | 262 |
| Plaintiff's Exhibit 35-C | 262 |
| Plaintiff's Exhibit 35-D | 265 |
| Plaintiff's Exhibit 37-A | 266 |
| Plaintiff's Exhibit 37-B | 269 |
| Plaintiff's Exhibit 38-A | 279 |
| Plaintiff's Exhibit 38-B | 284 |
| Plaintiff's Exhibit 99-E | 318 |
| Plaintiff's Exhibit 99-F | 320 |
| Plaintiff's Exhibit 435 | 331 |
| Plaintiff's Exhibit 434 | 331 |
| Plaintiff's Exhibit 439 | 333 |
| Plaintiff's Exhibit 269 | 335 |
| Plaintiff's Exhibit 429-A | 336 |
| Plaintiff's Exhibit 213 | 339 |
| Plaintiff's Exhibit 214 | 341 |
| Plaintiff's Exhibit 129 | 342 |
| Defendant's Exhibits 1037 and 1038 | 364 |
| Plaintiff's Exhibits 160-A and 160-B | 371 |
| Defendant's Exhibits 1024 and 1025 | 377 |

into evidence Exhibit 435.

MR. DAVIS: No objection.

THE COURT: 435 is received.

(Plaintiff's Exhibit 435 was received into evidence.)

BY MR. ZELLER

Q. Let's start with Exhibit 434. Exhibit 434 is an email to you from Mike Austin dated August 25, 2015.

A. Yes.

Q. Do you remember this email?

A. I do recall this, yes.

MR. ZELLER: Your Honor, I would like to admit into evidence Exhibit 434.

MR. DAVIS: No objection.

THE COURT: 434 is received.

(Plaintiff's Exhibit 434 was received into evidence.)

BY MR. ZELLER

Q. If you look on the second page also dated August 26, you wrote to Mike Austin at the top there, Mike, would you suggest that we direct them to Bryan Bullerdick at this point?

A. Yes.

Q. Do you see that?

A. I do.

Q. Why did you write that?
A. Well, one, because I believe this timing coincides with while we were still trying to figure out if we were going to be able to work together and get a distribution agreement completed.
Q. So you expected Bryan Bullerdick to handle the sale through B GSE for this project.
Is that right?
A. Yes.
Q. Do you know if that is how you handled this project, that you directed Mike Austin to contact Bryan Bullerdick about this inquiry?
A. I think I went at least that far that I asked Mike to contact him. I don't remember exactly how it went from there.
Q. Can you go to 439?
439 is an email from Mike Austin to you again on August 26, 2015 on the same subject line.
Do you see that?
A. Yes.
Q. Do you recall this email?
A. Uh-huh. Yes.
MR. ZELLER: Your Honor, I would like to admit Plaintiff's 439 into evidence.
MR. DAVIS: No objection.

THE COURT: It is received.

(Plaintiff's Exhibit 439 was received into evidence.)

BY MR. ZELLER

Q. Mike Austin responds to your email about suggesting that you direct him to Bryan Bullerdick, right?

A. Yes.

Q. Can you just read what Mike wrote to you?

A. Hi, Scott. I would. They are in pretty deep at Lemoore and have been keeping me up to speed on a regular basis. Our safest path. For sure. This is the CAS system and he was trying to take it 18 grain. We have quoted both versions, about 610 K, end of year award expected, 2016 build.

Q. Did you interpret this as meaning that there was already a quote out for this project from JBT to B GSE?

A. Yes.

Q. Were you familiar with an effort or do you recall an effort that B GSE made to create a blanket order for air conditioning units?

A. Yes, I do recall that.

Q. What do you remember?

A. Not a lot of detail, but that he wanted to place a blanket order so that our lead times would be shorter and that he could enjoy the pricing of a multiunit order.

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

NORTHERN DIVISION

JOHN BEAN TECHNOLOGIES CORPORATION, a Delaware corporation,
Plaintiff,
vs.
B GSE GROUP, LLC, a North Carolina limited liability company, et al.,
Defendants.

Case No. 1:17-CV-142RJS

BEFORE THE HONORABLE ROBERT J. SHELBY

September 30, 2022

Jury Trial

Volume IV

A P P E A R A N C E S

For Plaintiff: HARRY N. ARGER
STEVEN McMAHON ZELLER
10 South Wacker Drive
Suite 2300
Chicago, Illinois

For Defendants: EDWARD B. DAVIS
JOSHUA B. DURHAM
227 West Trade Street
Suite 1800
Charlotte, North Carolina

Court Reporter: Ed Young
351 South West Temple
Room 3.302
Salt Lake City, Utah 84101-2180
801-328-3202
ed_young@utd.uscourts.gov

# I N D E X


| Witness | Examination By | Page |
| --- | --- | --- |
| Scott Gwilliam | Mr. Davis (Cross Cont.) | 391 |
| Scott Gwilliam | Mr. Zeller (Redirect) | 430 |
| Joaquin Gabriel Magallanez | Mr. Zeller (Direct) | 437 |
| Joaquin Gabriel Magallanez | Mr. Davis (Cross) | 459 |
| Bryan Bullerdick | Mr. Arger (Direct) | 484 |

| Exhibit | Received |
| --- | --- |
| Defendant's Exhibit 1049 | 388 |
| Defendant's Exhibit 1874 | 390 |
| Defendant's Exhibit 1070 | 394 |
| Defendant's Exhibit 1052 | 398 |
| Defendant's Exhibit 1099 | 401 |
| Defendant's Exhibit 1071 | 404 |
| Defendant's Exhibit 1077 | 406 |
| Defendant's Exhibit 1078 | 408 |
| Defendant's Exhibit 1057 | 410 |
| Defendant's Exhibit 1058 and 1059 | 411 |
| Defendant's Exhibit 1068 | 419 |
| Plaintiff's Exhibit 151-A | 423 |
| Plaintiff's Exhibit 151-B | 425 |
| Plaintiff's Exhibit 151-C | 425 |
| Plaintiff's Exhibit 151-D | 426 |
| Plaintiff's Exhibit 151-E | 426 |
| Plaintiff's Exhibit 151-F | 427 |
| Plaintiff's Exhibit 151-G | 427 |
| Plaintiff's Exhibit 151-H | 428 |
| Plaintiff's Exhibit 437 | 441 |
| Plaintiff's Exhibit 442 | 444 |
| Plaintiff's Exhibit 443 | 444 |
| Plaintiff's Exhibit 453 | 446 |
| Plaintiff's Exhibit 448 | 446 |
| Plaintiff's Exhibit 444-B | 448 |
| Plaintiff's Exhibit 446 | 449 |
| Plaintiff's Exhibit 450-A | 450 |
| Plaintiff's Exhibit 457 | 452 |
| Plaintiff's Exhibit 467 | 452 |

INDEX (Cont.)


| Exhibit | Received |
| --- | --- |
| Plaintiff's Exhibit 459 | 453 |
| Defendant's Exhibit 1105 | 454 |
| Defendant's Exhibit 1072 | 469 |
| Defendant's Exhibit 1090 | 470 |
| Defendant's Exhibit 1100 | 472 |
| Defendant's Exhibit 1030 | 474 |
| Defendant's Exhibit 1110 | 479 |
| Plaintiff's Exhibit 35-A | 496 |
| Plaintiff's Exhibit 100 | 501 |
| Plaintiff's Exhibit 70 | 503 |
| Plaintiff's Exhibit 381 | 504 |
| Plaintiff's Exhibit 101 | 506 |
| Plaintiff's Exhibit 70 | 506 |
| Plaintiff's Exhibit 336 | 515 |
| Plaintiff's Exhibit 156 | 518 |
| Plaintiff's Exhibit 228 | 521 |
| Plaintiff's Exhibit 98 | 523 |
| Plaintiff's Exhibit 238 | 525 |
| Plaintiff's Exhibit 237 | 526 |
| Plaintiff's Exhibit 194 | 528 |
| Plaintiff's Exhibit 511 | 529 |
| Plaintiff's Exhibit 96 | 533 |
| Plaintiff's Exhibit 242 | 534 |
| Plaintiff's Exhibit 243 | 535 |
| Plaintiff's Exhibit 241 | 536 |
| Plaintiff's Exhibit 244 | 538 |
| Plaintiff's Exhibit 245 | 538 |
| Plaintiff's Exhibit 97 | 541 |
| Plaintiff's Exhibit 246 | 542 |
| Plaintiff's Exhibit 340 | 545 |
| Plaintiff's Exhibit 127 | 549 |
| Plaintiff's Exhibit 64 | 551 |
| Plaintiff's Exhibit 108 | 552 |
| Plaintiff's Exhibit 404-B | 554 |
| Plaintiff's Exhibit 43 | 555 |

Then going back to the first page, it mentions the B GSE proposal down at the very bottom of the page.

Do you know what project this email is about?

A. The name of Jun Lim and Lotus Tech would indicate that it was a project in Korea.

Q. Do you know what project it was?

A. It was a hangar. I never visited there, but I do know Gabe was working on this.

Q. And that was a bid that JBT ended up winning?

A. I believe so.

Q. Do you know anything else about that project or was it really Gabe that was running that?

A. I don't know the real details because he was running that project.

Q. If you will turn to Exhibit 1057, please, sir.

Do you recognize the last email at the top of Exhibit 1057 as an email from Arik -- how do you pronounce his last name, Meir?

A. Meir.

Q. It is from Arik Meir to you on November 28th, 2017.

A. Yes.

Q. Do you have any reason to doubt the authenticity of this document?

A. No.

MR. DAVIS: Your Honor, I would move to admit

Construction and Beth Haton for Eielson EIE-378 F-35 hangar dated July 16th, 2018. The equipment is for the HPC-F preconditioned air equipment, and it looks like we have actually two quotes, one for a 40 horsepower version of the HPC-F and one for a 50 horsepower version. There are some additional accessories as far as the stands and drip pans for the support of that equipment.

Q. Great.

MR. ZELLER: Your Honor, I would like to offer into evidence Exhibit 459.

MR. DAVIS: No objection.

THE COURT: It is received.

(Plaintiff's Exhibit 459 was received into evidence.)

BY MR. ZELLER

Q. Mr. Magallanez, do you recall how many projects there were for Eielson?

A. As I recall there were at least three to four, if not more, different projects for EIE. There was 373, 2378, so there were several of them.

Q. Do you have any recollection of how many bids you actually put through related to Eielson?

A. There were a number of bids depending on how many contractors would come to us either from a general contractor or a mechanical contractor or an electrical

contractor, so I would say dozens at least. I would say at least six to ten per hangar if not more. There were several, several quotes that would be going out for the different contractors.

Q. Did JBT win any of the contracts for the Eielson Air Force Base?

A. No, we did not.

MR. ZELLER: Your Honor, I need to offer into evidence Exhibit 1105.

MR. DAVIS: No objection.

THE COURT: 1105 is received.

(Plaintiff's Exhibit 1105 was received into evidence.)

MR. ZELLER: Can you call up Exhibit 1071?

If you can blow it up, that would be great.

BY MR. ZELLER

Q. Mr. Magallanez, this is Exhibit 1071. It is an email from you to Garrett MacFarlane dated November 17, 2016.

Who is Garrett MacFarlane?

A. Garrett MacFarlane is our commercial bridge sales manager.

Q. What is this email about?

A. This email is about United Airlines' hangars at Houston, for a construction project for new hangars at Houston.

didn't, but do you see in the second paragraph -- this is in August of 2015, August 26th, Mike Austin and Scott Gwilliam are trading emails and Mike says to Scott in this last email, the second paragraph, by the way, regards, AA demo, and that is perhaps American Airlines -- so great access to the ramp. Gabe and Bryan leave today.

Do you have any recollection of what that might be -- were you and Bryan maybe at an American Airlines demo that day?

A. This was not referring to Bryan Bullerdick. This was referring to probably Bryan Spradling --

Q. A lot of Bryans.

A. -- and we went to go to American Airlines for a demo.

Q. That is not Bryan Bullerdick?

A. No.

Q. Got you. Thank you.

That is all with that exhibit.

In 2015 was it your understanding that JBT provided full customer support for the sales that B GSE was making?

A. In what year?

Q. 2015.

A. Yes. In 2015, yes.

Q. I believe you testified that a year, maybe a year and a half after you began at JBT, which we now know was January of 2015, that you started working with more hangars?

A. Yes.
Q. F-35 hangars?
A. Started working more directly with the RFQs that would come in.
Q. At some point did you become concerned that JBT didn't have extensive hangar experience separate from B GSE?
A. No.
Q. You never had that concern?
A. Nope. We had our own design and engineering team that I went to for resources and questions for anything involving the F-35.
Q. Let's look at Exhibit 1072, please.
Mr. Magallanez, do you recognize Exhibit 1072 as an email string that you were on, and at least in the last email it was Mike Austin sending an email to you copied to Scott Gwilliam and others?
Do you see that?
A. Yes.
Q. Do you have any reason to doubt the authenticity of this document?
A. No.
MR. DAVIS: I would ask that Exhibit 1072 be admitted into evidence, Your Honor.
MR. ZELLER: No objection.
THE COURT: It is received.

(Defendant's Exhibit 1072 was received into evidence.)

BY MR. DAVIS

Q. If you look at the second email from the top, so this is your email of March 3rd, 2017 at 4:27 p.m., you make the statement to my knowledge we technically have not sold to a hangar project yet as just JBT alone.

Is that how you felt on March 3rd, 2017?

A. In March of 2017 we had not to my knowledge -- to my own knowledge I did not know the history before me of actually selling direct.

Q. Let's look at Exhibit 280, please.

Excuse me. That was a deposition exhibit. 1090. I have too many numbers on my outline here. 1090. Sorry.

Do you recognize Exhibit 1090 as an email, at least at the top, an email that you sent from your JBT email account to it looks like yourself and others with the subject line being South Korean F-35 hangar?

A. Yes.

Q. Do you have any reason to doubt the authenticity of this document?

A. No.

MR. DAVIS: I would ask that Exhibit 1090 be admitted into evidence, Your Honor.

MR. ZELLER: No objection.

THE COURT: It is received.

(Defendant's Exhibit 1090 was received into evidence.)

BY MR. DAVIS

Q. Mr. Magallanez, what project is this email about?

A. This looks to be about the South Korean F-35 hangar.

Q. And JBT ended up winning this bid.

Is that right?

A. We ended up getting awarded through Lotus Tech the bid for this hangar.

Q. Lotus Tech was your rep in Korea.

Is that right?

A. Lotus Tech was our rep to -- I believe it was Daewoo.

Q. Daewoo was the contractor?

A. Yes.

Q. And B GSE was also bidding for this job, correct?

A. B GSE I believe was also trying to bid this job, but at this time I think Lotus came to us because they were unhappy with B GSE for some reason or another and came to us about seeing if we could come through and provide equipment for this project.

Q. You were eager to get this project and liked the idea of getting a project that had been possibly headed to B GSE, correct?

A. I liked the idea of winning a project for JBT in

opportunity and says in the second paragraph not sure how I feel about bidding B GSE, but there can be multiple paths to the same project.
Do you see that?
A. Yes, I see that.
Q. Isn't it true that it was not uncommon, especially by 2017, for JBT to be bidding on a project that B GSE was bidding on and even at times when B GSE was selling JBT's product?
A. State that again.
Q. So there were times -- let's widen that, widen the net. There were times in 2015 and 2016 where JBT would direct bids to a project that B GSE was also bidding on with JBT equipment?
A. Initially, no. We would funnel that to JBT from around 2015 and 2016. By this time there was a lot of misinformation and questions and there was a lot of confusion out there so we started to bid these on our own --
Q. Right.
A. -- after some amount of time in 2017.
Q. I think your testimony, and I think I heard you say that by this time in 2017 your personally considered B GSE a competitor?
A. Yes.
Q. Let's go to the first page and kind of pick up the

70.

MR. DURHAM: No objection.

THE COURT: It is received.

(Plaintiff's Exhibit 70 was received into evidence.)

MR. ARGER: Thank you.

BY MR. ARGER

Q. Who is Carothers Construction?

A. They were a general contractor at one of the Beaufort hangars in South Carolina.

Q. And you have got an attachment there called F-35 final spec sheet.

Do you see that?

A. Yes, I do.

Q. Is that a document that you created?

A. I assume I did, yes.

Q. Well, if we go to -- this is where it gets really tricky -- it is marked as Exhibit 381 as the attachment to this email.

MR. ARGER: Pull that up, Cheryl, please.

BY MR. ARGER

Q. Do you recognize this document?

A. Yes, I do.

Q. Is this something you created?

A. Yes.

MR. ZELLER: We move to admit Exhibit 381. I will also note for the record it is for some reason also marked 89-C, 33 and 272. It was admitted as 89-C but attached to this email as 381, if that makes a difference.

We move to admit 381.

MR. DURHAM: No objection.

MR. ARGER: Thank you.

MR. DAVIS: It is received.

(Plaintiff's Exhibit 381 was received into evidence.)

BY MR. ARGER

Q. When did you create this document?

A. I believe early in 2014.

Q. Do you remember we asked you in your deposition that the metadata showed it was made in August of 2014?

Does that sound right to you?

A. That could have been a revision, yes.

Q. Well, you sent that email to Mr. Dils in July of 2014. Now you have created this document and you are sending it to Mr. Samuels at Carothers Construction on August 20, 2014.

Is it fair to say that you created it before you sent it on August 20, 2014?

A. That would be fair.

Q. If we could just go through this exhibit, and I am going to call it 381, because that is what the number is

Q. It is about 65 pages, correct?
A. If you say it is, yes.
Q. Try to scroll through it, but feel free to use the binder if you want to look at it in more detail.
Do you agree with me that the PC-Air unit that is being discussed in this document is the JBT unit?
A. I would agree with that.
Q. Do you agree with me that the power unit that is being discussed in this document is the JBT unit?
A. I would agree with that too.
Q. Let's go through this document in a little detail.
On the first page it says basis of design at the end of that aircraft cooling air paragraph.
Do you see that?
A. Yes, I do.
Q. And it says B GSE-HPC-30-F-18, right?
A. It does.
Q. But the actual product they are referring to is the JBT HPC 30-F 118, correct?
A. That is correct.
Q. You took JBT's name off the front and just put B GSE in front of it?
A. That is what Scott Gwilliam told me to do.
Q. Is that a yes?
A. Yes.

Group email address not a Bullerdick GSE email address, right?

A. That is correct.

Q. And this is while you're still employed at JBT?

A. That is correct.

Q. The first line says we have JBT in at Lemoore as basis of design. This is a big deal because Lemoore is going to have many F-35 hangars in the coming years.

Is that what you represented at that time?

A. Yes.

Q. Did you think Lemoore was going to be a big deal at that time?

A. I did.

Q. I know it is confusing and it is confusing for me, but in this case we're going to be talking about four military hangars. Lemoore Naval Air Base is in California, correct?

A. Yes.

Q. The Eielson Air Force Base which is near Fairbanks, Alaska, right?

A. Correct.

Q. Kadena Air Force Bars which is by Okinawa, Japan, correct?

A. Correct.

Q. And Beaufort South Carolina Air Station, Marine Corps Air Station in Beaufort, South Carolina.

Correct?
A. That is correct.
Q. Am I correct that after you left JBT, B GSE Group had contracts to supply products to all four of those hangars over the next three, four or five years after 2014?
A. Yes.
Q. And I know that some of those bases have multiple projects, meaning multiple hangar projects, right?
A. That is correct.
Q. So some of them, and we'll get to them, but at the end I am going to go through each of those locations and the projects that are at issue in this case, but those four were ones that B GSE Group did work on in the years after you left JBT, correct?
A. That is correct.
Q. Obviously you heard my opening statement and I'm focused on PC-Air products and ground power units, right? So who was providing PC-Air products for B GSE Group prior to April 1st, 2014?
A. JBT.
Q. Nobody else?
A. Nobody else.
MR. ARGER: If you could pull up Exhibit 156, please, Cheryl.
BY MR. ARGER

Q. Was he with the US Army?
A. Yes, sir.
Q. I think actually -- I apologize. I can't find my copy of that exhibit. I found it.
Sir, if we go up to the -- I'm sorry.
So this is you writing to him at the US Army and copying Mr. Dils and discussing some issues.
Is that right?
A. That is correct.
Q. If we go back to the highlighted section you wrote to him at this time in May of 2015, I suggest they try out in Fallon on the one bay training hangar because it is not a critical operational hanger. This is just me being up front because I can sell Twist PC-Air, old FCX air, if I wanted to, but they need help designing the product, and until I have time to do so we're stuck with the JetAire JBT product being the only one to currently meet the specification.
Did you say that in that email at that time, sir?
A. I wrote that in the email, yes.
MR. ARGER: Go up to the top of that paragraph and the sentence that starts neither, Cheryl.
BY MR. ARGER
Q. I will just read it. Neither FCX or Twist have never made a working unit.
Was that true at that time?

A. That wasn't a fair statement in this email, no.
Q. Had Twist ever made a PC air unit that met the 18 grain standard at this point in time?
A. They say they had. They were bidding on it.
Q. So your position is that they told you that they could make it. My question to you is do you know if they made one?
A. I don't know.
Q. If we could go to Exhibit 238, please.
What is this document?
A. This is a quote for Able Heating and Air.
Q. Who is Able Heating and Air?
A. They are a mechanical contractor in California.
Q. Did they work on the Lemoore project?
A. Well, they worked on various ones. I am not sure if this is Lemoore or not.
Q. This is a quote that B GSE Group sent to Able Heating and Air on or about August 25, 2015, correct?
A. Yes, it is.
MR. ARGER: We would move to admit this exhibit, 238.
MR. DURHAM: No objection.
THE COURT: It is received.
(Plaintiff's Exhibit 238 was received into evidence.)

BY MR. ARGER
Q. The total of the quote is $819,660, correct?
A. I would have to see the second page. Sorry.
Yes, that is correct.
Q. That is August 25th.
MR. ARGER: If you could now pull up Exhibit 237, please, Cheryl.
BY MR. ARGER
Q. This purports to be an email from Mr. Lock at Able to you on August 26th, 2015, so the next day.
Do you recognize this email?
A. That is correct.
MR. ARGER: We move to admit Exhibit 237, Judge.
MR. DURHAM: Just one moment, Your Honor.
No objection, Your Honor.
THE COURT: It is received.
(Plaintiff's Exhibit 237 was received into evidence.)
MR. ARGER: Thank you, Your Honor.
BY MR. ARGER
Q. If you can see, there is an attachment and it says quote 2181.
Do you see that?
A. Yes, I do.
Q. If we go back to Exhibit 238 the quote number is 2181.

Does that refresh your recollection that this related to Lemoore?

A. Yes, it does.

Q. If we go to the last paragraph of that document --

MR. ARGER: The one that says I would like to get moving, Cheryl, and pull that up on Exhibit 237, please.

BY MR. ARGER

Q. So this is the project manager Kevin Lock at Able telling you I would like to get moving on submittals ASAP.

Do you see that?

A. Yes, I do.

Q. And then the last sentence of that paragraph says our deadline for submission to the GC -- is that the general contractor?

A. Yes.

Q. -- is next Wednesday, September 2nd, so time is of the essence.

That is what he tells you on August 26, right?

A. Yes.

Q. Go to Exhibit 194, please.

That email we just looked at, 237, was sent on August 26 at 1416 military time which is 2:16, I believe.

Now we're looking at Exhibit 194 which is an email from you to Don Maynard at Twist on August 26 at 1924, which is 7:24 p.m.

(Plaintiff's Exhibit 96 was received into evidence.)

MR. ARGER: Thank you, Your Honor.

BY MR. ARGER

Q. Is this an email you sent to Twist six days after you were told the submittals were due in a week, and you're sending them an attachment, which is the JetAire JBT PC-Air unit, the manual for that?

A. I did that, yes.

Q. And the only word in the email is confidential, right?

A. That is correct.

Q. You wouldn't give it to me on the last one, but would you agree with me that the confidential information you're talking about in this email is the JBT manual?

A. That could be possible, yes.

Q. Well, is it true?

A. I don't remember back then what I meant by confidential.

Q. You don't remember -- what does the word confidential mean to you today?

A. Confidential means confidential.

Q. What does it mean? How would it be different in 2015 than it is to you today?

A. What I was meaning about confidential or what I was saying was confidential -- I don't understand that exactly

Is that right?
A. That is correct.
MR. ARGER: We would move to admit Exhibit 43.
MR. DURHAM: No objection.
THE COURT: Exhibit 43 is received.
MR. ARGER: Thank you.
(Plaintiff's Exhibit 43 was received into evidence.)
BY MR. ZELLER
Q. Who is Mr. Roach that this is being sent to or being copied to?
A. I don't remember him.
Q. Who is Mr. -- I didn't read his name before -- Wayne Thomas at Carothers Construction.
Who is he, the person that the email is being sent to?
A. Carothers Construction was a construction company on the second Beaufort Marine Corps Air Station F-35 project.
MR. ARGER: I am going to get into Beaufort, Judge, but I am just going to finish this email and that might be a good stopping point.
BY MR. ARGER
Q. Let's finish this email.
You're sending this to -- is Carothers who you would be sending your submittal to for this project?
A. That is possible.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| JOHN BEAN TECHNOLOGIES CORPORATION, a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>B GSE GROUP, LLC, a North Carolina limited liability company, et al.,<br><br>Defendant. | Case No: 1:17-cv-142RJS |

BEFORE THE HONORABLE ROBERT J. SHELBY

OCTOBER 3, 2022

JURY TRIAL

VOLUME V

PAGES 562-754

Reported by:
KELLY BROWN HICKEN, RPR, RMR
801-521-7238

APPEARANCES OF COUNSEL

FOR THE PLAINTIFF: HARRY N. ARGER
STEVEN McMAHON ZELLER
Attorneys at Law
10 SOUTH WACKER DRIVE
SUITE 2300
CHICAGO, ILLINOIS

FOR THE DEFENDANTS: EDWARD B. DAVIS
JOSHUA B. DURHAM
Attorneys at Law
227 WEST TRADE STREET
SUITE 1800
CHARLOTTE, NORTH CAROLINA

I N D E X


| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| BRYAN BULLERDICK | CROSS BY DURHAM(CONT'D) | 759 |
| | REDIRECT BY ARGER | 803 |
| | RECROSS BY DURHAM | 891 |


EXHIBITS RECEIVED INTO EVIDENCE


| PLAINTIFF'S | PAGE | PLAINTIFF'S | PAGE |
|---|---|---|---|
| 112 | 570 | 17 | 606 |
| 113 | 570 | 327A | 607 |
| 227A | 572 | 327B-327J | 609 |
| 227B | 572 | 338 | 611 |
| 247 | 573 | 72A | 612 |
| 341 | 576 | 218 | 612 |
| 40 | 578 | 226 | 613 |
| 42 | 580 | 225 | 614 |
| 264 | 582 | 253 | 614 |
| 265 | 582 | 254 | 615 |
| 353 | 583 | 255 | 616 |
| 279 | 584 | 256 | 616 |
| 280 | 584 | 257 | 617 |
| 15 | 586 | 258 | 618 |
| 14 | 586 | 13 | 618 |
| 161 | 590 | 12 | 618 |
| 291 | 595 | 65 | 621 |
| 292 | 595 | 7 | 624 |
| 356 | 596 | 398 | 428 |
| 357 | 596 | 428 | 627 |
| 16 | 597 | 281 | 627 |
| 19 | 603 | 215 | 631 |
| 505 | 604 | 213 | 631 |

| PLAINTIFF'S | PAGE | PLAINTIFF'S | PAGE |
|---|---|---|---|
| 335 | 605 | 248 | 632 |
| 261 | 633 | 393 | 660 |
| 262 | 634 | 403 | 661 |
| 11 | 635 | 427B | 662 |
| 10 | 635 | 394 | 662 |
| 300 | 637 | 323 | 664 |
| 364 | | 408 | 666 |
| 407 | 643 | 394 | 666 |
| 190 | 644 | 424 | 667 |
| 171 | 645 | 401 | 667 |
| 79 | 647 | 301 | 669 |
| 271 | 649 | 118 | 671 |
| 272 | 651 | 191A | 673 |
| 273 | 652 | 175 | 674 |
| 299 | 653 | 179 | 676 |
| 363 | 653 | 66A | 695 |
| 326 | 655 | 66B | 696 |
| 391A | 658 | 23A,23B | 697 |
| 391C | 659 | 216 | 716 |
| | | 71 | 717 |
| | | 99D | 737 |

A. Based on the subject line, yes.
Q. If we go to Exhibit 254, please.
That's the actual quote from Twist; correct?
A. Yes, sir.
MR. ARGER: We move to admit Exhibit 254.
MR. DURHAM: No objection.
THE COURT: It's received.
(Plaintiff's Exhibit 254 was received.)
MR. ARGER: Thank you.
Q. BY MR. ARGER: So this is about -- this is January 20th, 2016, for this Kadena project.
If we go to Exhibit 255, please. This is an e-mail from Kirstin Reyes at Prime Projects to you and copied a bunch of people dated January 25, 2016. It appears to be a confirm purchase order toward your proposal for the Kadena project. Are you aware of that?
A. Yes, sir.
Q. Who's Prime Projects with respect to Kadena?
A. I think they were the successful general contractor.
Q. And that's who you would be submitting to?
A. Yes, sir.
Q. Okay. We move to admit Exhibit 255.
MR. DURHAM: No objection.
THE COURT: 255 received.

THE WITNESS: Thank you.
THE COURT: Thank you.
Mr. Arger?
MR. ARGER: Thank you, Your Honor.
If we could pull up Exhibit 7, please. Just regular 7.
Q. BY MR. ARGER: Mr. Bullerdick, let me ask you to look at the screen. And this is an e-mail that you wrote around on or about February 10, 2016, to Mr. Schrinner and Mr. Dils with a copy to Mr. Maynard at Twist. So Mr. Schrinner is at Twist, and Mr. Maynard is at Twist and Dils is at B GSE, February 10, 2016. This is your e-mail; right?
A. Yes, sir.
MR. ARGER: We move to admit Exhibit 7, Judge.
MR. DURHAM: No objection.
THE COURT: It's received.
(Plaintiff's Exhibit 7 was received.)
Q. BY MR. ARGER: If we go down to -- again, this is around the time when the Kadena submittal was made, which I believe was -- actually it was a little later than -- no. I'm sorry. Anyway, you write, on the second paragraph:
The spec is pretty much a loser spec. Parts and pieces are too specific to a common unit. If I were supplying JBT I would not do anything different than the standard JBT

unit. I would state that it is the only unit working for this application and therefore will not be changed. I have a unique issue here as this is a first article Twist unit. So I have to be careful making blanket statements, it worked before, it will work again, other than I know it works if we take B GSE project ownership of the other hangars we will say we know what works and not focus on the source of supply on the first jobs until we have a commissioned unit. So it is a balancing act of pushback without alarming customer of a new supplier.

Is that what you said?

A. That's what I said.

Q. And when you're talking about, when you say, the first article Twist unit, you're talking about the first time Twist made this type of unit; right?

A. I'm talking about the first time Twist made a unit for me.

Q. This is the same Twist that you sent all the confidential information to in August and September of 2015; right? Same company?

A. Yes, sir.

Q. If we go to Exhibit 398, please.

Do you recognize this as the invoice for the Kadena P803 project from B GSE?

A. Yes, sir.

nameplate?

A. Yes.

Q. If we go to Page 13. Again, these are -- this is JBT material, isn't it?

A. All pictures of projects I sold, yes.

Q. That is the JBT PC Air, then; right?

A. Yes, it is.

Q. I can't tell. Can you enlarge that?

You didn't photo shop the name off this time, did you? Jetaire's name is still on it, isn't it?

A. It's still there, yes.

Q. It's what?

A. It's still on there, yes.

Q. Okay. A couple more pages. Page 15, that's a JBT unit; correct?

A. Yes, sir.

Q. And this one, actually the JBT name is off of it; right?

A. There's no logos on it, no.

Q. How do you determine which to take the logos off of and which ones to leave them on?

A. Honestly I didn't put them on or take them off. Someone did it.

Q. Somebody at B GSE?

A. Yes. Apparently, yes.

A. 376 and 379.
Q. What was the difference between 393?
A. I don't believe we did anything mechanical on 393.
Q. You just did power on 393.
A. I'd have to review it.
Q. Okay. We'll get to it in a second. So the mechanical is the same. Let's look at the mechanical scope. Let's pull up Exhibit 391C, please. Is that 391C? Thank you.
Is this the mechanical scope that B GSE prepared for the Eielson 379 project, again same as the 376?
A. Yes, sir.
Q. So 376, 379.
We move to admit 391C.
MR. DURHAM: No objection.
THE COURT: It's received.
(Plaintiff's Exhibit 391C was received.)
Q. BY MR. ARGER: If we go to Page 663 Bates number.
JBT photos; right?
A. That's correct.
Q. And that one I believe you or somebody at B GSE photo shopped the B GSE logo on that one; correct?
A. Yes, sir.
Q. Why?
A. Again --
Q. Why this one as opposed to the others?

A. We're putting these submittals together. My employers are pulling from previously submittals. They're just cutting and pasting. They must have gone back to a previously approved submittal.

Q. And a previously approved submittal that had JBT information; correct?

A. It had this brochure on it, yes.

Q. And Page 2 -- I'm sorry. Page 64, next page. Same stuff we've been saying. JBT photo; right?

A. Yes, sir.

Q. If we go to Exhibit 393A, please. 393A is an e-mail from you to again Trent Larson at Unit Company with a copy to Mr. Dils talking about both 376 and the 379 projects at Eielson. And you recall receiving -- you recall sending this e-mail on or about March 9, 2018?

A. Yes, sir.

MR. ARGER: We move to admit Exhibit 393, Judge.

MR. DURHAM: No objection.

THE COURT: It's received.

(Plaintiff's Exhibits 393 was received.)

Q. BY MR. ARGER: And again, just showing the similarity with the two projects. And you say: Trent, I believe this will help move forward the second order. We could be supplying the same scope and this is the schedule of values for each hangar.

Q. And are the manuals for products, are those used at all in that service?

A. That's a requirement for the service.

Q. We've looked at some drawings in the JBT materials. Let's go to that FCX manual, Exhibit 872. And let's look at Page 110.

Do you see Page 110 of Defendant's Exhibit 1872?

A. I do.

Q. Can you show some of -- or are there components on this schematic drawing that you can recall being in the JBT manual at Exhibit 18?

MR. ARGER: Judge, objection; leading.

MR. DURHAM: I just asked if there were --

THE COURT: It's a foundational question. That's all right. It's appropriate. It's overruled.

MR. DURHAM: Thank you, Your Honor.

THE WITNESS: Yeah. The majority of the things you find in here like the filter dryers, expansion valves and the hot gas bypass valve and the condenser bands and motors, condenser coils and blowers and compressors are all similar refrigeration 101 type of things you'd fine.

Q. BY MR. DURHAM: How many compressors are noted in this diagram?

A. Two compressors.

Q. Can we look at the bottom corner, sort of legend

conditioning units they basically paid for to buy from FCX. And that included building and improving on the F-35 air conditioning unit that they had already sold in 2008, 2009, 2010 years. So they were very much bidding, proposing, actively promoting at TSC shows that they had an F-35 variant and at the specs.

Q. Had you ever actually seen it?

A. Not since I worked at FCX Systems.

Q. Was it 18 grain or 55 grain or some other grain, do you know?

A. The original units that were built were built to meet the 18-grain specs, but so were everybody else's. So I could say that everybody's unit at that time had to be 18-grain specs back in 2008 and 2009. And everybody continued to do that until roughly 2015 or '16.

Q. Now, JBT, did they have an 18 grain in 2011 when you joined them?

A. Again, they did not have an 18-grain unit, or a unit that would do 18 grain in 2011.

Q. So it was customary that the specs ultimately changed to a 55 grain. Did the specifications ultimately change for F-35 to go to 55 grain?

A. Yes, sir, they did.

Q. And does that make it harder or easier to produce an air conditioning unit for an F-35?

A. It makes it significantly easier.
Q. I think you used the term COTS earlier when Mr. Arger was asking you questions. What was COTS?
A. COTS is commercial off the shelf. It's a military term when they're trying to get something that is very easily found and commercially available.
Q. And would that term apply to 55-grain air conditioning units?
A. It essentially almost makes the unit a commercial standard unit with a few modifications.
Q. So the point that we -- you were asking about this twisting metals. Was the point of sending anything to Twist so they could copy the JBT unit?
A. No, sir.
Q. Did the point have anything to do with B GSE's systems?
A. They had a lot to do or everything really to do with the system.
Q. Okay. Explain what you mean by that.
A. If you could see a picture of what a system looked like, the air conditioning was a very small part of that system. It has to be able to communicate and do a lot of things from being outside or on the roof. And this is something that B GSE was known to be the best at doing, is what we sold the systems. And everybody in this industry is

referred to about projects taking a long time.

But, Your Honor, just let me know when we need to -- I'll keep going, or I just want to be mindful of everybody's time.

THE COURT: Thank you. Why don't we work our way towards 3 o'clock or so. Another 10 or 15 minutes.

MR. DURHAM: Okay. Great, Your Honor.

THE COURT: Great. Thank you.

Q. BY MR. DURHAM: So you refer to projects taking a long time. Why do they take such a long time?

A. In the case of F-35 as mentioned early in this case, I think that Scott Gwilliam said that there is some sort of building being made. There's a new hangar. There's a new infrastructure. So we're one of 500 systems or parts that have to be put together and built. And these hangars and the earth that has to, you know, cure and all the things that have to happen just take years. So the job that may start in 2011 may not actually close out until 2015. There's just a lot of things that have to happen.

Q. And there has been reference to basis of design in this case. What does that mean?

A. Basis of design is a reference point for the government to say, okay, this is basically what we're looking for. Here's kind of an example. But there's no guarantee that means you'll get an award. It's just a lot of times it's

just simple to say, you know, I've looked at this product so find me something that is similar to this product.

Q. Let's look at Plaintiff's Exhibit 429A, please. I'm going to leave this 429 was -- is that the first page? There we go. I believe this was previously admitted into evidence.

Your e-mail, Mr. Gwilliam, in November of 2014 and sort of toward the top there's a various list of projects with numbers. You say: 3 to 7 additional hangars we are working on to become basis of design.

Who did you mean referring to "we" there?

A. Well, the basis of design, this is a system type of thing, so they're looking at how, like if you -- if we could actually pull the drawing, I know we can't, but if you could see how they picture all these different parts together. So the way you can come basis of design is to convince a military like the Navy that you have the big picture so that the general contractor understands all the different pieces. But a lot of people would not supply those individual pieces all as a package. And that's what we would try to do once we submit the bid.

Q. So would B GSE declare a base of design on projects sometimes?

A. Sometimes.

Q. And does that guarantee that B GSE will ultimately

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | | |
|---|---|---|
| JOHN BEAN TECHNOLOGIES CORPORATION, a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>B GSE GROUP, LLC, a North Carolina limited liability company, et al.,<br><br>Defendant. | ) | Case No: 1:17-cv-142RJS |

BEFORE THE HONORABLE ROBERT J. SHELBY

OCTOBER 4, 2022

JURY TRIAL

VOLUME VI

PAGES 755 - 934

Reported by:
KELLY BROWN HICKEN, RPR, RMR
801-521-7238

APPEARANCES OF COUNSEL

FOR THE PLAINTIFF:

HARRY N. ARGER
STEVEN McMAHON ZELLER
Attorneys at Law
10 SOUTH WACKER DRIVE
SUITE 2300
CHICAGO, ILLINOIS

FOR THE DEFENDANTS:

EDWARD B. DAVIS
JOSHUA B. DURHAM
Attorneys at Law
227 WEST TRADE STREET
SUITE 1800
CHARLOTTE, NORTH CAROLINA

# I N D E X


| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| BRYAN BULLERDICK | CROSS BY DURHAM(CONT'D) | 759 |
| | REDIRECT BY ARGER | 803 |
| | RECROSS BY DURHAM | 891 |
| DAVID DUSKI | DIRECT BY ARGER | 896 |
| | CROSS BY DURHAM | 970 |
| | REDIRECT BY ARGER | 998 |
| | RECROSS BY DURHAM | 999 |

EXHIBITS RECEIVED INTO EVIDENCE

| PLAINTIFF'S | PAGE | DEFENDANT'S | PAGE |
|---|---|---|---|
| 164 | 761 | 1188 | 764 |
| 384 | 767 | 1183 | 766 |
| 383 | 770 | 1187 | 775 |
| 268 | 799 | 1181 | 778 |
| 506 | 805 | 1190 | 779 |
| 62A | 819 | 1136 | 781 |
| 22A | 834 | 1200 | 783 |
| 22B | 834 | 1201 | 784 |
| 23A | 835 | 1217 | 784 |
| 66A | 837 | 1202 | 785 |
| 122 | 859 | 1203 | 786 |
| | | 1204 | 786 |
| | | 1215 | 787 |
| | | 1216 | 787 |
| | | 1236 | 788 |
| | | 1213 | 789 |
| | | 1227 | 789 |
| | | 1236 | 789 |
| | | 1230 | 790 |
| | | 1240 | 790 |
| | | 1205 | 791 |
| | | 1206 | 792 |
| | | 1231 | 792 |
| | | 1224 | 793 |
| | | 1229 | 793 |
| | | 1225 | 794 |
| | | 1228 | 794 |
| | | 1238 | 789 |
| | | 1172 | 876 |
| | | 1177,1178 | 894 |

option is to try to go till 5:00 today and get another couple hours of testimony and if it will make a difference or at least give the jury an option.

So will you all just visit, and let's us talk before we bring them in after the lunch and see where we are. Thank you.

Miss McNamee?

(The jury returned to the courtroom.)

THE COURT: A reminder, Mr. Bullerdick, you remain under oath, of course, sir. Thank you.

Mr. Arger?

MR. ARGER: Thank you, Your Honor.

Q. BY MR. ARGER: Mr. Bullerdick, on the Lemoore project I want to just make sure I understand the hierarchy. So we've got the government, and then I believe the general contract was a company called Soltek Pacific Construction; is that right?

A. Yes. One of those projects, yes.

Q. Okay. I'm talking about P328, which is the first one at issue in this case.

A. Yes.

Q. So we have the government, then we have Soltek, and then is it Able is underneath them as the mechanical?

A. Yes.

Q. And then B GSE is under Able.

A. Yes.

Q. So B GSE reports to Able who contracts with Soltek who contracts with the government; right?

A. Correct.

Q. Could you pull up Exhibit 62A, please?

Mr. Bullerdick, I'll call your attention to this e-mail. It's from Kevin Lock at Able to you and Mr. Dils regarding the P328 project at Lemoore. It's dated October 21, 2015. Do you see that?

A. It's flashing in and out.

MR. ARGER: We've got to do a reboot, I think.

THE CLERK: It's you.

MR. ARGER: It's us?

THE CLERK: Yeah.

Q. BY MR. ARGER: Again, just to refresh your memory, October 21, 2015, e-mail from Kevin Lock at Able to you and Mr. Dils regarding the P328 project; correct?

A. Correct.

MR. ARGER: We move to admit 62A.

MR. DURHAM: Your Honor, objection on hearsay grounds.

THE COURT: It is as to anyone except to Mr. Bullerdick's statements. Do you agree with that Mr. Arger?

MR. ARGER: Well, I think it puts him on notice of

Heating and Electric for the P328 F-35C Hangar 5 add and modification project at Lemoore?

THE COURT: Mr. Arger, I'm sorry to interrupt. I've had a chance now to review the content of the e-mails in 62A, and I am satisfied that it's a business record.

MR. ARGER: Thank you, Your Honor.

THE COURT: We will receive it over the hearsay objection, at least.

MR. ARGER: Very good. Thank you, Your Honor. You saved us 10 minutes.

(Plaintiff's Exhibit 62A was received.)

Q. BY MR. ARGER: All right. Just for context, submittal, September 8, 2015. So have you got it so far?

A. Yes.

Q. So pull up 62A, which has now been admitted.

This is an e-mail from Mr. Lock at Able who you submitted to saying:

Bryan, please see the attached approved submittals for the HPC system. There are several notes on the submittal that need to be confirmed by B GSE. Please review and let me know ASAP if there are any issues.

Right? That's what he told you?

A. Yes.

Q. And he's actually forwarding to you an e-mail, an attachment that he received from the general contractor Soltek

Pacific. See that right below it?

A. Yes.

Q. And that e-mail which has been received by you now said:

Kevin, was the attached Able Heating and Air Conditioning submittal for the high pressure cooling for the aircraft in accordance with the contract drawings M-5.00 and M-5.01 relative to the P328 F-35C Hangar 5 Addition and Modification Project at NAS Lemoore has been government approved as noted. Do you see that?

A. Yes.

Q. This is notice to you that the government has approved the submittal as noted. Correct?

A. That's what it said, yes.

Q. Actually the government approved as noted is even bolded; right?

A. Yes.

Q. If you could look at Exhibit 62B, please.

This is the attachment to that e-mail which is the government's approval as noted. Do you agree with that?

A. Yes.

Q. All right.

We move to admit Exhibit 62B.

MR. DURHAM: Just renewing the original objection, Your Honor.

THE COURT: That's overruled. The exhibit is received.

(Plaintiff's Exhibit 62B was received.)

MR. ARGER: Thank you, Your Honor.

Q. BY MR. ARGER: You typically get involved with -- strike that.

Do you see the -- again this was received by you, an e-mail on October 21st, 2015, after only the initial submission for P328; correct?

A. I assume it's the initial submission, yes.

Q. We're going to get back to that one because that's the one we have all the Twist discussion, and we're going to solve it. We're going to get back to that one. But I want to finish up a point that I was talking about earlier.

If we go down to the section that says certification, it's about a quarter of the way down on top. It says, "it is certified." Do you see that? And again, this is a document from the government approving the submittal as noted to the general contractor who then gives it to the subcontractor who then gives it to you; correct?

A. Correct.

Q. So it is written on here, the government is saying -- do you recognize the signature there, October 6, 2015?

A. No.

that in it.

Q. While we're on that subject, I was going to go to it later but it's a good time to do it now, I just want to remind everyone -- let me just go through the chronology of that Revision 0, September 8, 2015, submittal, okay?

First let's start with Exhibit 336. It's already in evidence. March 3rd, 2014, you're still an employee at JBT; right?

A. Yes.

Q. And you write to JBT to Mr. Fullmer and copy Amy and Mr. Dils: We have JBT in at Lemoore as basis of design.

Right?

A. Yes.

Q. Go to Exhibit 228. Again this exhibit is already admitted.

May 13th, 2015. You're writing to Mr. Woo and Mr. Maynard at Twist and saying: I just want to clarify, 18-grain will be required in Lemoore. Correct?

A. That's what I said at the time.

Q. Okay. If we could go to Exhibit 237.

It's an e-mail from Mr. Lock at Able saying on August 26, 2015, saying, last paragraph says: I would like to get moving on submittals ASAP. Our deadline for submission to the GC, general contractor, is next Wednesday, September 2nd, so time is of the essence.

Q. Mary Small is someone who works at B GSE Group; right?

A. Yes, she is.

Q. You copied Mr. Dils. You sent this on or about July 16th, 2016; correct?

A. Yes.

MR. ARGER: We move to admit Exhibit 122, Judge.

MR. DURHAM: No objection, Your Honor.

THE COURT: It's received.

(Plaintiff's Exhibit 122 was received.)

Q. BY MR. ARGER: Will you go down to the section where it says "Mary."

It says: On the blanket order six power units also go to Beaufort. Right? We talked about Beaufort in this case. We have to make sure that the right ones go to the right place, and we do not want JBT knowing the destinations if possible.

Did you write that at the time, you didn't want JBT to know the destinations?

A. At that time I wrote that, yes.

Q. And if we go down, there's Beaufort needs, there's Kadena needs. And you talked about earlier that you provided JBT units at Kadena; right? The one in Japan?

A. Yes, I did.

Q. This is a blanket order. And according to this you

don't want JBT to know they're going there; right?

A. According to that, yes.

Q. Again, what's in your hard drive I've looked at everything what you prove in this case. I've seen no evidence or anyone from B GSE telling JBT that the units they are buying under this blanking order are going to Japan. Do you agree with that?

A. Mike Fullmer knew where they were going because Mike Fullmer had to service them over there.

Q. Is that in an e-mail somewhere, because I haven't seen it?

A. I think they got service, so he must have found out.

Q. What year was that?

A. 2016. They had warranty problems in 2016.

Q. Can we go back to the blanket order please, Exhibit 1240?

So that's February 23rd, 2016. Your e-mail was in July, I believe. Can you pull that back up? July 18th, 2016. So at least as of July 18th, 2016, nobody at JBT knew they were going to Kadena in Japan, did they?

A. I don't think they were manufactured yet, so I didn't know where they were going at the time.

Q. Well, somehow they were manufactured in 2016, and Mike Fullmer had to go service them right after that in 2016;

A. That's correct.

Q. But you did do it.

A. It was done, yes.

Q. There was some testimony this morning that I wasn't quite sure and I'm a terrible note taker. But did you say neither Northern Air nor Twist nor JBT made a unit that complied?

A. There was a compliance problem with 18 grains. With an ITW would be part of that, too.

Q. If you could pull up Exhibit 98.

Have you looked at this before? This is the e-mail that you sent on May 22nd of 2015 to Joe Rodriguez of the Army with a copy to Mr. Dils. If you go to the second line of the paragraph that begins, naming suppliers, the second line that says, neither. You said: Neither FCX or Twist have never made a working unit. Do you see that?

A. Yes.

Q. You go down a few more lines, I won't worry about reading it again. But go down to the, this is just me sentence, Cheryl, please. It says: This is just me. It starts on the right.

You wrote: This is just me being upfront because I can sell Twist PC Air, old FCX Air, if I wanted to. But they need help designing the product. And until I have time to do so we're stuck with the JetAire JBT product being the only one

to currently meet the specifications.

That's what you said at that time, wasn't it?

A. That's what I said there, yes.

Q. If we could pull up Exhibit 7, please.

This is an e-mail you sent to Mr. Schrinner at Twist with a copy to Mr. Maynard at Twist with a copy to Mr. Dils. You sent this on February 10th, 2016, so maybe nine months after you sent the one back to the Army. If you'll go to the second paragraph, you say: The spec is pretty much a loser spec. Part S and pieces are too specific to a common unit. If I were supplying JBT I would not do anything different than the standard JBT unit. I would state that it is the only unit working for this application and therefore will not be changed.

That's what you said at that time in 2016, wasn't it?

A. I said that there, yes.

Q. This could be my last question.

Do you agree with me it would not be appropriate to include pictures of a JBT product in a document related to the sale of a Twist PC Air unit? Would not be appropriate to do that.

A. It would not be the best thing to do. But pictures don't have a whole lot of weight.

Q. Would it be appropriate to do that, have pictures

down and return to counsel table.

Your next witness, Mr. Arger?

MR. ALGER: Yes, Your Honor. We would call Mr. David Duski.

THE COURT: Mr. Duski, come on up here, if you, please, and we'll administer an oath.

THE CLERK: Please raise your right hand.

DAVID DUSKI,

called as a witness at the request of Plaintiff, having been first duly sworn, was examined and testified as follows:

THE WITNESS: I do.

THE CLERK: Thank you. Please be seated.

Please state and spell your name for the record.

THE WITNESS: David, D-A-V-I-D, last name Duski, D-U-S-K-I.

DIRECT EXAMINATION

BY MR. ARGER:

Q. Good afternoon, Mr. Duski.

A. Good afternoon.

Q. Could you state your name for the record, please?

A. David Duski.

Q. Can you introduce yourself and tell us where you work?

A. Sure. I work at an international consulting firm

called Charles River Associates in Chicago.
Q. Okay. Can you tell us a little bit about what kind of business it is?
A. So among other CRA provides litigation support services to companies involved in dispute, which is like the ones we are here to talk about today.
Q. What's your position there?
A. I'm a principal in its intellectual property practice.
Q. As a principal in a intellectual property practice, what do you actually do?
A. A lot of my work is involved in advising clients on the economic surrounding intellectual property issues, such as, you know, licensing in or out technology. But the vast majority of my work involves the assessment of economic damages involving intellectual property in disputes such as the one that we are here to talk about today.
Q. Okay. Can you tell us a little bit about your educational background?
A. Sure. I graduated with a Bachelor of Science degree in Commerce with majors in accounting and finance from DePaul University with high honors.
Q. What about after you graduated? Tell me a little bit -- tell us a little bit about your employment history.
A. So for the first approximately 12 1/2 years after I

received my undergraduate degree, I worked for a boutique consulting firm in Chicago that provided financial consulting within the litigation and dispute resolution process. After that time I transitioned to a firm called BDO. BDO is the fifth largest public accounting and advisory firm in the world. And when I was at BDO I led its national intellectual property consulting practice.

Q. And then take it all the way to Charles River.

A. I left BDO in February of this year and joined Charles River Associates, also known as CRA in its intellectual property practice.

Q. Do you hold any professional licenses or certifications?

A. I do. I'm a certified public accountant licensed in Illinois and Wisconsin. I'm a certified licensing professional and certified fraud examiner.

Q. What about do you lecture about this type of thing?

A. I do. I have given lectures on the topic of intellectual property damages in the past. Those have been for example for the Chicago Bar Association, the John Marshall Law School in Chicago. The University of Loyola Chicago School of Law and the Intellectual Property Law Association of Chicago.

Q. What about professional organizations? Are you a member of any of those?

A. I'm a member of several professional organizations. Those include the American Institute of Certified Public Accountants, the Illinois CPA Society, the American Bar Association, the Chicago Bar Association, the Association of Certified Fraud Examiners, and the Licensing Executive Society.

Q. What about ongoing educational activities? Is there anything required in your field in that regard?

A. In order to maintain one or more of my licenses or certifications I have to engage in at least 40 hours of continuing professional education a year to stay current on the topics affecting the accounting, licensing, and fraud profession.

Q. So today you're here testifying as an expert on damages in this case. What kind of experience do you have to testify?

A. I've been retained as an expert in numerous matters throughout my career providing expert opinions regarding economic damages in those matters.

Q. And what -- can you tell me what type of assignments they were?

A. Those cases involved allegations of trade secret misappropriation, trademark infringement, copyright infringement, breach of contract, patent infringement among others.

Q. Okay. So the issues in this case are something that you've had experience in?

A. I have, yes.

Q. You said you've worked in a lot of litigation matters. Can you ballpark how many you've worked on in 15, 16, 17 years?

A. I'd say over my 17-year career I've probably worked on 100 or more litigation matters.

Q. How many of those specifically relate to lost profits and unjust enrichment damages?

A. I would say probably a couple dozen. And notably there's been a few that have been in either the aerospace industry or involving the military.

Q. I was going to ask you, do you have any experience in aerospace or military?

A. I've worked on a few assignments in that industry. One that comes to mind is an assignment involving technology where the technology at issue was technology that allows military pilots and C130Js to be able to use night vision goggles in conjunction with what they call a multifunction color display. So they would be able use flight at night with night vision goggles and still be able to look at the color displays in front of them.

There was another trade secret misappropriation matter that involved mobile armor for Hummvees that are

obviously used by the military. And then I also recall working on a case kind of on the commercial side of things involving commercial aircrafts. And the technology in that case is perhaps something that Mr. Bullerdick is familiar with because he's an airline pilot. And that was early ground proximity warning systems. So those are systems that are in the -- or instruments that are in the cockpit of all commercial and private aviation of my understanding that alert pilots if they're getting too close to the terrain so they pull up and otherwise avoid a crash.

Q. Is it fair to say that assessing economic damages has been a main focus of your practice the last 17 years or so?

A. It has, yes.

MR. ARGER: Judge, I move at this time to qualify Mr. Dusti as an expert in the field of economic damages including the assessment of lost profits and unjust enrichment.

MR. DURHAM: No objection, Your Honor.

THE COURT: He will be recognized.

MR. ARGER: Thank you.

Q. BY MR. ARGER: Let's talk about this case. Who retained you?

A. Counsel for JBT retained my firm at the time BDO back in the fall of 2018, I recall.

Q. And what were you asked to do?

A. I was asked to assess the amount of damages that may be recoverable by JBT for the wrongdoing of the defendants if the jury determines that it's appropriate to do so.

Q. What about, did you look at any other -- did you look at the other side's expert?

A. I did. I also reviewed the defendant's economic expert's report in rebuttal to mine.

Q. Had you ever encountered him in the past? Do you know him personally?

A. I've met Mr. Harris once before at a training that we were both at probably shortly before I was retained on this case coincidentally enough.

Q. So what you're asked to do, have you formed some opinions regarding this case?

A. I have, yes.

Q. And have you prepared a couple of demonstrative exhibits that would kind of reflect what your testimony is going to be?

A. I have, yes.

Q. Okay. Will you pull up his lost profit summary as a demonstrative at this time.

We did exchange these last night, by the way.

THE COURT: Is there an exhibit number associated with it?

MR. ARGER: We'll call it 515. I know we're somewhere in the 510s, so I'm going to guess 515.

Q. BY MR. ARGER: All right. So looking at Exhibit 515 can you tell us what this is?

A. Sure. Just to give some context I provided two primary opinions in this case, one is I calculated what I believe to be the lost profits suffered by JBT as a result of the defendant's wrongdoing. And that's what you see on the slide here. And I calculated lost profits for three particular jobs. As you can see, that is Lemoore P328, Kadena P803 and Beaufort P465. And the total lost profits which relates to just PC Air unit and services, I might add total, $201,777.

Q. And I kind of screwed this up without asking you a couple quick questions. Does this Exhibit 515 fairly and accurately reflect your testimony in this case?

A. It does, yes.

Q. And do you think it would be helpful for the jury to see it?

A. I think so, yes.

MR. ARGER: We ask that this be published to the jury, Judge.

MR. DURHAM: No objection. Sorry.

THE COURT: It's all right. It's received. Thank you.

Q. BY MR. ARGER: Now that they've seen it, they've heard you say it, but give them a quick summary of what you just said.

A. Sure. I apologize. I didn't recognize that the jury didn't have the benefit of the exhibit.

Q. That's my fault.

A. As I mentioned, I calculated lost profits damages for JBT for three particular projects related to PC Air equipment and services, not for GPUs. And the total as you can see on the screen for all three together is $201,777.

Q. So that's lost profits?

A. That's correct.

Q. You also did unjust enrichment opinions?

A. I did prepare a calculation of unjust enrichment damages, yes.

Q. Let's pull that up, they're not going to see it just yet. Pull it up, and we'll call it Exhibit 516. And tell us what we're looking at on 516.

A. Sure. This is my calculation of B GSE's unjust enrichment. And we'll get into shortly what exactly that means. But as you can see from this slide I've calculated B GSE's unjust enrichment for eight particular projects. And these are the projects that you've heard testimony about so far in this case. And the unjust enrichment that I calculated include in some cases PC Air, in some cases just GPU, in other

cases both PC Air and GPU equipment and services. And the grand total -- I'm sorry. This hasn't been admitted.

Q. They haven't seen it yet.

A. I'll hold off on that, then.

Q. Let me ask you a couple quick questions. Does this fairly and accurately reflect your testimony in this case?

A. It does, yes.

Q. And would be this helpful for the jury to see?

A. Yes, it would.

MR. ARGER: We move to publish this, Judge.

MR. DURHAM: No objection.

THE COURT: As what? Exhibit 516?

MR. ARGER: 516. Thank you, Your Honor.

Q. BY MR. ARGER: All right. So I guess we'll keep the unjust enrichment because it's got eight projects. How did you arrive at these eight specific projects?

A. I've been in the courtroom the entire time this week and last week listening to the testimony of the witnesses and hearing the evidence. And these are the projects in which based on the evidence presented it appears that JBT either suffered lost profits or in this case for this slide was unjustly enriched by virtue of its unlawful actions.

Q. Okay. We'll go through to those projects later. But just tell me how your methodology, give me how you arrived at your opinions in this case. What did you do?

A. Like I mentioned, I was first retained in the case in the fall of 2018, so almost exactly four years ago. I reviewed the pleadings in this case such as the complaint, the answer, interrogatories, things along those lines. I also reviewed discovery, which are documents produced by both parties in this case. I reviewed the deposition testimony of key witnesses. I had a discussion with a JBT employee about some of their financial information. I prepared two expert reports in this case summarizing my opinions that I'm going to give today. I was deposed in this matter. I reviewed the expert reports submitted by the defendant's financial expert. And like I had mentioned I have been in the courtroom all of last week and up to today listening to the live testimony and the evidence as it's been presented.

Q. Is it usual and customary for experts in the field of economic damages to rely on those types of source of information to come to their opinions in a case?

A. It is, yes.

Q. And to what extent does your experience bear on your opinions in this case?

A. It bears heavily on my opinions.

Q. In what way?

A. Leveraging my knowledge, my training, my expertise in this field over the last 17 years specifically as it relates to the calculations that we're going to talk about, I

relied on that experience very much.

Q. Okay. Let's talk about your opinions. You testified you gave opinions regarding lost profits and unjust enrichment; is that right?

A. Yes, that's correct.

Q. What's your basis for calculating lost profits and unjust enrichment in this case?

A. Just to be clear I'm not a lawyer. I don't have a legal background, and I'm not providing any legal opinions in this case. But for me to perform the work that I did, I needed a foundational assumption from counsel to instruct me as to what measures of damages may be appropriate under the law for these specific causes of action. And counsel gave me the operative assumption that both lost profit damages and the defendant's unjust enrichment are available remedies for trade secret misappropriation and false designation of origin.

Q. And can you just explain at a high level when you say lost profits or the analysis of lost profits, just explain to us what that means?

A. Sure. Lost profits attempts to measure and determine the but for revenues and profits that in this case JBT would have earned but for the defendant's actions. So really what it attempts to do is make JBT whole, to put them in the financial position they would have been in had the wrongdoing not occurred.

Q. Okay. Same question for unjust enrichment. Can you explain that at a high level?

A. Sure. That may not be a term that the jury has heard before. Unjust enrichment tries to measure the ill-gotten gains that the defendant has received by virtue of their wrongdoing. And theoretically, if the jury determines it was appropriate to do so, those ill-gotten gains would be surrendered to JBT, the intellectual property owner, as a form of damages.

Q. So unjustly enriched like it sounds.

A. Correct.

Q. How do you measure or calculate unjust enrichment?

A. Well, in this case I measured the defendant's unjust enrichment as the profits that it earned for the eight particular projects that we're here to talk about today for the sale of GPUs and/or PC Air units and services.

Q. So what are you looking at when you're doing this analysis exactly?

A. Well, when I was going through the volume of documents that were provided to me I was looking for a lot of evidence as it relates to damages. Those are things like evidence of the defendant's wrongdoing and how that may have contributed to any loss of sales and profits of JBT or how the wrongdoing may have unjustly enriched them, in other words, the profits that they earned on the projects that we're here

to talk about. So information included things like purchase orders, contracts, invoices, quotations, e-mail correspondence, sworn deposition testimony. I reviewed all of that to determine -- or in order to form the opinions that I'm here to give today.

Q. So in terms of numbers, you are looking at revenues and costs; right?

A. Among other things, yes.

Q. Okay. As part of your assignment, were you given kind of an understanding of which party bears the burden of proving evidence versus costs?

A. Yes. So in an unjust enrichment calculation, again, I'm not lawyer so I had to rely on counsel for the operative assumption as to who bears which burden of proof for revenues and costs in this case to form my analysis. And I was given the operative instruction in this case that the defendant JBT only bears the burden of proving the defendant's gross revenues, in this case, you know, the revenues specific to the eight projects that we're here to talk about here today.

I then understand that the burden shifts to the defendant to prove any and all costs or deductions claimed from those revenues which include things like apportionment.

Q. Okay. What's apportionment?

A. So --

Q. What do you mean by apportionment?

A. Fair question. In an unjust enrichment claim defendants may argue that some portion of the profits are attributable to lawful factors in addition to unlawful factors. So the defendants may argue what we call apportionment.

I understand again from an operative instruction from counsel that the defendants bear the burden of providing such an apportionment exercise or calculation, and that it has to be done to a reasonable degree of certainty. In other words, can't be speculative. And that's my experience working on other matters where an unjust enrichment claim was asserted.

Q. Okay. And what bears the burden on that apportionment analysis?

A. My understanding is it's the defendant's burden.

Q. All right. I know we're going to get to each project, and we're getting there close. But let me just talk. What evidence did you review when you formed your opinions in this case?

A. I just mentioned kind of the volume of discovery and other documents that I have reviewed, things like financial information produced by both parties, deposition testimony, e-mail correspondence which would have been part of the discovery produced by the parties, contracts, purchase

orders, solicitations, things along those lines that help inform the opinions that I'm here to give today.

Q. That was a bad question. What are you looking for, I guess is what I was going to ask?

A. Well, in a broad sense I'm looking for two things. One is the information that would allow me to calculate the defendant's unjust enrichment as well as JBT's lost profits, and then also evidence that the bad acts from the defendants caused JBT to lose those sales and profits.

Q. I think you already said it, but the examples would include the types of evidence that you just mentioned?

A. That's correct, yes.

Q. Okay. All right. Let's go to, what have we got first, Lemoore P328. You've got lost profits on the other screen, I believe. 515. There you go. $96,664. How did you come to that conclusion?

A. Well, we could walk through the specific mechanics of that calculation if you'd like.

Q. Well, first tell us, just remind us what the project was, P328.

A. The project to my recollection was for an F-35 military hangar at the Naval Air Station based in Lemoore, California, which required among other things PC Air and GPU equipment.

Q. And what was B GSE's role in that project?

A. I understand that they were bidding for both PC Air and GPU equipment.

Q. To contract for both?

A. I'm aware that they won the contract for PC Air only on that project.

Q. Who did they purchase the PC Air units from in that case in that project?

A. We heard testimony that that was from Twist.

Q. What's your understanding of the wrongdoing that would cause JBT to lose sales and profits on this project?

A. So I think we heard this just a little while ago with Mr. Arger's examination of Mr. Bullerdick in walking through the timeline --

Q. This Mr. Arger?

A. Correct. And just kind of recap it, but hopefully not mischaracterize what was said is in that case B GSE was awarded the contract for PC Air in August of 2015 and that submittals were due in a very short amount of time, in other words I think it was a week's time. And then there was some discussion with Mr. Bullerdick and B GSE providing Twist some confidential information and some trade secret information of JBT to help them prepare the submittals so they could submit it on time and get approval from the government to manufacture these units.

And I recall from Mr. Bullerdick's deposition

testimony that at this time Twist had not manufactured an exact PC Air unit that was described in the specification. And I think we heard evidence that the submittal that was submitted I think in August or September of that year contained a lot of what is JBT's trade secret information, and other confirmation -- or excuse me -- other confidential information.

Additionally we know that JBT had issued a quotation for PC Air units to B GSE that they had a compliant product at the time. And I understand that it's JBT's argument in the evidence that they're trying to present here is that it was the use of JBT's confidential and trade secret information that allowed Twist and JBT to prepare this submittal to submit to the government in the timeframe that was required to ultimately manufacture and sell the product.

So absent the wrongdoing from the defendants, B GSE would have purchased the PC Air units from Twist but from JBT.

Q. What evidence are you aware that JBT would have done so?

A. Well, like I mentioned JBT provided a quote for PC Air to B GSE during this process. I'm also aware from Mr. Bullerdick's deposition testimony that JBT routinely analyzes profitability on a project-by-project basis. And in fact, from my discussion with JBT's global pricing manager that in conjunction with a bid on any project that they give

they prepare what they call an internal loss workbook, kind of like a profit-and-loss statement to estimate what they think that profitability will be on that quote prior to issuing that quote because again, JBT wants to make sure it makes economic sense to pursue this opportunity so they assess what their expected revenues and profits are associated with a particular quote.

Q. So just give us the steps you used at a high level. Give us the steps to do a lost profit calculation. What are you doing?

A. Sure. So I'm relying on part on this cost workbook that I just described to you that was produced by JBT that was specific to the quote that it gave B GSE for Lemoore P328 project. That document had what JBT expected its selling price and what its revenues were going to be had it made a sale and also the cost that it expected to incur such as manufacturing costs and other things that go into it. And that resulted if you subtract the revenues -- or excuse me -- if you subtract the cost from the revenues you end up with what you expected their profits to be on this particular project.

Q. All right. Let's talk about the calculations you performed. What would you rely to estimate on JBT's before revenues and costs related to this project?

A. It would have been that JBT cost workbook that we

just talked about that was specific to the quote provided to B GSE for the Lemoore 328 project.

Q. So for your purposes you can look at this. But tell me what Exhibit 433 is.

A. This is the JBT profit-and-loss statement that I relied on in conjunction with my calculation of lost profits related to the Lemoore P328 project.

Q. Does JBT's quote match those on this profit and loss?

A. Yes. So the quantities and the prices quoted to B GSE match those amounts that are on its internal profit-and-loss statement.

Q. Did you look at like historical variance between this and, you know, actual expectations and things of that nature?

A. Well, I had a discussion with JBT's global pricing manager because I wanted to know how closely did these expected profits track to historical results. And he informed me that they track very closely because JBT has been manufacturing and selling these units for quite sometime. So they know historically what their costs are and what their profits are so when they prepare these quotes there's a small variance, perhaps, if any between their estimated and actual profitability.

Q. Do you have a summary of those calculations?

A. I do, yes.
Q. Is that Defendant's Exhibit 1242?
A. Yes. I prepared a summary of this calculation, which is an aggregation of all of these business records from JBT in my expert reports.
Q. Page 51 is what I wrote down. Is that right?
A. I think so. We'll find out.
Yes. This is the summary calculation that I provided regarding lost profits for Lemoore P328.
MR. ARGER: Judge, we move to admit this page only of Exhibit 1242.
MR. DURHAM: Your Honor, we object on hearsay grounds and foundation and demonstrative --
MR. ARGER: You know what. That's fine. I just want them to be able to see it. It would make easier for me if we just publish it.
THE COURT: We'll not receive it, but we'll publish it to the jury.
MR. ARGER: Perfect. That's fine. Thank you.
Q. BY MR. ARGER: What is this document as Exhibit 1242, Page 51?
A. Sure. I can walk the jury through this at a very high level. This essentially is my calculation of what I believe to be the lost profits suffered by JBT related to PC Air units and services for the Lemoore P328 project.

So as you can see, they kind of categorize by both the actual units themselves, the -- sorry -- the master controllers, sites, startup testing and commissioning and training of the equipment as well as the wire diagram. So all of these values come directly from that JBT internal cost workbook that we had talked about before.

So you'll see on your screen quantities, that's the quantity that JBT was quoting; the price that they were quoting to be B GSE; and then the total, which is just the multiplication. So you would aggregate all of the lost revenues as you see here and then subtract from that all of the costs that I've identified, as well.

So in this case lost revenues were $446,813 and costs were $350,150. If you were to perform the subtraction it results in lost profits of $96,664.

Q. Add up the numbers for me. How do you get to the 446 and how do you get to the 350?

A. Sure. So if you were to aggregate the lost revenue line items, right, for each of those, I guess it's four categories, you would get the 446,813. And then if you were to add up all of the individual cost line items under those four categories, you would get the 350,150. So that's how the mechanics of that calculation works.

Q. You're going to hear about -- did you do any investigation with regard to JBT's ability to make these sales

like they were able to perform?

A. Yes. As part of my conversation with JBT's global pricing manager I wanted to understand whether or not JBT would have been able to actually manufacture and deliver these products, commonly referred to as manufacturing capacity. And he informed me that they did not have any issues with manufacturing capacity and that they would not have been actively quoting a project that they knowingly couldn't perform under.

Q. So even if we assumed JBT had sufficient capacity to manufacture and make the sale, what is evidence is that they would have in fact captured this sale.

A. Well, I have not seen quotes provided by other manufacturers of PC Air of compliant product that were submitted to B GSE. And I understand that in this business if B GSE, for example, wanted to purchase equipment that it was going to sell to the military it has to issue a purchase order. And I haven't seen any evidence that there were other suppliers of compliant product that submitted quotations for this particular project to B GSE. It was just JBT that I was aware of. In fact, I believe Mr. Bullerdick testified in his deposition that JBT was B GSE's first choice for PC Air on this project.

Q. Thank you. While we're on P328 can we talk about the unjust enrichment analysis that you did for that project?

A. Sure.

Q. Did you prepare a similar type of document like this for that?

A. I did. I provided what a I'll call summary calculation of B GSE's unjust enrichment associated with this project.

Q. Could you pull up Page 61 of this Exhibit 1242?

And what are we looking at here on Page 61?

A. This is my calculation of B GSE's unjust enrichment associated with PC Air units and services for the Lemoore P328 project.

Q. Again we won't admit it, but we'll publish it to the jury.

THE COURT: Any objection to that, Mr. Durham?

MR. DURHAM: No objection.

THE COURT: Publish it to the jury, Miss McNamee.

Q. BY MR. ARGER: You mentioned B GSE profits. Are they the same as unjust enrichment?

A. In this case I think we could use those two terms interchangeably. As I've described, I've measured B GSE's unjust enrichment as the profits it earned on each of these eight projects that we're going to talk about. So for today's discussion we can use those terms interchangeably.

Q. So what's your opinion here on the unjust enrichment damages for the P328 project?

A. Well, the total unjust enrichment damages for this particular project total $169,280.

Q. What do you rely on as your basis for that?

A. Well, for this particular project I relied on a profit-and-loss statement that B GSE prepared associated with this particular project.

Q. Can you put Exhibit 327B up?

Is this the profit-and-loss statement that you just referred to?

A. It is, yes.

Q. I believe that is 327B?

A. Yeah.

MR. ARGER: I believe that's in, Judge. It's one of those where we had -- I believe that it corresponds to the A through J attachments that we redacted. We just used the ones that were specific to this. At least that's what my notes say. Does that sound right? 327B?

MR. DURHAM: Yeah. That's fine.

MR. ARGER: Okay.

MR. DAVIS: That's fine.

MR. ARGER: We had to make sure.

THE COURT: Okay. Thank you.

Q. BY MR. ARGER: All right. Should we take a look at it again? I apologize. Explain to us, this is a profit-and-loss from Bullerdick or B GSE?

A. That's correct.
Q. Okay.
A. We heard about this document briefly yesterday.
Q. And can you just walk us through what we're looking at here?
A. Sure. This is somewhat similar to the JBT profit-and-loss statements in terms of the mechanics of the actual calculations. So this lists out individual components that B GSE was to provide related to this particular product. So it includes things like conditioned air system equipment, which I understand to be for purposes of this matter is synonymous with PC Air, and pit equipment and then startup training, supervision and commissioning, as well as it looks like some conditioned air system piping.
And it includes what JBT -- or excuse me -- what B GSE costs are, in other words, the costs that it was going to pay Twist to acquire these particular products or for these services; and then the amount that it was going to be charging in this case, which is I think Able Heating and Air which was the ultimate subcontractor that they were selling to. So if you take the different between those two amounts, its revenues and costs, you'll arrive at B GSE's profits.
Q. Now I suspect we're going to hear a lot about actual versus estimates and revised submittal and this and that. And these projects take forever. Are these actual

costs and revenues?

A. On this spreadsheet, I can't say for certainty. I heard Mr. Bullerdick testify that these were accurate and reliable at the time that they're created. And it represented to me the best information I had to be able to determine B GSE's profits.

Q. I guess that's my question. How can you rely on these if they're not actual?

A. Because based on the totality of the evidence that I've reviewed, I view these as the best most reliable information that was made available to me by B GSE to perform this calculation.

Q. So the information that's been produced pulled off hard drives or whatever has been produced in this case this is the most accurate information that you were able to review; correct?

A. I believe for this particular project, yes.

Q. Was there more than one profit-and-lost statement provided by B GSE for this P328 project?

A. My recollection is that there was more than one iteration.

Q. How do you determine on which one to rely on?

A. Well, this particular profit-and-loss statement had the word final in its title. In the actual file name it said final. That's one thing. Also if you look at the file's

metadata you could ascertain the time in which that file was last modified.

Q. For us old people what is metadata? My kids know.

A. Well, I'm not an IT professional, but metadata could be thought of as digital properties of a file. So if any of you in this room had worked with Microsoft Word, Excel and PowerPoint and things like that and you right click on it and you go to file properties, it will tell you among other things who authored the documents, when it was created and when it was last saved or modified. So that's what I as a lay person kind of consider the metadata of the file.

Q. So this Exhibit 327B is the most current and accurate up to date profit-and-loss statement that has been produced?

A. That's I'm aware of, yes.

Q. It's the best information available that you're aware of to determine the unjust enrichment damages in this case for this project?

A. For this particular project, yes.

Q. All right. Just walk us through, you did a little bit, all these line items. Can you just kind of go through and tell us what they generally are?

A. I can as a nontechnical person. The conditioned air equipment to me relates to PC Air units and components. Pit and pit equipment are, you know, to my understanding

relate to pits. And as we can talk about when we look at my calculation I didn't include any revenue or profits from pits, but rather just line items that to me directly related to PC Air unit and services only, including startup, training, supervision and commission. You'll see a line that relates to CAS, startup and commissioning, five days, things along those lines.

Q. CAS is conditioned air system you're talking about?

A. Yes. I think I also heard it referred to by Mr. Gwilliam compressed air system. I'm not sure which is correct.

Q. So you said you did include or did not include the pit or pit equipment information?

A. I did not anything related to pit or pit equipment.

Q. Why did you do that? Why did you exclude that?

A. Because I understand that the, you know, alleged wrongdoing to this -- or for this particular project related to just PC Air. In other words, as I mentioned before, B GSE was not awarded the contract for GPUs.

Q. Okay. Can you -- I want to go back to this Page 60. So go to your report Page 61. 1242, Page 61, please.

I think we're done with that. Are you done with this? Is there anything else on this?

A. I don't believe so, no.

Q. All right.

Again just for demonstrative purposes we publish this to the jury, Judge.

THE COURT: Yes.

Q. BY MR. ARGER: So this is Page 61 of Exhibit 1242. What have you done here? What are we looking at?

A. Sure. As I mentioned a few minutes ago, my calculation of unjust enrichment just relates to what appears to be a PC Air equipment and services that were identified as B GSE's P&L for this project. So you can see the individual line items that I included that relate to conditioned air system equipment and then also startup training, supervision and commissioning that B GSE performed and was charging for. And the quantities, the costs and the sales prices all come directly from that B GSE P&L that we just saw a short time ago.

The total sale column that you see here is just, you know, multiplication, right, of selling price times quantity, and total cost is cost times quantity. And then the profit for unjust enrichment is just the subtraction between those two amounts. And in aggregate the total unjust enrichment associated with this project is $169,280.

Q. So you totaled the sale, and we're just talking about the PC Air, totaled the sell, totaled the costs, subtracted them and came up with 169,280; is that right?

A. That's correct.
Q. Anything else that corroborates these numbers?
A. I recall that the quotation that B GSE provided to Able Heating and Air, in other words the subcontractor, that those amounts tied to the selling prices that were on its P&L statement that I've also included on this schedule here.
Q. Can you pull up Exhibit 278, please?
I guess it's in, Judge.
THE COURT: Go ahead.
MR. ARGER: I'm impressed that you keep them on that notepad.
THE COURT: Go ahead and use it for now.
MR. ARGER: Thank you.
Q. BY MR. ARGER: So this is a quotation that you just referred to?
THE COURT: It's in.
MR. ARGER: Thank you, Your Honor.
THE WITNESS: Yes, I believe so.
Q. BY MR. ARGER: So how does this corroborate what we saw on Page 61?
A. Well, if you look at the rate on the spreadsheet -- excuse me -- it's not a spreadsheet on this quote that was provided to Able Heating and Air, that is in essence B GSE's selling price. So that's the price that they were charging Able Heating and Air for those products and services, and

these are the ones that match to the amounts that were included in the profit-and-loss statement.

Q. If it's the defendant's burden to prove the cost why are you looking at costs at all?

A. Well, because when I viewed the costs on the profit-and-loss statements those costs appear to be directly related and attributable to the revenues that were included there. In other words, it was pretty clear to me that these were the acquisition costs that B GSE incurred to acquire the equipment. You know, the amount that they ended up paying Twist for this equipment and services. So therefore I felt it was appropriate to include those amounts for purposes of my analysis despite not being JBT's burden.

Q. Any other types of costs that you considered?

A. I looked for other or evidence of other costs that could be quantified with a reasonable degree of certainty that may have related to this job, however no such costs had been made available to me by B GSE, so I didn't include in my analysis any additional costs.

Q. So basically you can't reasonably consider cost information that hasn't been provided, quantified?

A. That's fair, yes.

Q. All right. So I think in summary, if we could go back to Exhibit 516, we've got lost profits on P328 project of the 96,664. If we could go to 515. We've got unjust

enrichment damages on P328 of 169,280.

A. That's correct.

Q. We can move through those quickly, more quickly.

P378, the second Lemoore project. Can you pull up Exhibit 1242, Page 64, Cheryl? 1242, Page 64.

Again, for demonstrative purposes, Judge. Can we publish it to the jury?

THE COURT: Yes.

MR. ARGER: Thank you.

Q. BY MR. ARGER: Tell us what we're looking at this page.

A. Sure.

Q. This is P378 project.

A. Yes.

Q. What are we looking at?

A. This is my calculation of B GSE's unjust enrichment associated with the second Lemoore project, which is Lemoore P378. So this probably looks very much similar to the exhibit that we just looked at previously, whereby I aggregated revenues and expenses associated with PC Air equipment and services to determine B GSE's profit on this project.

Q. Just quick background. What was the P378 project for?

A. My understanding was this was for a second or different F-35 hangar at the Lemoore Air Base.

Q. And B GSE's role here?
A. It was bidding for PC Air and GPU, as well.
Q. Did it win the contract for both?
A. Initially my recollection is that it did win it for both, but that the contract for GPUs was subsequently revoked by the contractor.
Q. Okay. We won't go there with you.
Who did B GSE purchase the PC Air from on this project?
A. My recollection was Twist.
Q. Let's go to your unjust enrichment calculation looking at Page -- P264. Generally, will you walk through the analysis again?
A. Sure. Again, like P328 because B GSE wasn't awarded the contract for GPUs I focused my unjust enrichment calculation on PC Air units and services only. And to do so I relied on another profit-and-loss statement that B GSE has produced specific to the Lemoore P378 project.
So the mechanics, the calculation and the methodology is almost identical in terms of aggregating the line items from B GSE's P&L that appeared to directly relate to the PC Air unit and services. So I included both the costs identified in that spreadsheet as well as the revenues that it was going to earn on that project to determine a total unjust enrichment, which in this case per the schedule was $337,667.

Q. Total sale minus total cost, and that's how you get to your number?

A. That's correct.

Q. Will you pull up Exhibit 327, please.

I believe this is in, too, Judge.

Do you remember Mr. Bullerdick talking about this exhibit?

A. Briefly, yes.

Q. Okay. And did you rely on this?

A. I did, yes.

Q. Why?

A. Because this was the best, most reliable information that had been made available to me from B GSE for me to determine, you know, the revenues and costs associated with the Lemoore P378 project.

Q. Okay. And did you include amounts from this P&L like you did for P328?

A. I did. I followed the same methodology. However, I note that there's a lot of line items you'll see on this P&L that I did not include because they did not appear to me to relate directly to PC Air units and services. So things like the GPUs identified as 270 VDC supply, pit supply, you know, thing along those lines that don't relate to PC Air I excluded for purposes of my calculation.

Q. And for this project you only did the unjust

enrichment; correct?

A. That's correct. I did not do a calculation of lost profits.

Q. Why did you only do unjust enrichment?

A. For this particular project I wasn't asked to assess any potential lost profits that B GSE may have incurred.

Q. JBT?

A. Excuse me. JBT.

Q. Just real quick. If we go back to 515, please, Cheryl. Is that 516?

So there we've got the unjust enrichment for PC Air 378 for 337,667; correct?

A. That's correct, yes.

Q. That was a lot quicker.

Let's go to the third one, which is Kadena, the one in Japan, P803. If we could pull up Page 58.

THE COURT: Actually, Mr. Arger, I think this may be where I interrupt your examination. We've been going for about an hour and a half.

MR. ARGER: Judge, you know you can interrupt me any time.

THE COURT: I'm not bashful about it.

MR. ARGER: I know that.

THE COURT: So, members of the jury, last Monday in

jury selection I told you that my estimation was that we would get the case to you to begin your deliberations sometime tomorrow, and it's important to me that you can rely on what I tell you. I recognize and appreciate your service and the importance of your service, also the inconvenience of stepping outside of your lives to come and do this. We've tried to be as respectful as we could of your time. We've done a lot of work when we can outside of your presence, and we'll do more tonight.

We're close. I think we're probably a little bit off schedule now. I think there's a chance we could get to closing arguments and my instructions to you in time for you to begin your deliberations tomorrow late in the day, maybe tomorrow evening. It's possible that we'll go into Thursday.

What I want to propose we do today, but I want you to take a few minutes and visit amongst yourselves and talk about your schedules, I propose that we take a short break now, 10 or 15 minutes, and then maybe get another hour and a half in until about between say 4:30 or 5:00 to give ourselves a little bit of extra room and then see how we're coming along tomorrow.

I hate this conversation. It's one I desperately try to avoid. This case has been complex. I've been at this 10 years. I'm usually pretty good at guessing how things are going. This case has been a little complex because so much of

the defense case has come through cross-examination of witnesses in the plaintiff's case.

This is the plaintiff's last witness. I anticipate that the plaintiff will close his case in chief most likely before we leave today. And I think the defense will get its case in tomorrow. The only question in my mind is when tomorrow. And tonight after you go home we'll be working to finalize the jury instructions you'll all receive and the like.

I raise it now for two reasons, one is to see if it would work with your schedules if we go-between say 4:30 and 5:00 tonight; and second, I knew this was a document intensive case before it started. In fairness, I did not know how many documents were involved, so I've been learning along with you. And I'm just thinking about what your deliberations might look like. And as I'll explain in the instructions I'll give you you'll decide how you deliberate and the process and your schedule and the like.

I think you may want to prepare yourselves for the possibility that you may be in jury service through Thursday and possibly Friday, but I don't know that. I mean, I just don't have any way to know. I just wanted to start putting that on your radar screens in case you've got other commitments and obligations and things you're balancing. We'll continue to do the best we can. I will assure you --

it's not if it's anybody's fall. It's my fault, not the parties' fault that we find ourselves where we are. We're doing the best we can. I appreciate your patience.

Why don't we take a recess, take 10 or 15 minutes. Let Miss McNamee know if you're all available to go until 4:30 or 5:00 today, and we'll go from there.

THE CLERK: All rise for the jury, please.

(The jury left the court proceedings.)

THE COURT: Mr. Duski, I'll instruct you not to discuss your testimony with anyone during the recess.

THE WITNESS: Okay.

THE COURT: Why don't we all try to get back a little after 3:00 and see what the jury has to say. Thanks everyone.

MR. ARGER: Thank you, Your Honor.

(Recess.)

(Recess)

THE COURT: Counsel, I should have invited you all to sit. I'm sorry.

Well, maybe you have noticed, but I think as juries go, this is a pretty happy lot and they have been fairly patient. I think there are some scheduling concerns for some of the jurors on Friday, and so they hope they get the case sometime tomorrow. Let's just see what we can do. They have all cleared their schedules to stay until 4:30 or 5:00 today.

Let me ask you if there is something you think I should have said to the jury in that dialogue that I had with them that I didn't, because it's not too late, if there is something more to say, to make sure that they are not directing any blame or fault at anybody.

Mr. Davis, did I address your concerns?

MR. DAVIS: Your Honor, I was comfortable with what you said and I appreciate that.

THE COURT: Mr. Arger?

MR. ARGER: Same here. Appreciate your comments, Judge.

THE COURT: Let's get them back in and get back at it.

Thank you.

(Jury present.)

THE COURT: Some of you are no longer making eye contact with me when you come in. I understand. I appreciate you working your schedules out to make it possible for us to go on. I have reiterated with the lawyers the importance of trying to get the case to you by the end of the day tomorrow if that is at all possible. We're going to keep marching in that direction.

Thank you.

Mr. Arger.

MR. ARGER: Thank you, Your Honor.

THE COURT: Mr. Duski, you remain under oath, sir.

Mr. Arger.

MR. ARGER: Thank you, Your Honor.

BY MR. ARGER

Q. Let's move to the third project, Kadena P-803.

MR. ARGER: If we could pull up Exhibit 1242, page 58, please, Cheryl.

BY MR. ARGER

Q. Mr. Duski, this appears to be the calculation of your lost profits opinions for the P-803 Kadena project.

Is that right?

A. Yes. It is a summary schedule of that calculation.

MR. ARGER: Again, we'll publish this but not move to admit page 58.

BY MR. ARGER

Q. Explain what you have done here.
A. Sure. So this schedule looks very similar to the lost profits schedule that we talked about earlier for Lemoore P-38. What I have done here is I have relied on another internal JBT cost workbook that they had prepared in conjunction with a blanket quotation for PC-Air units for this product.
I think, as you recall from some of the testimony this week, a blanket purchase order to my understanding is an order for units that are not particularly earmarked for a given project. But in conjunction with that blanket quote that was provided to B GSE, JBT prepared an internal profit and loss statement to determine what its expected profitability would be if they were to sell the units.
Q. The total lost profits was calculated to be what?
A. The total lost profits for the Kadena P-803 project is $61,932.
Q. Real quick, what was the Kadena P-803 project?
A. That was for an F-35 military hangar at the military base in Okinawa, Japan.
Q. What was B GSE's role?
A. They were bidding, to my recollection, on PC-Air and GPU units.
Q. Did they get the contract for both?
A. I believe that they did and they purchased GPU Units

from JBT.
Q. Is that the blanket order we heard about today?
A. Yes. I think that that is the same way.
Q. Who beat --
A. My recollection is Twist.
Q. Did JBT submit a quote to B GSE for this project?
A. Not a quote specific to this project. Like I mentioned, they prepared a blanket quote for PC-Air units. The reason why is as the parties were trying to work out and renew the distribution agreement, B GSE provided JBT a list of projects that it had in the pipeline and this Kadena project was one of them that was identified. B GSE also had mentioned to JBT that it was working on a project specific to Japan, which led JBT to believe that B GSE was bidding JBT equipment without specific quotes.
Q. What did you rely on to come up with this calculation?
A. As I mentioned, I relied on an internal profit and loss statement that JBT had prepared in conjunction with that blanket quote that it had provided B GSE.
Q. For your purposes what does a blanket quote mean?
A. As I testified just a few moments ago, my understanding is it is a quote for product that is not earmarked for a specific project. Theoretically the units could be bought for a variety of projects.
Q. If you could, walk us through your calculation and how

you got to 61,932.
A. Sure. This is a summary calculation. I believe the schedules behind it kind of provide more of the mechanics, but this schedule identifies that JBT lost revenues of $267,894 but avoided costs of $205,962. So their lost profits associated with PC-Air units and services related to Kadena P-803 was $61,932.
Q. Who did you talk to and what did you do to determine whether JBT had the capacity and ability to make this?
A. Again, I talked to JBT's global pricing manager, like I said, for the Lemoore project we talked about. I wanted to be sure and be comfortable that JBT could actually manufacture these units and deliver them. I was told by JBT's pricing manager that it didn't have concerns about manufacturing capacity, in other words it could have, because, again, it wouldn't be providing quotes to B GSE that it knowingly couldn't deliver.
Q. Did they have the capacity and what evidence is there that they would have in fact captured this sale?
A. Well, again, as we heard throughout this trial or at different points of the trial, that the submittal related for PC-Air for this project contained a lot of JBT trade secret and confidential information that between Twist and JBT was used to prepare that submittal in order to get approval.

Again, JBT submits a blanket quote for this particular project to B GSE. If you recall, this project had a requirement that the PC-Air units be in service for at least two years before contract bidding. My rough recollection was they won the project in -- I don't know if it was 2014 or 2015. In any event, my understanding is that the products that would be supplied and that would be deemed compliant would have to be in service at least since 2013, for example.

Again, I had not seen or recall seeing evidence from other suppliers of PC-Air equipment that would have met the specifications and also have met that two year requirement.

Q. Thank you for that.

61,932 in lost profits.

Let's go to your unjust enrichment opinion. Did you do one for this project as well?

A. I did, yes.

MR. ARGER: If we could pull up page 63 of this exhibit, Cheryl, please.

BY MR. ARGER

Q. What did you rely on?

MR. ARGER: We will publish this to the jury, Judge, but it is not admitted.

THE WITNESS: Again, the focus of my unjust enrichment calculation for this particular project was

limited to PC-Air related equipment and services. So you'll see again a lot of the same or similar line items that we talked about with the first two projects in terms of quantity, and the costs would be the costs that B GSE was going to be paying Twist to acquire these products, and the selling price being the selling price that B GSE charged to the contractor, which I recall to be Prime Projects International for this particular project.

BY MR. ARGER

Q. What did you rely on as the basis for B GSE's unjust enrichment calculation?

A. Well, I relied on a couple of different documents for this one and I can explain. First, I relied on the most recent profit and loss statement made available to me by B GSE. That is what I initially relied on.

Subsequently B GSE had produced some additional documentation that I thought was relevant for my analysis to make it more accurate. So, for example, there were two additional documents that I relied on for this. One was an invoice that B GSE submitted to Prime Projects International, and another document was an email between PPI and B GSE where there was some kind of dispute as to how much PPI wanted to pay for a specific service.

MR. ARGER: Cheryl, can you pull up Exhibit 281, please.

BY MR. ARGER
Q. Is this the P and L that you relied on that you just mentioned?
A. Yes. For this analysis I relied on this P and L for B GSE's costs. I can walk through some of the other documents of how I ascertained B GSE's revenues.
Q. We'll ask you to do that.
MR. ARGER: I believe we admitted this, 281. We can publish that.
BY MR. ARGER
Q. Again, this is the most up-to-date profit and loss that you were able to find in the materials that were produced in this case?
A. That is correct. This appeared to be the most updated based, again, on that metadata that I reviewed.
MR. ARGER: Cheryl, can you pull up Exhibit 398?
BY MR. ARGER
Q. Is this the invoice you looked at?
A. It is the invoice that I looked at and subsequently relied on.
MR. ARGER: I believe this has been admitted as well.
BY MR. ARGER
Q. Can you explain how you used this document in your analysis?

A. Does the jury have the benefit of seeing it, counsel?

THE COURT: It is in front of you, isn't it?

UNIDENTIFIED JUROR: Yes.

THE WITNESS: Great.

This was an invoice sent by B GSE, like I said, to the contractor related to this project for PC-Air equipment. I think this is dated December 19th, 2017. So this invoice to my recollection was dated after the date of the P and L that we just looked at. If you scroll to -- I think it is the second page. That would be helpful.

You'll see a customer discount line kind of at the top third of the --

BY MR. ARGER

Q. 139,000?

A. Yes. Again, there was not any discovery on this particular document. In other words, I didn't have the opportunity to ask B GSE what customer discount it represented -- what it represented or related to, but what I assumed is it gave kind of a discount for the entire invoice, for all of the line items and all of the costs that are immediately above it and included on the first page.

So if you were to do the math and you were to add up all of the amounts directly above that discount, and you were to divide the $139,231 by the total that they are going to be billing, it reflected about a 11.4 percent discount

that it was giving. So I thought it would be appropriate to reduce B GSE's revenues from each of the line items that I included in my analysis by that 11.4 percent discount because, again, the goal is to try and accurately display the revenues that B GSE ultimately earned on this project. I thought that this invoice was very informative.

Q. Why did you rely on this invoice, because of the P and L?

A. Yes. That was something that jumped out at me as to why it may be relevant to my analysis. Then I also saw that a discount was ultimately given, which may or may not have been reflected in the P and L that I relied on and I couldn't tell, but just to be conservative I wanted to include it.

Q. Any other adjustments you made after the P and L?

A. Yes. There was one other adjustment that I made for B GSE's revenue that actually decreased it from what was shown on the P and L, and that came from an email between B GSE personnel and PPI personnel, which we could look at in a minute, which basically explained that PPI was kind of questioning some amounts that were charged and were only willing to pay about 50 percent of what B GSE had initially invoiced. We could take a look at that and I could explain that.

MR. ARGER: If we can pull up 428, please, Cheryl.

I believe this is admitted.

BY MR. ARGER

Q. Is this the email correspondence you're talking about?

A. It is, yes.

Q. What are we looking at here?

A. I think if you go to the second or third page -- let's stop there.

So the bottom third you'll see in bold line item one, CAS training and startup, so you see here that PPI was essentially emailing B GSE and said that they kind of had a problem with paying the initial amount that was charged. I think it was $29,412 for PC-Air training and startup. You can see in the red font that says that we are willing to pay 50 percent of this line item, $14,607, which was a 50 percent discount. The rest of this email above it shows that B GSE ultimately agreed and accepted their offer for that.

What does that mean for my analysis? What it means is that I took that $14,706 and I substituted that into my analysis for the revenue that B GSE earned related to CAS training and startup.

Q. You took the most recent and up to date P and L that was in the record and you applied additional things that came in afterwards to make it as accurate as possible.

That is what you did?

A. Yes. I felt that after including these two additional pieces of information that it better reflected B GSE's unjust enrichment on this particular project.
Q. At the same time, and I am just going to recap, and I am not going to pull the exhibit up unless you want me to, lost profits, 61,932, unjust enrichment, 194,536, on this Kadena 383 project, right?
A. That sounds correct, yes.
Q. I can pull it up if you want me to.
Let's go to Beaufort P-465.
MR. ARGER: For that I need page 55 of Exhibit 1242, please, Cheryl.
Again, this is just for demonstrative purposes and we are not seeking to admit it. We will just publish it so they can follow along.
BY MR. ARGER
Q. Can you explain to us what this page represents with regard to the Beaufort P-465 project?
A. Sure. So just to remind to the jury, I performed a calculation of lost profits and unjust enrichment for Beaufort P-465. This is the last project that we're going to talk about today that I have calculated lost profits for. What you see on your screen looks very similar to the two prior lost profits calculations that we talked about.
For this particular calculation, again, I relied on an

internal JBT cost workbook for P and L that JBT had prepared in conjunction with the bid that it provided to B GSE for PC-Air units for this particular project.

Again, when I talked to JBT's global pricing manager I asked a few different things. One, again, I wanted to know how closely do estimates track actuals and he said very closely, because they have been manufacturing and selling these units for some time, so they could reasonably estimate their cost. They are not wild guesses.

He also informed me that he didn't believe that they had any manufacturing capacity or constraints to be able to manufacture these units and sell them because, again, they would not be submitting quotes that they knowingly couldn't deliver the products for.

Q. The Beaufort P-465 is a facility for F-35 aircraft in Beaufort, South Carolina. What was B GSE's role in this project?

A. For this particular project they were to my understanding bidding PC-Air and GPUs among perhaps other things. I am not sure if pits were included.

Q. Did they contract for both?

A. I believe that they did and I believe that they purchased GPU units from JBT.

Q. So a blanket order?

A. I can't recall if the units -- the GPU units that they

purchased for this project were from a blanket order or not, I can't recall.

Q. Do you remember the exhibit that I had today going over the destinations with Beaufort and Kadena on it?

A. Yes.

Q. Do you remember that?

A. Yes.

Q. Anyway, who did they get the PC-Air from on this project?

A. Twist.

Q. Let's talk about the basis for the lost profit calculation here.

A. Sure. Similar to the other two projects that we talked about, the submittal for this particular project that JBT and/or Twist put together included what we have heard in this trial to be trade secret information and other confidential information of JBT. JBT is arguing that it was that information that allowed B GSE to meet the specs and prepare the submittal in order to get approval at that time to be able to manufacture and deliver a product, because my recollection of the testimony is that you have to get approval from the government before you could actually manufacture and sell the product.

So even if you could theoretically manufacture a product a year later, it is not as important as to whether

or not you could meet the specs a year before to get the approval to do so. I think that in this case is an important distinction.

Like I had mentioned, JBT had submitted a quote for PC-Air on this project to B GSE. I recall the testimony that it was not until B GSE was seeking a quote from Twist that it ultimately canceled the purchase order that it issued to JBT, which I understand is a binding contract to go ahead and purchase those units until after it got the PO from Twist. So but for the wrongdoing of the defendants, the evidence suggests that B GSE would have had to purchase these units from JBT.

Q. And the total is 43,181, which is the revenues of 321,857, subtracting the costs of 278,675 and 43,181.

Is that right?

A. Yes. As you see on kind of the bottom right of the schedule, I aggregate lost revenues which, again, you can ascertain by adding up the individual lost revenue line items, those three individual line items above, and then adding together all of the costs, the manufacturing costs and the engineering costs and things of the like, and you end up with lost profits of $43,181.

Q. You said this, but how do you know that the sales would have been made by JBT and not some other supplier for this project?

A. Well, similar to the other projects, I can't recall seeing a quotation that was provided by another supplier of PC-Air products at the time to B GSE, or correspondence from B GSE with another supplier asking for a quote for what would eventually be compliant PC-Air products.
Q. How did you figure out JBT's capacity and ability?
A. Again, I talked to JBT's global pricing manager as I did with each of the two prior lost profits calculations, and asked them whether or not JBT would have had the manufacturing capacity to manufacture and sell these four units that are associated with this project. He informed me that they could because, again, he said that they wouldn't be actively quoting projects that they knowingly couldn't deliver.
Q. Let's go to your unjust enrichment opinions on the project.
MR. ARGER: Cheryl, if you could pull up page 62 of 1232, please.
Again, we will publish but won't admit.
THE WITNESS: Sure. So this is a summary of my unjust enrichment calculation for PC-Air for the Beaufort 465 project. We could walk through the document I relied on and how I got to the figures if you would like.
BY MR. ARGER
Q. Sure, if you just want to do it real quick. I will

pull up the P and L and do you want that first or --

A. In terms of the source that I relied on for this particular calculation it was the most recent profit and loss statement that B GSE produced that I'm aware of similar to the B GSE P and Ls that we previously talked about, but it was specific to this project.

MR. ARGER: Cheryl, if you would call up 327-D.

I believe this is admitted as one of those attachments to 327.

BY MR. ARGER

Q. Mr. Duski, is this the most up to date P and L that you saw that was produced in this case?

A. That I'm aware of for this particular project, yes.

Q. Talk about your methodology in using this in coming up with your unjust enrichment opinion for this project.

A. Yes. Zoom in on the section that says PC-Air and has kind of the blue header bar. Again, those are the line items that I focused on, because I wanted to focus on items that directly related to PC-Air. As you can see on this invoice, there are a lot of other items and components that relate to power. Again, as I mentioned earlier, I understand that B GSE purchased power from JBT so I excluded that. I excluded items related to pits and other things that didn't appear to relate directly to PC-Air for this project.

Q. There is more to it, I think.
MR. ARGER: If we go down, Cheryl, a little bit, it shows the total profit.
BY MR. ARGER
Q. At least according to this final P and L that was produced it shows gross profit of 235,000. Obviously you came up with 27,000, so you're just relating it to the project that JBT could have gotten that they didn't get?
A. No. I wouldn't necessarily agree with that, because the unjust enrichment --
Q. I gave it a shot.
A. The unjust enrichment calculation, as I said before, does not try to capture the revenues that JBT lost, but rather the gains that B GSE received. Those are two different things. Just so the record is clear, these are the amounts -- or the profits I believe B GSE was enriched on this project related to PC-Air.
Q. Right. You said that better than I did, by the way.
MR. ARGER: Let's put page 62 of Exhibit 1242 back up, please, Cheryl.
BY MR. ARGER
Q. There you have the total costs and total sales that you gathered from that P and L, right?
A. That is correct. The mechanics of this calculation are identical to the unjust enrichment calculations that we have

talked about previously.

Q. All right. I don't know if we need to go back to the demonstrative. Let's save that for the next one.

Are you ready to move on to the next B GSE project?

A. Yes. That is fair.

MR. ARGER: Let's go to page 65 of Exhibit 1242, please, Cheryl.

BY MR. ARGER

Q. Let's talk about the Beaufort P-464 project.

MR. ARGER: Again, we'll publish but won't admit page 65.

BY MR. ARGER

Q. What are we looking at here, Mr. Duski?

A. So this is a summary of my unjust enrichment calculation for PC-Air and GPUs. This time for the Beaufort P-464 project. This is the first project that we're talking about in which I calculated unjust enrichment related to GPUs, because my understanding is B GSE won the contract in this case for both PC-Air and GPUs, but in this case they didn't purchase the GPUs from JBT. I think they purchased them from Piller, from my recollection of the testimony.

Q. Beaufort is obviously another project that --

A. Yes. My understanding is that this was for a second or different hangar at a base in Beaufort, South Carolina, an F-35 hangar.

Q. So you said B GSE won the contract for both and you think the GPUs was Piller.

Who did they purchase the PC-Air from?

A. I think in this instance it was from Northern Air not Twist, but I could be getting my facts mixed up. I think it was Northern Air.

MR. ARGER: If we could pull up Exhibit 407, please.

BY MR. ARGER

Q. Did you rely on this document?

A. Yes, I did. This is kind of that internal --

MR. ARGER: I believe this has been admitted, right?

BY MR. ARGER

Q. Go ahead.

A. Sure. This is B GSE's profit and loss statement related to the Beaufort P-464 project, although it does not appear on the face of this document that it says 464. It does say Beaufort 3, and my recollection from the actual digital file name is that it referenced 464, or if there was an email attaching this document, it identified it as 464, not 465, which we have already talked about.

Q. Do you remember Mr. Bullerdick mentioning that same thing when we talked about this exhibit?

A. That is my recollection. I just wanted to point that

out.

Q. Cutting to the chase, you used the same methodology that you used on the prior projects that we went through?

A. Yes. I think this one is an example of one where initially I relied on a P and L produced by B GSE, and then subsequently they produced a more updated and a more recent version of the P and L that I ascertained from the files metadata. So I replaced what I had previously relied on with a newer updated version of the P and L from B GSE, because that was my goal this entire time I was preparing the analysis, was I wanted to rely on the most updated P and L that B GSE had prepared and relied on.

MR. ARGER: Cheryl, let's go back to page 65 of Exhibit 1242, please.

BY MR. ARGER

Q. Again, does this summarize your unjust enrichment opinion regarding this project?

A. Sure. So the air supply heading is just the same heading that I used from the P and L that we had just looked at but that relates to PC-Air, so you're going to see a lot of the same line items from the previous projects that we talked about.

You'll also see here for the first time a calculation related to power systems or GPUs. So these are line items from that P and L which appear to relate directly to ground

power units and services. I included those specific line items, the quantities, the costs, and the selling prices, as well as the services for air shipping, air startup. I don't recall that P and L showing information for power, so that is not included.

MR. ARGER: If we can go back to Exhibit 515, please.

BY MR. ARGER

Q. Again, lost profits. I guess they don't relate to P-464, but we went through the three projects and you got lost profits and they appear on this exhibit, correct?

A. That is correct.

Q. Go to 516.

Again, you have done the Lemoores, we have done Kadena and we have done the two Beauforts, the unjust enrichment damages, and just so we see -- Beaufort is the first one where you have got PC-Air unjust enrichment and GPU unjust enrichment and the total over on the right of 442,550, correct?

A. That is correct, yes.

Q. All right. Home stretch. We have three Eielson projects. Let's run through them.

Let's go to Eielson 376 first.

MR. ARGER: Pull up page 66 out of Exhibit 1242, please, Cheryl.

BY MR. ARGER
Q. What are we looking at here?
MR. ARGER: This is published and not admitted.
THE WITNESS: So this is my calculation of B GSE's unjust enrichment related to the first of three Eielson projects that we're going to talk about this afternoon. This is Eielson 376 which, my understanding is, for a hangar project at an air base in Fairbanks, Alaska for F-35s.
BY MR. ARGER
Q. B GSE's role was what?
A. They were bidding on PC-Air and power.
Q. Did they win the contract for both?
A. Yes, they did.
Q. Can you explain your damages calculation here?
A. Sure. So it is very similar to the ones that we talked about before. Again, I am focusing this analysis on both PC-Air and also GPU equipment and services. I relied on the most -- in part I should say, on the most up-to-date profit and loss statements made available to me by B GSE.
This is another example where I initially relied on one version of a profit and loss statement B GSE made available, and then subsequently they produced an updated version, which I could tell was updated based on the metadata from the file. Again, my goal was to use the most current profit and loss statement that was made available for a particular

project. I relied on the B GSE P and L for the PC-Air units and costs.

However, the profit and loss statement that I reviewed did not have any information related to GPUs. What I wanted to do was find other evidence that would allow me to reliably calculate the profits that B GSE earned on GPUs. To do so I relied on invoices that B GSE submitted to the contractor, in other words the revenue that it had earned on these units, and then the purchase orders it submitted to I think Piller to acquire these units. Again, that would be their costs. If you were to do the subtractions, that would result in the profits related to GPUs.

Q. I think we have got some exhibits for you to look at and you tell me if these are the exhibits that you were just referring to.

MR. ARGER: First one, Cheryl, pull up Exhibit 408.

BY MR. ARGER

Q. Is this a profit and loss statement?

MR. ARGER: I think it has been admitted.

BY MR. ARGER

Q. Is this the most up-to-date profit and loss statement you just referred to?

A. That I'm aware of, yes, for this particular project. I note, like I mentioned earlier, that there was nothing on

this profit and loss statement that seemed to relate to GPUs, which led me to look for other evidence that I could ascertain revenue and cost information from.

Q. You didn't take it at face value. You tried to gather GPUs through other evidence that has been produced in the case?

A. That is correct.

MR. ARGER: Pull up Exhibit 397, please, Cheryl.

BY MR. ARGER

Q. It is a purchase order. 397.

MR. ARGER: I believe it has been admitted.

BY MR. ARGER

Q. How did this factor into your opinion?

A. So this is a purchase order that B GSE submitted to Piller Power Systems. You can see that up in the upper left-hand corner. Piller Power Systems is listed as the supplier. You'll see the job is Eielson 376.

What I saw here is that they were issuing a purchase order for four units at a price of $25,000 each. So what I took that to mean is that $25,000 represents B GSE's costs, because that is the acquisition cost to get the units from them. So that is what I relied on for the cost information for the GPUs.

MR. ARGER: If you could pull up Exhibit 395, please, Cheryl.

I believe this has also been admitted.

BY MR. ARGER

Q. What do we have here?

A. This is an invoice that Piller Power Systems submitted to B GSE. Again, four units at a cost of $25,000. So not only did B GSE submit a purchase order, Piller actually submitted them an invoice for these orders, which suggests to me that if they submitted an invoice, that means these units were shipped.

MR. ARGER: Exhibit 424, please, Cheryl.

BY MR. ARGER

Q. Another invoice?

A. Yes.

Q. How does this factor into your opinion?

A. So this is an invoice, but it is a B GSE invoice to the contractor. So this represents the amounts that B GSE earned related to the GPUs. You can see they are billing them for a quantity of four and they purchased four and they are charging the contractor a price of $28,000.

They have also billed them for four stands at $500 each. I think there is shipping of 16,500. This is an invoice that presumably B GSE generated to the contractor, and from an accounting perspective you recognize the revenue, generally speaking, when the revenue is earned, and oftentimes that is when the units are shipped and the

invoice is generated.

MR. ARGER: Can you pull up Exhibit 401, please, Cheryl.

I believe this is admitted.

BY MR. ARGER

Q. This is a purchase order. How did that factor into your opinion?

A. We just looked at the $500 price tag that B GSE charged for stands, and this is a purchase order of four stands, so this would represent B GSE's costs for those stands of $310 each.

Q. You used the same methodology on this project as you did for the other ones we went through?

A. Yes.

Q. The prior P and L was subsequently updated with more current information as you found it in the record that has been produced, correct?

A. Yes. It was a more recent P and L for the files metadata, so it led me to believe that that was more accurate and reliable information than the version that it replaced.

MR. ARGER: Cheryl, can we pull up Exhibit 1242, page 66 one more time?

BY MR. ARGER

Q. I will ask you, Mr. Duski, to summarize your opinions

for the P-376 project.
A. Absolutely. So based on the documents that we just discussed that I relied on for revenues and costs related to GPU units and services and PC-Air, B GSE earned revenue of $658,500 and incurred costs of $435,540, resulting in profits of $222,960.
There is one other thing that I wanted to point out here. The documents I reviewed for GPUs didn't have any cost data for power shipping, power startup, commissioning and training, so I had to estimate what those costs would be. I estimated that they would have earned the same margin that it did for PC-Air shipping, startup and commissioning which was zero. So I have assumed a zero margin on those services as well.
Q. I think you have indicated -- you're testing my vision here -- source in footnote B under the sources, is that what you're talking about right there?
A. That is correct.
So if you see the power shipping, power startup, commissioning and training, you will see 16,500 for both costs and revenue, and 6,500 for both cost and revenue resulting in no margin on those particular line items.
MR. ARGER: Move to P-379 on Eielson and pull up page 69 of Exhibit 1242, please.
BY MR. ARGER

Q. Mr. Duski, what are we looking at here on page 69?

MR. ARGER: We'll publish but won't admit.

THE WITNESS: Sure. This is a summary of my unjust enrichment calculation related to another Eielson hangar in Fairbanks, Alaska, specifically Eielson 379.

Now, on the face of this schedule it is going to look very similar to the one we just talked about. We have revenue and costs for PC-Air and for GPUs and for the services in shipping. This one was a little unique in the sense that I was not aware of a profit and loss statement provided by B GSE for this particular project. I couldn't find one in the production.

So for like the GPUs we talked about in the prior project, I started to look for invoices, quotations, purchase orders that may shed some light on what revenues B GSE earned and what costs they incurred related to each of these line items. We could walk through them in more detail, but generally speaking I relied on quotations, purchase orders and invoices that were made available to help me kind of aggregate all of this information together and determine what I believe the profits to be with this project.

MR. ARGER: Let's pull up a couple of exhibits that have been admitted and ask you how they factor into this particular project. Pull up Exhibit 391-C.

THE WITNESS: This may be the document that I relied on in part. If you scroll a couple of pages, I think that there was a quotation included as part of this document.

We're there, if you went to hold it on this page.

BY MR. ARGER

Q. Page 60, Bates number 60. All right.

How does this factor into your opinion on this project?

A. Well, this is a quote that B GSE prepared in relation to this particular project. What I was trying to use this for is to determine the selling price that B GSE was going to be charging its customer for PC-Air and GPU related equipment. Here you can see, for example, that they were going to supply four units I think at a price of $119,900. They have stands for $2,500 each and they have shipments in the amount of 12,250 and startup and training for I think 8,900.

So I used this particular document and this quotation to estimate what I believe to be the revenues that B GSE earned related to PC-Air for this project.

If you scroll down actually another page, perhaps go one more, okay, you'll see this red box that is highlighted. You'll notice that there is a total project discount that B GSE was willing to give. So this is very similar to that Kadena project that I talked about earlier. This project

discount is a function of the total quotation amount, something like 13 percent, so they are going to give a 13 percent discount. I discounted each of the selling prices for B GSE's revenues for the line items that I included by that approximate 13 percent, because I thought it more accurately represents B GSE's revenues for these units.

Q. Anything else on this exhibit that you want to look at?

A. Not that I can think of, no.

MR. ARGER: Cheryl, pull up Exhibit 403, please.

BY MR. ARGER

Q. Did you utilize this exhibit?

A. Yes. This is a purchase order that B GSE issued to Northern Air, who is the supplier of PC-Air on this particular project. Again, this would represent B GSE's costs for PC-Air equipment and services. So you'll see that they had issued a PO for four units at $69,900, stands for $2,500, perhaps some packaging, but I don't recall including that.

So I relied on this document for the cost of PC-Air equipment that B GSE was going to incur on this project.

Q. And what about the cost information on this project? Is that part of it?

A. Well, this is just a purchase order, right? So this is the amount that -- if you scroll up one second -- so this is

a purchase order, so this is what B GSE was going to be paying in this case Northern Air for the PC-Air units. So B GSE's costs were going to be $69,900 per unit that it was going to apply from Northern Air.

Q. Fair enough. I'm ahead in my notes.

MR. ARGER: Can you pull up Exhibit 427-B, please.

BY MR. ARGER

Q. How did this invoice factor into your opinion, if it did factor into your opinion?

A. It did. So this is an invoice that B GSE submitted related to GPUs for this particular Eielson 379 project. We know that because under the bill to column it references Eielson 379. So this is the amount that B GSE was going to receive in revenue from the contractor.

You can see there is a quantity of four at a price of $28,000 each. There are stands at $500 each. There is cables and shipping materials, startup training and commissioning like we have seen before, so I relied on this document for those amounts.

Q. Any other assumptions that you made with your opinions on this project given the fact that P and Ls were not provided for this project?

A. Right. So if we could go back to my summary calculation for this project, that may be helpful.

Q. Page 69.

A. So the one thing that was lacking or that I couldn't find that related to this project are some of the costs that B GSE incurred related to some of the GPU units and services. Again, I had to make some estimates because I felt it appropriate to include at least some estimates of what their costs are.

For this particular project for GPUs, I relied on the costs that B GSE paid for these GPU units and services for other Eielson projects, which I had that information. You see all of those footnotes or those little superscript letters in this analysis. That explains to you each of the assumptions that I made and where I pulled those figures from absent better information. Noticeably for services and shipping for both PC-Air and power, no profit was assumed to have been made on those services.

So, again, the footnotes kind of explain what I'm trying to articulate to you and the assumptions that I made regarding costs. Despite not being JBT's burden, I made my best attempt to estimate what those costs would have been.

Q. You basically used the cost information from 276 and 393 because it was a similar type of situation?

A. I thought it was a reasonable assumption to make.

Q. Can you give that opinion to a reasonable degree of certainty in this case?

A. Absent better information, yes, I think that is a fair

statement.

Q. All right. If we could go just real quickly -- that was 158 and 56, unjust enrichment and damages on that particular project, is that right, on P-379?

A. Yes. So for Eielson -- it is actually EIE-379. I don't know why Lemoore is P and Eielson is EIE, but for the Eielson EIE-379 project, based on the information that I reviewed I determined the total revenue B GSE earned related to PC-Air and GPUs to be $603,377, with incurred costs of $445,321, resulting in profits of $158,056.

Q. Very good. Last one. Eielson 393.

MR. ARGER: If you could pull up page 70 out of Exhibit 1242, please, Cheryl.

You can take that other exhibit down. Thank you.

Again, we'll publish and not admit.

BY MR. ARGER

Q. Page 70. What are we looking at here, Mr. Duski?

A. This is the summary calculation I prepared for a third Eielson project for a F-35 hangar at Fairbanks, Alaska. This one is entitled Eielson EIE-393. This calculation only relates to ground power units not PC-Air units, because I understand that B GSE was not awarded the contract for PC-Air for this particular project.

Q. We have got 475,200 in revenue and 379,360 in costs. You used the same methodology that you used on the other

projects?
A. That is correct. That results in profits of $95,840.
Just as additional background, I relied on what I understood to be the most up-to-date B GSE profit and loss statement related to this project. So that is where these numbers, both revenues and costs, are taken from.
MR. ARGER: Cheryl, can you pull up Exhibit 404-B, page 9, please.
I believe this was previously admitted.
BY MR. ARGER
Q. Is this the most up-to-date profit and loss that you just referenced?
A. Yes, that I'm aware of for the Eielson 393 project. You can see that in the header in the upper left-hand side. Again, these amounts shown for costs and quantity and selling price, all of those values I have included on the schedule that we just looked at.
Q. Again, the same methodology you used on all of the other projects using the most up-to-date information that has been provided?
A. That I'm aware of, yes.
MR. ARGER: If we could go back to Exhibit 515, please.
BY MR. ARGER
Q. Okay. We are done with all of the projects. I will

ask you two questions.

Can you recap your lost profit opinions based on this exhibit?

A. Sure. I have calculated the total lost profits damages that I believe JBT suffered as a result of the defendants' wrongdoing for the Lemoore P-328 project, the Kadena P-803 project and the Beaufort P-465 project, and the total lost profits for all three projects combined total $201,777.

MR. ARGER: Go to Exhibit 516, please, Cheryl.

BY MR. ARGER

Q. Recap your unjust enrichment opinions in this case.

A. Sure. So this demonstrative that we're looking at we saw at the very beginning of my testimony and it summarizes the unjust enrichment, which also could be referred to as B GSE's profits that it earned on the eight projects that we're here to talk about today for unjust enrichment, for ground power units or some combination of both. If you were to add up the total unjust enrichment for each of the eight projects together on the screen, you would get a total of $1,648,153.

MR. ARGER: Thank you.

We will pass the witness, Judge.

THE COURT: Mr. Durham.

MR. DURHAM: Thank you.

CROSS-EXAMINATION

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

NORTHERN DIVISION

| | | |
|---|---|---|
| JOHN BEAN TECHNOLOGIES CORPORATION, a Delaware corporation, | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No. 1:17-CV-142RJS |
| B GSE GROUP, LLC, a North Carolina limited liability company, et al., | ) | |
| Defendants. | ) | |

BEFORE THE HONORABLE ROBERT J. SHELBY

October 5, 2022

Jury Trial

Volume VII

A P P E A R A N C E S

For Plaintiff: HARRY N. ARGER
STEVEN McMAHON ZELLER
10 South Wacker Drive
Suite 2300
Chicago, Illinois

For Defendants: EDWARD B. DAVIS
JOSHUA B. DURHAM
227 West Trade Street
Suite 1800
Charlotte, North Carolina

Court Reporter: Ed Young
351 South West Temple
Room 3.302
Salt Lake City, Utah 84101-2180
801-328-3202
ed_young@utd.uscourts.gov

I N D E X


| Witness | Examination By | Page |
|---|---|---|
| Bryan Bullerdick | Mr. Durham (Direct) | 1012 |
| Bryan Bullerdick | Mr. Zeller (Cross) | 1021 |
| Bryan Bullerdick | Mr. Durham (Redirect) | 1043 |
| Bryan Bullerdick | Mr. Zeller (Recross) | 1044 |
| Nicholas Harris | Mr. Durham (Direct) | 1045 |
| Nicholas Harris | Mr. Arger (Cross) | 1073 |
| Nicholas Harris | Mr. Durham (Redirect) | 1098 |
| Nicholas Harris | Mr. Arger (Recross) | 1099 |

| Exhibit | Received |
|---|---|
| Defendant's Exhibit 1051 | 1014 |
| Plaintiff's Exhibit 474 | 1022 |
| Plaintiff's Exhibit 473 | 1024 |
| Plaintiff's Exhibit 492 | 1026 |
| Plaintiff's Exhibit 493 | 1029 |
| Plaintiff's Exhibit 494 | 1031 |
| Plaintiff's Exhibit 496 | 1035 |
| Plaintiff's Exhibit 498 | 1038 |
| Plaintiff's Exhibit 500 | 1040 |

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

JOHN BEAN TECHNOLOGIES CORPORATION, a Delaware corporation,

Plaintiff,

vs.

B GSE GROUP, LLC, a North Carolina limited liability company, et al.,

Defendant.

Case No: 1:17-cv-142RJS

BEFORE THE HONORABLE ROBERT J. SHELBY

OCTOBER 6, 2022

JURY TRIAL

VOLUME VIII

VERDICT

PAGES 1109-1144

Reported by:
KELLY BROWN HICKEN, RPR, RMR
801-521-7238

APPEARANCES OF COUNSEL

FOR THE PLAINTIFF:
HARRY N. ARGER
STEVEN McMAHON ZELLER
Attorneys at Law
10 SOUTH WACKER DRIVE
SUITE 2300
CHICAGO, ILLINOIS

FOR THE DEFENDANTS:
EDWARD B. DAVIS
JOSHUA B. DURHAM
Attorneys at Law
227 WEST TRADE STREET
SUITE 1800
CHARLOTTE, NORTH CAROLINA

In a moment we'll read the instruction together. I'll go over the verdict form. We'll hear from the lawyers, and we'll get you back to deliberating on the final question.

Before we do that, it's important that everything that happened outside of the presence -- in the courtroom be part of the record. So I want to state what just happened and make sure that we get it right, and then ask some followup questions, I think I'll direct them to the foreperson. And then I'm going to ask each of you if what he has said accurately reflects your deliberations, your intent and your concern.

So as I was making my way out of the court into the elevator to go to my chambers, I think it was Juror Number 1 who was in the doorway, there were at least two other jurors that I could see, Juror Number 3 and somebody else, expressing concern that there had been some confusion about the verdict that had just returned. And it was a very short discussion.

But what I took from that discussion was where the number, what I inferred from what I heard is where the number $323,256 appears anywhere in this verdict form, it was your intention that that number be awarded one time, not each time it was in the verdict form.

And I asked the group that was in the doorway, did every other answer in the verdict accurately and correctly reflect your verdict, your unanimous verdict, and was there

any confusion? And your answer was, it was accurate in every other way. That's what you understood.

Mr. Foreperson, have I correctly stated what the discussion was, and have I stated correctly the jury's views?

JUROR NUMBER 4: Yes, you have.

THE COURT: Is there anyone on the jury who disagrees with the way I just characterized that? Have I misstated anything? It's the intention -- I'm going to ask you in a minute to raise your hand, actually. I'm going to ask you, is it your intention individually that everywhere in the verdict form with a number $323,256 appears it was your personal and collective intention that that number be awarded once? Is that true by show of hands?

(All raised hands.)

THE COURT: And is it true that on the tortious interference with prospective economic advantage you've given different numbers for the different projects. Is it your intention that those numbers be awarded for each of those projects? By show of hands, yes?

(All raised hands.)

THE COURT: Yes. Everyone. That's unanimous on all counts.

And just to make sure that we're accurate and correct on this important point, Question 19 asks you about whether with respect to the claim for tortious interference

chance to review it and tell me if you have any heartburn.

And, Mr. Arger, I wasn't trying to call you out on the whole thing about speeding up. I can see on their faces they're tired. It's been a long --

MR. ARGER: I was just about done, anyway. And I want to express my apologies again. You know, this obviously came on us quickly, and we were doing the best we could and researched it. And I apologize for that comment. I withdraw it.

THE COURT: I don't think you were deliberately trying to skirt the Court.

MR. ARGER: No, I was not.

THE COURT: Mr. Davis?

MR. DAVIS: Yeah, Your Honor, I just, and there may be nothing we can do about it and maybe just kind of poll the jury like you did before. But I just wonder if we're going to run into a similar issue with two blanks. And I know it's against them both. But just kind of anticipating that we ran into that issue before and how we resolved that a second time.

MR. ARGER: It does say and/or.

THE COURT: Well, there is a different instruction, of course --

MR. ARGER: I'm staying out of jury instructions. I'll let Miss Fry do it.

THE COURT: There's a different instruction in the

other instructions about treating each defendant separately, but I am concerned after a day and a half of deliberations, I don't think they're going back to their original jury instructions. If you -- we can do two things. I can bring them all back in and I can say, just a reminder that B GSE and Bryan Bullerdick are separate parties, and this is asking you to assess whether you wish to award punitive damages to either one and in what amount, and those will be separate amounts. And then I can send them back out. Or I can just go say that to them right now. I wouldn't ordinarily, but I'm just trying to respect our jury's time. Whatever you want.

MR. ARGER: I don't care.

MR. DAVIS: And stated another way, are we clarifying to them that those two blanks are going to be added to a total?

THE COURT: I'll say that.

MR. DAVIS: So they understand that.

THE COURT: That's what I'll say. If there's any numbers on them.

MR. DAVIS: If there's any numbers on there.

MR. ARGER: I'm fine. Don't call them back in.

THE COURT: It will be a short discussion. I sense they're not going to be long. But I don't know. I'm going to ask you, are there rooms here where you can be comfortable? You know there's an attorney lounge.