## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JOHN BEAN TECHNOLOGIES CORPORATION, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>B GSE GROUP, LLC, a North Carolina limited liability company, and BRYAN BULLERDICK, an individual,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 1:17-cv-00142-RJS<br><br>Chief Judge Robert J. Shelby |

After a six-day trial, a jury returned verdicts in favor of Plaintiff John Bean Technologies Corporation (JBT), assessing total damages of $1,125,033 against Defendants B GSE Group, LLC (BGSE) and Bryan Bullerdick.[1]  Now before the court are several post-trial motions JBT filed seeking, among other things, enhanced or exemplary damages,[2] pre- and post-judgment interest,[3] attorneys' fees and nontaxable expenses,[4] and leave to register the court's Judgment in other districts.[5]  For the reasons discussed below, JBT's Motion for Enhanced Damages is DENIED, JBT's Motion for Pre- and Post-Judgment Interest is GRANTED IN PART and DENIED IN PART, JBT's Motion for Attorneys' Fees and Expenses is GRANTED IN PART and DENIED IN PART, and JBT's Motion for Leave to Register the Judgment in Other Districts is GRANTED.

---

[1] Dkt. 262; Dkt. 263.

[2] Dkt. 285, *JBT's Motion for Enhanced Damages*.

[3] Dkt. 286, *JBT's Motion for Pre- and Post-Judgment Interest*.

[4] Dkt. 278, *JBT's Motion for Award of Attorneys' Fees and Nontaxable Expenses*.

[5] Dkt. 295, *Motion for Leave to Register Judgment in Other Districts*.

## BACKGROUND AND PROCEDURAL HISTORY[6]

This action arises out of a collapsed business relationship between JBT and Defendants, who once worked together to provide ground support equipment for F-35 military aircraft.[7]  JBT claimed Defendants used its proprietary materials and trade secrets to bolster their own competitive position and deprive JBT of certain contractual opportunities, including F-35 subcontracts at Naval Air Station Lemoore (Lemoore P-328), Marine Corps Air Station Beaufort (Beaufort P-465), and Kadena Air Base (Kadena P-803).[8]  Defendants counterclaimed, asserting, among other things, that JBT's post-suit conduct constituted an unfair and deceptive trade practice under North Carolina law.[9]  After several years of pre-trial litigation, a jury trial was held to resolve questions that were left unresolved by the court's Summary Judgment Order.[10]

After two days of deliberation,[11] the jury returned unanimous verdicts in favor of JBT on all of its claims, assessing total damages of $1,125,033 against Defendants.[12]  Specifically, the jury denoted the following awards on the Amended Verdict Form submitted by the parties:

1. $323,256 on JBT's misappropriation of trade secrets claims (Claims 1 & 2);
2. $323,256 on JBT's claim for unfair competition and false designation of origin under the Lanham Act (Claim 3);
3. $323,256 on JBT's claim for breach of the parties' 2011 Confidentiality Agreement (Claim 5);

---

[6] The court assumes the parties' familiarity with the facts and procedural history of this long-running dispute, which has been detailed at length in previous court orders.  *See, e.g.*, Dkt. 184, *Memorandum Decision and Order* (*Summary Judgment Order*) at 3–16 (published as *John Bean Techs. Corp. v. B GSE Grp., LLC*, 480 F. Supp. 3d 1274 (D. Utah 2020)); Dkt. 339, *Memorandum Decision and Order* at 1–6.  Therefore, the court will reiterate only the facts and procedural history relevant to the instant motions.

[7] Dkt. 99, *First Amended Complaint* (*Amended Complaint*) ¶¶ 1–15; *Summary Judgment Order* at 1–3.

[8] *Summary Judgment Order* at 7–15.

[9] *See* Dkt. 49, *Defendants' Amended Answer and Counterclaims*; Dkt. 108, *Defendants' Answer to First Amended Complaint and Counterclaims*.

[10] *See* Dkt. 199, *Joint Status Report* at 2–3 (summarizing the issues remaining for trial); Dkts. 253–257, 261, *Minute Entries for Proceedings Held from September 29, 2022 to October 6, 2023*.

[11] *See* Dkt. 257; Dkt. 261.

[12] *See* Dkt. 262; Dkt. 263.

4. $323,256 on JBT's claim for breach of the parties' 2011 Non-Disclosure Agreement (Claim 6);
5. $323,256 on JBT's claim for breach of the parties' 2012 Distributorship Agreement (Claim 7);
6. $96,664 on JBT's claim for tortious interference with the Lemoore P-328 project (Claim 8);
7. $43,181 on JBT's claim for tortious interference with the Beaufort P-465 project (Claim 8); and
8. $61,932 on JBT's claim for tortious interference with the Kadena P-803 project (Claim 8).[13]

After the verdict was read, the jury sought to clarify its intention behind the repeated entries for $323,256 for Claims 1–3 and 5–7.  In open court, it confirmed that it found Defendants liable on all these claims, with the total damages reflected by a *single* award of $323,256.[14]  When combined with the jury's assessment of damages on JBT's tortious interference claims, JBT was therefore left with a damages award of $525,033.[15]  Additionally, the jury found punitive damages were warranted on JBT's tortious interference claim, which it set at $500,000 against BGSE and $100,000 against Bullerdick.[16]  In addition to these damages, the jury found, by clear and convincing evidence, that Defendants' conduct was "willful and malicious" for the purpose of JBT's trade secret misappropriation claims and "willful" for the purpose of its Lanham Act claim.[17]

After the court entered its Judgment,[18] JBT moved for an award of exemplary damages on its trade secret misappropriation claims, as well as statutory enhancement of the jury's damages award on its Lanham Act claim.[19]  JBT contends these additional damages are

---

[13] Dkt. 262 at 2–7.

[14] Dkts. 326–335, *Trial Transcript* (*Trial Transcript*) at 1118:25–1123:14.

[15] Dkt. 262.

[16] Dkt. 263.

[17] Dkt. 262 at 2–3.

[18] Dkt. 273, *Judgment on the Jury Verdicts*.

[19] Dkt. 285.

warranted because "[t]his is not a case of ordinary misconduct."[20]  Rather, "[t]his is a case of extraordinary willful intent to scheme and deceive an entire market of buyers, including the U.S. government."[21]  JBT also moves for an award of pre- and post-judgment interest,[22] recovery of attorneys' fees and expenses,[23] and leave to register the Judgment in other districts.[24]  Having fully reviewed the parties' briefing and finding that oral argument would not be materially helpful,[25] the court now rules on the instant Motions.

## DISCUSSION

As noted, JBT has filed several motions seeking to expand the scope of its recovery against Defendants, ranging from enhanced damages to attorneys' fees and expenses.[26]  The court will address each request in turn, starting with JBT's request for enhanced damages.  For the reasons discussed below, the court concludes that the consolidated nature of the jury's damages award leaves it unable to properly ascertain exemplary or enhanced damages for specific claims, and thus denies JBT's Motion for Enhanced Damages.[27]  While the court grants JBT's request for post-judgment interest, it declines to award prejudgment interest given Utah courts' "reluctan[ce] to award prejudgment interest on lost profits . . . [or] unjust enrichment,"[28] both of which were considered by the jury in reaching its final damages award.[29]  Moreover, the

---

[20] *Id.* at 3.

[21] *Id.*

[22] Dkt. 286.

[23] Dkt. 278.

[24] Dkt. 295.

[25] *See* DUCivR 7-1(g).

[26] *See generally* Dkt. 278; Dkt. 285.

[27] Dkt. 285.

[28] *ClearOne Communs., Inc. v. Chiang*, 432 F. App'x 770, 774–75 (10th Cir. 2011) (applying Utah law).

[29] *See infra* Section II.

court determines that an award of attorneys' fees and expenses is warranted given the gravity of Defendants' misconduct, but it significantly reduces JBT's requested amount to account for unreasonable, unnecessary, or otherwise unsupported fees and expenses.[30]   Finally, the court grants JBT's request for leave to register the Judgment in other districts.[31]

## I.    JBT's Motion for Exemplary or Enhanced Damages[32]

The court first considers JBT's request for exemplary or enhanced damages for its trade secret misappropriation and Lanham Act claims, respectively.  In doing so, the court starts with the governing legal standards before turning to the merits of JBT's requests.

LEGAL STANDARDS

Utah's Uniform Trade Secret Act (UTSA) provides that exemplary damages may be awarded for trade secret misappropriation if "willful and malicious" misappropriation is shown.[33] In particular, it allows exemplary damages up to twice the amount of damages awarded for "actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss."[34]  Similarly, under the federal Defend Trade Secrets Act (DTSA), the court may "award exemplary damages" up to twice the amount of assessed damages "if the trade secret [was] willfully and maliciously misappropriated."[35]

In determining whether to award exemplary damages under these statutes, courts in this District consider the following factors:

---

[30] *See* Dkt. 278.

[31] *See* Dkt. 295.

[32] Dkt. 285.

[33] Utah Code Ann. § 13-24-4(2).

[34] *Id.* § 13-24-4(1).

[35] 18 U.S.C. § 1836(b)(3)(C).

(1) the deliberateness of the defendant's actions; (2) the defendant's good-faith belief that it was not misappropriating a trade secret; (3) the defendant's behavior as a party in litigation; (4) the defendant's size and financial condition; (5) the closeness of the case; (6) the duration of the defendant's misconduct; (7) the presence of any remedial action by the defendant; (8) the defendant's motivation for harm; and (9) the defendant's attempts to conceal its misconduct.[36]

In short, "an award of exemplary damages is appropriate where . . . it is supported by the verdict and accomplishes the public objective of punishing and deterring malicious conduct."[37] "[W]here the question of willful and malicious misappropriation has already been decided by the jury," some courts have cautioned that a district court's "discretion [over exemplary damages] is limited."[38] "In such circumstances, a court may refuse to enhance damages only if it can do so without second guessing the jury or contradicting its findings."[39]

In addition to the DTSA and UTSA, the Lanham Act also allows the court to enhance the jury's damages award to account for the gravity of the defendant's misconduct. It states, "the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount."[40] While the decision to enhance damages lies within the discretion of the district court, case law cautions that such

---

[36] *Bimbo Bakeries USA, Inc. v. Sycamore*, No. 2:13-cv-00749-DN-DBP, 2018 U.S. Dist. LEXIS 54556, at *9 (D. Utah Mar. 29, 2018) (citing *USA Power, LLC v. PacifiCorp*, 372 P.3d 629, 660 (Utah 2016) (adopting the factors outlined in *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827–28 (Fed. Cir. 1992))); *see also ClearOne Communs., Inc. v. Bowers*, 643 F.3d 735, 759 (10th Cir. 2011) (affirming a district court's award of exemplary damages based on an analysis of the *Read* factors).

[37] *Storagecraft Tech. Corp. v. Kirby*, No. 2:08-cv-00921-DN, 2012 U.S. Dist. LEXIS 140706, at *5 (D. Utah Sep. 27, 2012); *see also Russo v. Ballard Med. Prods.*, No. 2:05-cv-59-TC, 2007 U.S. Dist. LEXIS 16291, at *7 (D. Utah Mar. 7, 2007) (declining to award exemplary damages where the court did "not find a public objective would be served" by such an award).

[38] *Storagecraft Tech. Corp.*, 2012 U.S. Dist. LEXIS 140706 at *4–5; *see also ClearOne Communs., Inc. v. Chiang*, No. 2:07-CV-37-TC, 2009 U.S. Dist. LEXIS 35311, at *17 (D. Utah Apr. 20, 2009), *rev'd on other grounds sub nom.*, *ClearOne Communs., Inc. v. Biamp Sys.*, 653 F.3d 1163 (10th Cir. 2011) ("Special weight is placed on the jury's verdict. The jury carefully weighed the evidence, and its factual findings (which were based on clear and convincing evidence) should be respected." (collecting cases)).

[39] *Storagecraft Tech. Corp.*, 2012 U.S. Dist. LEXIS 140706, at *4–5 (quoting *BioCore, Inc. v. Khosrowshahi*, No. 98-2031-KHV, 2004 U.S. Dist. LEXIS 2167, at *13 (D. Kan. Feb. 2, 2004)).

[40] 15 U.S.C. § 1117(a).

6

enhancements "should constitute compensation and not a penalty."[41]  For example, "courts have concluded that enhancements are warranted to properly compensate a plaintiff where the measure of damages is conservative and otherwise understates the award."[42]  In reaching this determination, courts generally look to equitable considerations.[43]

<u>APPLICATION</u>

As prefaced above, JBT moves for exemplary damages pursuant to the UTSA and DTSA based on Defendants' "willful and malicious" trade secret misappropriation, as well as for enhanced damages under the Lanham Act.[44]  It argues these additional measures are warranted given "[t]he brazen nature in which Defendants handed JBT's trade secrets to its competitors, photoshopped product images, . . . doctored e-mails[,] and lied to general contractors" as part of their effort to undermine JBT's competitive position and generate business for BGSE.[45]  JBT seeks the maximum possible award under these enhancement mechanisms—that is, "an award of enhanced damages in the amount of $646,512 on its two trade secrets claims"[46] and "all of BGSE's unjust enrichment of $525,033[] and JBT's damages (lost profits) of $201,777," which it

---

[41] *Vitamins Online, Inc. v. HeartWise, Inc.*, No. 2:13-cv-00982-DAK, 2020 U.S. Dist. LEXIS 210754, at *68 (D. Utah Nov. 10, 2020), *aff'd on other grounds*, 71 F.4th 1222 (10th Cir. 2023) (quoting *Novell, Inc. v. Network Trade Ctr., Inc.*, 25 F. Supp. 2d 1233, 1244 (D. Utah 1998)).

[42] *Abbott Labs. v. H&H Wholesale Servs., Inc.*, No. 15-cv-5826 (CBA) (LB), 2022 U.S. Dist. LEXIS 232695, at *33 (E.D.N.Y. Dec. 27, 2022) (internal quotation marks and citations omitted); *see also ALPO Petfoods, Inc. v. Ralston Purina Co.*, 997 F.2d 949, 955 (D.C. Cir. 1993) ("An enhancement is appropriate to compensate a Lanham Act plaintiff only for such adverse effects as can neither be dismissed as speculative nor precisely calculated."); *Marten Transp., Ltd. v. Plattform Advert., Inc.*, No. 14-2464-JWL, 2016 U.S. Dist. LEXIS 97754, at *45 (D. Kan. July 26, 2016) (addressing the "anomalous" nature of the statute, which "provide[s] for an award over the amount found as actual damages while requiring such award to be compensatory and not punitive").

[43] *See, e.g.*, *Vitamins Online*, 2020 U.S. Dist. LEXIS 210754, at *68; *Bimbo Bakeries*, 2018 U.S. Dist. LEXIS 54556, at *7; *Atlas Biologicals Inc. v. Kutrubes*, No. 15-cv-00355-CMA-KMT, 2019 U.S. Dist. LEXIS 161501, at *38 (D. Colo. Sep. 23, 2019) (stating "the [c]ourt has discretion to treble damages, subject to equitable considerations, in order to remedy a violation of the Lanham Act").

[44] Dkt. 285 at 4.

[45] *Id.* at 3.

[46] *Id.* at 14.

7

further contends "should [] be trebled."[47]  If granted, these enhancements would nearly quadruple the jury's non-punitive damages award.[48]

In arguing for enhancement, JBT points out that the trial record is replete with examples of deceit and betrayal by Defendants, ranging from their divulgement of JBT's trade secrets to the co-opted photos and materials used as part of BGSE's submittals.[49]  And it stresses that the jury found, by clear and convincing evidence, that Defendants' conduct was indeed "willful and malicious."[50]  Under these circumstances, JBT contends "all nine *Read* factors" favor an award of exemplary damages and that further enhancement under the Lanham Act is needed to "ensure [] Defendants are completely deprived of their profits from willful and malicious conduct."[51]

### A. *An Award of Exemplary or Enhanced Damages Is Precluded by the Jury's Consolidated Damages Award*

But this is not a typical case.  Notwithstanding the purported merits of JBT's position, the court lacks a critical piece of information needed to properly assess exemplary or enhanced damages under the statutes: the specific damages attributed to these claims.  As discussed, exemplary damages under the DTSA and UTSA, as well as enhanced damages under the Lanham Act, are tied to the damages amounts assessed for trade secret misappropriation and Lanham Act violations, respectively.[52]  In the context of JBT's trade secret misappropriation claims, for example, exemplary damages cannot exceed twice the amount of damages awarded

---

[47] *Id.* at 16.

[48] *Compare* Dkt. 262 (assessing non-punitive damages of $525,033 for all of JBT's claims), *with* Dkt. 285 (requesting enhanced or exemplary damages of $1,978,653).

[49] *See* Dkt. 285 at 6, 12–14.

[50] Dkt. 285 at 4 (citing Dkt. 262 at 2); *see also* Dkt. 262 at 3 (finding, by clear and convincing evidence, that BGSE's actions "[w]ith respect to JBT's claim for false designation of origin . . . were willful").

[51] Dkt. 285 at 3–4.

[52] 18 U.S.C. § 1836(b)(3)(C); Utah Code Ann. § 13-24-4(2); 15 U.S.C. § 1117(a).

for "actual loss caused by misappropriation and the unjust enrichment caused by misappropriation."[53]  Similarly, enhanced damages under the Lanham Act are tied to damages resulting from Lanham Act violations, though there appears to be more leeway for assessing lost profits.[54]  But here, the court has a single damages award—$323,256—encompassing damages from six different claims,[55] only three of which are eligible for statutory enhancement.  In the face of such an opaque award, the court cannot ascertain "loss[es] caused by misappropriation" or losses attributed to Defendants' Lanham Act violations without resorting to speculation.

Nevertheless, the parties offer competing theories for how the court should ascertain the relevant damages amounts.  JBT posits that the court can award exemplary damages of $646,512—reflecting an enhancement of two times the "$323,256 [awarded] to JBT for Defendants' misappropriation of trade secrets."[56]  For its Lanham Act claim, JBT argues the court should enhance the jury's damages award to at least $525,033, which is "the minimum amount of lost profits presented to the jury[] by Defendants' own expert."[57]  For their part, Defendants counter that "for all of the claims for which liability was established at [s]ummary [j]udgment, and for all of the additional conduct JBT presented at trial[,] . . . the jury awarded JBT only $323,256."[58]  As such, Defendants state the court should, at most, apportion that amount equally among the six claims, leading to an amount of $53,876 per claim.[59]  Under

---

[53] Utah Code Ann. § 13-24-4(1)–(2); *see also* 18 U.S.C. § 1836(b)(3)(B)(i) (reflecting an analogous limit for exemplary damages).

[54] 15 U.S.C. § 1117(a).

[55] *See* Dkt. 262 (reflecting the same damages amount for claims 1–3 and 5–7); *Trial Transcript* at 1122:6–14 (clarifying that "everywhere in the verdict form . . . $323,256 appears . . . that that number be awarded once," rather than for each claim).

[56] Dkt. 285 at 14.

[57] *Id.* at 15.

[58] Dkt. 300, *Defendants' Response to JBT's Motion for Enhanced Damages* at 3.

[59] *See id.* at 13 n.77.

Defendants' theory, the greatest enhancement for each of JBT's trade secret misappropriation claims would be $107,752.  Defendants further assert that enhanced damages under the Lanham Act are not suitable, as the consolidated damages award adequately compensates JBT for relevant losses.[60]

The parties' competing approaches suffer from the same fatal defect—they both assume the court has an overriding power to speculate specific damage amounts from an otherwise indivisible award.  However, "it is not within the province of this [c]ourt to speculate as to how the jury arrived at the amount of damages."[61]  Nor can the court simply carve up a consolidated award among several causes of action to determine "actual damages" for the purpose of anchoring exemplary or enhanced damages.[62]  As a sister court observed, "[e]nhancement by speculation can never be permitted."[63]  This sort of guesswork also raises the risk of additur—a court-imposed increase of a jury's award of damages[64]—which is deemed "an unconstitutional

---

[60] *See id.* at 13–20.

[61] *Saint-Jean v. Emigrant Mortg. Co.*, 337 F. Supp. 3d 186, 208 (E.D.N.Y. 2018) (declining to "bifurcate economic from emotional damages" assessed as part of a consolidated award); *see also Garcia v. Tyson Foods, Inc.*, 770 F.3d 1300, 1308 (10th Cir. 2014) ("[S]peculation about how the jury calculated damages . . . is improper as long as the award is within the range of evidence."); *N. Am. Specialty Ins. Co. v. Britt Paulk Ins. Agency, Inc.*, 579 F.3d 1106, 1113 (10th Cir. 2009) (explaining that courts are "generally unwilling to disturb or second guess the jury's verdict" so long as the "jury [was] instructed not to award duplicative damages and it return[ed] a total damage figure within the range of evidence").  As discussed in this court's concurrent Order denying Defendants' Renewed Motion for Judgment as a Matter of Law, the jury was appropriately instructed to avoid duplicative damages and the total damage figure fell well within the range of evidence presented at trial.  *See* Dkt. 339 at 11–13, 18–19.

[62] *See Rotating Prods. Sys. v. Bock Specialties, Inc.*, No. 95-WM-1707, 97-WM-278, 2001 U.S. Dist. LEXIS 25147, at *27–31 (D. Colo. Mar. 19, 2001), *aff'd*, 42 F. App'x 460 (Fed. Cir. 2002) (declining to enhance a consolidated $640,000 jury award for seven claims, four of which "provide[d] no basis for enhancing damages"); *see also Harvey v. Gen. Motors Corp.*, 873 F.2d 1343, 1349 (10th Cir. 1989) (holding that enhancement requires a showing that the "injuries are capable of logical, reasonable or practical division," while applying Wyoming law).

[63] *Rotating Prods.*, 2001 U.S. Dist. LEXIS 25147, at *31.

[64] Black's Law Dictionary (11th ed. 2019) (defining additur as "the increase of a jury's award of damages").

reexamination of the jury verdict in violation of the Seventh Amendment."[65]  Where, as here, "a jury verdict is ambiguous," Tenth Circuit case law cautions against district courts' speculation of damages because "it is [] possible that the jury found a lower total damages figure," and therefore, "a judgment for [a] higher amount risks additur."[66]

"Indeed, it is conceivable that the jury may have allocated little or no damages to those causes of action which allow enhancement or exemplary damages."[67]  Here, the court cannot say with certainty that even one dollar was directly attributed to JBT's trade secret misappropriation claims given the jury's clarification that the "number . . . awarded was the *total* number" awarded for the several claims, "not the number [awarded] on each one."[68]  Therefore, an enhancement of two dollars risks exceeding the statutory maximum for exemplary damages under the DTSA or UTSA and hews dangerously close to additur.[69]  Similarly, the court cannot enhance the damages for Defendants' Lanham Act violations without knowing what "amount [was] found as actual damages."[70]  Under these circumstances, it "would be a matter of pure

---

[65] *Lyon Dev. Co. v. Bus. Men's Assurance Co. of Am.*, 76 F.3d 1118, 1125 (10th Cir. 1996); *see also ClearOne Communs.*, 653 F.3d at 1179 ("A court-imposed increase of damages encroaches on the defendant's right to a jury trial because it 'is a bald addition of something which in no sense can be said to be included in the verdict.'" (quoting *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935))).

[66] *ClearOne Communs.*, 653 F.3d at 1179–82 (reversing a district court's enhanced and exemplary damages awards because, among other things, it impermissibly assumed that the jury apportioned damages).

[67] *Rotating Prods.*, 2001 U.S. Dist. LEXIS 25147, at *29.

[68] *See Trial Transcript* at 1119:6–9 (emphasis added).  While JBT acknowledges "it was determined in open court that the [j]ury intended a single award of $323,256," Dkt. 285 at 3 n.1, it still states that the jury awarded $323,256 for Defendants' misappropriation of trade secrets and the same amount for its Lanham Act claims.  *See id.* at 14–15.  But JBT does not explain how it reaches this conclusion in light of the jury's clear confirmation that $323,256 was "not the number [awarded] on each" claim, but rather "the total number."  *Trial Transcript* at 1119:6–9.  In any event, the court cannot reconcile JBT's puzzling approach with the jury's clarification in open court.

[69] *See ClearOne Communs.*, 653 F.3d at 1179.

[70] 15 U.S.C. § 1117(a); *see also Bimbo Bakeries*, 2018 U.S. Dist. LEXIS 54556, at *6 ("Because the jury did not find an amount of actual damages, there is no basis to determine what three times actual damages . . . might be.").

speculation to determine what amount of the damages," if any, "is attributable to those causes [of action] which allow . . . enhancement."[71]

Of course, there were diligent efforts to prevent such an unsatisfactory outcome.  The verdict forms proposed by the parties,[72] as well as the one finally adopted by the court,[73] all contained placeholders for specific damages amounts for *each* cause of action and did not provide a place for aggregated damages.  In the context of JBT's trade secret misappropriation claims, the jury was instructed that it "should award the amount of money that will fairly and adequately compensate JBT for measurable losses of money *caused by* [Defendants'] trade secret misappropriation."[74]  The verdict form reiterated: "You may only award an amount that would fairly compensate JBT for damages proximately caused by [Defendants'] use of its trade secrets."[75]  Additionally, the jury was advised that damages for Defendants' Lanham Act violations needed to be caused by the false designation of origin.[76]

But even with carefully designed verdict forms and clear instructions, juries sometimes color outside the lines.  When the result is an ambiguous verdict, "the court's options are to explain the ambiguity to the jury and send the jury back into deliberations with instructions to clarify the ambiguity or to order a new trial."[77]  In this case, members of the jury noticed the ambiguity themselves and immediately sought to clarify their intention.[78]  As discussed, the jury

---

[71] *Rotating Prods.*, 2001 U.S. Dist. LEXIS 25147, at *30–31.

[72] *See generally* Dkt. 213, Dkt. 235; Dkt. 244; Dkt. 252.

[73] Dkt. 262.

[74] *See* Dkt. 266, *Final Substantive Jury Instructions* (*Jury Instructions*), No. 19 (emphasis added).

[75] *Id.*

[76] *Id.*, Nos. 23–25.

[77] *Unit Drilling Co. v. Enron Oil & Gas Co.*, 108 F.3d 1186, 1193 (10th Cir. 1997).

[78] *See Trial Transcript* 1118:25–1120:18 (recounting how the jury became concerned that its intent could be misconstrued after hearing the verdict read out loud).

entered the same amount—$323,256—for several causes of action on the verdict form.  But after

the verdict was read, the jury clarified its "intention [] that everywhere in the verdict form . . .

$323,256 appears . . . that that number be awarded once," rather than for each claim.[79]  Neither

side raised any objections to the jury's clarification before it was discharged, nor did they

challenge the court's reflection of the consolidated award as part of the final Judgment.[80]  And

while Defendants contest the sufficiency of the evidence supporting the jury's award,[81] the

parties' post-trial briefing leaves the consolidated nature of the jury's award relatively

undisturbed.  So, whether by the jury's own ingenuity or the parties' acquiescence, it is still the

controlling verdict in this case, unwieldy as it is.

In sum, the court concludes that the consolidated nature of the jury's award is fatal to its

assessment of exemplary or enhanced damages under the DTSA, UTSA, or Lanham Act.

Recognizing that "[e]nhancement by speculation can never be permitted,"[82] the court must

therefore decline JBT's request for exemplary and enhanced damages.

### B.  A Weighing of the Equities Militates Against an Award of Lost Profits

JBT also seeks disgorgement of BGSE's profits under the Lanham Act, which is not

strictly tied to the "amount found as actual damages," as with enhanced damages under

15 U.S.C. § 1117(a).[83]  But it is still the case that "such sum[s]" must "constitute compensation

---

[79] *See id.* 1122:6–14.

[80] *See generally* Dkt. 270, *Defendants' Objections to Proposed Judgment* (challenging JBT's Proposed Judgment on the grounds that it was premature and contained improper references to post-judgment interest, taxable costs, and future awards); Dkt. 271, *JBT's Response to Defendants' Objections to Proposed Judgment.*

[81] *See generally* Dkt. 284, *Defendants' Motion for Judgment as a Matter of Law.*

[82] *Rotating Prods.*, 2001 U.S. Dist. LEXIS 25147, at *31.

[83] *See* 15 U.S.C. § 1117(a) ("In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed.  In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount.").

and not a penalty."[84]  Additionally, "an award of profits under the Lanham Act is truly an

extraordinary remedy and should be tightly cabined by principles of equity."[85]  JBT recognizes

this burden, but contends an enhanced award is necessary to compensate it for "any

unquantifiable damages, such as loss of goodwill, reputation and market share" resulting from

Defendants' misconduct.[86]  The court disagrees.

First, the court concludes JBT is not undercompensated by the jury's damages award.

Despite JBT's concerns of "unquantifiable damages" resulting from Defendants' misconduct, the

jury was clearly instructed to consider broad factors in shaping its damages award, including

"[a]ny injury to or loss of JBT's reputation [or] . . . goodwill."[87]  It was also advised that JBT

was "entitled to any profits earned by BGSE that are attributable to its illegal conduct, in

addition to actual damages."[88]  Without evidence to the contrary, the court presumes the jury

followed these instructions.[89]  Moreover, the question of damages was hotly contested

throughout litigation, with extensive testimony provided at trial by experts on both sides.  The

jury opted for a holistic approach on damages, awarding $323,256 across several claims and an

additional $201,777 on JBT's tortious interference claims—"match[ing] to the dollar

Defendants' expert's calculation of Defendants' total unjust profits."[90]  While JBT maintains

actual damages or lost profits resulting from Defendants' misconduct were much higher, the

---

[84] *Id.*

[85] *Western Diversified Servs., Inc. v. Hyundai Motor Am., Inc.*, 427 F.3d 1269, 1274 (10th Cir. 2005).

[86] Dkt. 285 at 17.

[87] *Jury Instructions*, No. 24.

[88] *Id.*, No. 25.

[89] *See Helmer v. Goodyear Tire & Rubber Co.*, 828 F.3d 1195, 1200 (10th Cir. 2016) (explaining that courts "generally presume that juries follow the instructions given to them" (internal quotation marks and citation omitted)).

[90] Dkt. 285 at 15 n.4.

court sees no reason to disrupt the jury's findings or risk duplicative damages for conduct already sanctioned by the jury's award.

Second, the court is mindful that an award of lost profits under the Lanham Act should not be punitive or constitute a windfall for the plaintiff. By now, the misconduct that prompted JBT's Lanham Act claim—among other claims—has been thoroughly sanctioned by an award of compensatory damages,[91] punitive damages,[92] and now, attorneys' fees and expenses.[93] Further awards are not necessary to achieve the deterrence or compensatory aims of the Lanham Act's enhancement provision.[94]

For these reasons, the court declines to award further disgorgement of BGSE's profits under the Lanham Act, or grant exemplary or enhanced damages for JBT's trade secret misappropriation and Lanham Act claims, respectively. Accordingly, JBT's Motion for Enhanced Damages is denied in its entirety.[95]

## II.   JBT's Motion for Pre- and Post-Judgment Interest[96]

### A. Prejudgment Interest

JBT requests an award of prejudgment interest "from at least the time of [Defendants'] misappropriation of JBT's trade secrets," and proposes $116,321.06 "[u]sing simple interest and applying the historic rates under Utah law" starting on August 31, 2015.[97] Defendants object on

---

[91] Dkt. 262.

[92] Dkt. 263.

[93] *See infra* Section III.

[94] *See Marten Transp.*, No. 14-2464-JWL, 2016 U.S. Dist. LEXIS 97754, at *51–52 (declining to award lost profits because, among other reasons, an "award of punitive damages (when considered with the attorney fees awarded [])already provide[d] a windfall to [the plaintiff] while providing sufficient punishment and deterrence . . . ; thus, an additional award of [the defendant's] profits [was] not necessary to achieve any such aim").

[95] Dkt. 285.

[96] Dkt. 286.

[97] *Id.* at 3–4.

the grounds that "the jury's award for [] trade secret misappropriation factored in BGSE's alleged unjust enrichment," which they argue limits the availability of prejudgment interest under relevant case law.[98]  Additionally, Defendants point out that the jury considered misconduct from as late as October 16, 2018 when assessing damages under JBT's claims.[99]  Therefore, Defendants contend "[t]here is no reason to believe that August 31, 2015, was the date <u>all</u> of the damages were incurred."[100]  Lastly, Defendants challenge JBT's method of calculating prejudgment interest and assert "the federal rate should apply."[101]  For the reasons discussed below, the court concludes prejudgment interest is not appropriate in this case.

As a general matter, federal law governs prejudgment interest for federal claims, while state law determines the availability of prejudgment interest for pendent state claims.[102]  But the choice of law for prejudgment interest becomes less clear when, as here, the court is confronted with a consolidated damages award reflecting state and federal claims.  When faced with a similar verdict nearly four decades ago, one district court described the question of whether to apply state or federal law as "puzzling" and muddled by "admittedly mixed" authority.[103]  The court ultimately sidestepped the question, noting that both state law and the discretion afforded by federal law supported such an award.[104]  In another case, the First Circuit discussed with

---

[98] Dkt. 301, *Defendants' Response to JBT's Motion for Pre- and Post-Judgment Interest* at 2–3 (citing *Russo*, 2007 U.S. Dist. LEXIS 16291, at *4–6).

[99] *Id.* at 3–4 (citing *Jury Instructions*, No. 22).

[100] *Id.* at 3.

[101] *Id.* at 4–5.

[102] *Olcott v. Del. Flood Co.*, 327 F.3d 1115, 1126 (10th Cir. 2003) ("Where state law claims are before a federal court on supplemental jurisdiction, state law governs the court's award of prejudgment interest."); *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1236 (10th Cir. 2000) (stating that the Tenth Circuit "look[s] to federal law to determine the propriety of prejudgment interest on the federal claims and to Kansas law for the pendent state claim"); *see also Vitamins Online*, 2020 U.S. Dist. LEXIS 210754, at *63–68 (applying federal law to determine propriety of prejudgment interest on Lanham Act claims and Utah law for a pendent state law claim).

[103] *Ward v. Succession of Freeman*, No. 85-1254, 1987 U.S. Dist. LEXIS 1392, at *1 (E.D. La. Feb. 20, 1987).

[104] *Id.* at *2.

approval a district court's decision to deny prejudgment interest based solely on federal principles where "all claims, both federal and state, were sent to the jury together, resulting in a general verdict."[105]

In a more recent case dealing with a consolidated damages award for state and federal claims, a district court concluded, "the fact that the jury did not specifically allocate the damages among [the plaintiff's] various claims does not outright preclude an award . . . for prejudgment interest."[106]  However, it described the situation as "problematic" and applied both legal frameworks to respective claims before concluding that prejudgment interest was not warranted under state or federal law.[107]

Though case law provides less clarity than one would hope, the court is persuaded that the prudent approach is to apply state law to the state claims and federal law to the federal claims,[108] consistent with the Tenth Circuit's general approach to choice of law for prejudgment interest.[109]  If prejudgment interest is available on all of the claims, the court can properly assess prejudgment interest for a consolidated damages award.[110]  However, if damages are not warranted on JBT's state claims, for example, prejudgment interest must be withheld because the

---

[105] *Wojtkowski v. Cade*, 725 F.2d 127, 129 (1st Cir. 1984); *see also Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc.*, 35 F.3d 1226, 1246 (8th Cir. 1994) (concluding that a district court did not err by refusing to award prejudgment interest for a damages award reflecting both state and federal claims when federal common law principles weighed against such an award).

[106] *Jadwin v. Cty. of Kern*, No. 07-CV-0026-OWW-DLB, 2010 U.S. Dist. LEXIS 30949, at *42 (E.D. Cal. Mar. 31, 2010).

[107] *Id.* at *42–48.

[108] *Cf. id.*

[109] *See United Phosphorus*, 205 F.3d at 1236.

[110] *Cf. Jadwin*, 2010 U.S. Dist. LEXIS 30949, at *42–48 ("Because prejudgment interest is theoretically available on all of [the plaintiff's] claims submitted to the jury, the fact that the jury did not specifically allocate the damages among [the plaintiff's] various claims does not outright preclude an award . . . for prejudgment interest."); *see also Ward*, 1987 U.S. Dist. LEXIS 1392, at *1–3 (granting prejudgment interest where it was warranted under state law and as a matter of federal discretion).

court "cannot tell to what extent, if any, the jury's awards of damages . . . were based on the state claims" as opposed to the federal claims.[111]  This seems to be the best way to preserve the court's longstanding approach to choice of law and avoid unintentionally burdening Defendants with prejudgment interest when it would otherwise be incompatible with state or federal law.

Because the court ultimately concludes prejudgment interest is inappropriate under Utah law, it addresses only this legal framework.  As the Utah Supreme Court explains, "[t]he purpose of awarding prejudgment interest is 'to compensate a party for the depreciating value of the amount owed over time and, as a corollary, to deter parties from intentionally withholding an amount that is liquidated and owing.'"[112]   Under Utah law, "[p]rejudgment interest may be recovered where the damage is complete, the amount of the loss is fixed as of a particular time, and the loss is measurable by facts and figures."[113]  This does not mean "that at the time the damages accrued, all of the damage figures must be known and remain static throughout the litigation."[114]   Rather, the focus is "on the measurability and calculability of the damages."[115]  "Where damage figures are subject to calculation, . . . even if the method of calculating is uncertain, or the damage figures change, prejudgment interest is appropriate."[116]

---

[111] *Cf. Wojtkowski*, 725 F.2d at 129; *see also Sw. Rec. Indus., Inc. v. FieldTurf, Inc.*, No. 01-50073, 2002 U.S. App. LEXIS 30245, at *25–26 (5th Cir. Aug. 13, 2002) (concluding a district court did not abuse its discretion by denying prejudgment interest where "[the] submission of a general damage question made it impossible to determine which portion of the award was attributable to" the claims eligible for prejudgment interest).

[112] *Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 210 P.3d 263, 275 (Utah 2009) (quoting *Carlson Distrib. Co. v. Salt Lake Brewing Co.*, 95 P.3d 1171, 1179 (Utah Ct. App. 2004)).

[113] *Id.* at 272 (quoting *Saleh v. Farmers Ins. Exch.*, 133 P.3d 428, 436 (Utah 2006)).

[114] *Id.*

[115] *Id.*

[116] *Id.* at 273.

Defendants argue the damages here likely derive from BGSE's unjust enrichment, which they maintain "does not qualify for prejudgment interest" under Utah law.[117]  They point out that damages were heavily litigated and "the jury weighed [] competing opinions from experts, some of which exceeded the award, and 'likely considered . . . unjust enrichment in determining the damages.'"[118]  Because JBT's claims centered on "several projects and several different dates," Defendants further challenge that "one can only speculate about the amount of damages," thereby precluding an award of prejudgment interest.[119]  JBT counters that "federal law controls the prejudgment interest question" and asserts "[i]t is common in this . . . [D]istrict[] to award prejudgment interest on an award based on the defendant's profits."[120]  However, as discussed, the court applies Utah law to determine the propriety of prejudgment interest on JBT's state claims.

Importantly, "Utah courts are reluctant to award prejudgment interest on lost profits . . . [or] unjust enrichment."[121]  In the former case, this is because "the very nature of lost future profits injects an air of uncertainty and speculation into the calculation of damages," requiring the jury to "speculate . . . what profits would have been generated had the defendant not acted wrongfully."[122]  "Damages in such cases do not represent an actual, ascertainable loss; they represent the factfinder's best approximation of that loss."[123]  Similarly, Utah courts are wary of prejudgment interest for unjust enrichment, cautioning that it is not only speculative, but also

---

[117] Dkt. 301 at 2–3 (quoting *Russo*, 2007 U.S. Dist. LEXIS 16291, at *4–6).

[118] *Id.*

[119] *Id.* at 3.

[120] Dkt. 313, *JBT's Reply in Support of Its Motion for Pre- and Post-Judgment Interest* at 4.

[121] *ClearOne Communs.*, 432 F. App'x at 774–75 (applying Utah law).

[122] *Id.* at 774 (quoting *Anesthesiologists Assocs. of Ogden v. St. Benedict's Hosp.*, 852 P.2d 1030, 1042 (Utah Ct. App. 1993), *rev'd on other grounds*, 884 P.2d 1236 (Utah 1994)).

[123] *Id.*

risks duplicating what may have already been contemplated by a jury's unjust enrichment award.[124]

Still, Utah courts "recognize[] that prejudgment interest is sometimes appropriate on an award of lost profits, if the lost profits calculation is based on 'known, calculable figures,' and is shown to be non-speculative."[125]  In *Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, for example, the Utah Supreme Court affirmed a trial court's conclusion that prejudgment interest was appropriate on a case dealing with lost profits for work performed under a fixed-price contract with a consistent ten percent profit.[126]  In the context of unjust enrichment, the Utah Court of Appeals affirmed a trial court's grant of prejudgment interest on an unjust enrichment award where it was based on "the dollar amounts written on [] forged checks," and was therefore readily ascertainable.[127]

But this is not such a clear-cut case.  The question of damages arising from Defendants' misconduct was heavily litigated, with extensive exhibits and expert testimony presented by both sides.  These experts "used speculative assumptions to extrapolate lost profits,"[128] drawn largely from historical profit-and-loss statements and understandings of the advantages provided by JBT's trade secrets and confidential materials.[129]  In estimating BGSE's unjust enrichment, JBT's expert cautioned he could not "say for certain[]" whether the BGSE's profits were derived

---

[124] *See id.* at 775–76 (applying Utah case law).

[125] *KTM Health Care Inc. v. SG Nursing Home LLC*, 436 P.3d 151, 173 (Utah Ct. App. 2018) (quoting *Encon Utah*, 210 P.3d at 274).

[126] 210 P.3d at 274.

[127] *Kimball v. Kimball*, 217 P.3d 733, 750–51 (Utah Ct. App. 2009).

[128] *BC Technical, Inc. v. Ensil Int'l Corp.*, No. 02-CV-700-TS, 2009 U.S. Dist. LEXIS 1829, at *27 (D. Utah Jan. 9, 2009) (applying Utah law and denying plaintiff's request for prejudgment interest given "[t]he speculative nature of the evidence" of damages presented to the jury).

[129] *See, e.g.*, *Trial Transcript* at 913:20–921:22 (discussing the methodology used by JBT's expert to estimate JBT's lost profits and BGSE's unjust enrichment for a specific F-35 project); *see also* 1045:15–1099:10 (reflecting testimony from Defendants' damages expert).

from "actual costs and revenue" and noted there were other costs that he did not have the data to quantify "with a reasonable degree of certainty."[130]  Ultimately, the jury was charged with wading through these competing approaches to determine the appropriate damages award— considering, among other things, "JBT's lost profits" and Defendants' "unjust enrichment"— "even if that amount [was] more than the actual damages suffered by JBT."[131]  While the court found the evidence presented at trial was sufficient to sustain the jury's damages award,[132] it is far too speculative to warrant prejudgment interest under Utah's more exacting standards.[133]  Moreover, as Defendants point out, the fact that the jury may have considered lost profits and unjust enrichment cuts against the need to further compensate JBT with prejudgment interest.[134]

In sum, the court concludes prejudgment interest is not appropriate for JBT's state claims given the malleable nature of damages in this case and the risk of allowing a double recovery for

---

[130] *Id.* at 921:21–927:19.

[131] *See Jury Instructions*, No. 19 (instructing the jury it could consider lost profits and unjust enrichment on JBT's in awarding damages on JBT's trade secret misappropriation claims); *see also id.*, No. 20 (same), No. 28 (instructing the jury it could "consider the amount of lost profits" to JBT and "the profits obtained by [Defendants]" when assessing damages for JBT's breach of contract claims), No. 32 (instructing the jury that damages on JBT's tortious interference claims could "include the amount of profit that JBT would have received, but did not actually receive, as a result of [Defendants'] interference").

[132] Dkt. 339 at 11–13, 18–19.

[133] *See ClearOne Communs.*, 432 F. App'x at 775 (denying a request for prejudgment interest for claims under Utah law, noting that the "use of proxies or estimates, even if actual sales were involved in their computation, does not constitute the mathematical certainty necessary for an award of prejudgment interest"); *see also id.* at 776 (explaining that "[t]he fact that the jury agreed with [one expert's] valuation . . . does not mean that the damages were calculable with mathematical accuracy"); *USA Power*, 372 P.3d at 667 ("[E]vidence that is sufficient to permit a jury to consider whether to award damages for lost profits may still be insufficient to justify an award of prejudgment interest.").

[134] *See Russo*, 2007 U.S. Dist. LEXIS 16291, at *4 (denying prejudgment interest "because the [underlying] award [was] not definitely calculable and [was] based on unjust enrichment); *see also Dejavue, Inc. v. U.S. Energy Corp.*, 993 P.2d 222, 228 (Utah Ct. App. 1999) (finding no error where a trial court denied prejudgment interest on a consolidated damages award that possibly reflected damages for unjust enrichment); *Shoreline Dev. v. Utah Cty.*, 835 P.2d 207, 212 (Utah Ct. App. 1992) (holding that, "[g]iven the risk of double recovery, . . . [p]rejudgment interest may not be subsequently added by a trial court to a jury's award for unjust enrichment").

factors already considered by the jury.[135]  And because the jury's consolidated damages award makes it "impossible to determine which portion of the award was attributable to" those claims,[136] JBT's request for prejudgment interest must be denied in its entirety.  Accordingly, the court does not address Defendants' contentions regarding the appropriate starting date for the accrual of prejudgment interest or the correct rate to apply.[137]

## B. Post-Judgment Interest

In addition to prejudgment interest, JBT requests an award of post-judgment interest under 28 U.S.C. § 1961, "starting from entry of the judgment on November 1, 2022, . . . as well as on any other amount awarded to JBT."[138]  When compared to JBT's request for prejudgment interest, this request is decidedly less controversial.  "Defendants do not contest that 28 U.S.C. § 1961(a) provides that 'Interest shall be allowed on any money judgment in a civil case recovered in a district court.'"[139]  And, for once, the consolidated nature of the jury's damages award does not preclude this relief because "[f]ederal law governs the calculation of post-judgment interest in federal court, which is considered a procedural matter, even on state-law claims."[140]  Therefore, the court grants JBT's request for post-judgment interest.[141]

---

[135] *See Russo*, 2007 U.S. Dist. LEXIS 16291, at *4–6 (denying prejudgment interest where "the jury weighed the conflicting opinions of experts who testified to a spectrum of damages, some in excess of the jury's award," and "the jury likely considered [] unjust enrichment in determining the damages").

[136] *See Sw. Rec. Indus.*, 2002 U.S. App. LEXIS 30245, at *25–26.

[137] *See generally* Dkt. 301 at 3–5.

[138] Dkt. 286 at 4.

[139] Dkt. 301 at 5 (quoting 28 U.S.C. § 1961).

[140] *Pedroza v. Lomas Auto Mall, Inc.*, 663 F. Supp. 2d 1123, 1130 (D.N.M. 2009) (citing *Transpower Constructors v. Grand River Dam Auth.*, 905 F.2d 1413, 1423–24 (10th Cir. 1990)).

[141] *See id.* (granting post-judgment interest because "the request [was] unopposed[] and . . . accord[ed] with the law on the subject").

### III.    JBT's Motion for Attorneys' Fees and Expenses[142]

The court next turns to JBT's requests for attorneys' fees and nontaxable expenses.  JBT argues that an award of attorneys' fees is warranted under the Lanham Act, DTSA, and UTSA given the nature and extent of Defendants' misconduct.[143]  It further contends that attorneys' fees and expenses related to other, noncompensable claims should be granted given the "common core of facts" underlying JBT's affirmative claims.[144]  Additionally, JBT seeks an award of attorneys' fees spent defending against two of Defendants' counterclaims.[145]  Finally, JBT requests reimbursement for certain nontaxable expenses which were "incidental to the services of JBT's attorneys," such as "costs for travel . . . , legal research, . . . and other miscellaneous costs."[146]  The court addresses each request in turn.

#### A.  *JBT Is Entitled to Attorneys' Fees Under the Lanham Act*

<u>LEGAL STANDARDS</u>

The Lanham Act provides that the "court in exceptional cases may award reasonable attorney fees to the prevailing party."[147]  "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances."[148]  The Supreme Court further explains that "an 'exceptional' case is [] one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in

---

[142] Dkt. 278.

[143] *Id.* at 3–6.

[144] *Id.* at 6–7.

[145] *Id.* at 8–11 (referencing Defendants' counterclaims brought under the North Carolina Unfair or Deceptive Trade Practices Act and the Utah Truth in Advertising Act).

[146] *Id.* at 11–12.

[147] 15 U.S.C. § 1117(a).

[148] *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).

which the case was litigated."[149]  Similarly, the Tenth Circuit notes while "no one factor is

dispositive, a case may be deemed exceptional because of [] its lack of any foundation, . . . the

unusually vexatious and oppressive manner in which it is prosecuted, or [] perhaps for other

reasons as well."[150]  Additionally, courts can also consider such relevant factors as

"frivolousness, motivation, objective unreasonableness . . . and the need . . . to advance

considerations of compensation and deterrence."[151]

<u>APPLICATION</u>

JBT contends this case is exceptional for three reasons: (1) because "the jury found that

BGSE's conduct . . . was a willful violation of the Lanham Act," which it maintains is "by itself

[] enough to support an award of fees";[152] (2) Defendants' Lanham Act defenses were objectively

unreasonable;[153] and (3) "Defendants continued their wrongful actions after being put on notice

of their violations."[154]  Defendants counter that JBT's reverse passing off claim under the

Lanham Act was a novel one for the Tenth Circuit, and state "[t]here existed a legitimate dispute

concerning what goods BGSE allegedly reverse passed off."[155]  Defendants also defend their

record at trial, noting, "[t]he damages JBT sought to impose on Defendants were not close to

---

[149] *Id.*

[150] *King v. PA Consulting Grp., Inc.*, 485 F.3d 577, 584 (10th Cir. 2007) (quoting *Nat'l Ass'n of Pro. Baseball Leagues, Inc. v. Very Minor Leagues, Inc.*, 223 F.3d 1143, 1146 (10th Cir. 2000)); *see also Derma Pen, LLC v. 4Ever Young Ltd.*, 999 F.3d 1240, 1243–46 (10th Cir. 2021) (holding that *Octane Fitness*'s guidance on exceptionality should extend to the Lanham Act context and advising that the *King* factors are still "useful inquiries for identifying exceptional cases under the *Octane* [*Fitness*] standard").

[151] *Octane Fitness*, 572 U.S. at 554 n.6 (referencing the "nonexclusive" list of "factors" applied to "a similar provision in the Copyright Act" in *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994)).

[152] Dkt. 278 at 5 (collecting cases).

[153] *Id.* at 5–6.

[154] *Id.* at 6.

[155] Dkt. 299, *Defendants' Response to JBT's Motion for Award of Attorneys' Fees and Nontaxable Expenses* at 4 (citing *Summary Judgment Order* at 33–37).

what the jury ultimately awarded."[156]  As such, they argue "[t]here was nothing unusually weak

about [their] defense" and "no fees should be awarded under the Lanham Act" as a result.[157]

Considering the totality of the circumstances, the court concludes this is an exceptional

case warranting an award of reasonable attorneys' fees.  As discussed when resolving the parties'

cross-motions for summary judgment, the evidence underlying JBT's Lanham Act claim

demonstrated blatant misconduct by Defendants:

> In the project submittals for Lemoore P-328, Beaufort P-465, Kadena P-803, and
> Lemoore P-378(A), BGSE included a lengthy excerpt copied from the JBT HPCF
> O&M Manual.  BGSE removed all references to JBT and superimposed BGSE's
> logo over JBT's.  Further, the submittals contained JBT's HPCF 3000 Tech. Sheet,
> stripped of its JBT identifiers and replaced with BGSE's.  The two-page technical
> specification purported to provide engineering details for a BGSE PC Air unit, even
> though no such unit existed.  Thus, although BGSE represented that it was offering
> for sale a BGSE product to be manufactured by Twist, the substance of the submittal
> revealed the product being offered for sale was actually produced by JBT.[158]

While the court gave thoughtful consideration to Defendants' argument that these actions fell

outside the scope of the Lanham Act, summary judgment was not a close call.[159]  Moreover, the

jury determined there were "additional false designations of origin by BGSE" based on the

evidence presented at trial.[160]  Given the extensive and compelling evidence of Defendants' false

designation of origin, their hopes of defeating JBT's Lanham Act claim were distant at best.

Of course, Defendants were entitled to zealously advocate for themselves and the merits

of their position.  But litigation is a risky endeavor, particularly with a starting position as

tenuous as Defendants'.  Whereas many parties faced with uncontroverted evidence of rampant

---

[156] *Id.* at 5 n.17.

[157] *Id.* at 5.

[158] *Summary Judgment Order* at 37–38.

[159] *See id.* at 31–41.

[160] Dkt. 262 at 3.

misconduct will attempt to reconcile, or perhaps mitigate the fallout of their misconduct, Defendants doubled down.  They exacerbated the risk of fee-shifting under the Lanham Act by continuing to use JBT's proprietary materials and altered photographs even after JBT filed suit,[161] and then responding to JBT's claims with several unavailing counterclaims.[162]  While Defendants' litigation conduct was not necessarily sanctionable in isolation,[163] they still forced JBT to spend several years and millions of dollars to obtain compensation for Defendants' blatant Lanham Act violations.[164]  Ultimately, Defendants' limited success at reducing the jury's damages award came at a great cost.  And in exceptional cases such as this one, the Lanham Act suggests this cost should be borne by the party that made it necessary in the first place.[165]

Though not strictly necessary for the court's finding of exceptionality, another factor weighs on the relevant "considerations of compensation and deterrence" in this case—the nature of the parties' relationship and industry.[166]  After several years of heated litigation, it can be easy to lose sight of the fact that JBT and Defendants were once business partners working to support one of the United States' most advanced military aircrafts—the F-35.[167]  Yet, despite the

---

[161] *See generally* Dkt. 288, *Exhibits to JBT's Motion for Enhanced Damages.*

[162] *See* Dkt. 49; Dkt. 108; *see also* Dkt. 121, *Minute Entry for Proceedings Held on September 25, 2018* (summarizing the court's decision to dismiss Defendants' sixth counterclaim by oral ruling); *Summary Judgment Order* at 67 – 77 (granting JBT summary judgment on all but one of Defendants' remaining counterclaims).

[163] To be clear, Defendants' litigation conduct was not completely without controversy.  The court repeatedly ordered Defendants to show cause why they should not be held in contempt for allegedly violating its preliminary injunction order.  *See* Dkt, 41; Dkt. 63.  However, at the scheduled civil contempt hearing, the parties reached a resolution on the purported violations, prompting the court to enter a stipulated order resolving the orders to show cause.  Dkt. 83, *Minute Entry for Proceedings Held on December 8, 2017*; Dkt. 91, *Stipulated Order*.

[164] *See generally* Dkt. 278.

[165] 15 U.S.C. § 1117(a).

[166] *See Octane Fitness*, 572 U.S. at 554 n.6 (quoting *Fogerty*, 510 U.S. at 534); *see also King*, 485 F.3d at 592 (explaining that "a case may be deemed exceptional because of [] its lack of any foundation, . . . the unusually vexatious and oppressive manner in which it is prosecuted, or [] *perhaps for other reasons as well*" (emphasis added)).

[167] *See generally Summary Judgment Order* at 1–7.

profound trust they were given to work alongside highly-classified defense technology, Defendants' actions were anything but reassuring.  They misappropriated trade secrets,[168] spread misinformation about JBT's manufacturing capabilities,[169] and used JBT's proprietary materials and photographs as part of their effort to undermine JBT's competitive position.[170]  While this kind of misconduct cannot be tolerated in any industry, it is particularly concerning given its proximity to critical warfighting technology, among parties entrusted to act with far more discretion.  In determining whether a case is exceptional, *Octane Fitness* explains that a range of factors may be relevant, including "the need in particular circumstances to advance considerations of compensation and deterrence."[171]  Under these rare circumstances, the court concludes the twin "considerations of compensation and deterrence" demand a full accounting of the costs of Defendants' Lanham Act violations and the attorneys' fees spent to remedy them.

"After [] more than six years of often contentious litigation, [the] court [has become] singularly familiar with this case and these parties."[172]  And this case has proven to be far from routine, both in terms of the substantive strength of JBT's litigating position and Defendants' determination to contentiously litigate it to the very end.  For these reasons, the court concludes this case is indeed "exceptional" and warrants reasonable fee-shifting under the Lanham Act.[173]

---

[168] *Id.* at 19–31.

[169] *Id.* at 2, 12–13.

[170] *See generally id.* at 3–15 (summarizing Defendants' misconduct).

[171] 572 U.S. at 554 n.6 (quoting *Fogerty*, 510 U.S. at 534).

[172] *See Derma Pen*, 999 F.3d at 1245 (explaining the deferential standard of review for a district court's finding of exceptionality given its "singular[] familiar[ity]" with the case).

[173] *See* 15 U.S.C. § 1117(a).

**B. *JBT is Entitled to Attorneys' Fees Under the DTSA and UTSA***

Both the DTSA and the UTSA permit an award of reasonable attorneys' fees to the prevailing party if a trade secret has been willfully and maliciously misappropriated.[174]  JBT contends this requirement "was met by the jury's unanimous finding that Defendants misappropriated JBT's trade secrets willfully and maliciously by clear and convincing evidence," and urges the court to grant attorneys' fees under both statutes.[175]  Defendants stake their opposition to the fact "[t]he trade secret at issue"—one of JBT's operations manuals—contained sections that overlapped third-party sources.[176]

On balance, the court concludes this is a clear case for an award of attorneys' fees under the DTSA and UTSA.  Indeed, the operations manual at the center of JBT's trade secret misappropriation claims contained vast amounts of confidential information, including information specific to JBT.[177]  Bullerdick acknowledged as much when he sent the manual—labeled as "confidential"—to one of JBT's competitors, Twist, Inc., to support its efforts to develop a product that could compete with JBT's ground equipment.[178]  And, as noted, the jury found that Defendants' misappropriation of the manual was both willful and malicious.[179]  Far from exonerating Defendants, the circumstances of Defendants' misappropriation of JBT's

---

[174] *See* 18 U.S.C. § 1836(b)(3)(D); Utah Code Ann. § 13-24-5.

[175] Dkt. 278 at 3–4; *see also* Dkt. 262 at 2.

[176] Dkt. 299 at 5–6.

[177] *See generally* Dkt. 339 at 20 (discussing Defendants' argument that the partial overlap with third-party materials absolved their contractual duties to preserve the manual's confidentiality).

[178] *See Summary Judgment Order* at 24 n.153 (noting Bullerdick's testimony that the manuals were not considered confidential was contradicted by his own email to Twist providing the HPCF Manual and describing it as such).

[179] Dkt. 262 at 2.

manual] fully support an award of reasonable attorneys' fees.[180]  Accordingly, the court exercises its discretion to grant JBT's request for attorneys' fees under the DTSA and UTSA.[181]

## C.  *The Common Core Approach Applies to All of JBT's Affirmative Claims, Except Trademark Infringement and Defamation*

Having found JBT is entitled to attorneys' fees on its Lanham Act and trade secret misappropriation claims, the court next considers whether this award properly encompasses JBT's other affirmative claims.  Under Utah law, "parties need not segregate fees for compensable and noncompensable claims if the claims 'sufficiently overlap and involve the same nucleus of facts.'"[182]  "Put differently, if a compensable claim is 'inextricably intertwined' with a noncompensable claim, fees related to the noncompensable claim are 'appropriately included in the fee calculation.'"[183]  Utah case law even contemplates recovery of fees for unsuccessful claims, as long as the "plaintiff achieve[d] success on a significant, interrelated claim."[184]  Similarly, under federal law, "when a plaintiff brings multiple claims, and the claims 'involve a common core of facts or will be based on related legal theories,' the fee applicant may claim all hours reasonably necessary to litigate those claims."[185]  If the plaintiff has achieved a

---

[180] *See, e.g.*, *StorageCraft Tech. Corp. v. Kirby*, No. 2:08-cv-00921, 2012 U.S. Dist. LEXIS 140704, at *5 (D. Utah Sep. 27, 2012) (concluding that the "jury's finding of willful and malicious misappropriation . . . entitles [the plaintiff] to an award of attorneys' fees and costs" under the UTSA); *Bimbo Bakeries*, 2018 U.S. Dist. LEXIS 54556, at *11 (same); *see also ClearOne Communs., Inc. v. Chiang*, No. 2:07-cv-37-TC-DN, 2009 U.S. Dist. LEXIS 121061, at *9 (D. Utah Dec. 30, 2009) (exercising the discretion to award attorneys' fees under Utah Code Ann. § 13-24-5 where it was "remedial, to make [the plaintiff] whole for the cost of bringing the litigation").

[181] *See* 18 U.S.C. § 1836(b)(3)(D); Utah Code Ann. § 13-24-5.

[182] *First Am. Title Ins. Co. v. Nw. Title Ins. Agency*, 906 F.3d 884, 900 (10th Cir. 2018) (quoting *Daynight, LLC v. Mobilight, Inc.*, 248 P.3d 1010, 1013 (Utah Ct. App. 2011)).

[183] *Airstar Corp. v. Keystone Aviation LLC*, 514 P.3d 568, 585 (Utah Ct. App. 2022) (quoting *Golden Meadows Props., LC v. Strand*, 241 P.3d 375, 384 (Utah Ct. App. 2010)).

[184] *Dejavue*, 993 P.2d at 227 (quoting *Jane L. v. Bangerter*, 61 F.3d 1505, 1512 (10th Cir. 1996)); *see also id.* ("[W]hen a plaintiff brings multiple claims involving a common core of facts and related legal theories, and prevails on at least some of its claims, it is entitled to compensation for all attorney fees reasonably incurred in the litigation.").

[185] *Atlas Biologicals, Inc. v. Kutrubes*, No. 1:15-cv-00355-CMA-KMT, 2020 U.S. Dist. LEXIS 121433, at *10 (D. Colo. July 10, 2020) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983)).

significant result in the case, the Tenth Circuit instructs that "it [is] legally incorrect for the district court to reduce the plaintiff['s] fee request on the basis of the plaintiff['s] 'only partial success' for [its] interrelated claims."[186]

JBT posits that its "successful claims for trade secret misappropriation and false designation of origin . . . share common core facts with its other claims," entitling it to recover all of its attorneys' fees under the common core approach,[187] though it later concedes to a five percent reduction to account for its voluntarily dismissed trademark infringement claim.[188]  It argues, "[a]ll of these claims were based upon [Defendants] having access to, wrongly retaining and using JBT's trade secrets and other confidential and proprietary information to bid and win awards for military projects," negating the need to carve out the fees related to its Lanham Act and trade secret misappropriate claims.[189]  For their part, Defendants contend the common core approach is unwarranted, and challenge JBT's assertion that its claims were overlapping as "too conclusory."[190]  Defendants further critique that JBT's purportedly overlapping claims were even asserted against different parties, with some directed only at Bullerdick and others at BGSE.[191]

Though Defendants emphasize the differences between JBT's claims, they all arose out of the same basket of misconduct.  In effect, Defendants used the advantages and resources they gained as JBT's business partner to undermine JBT's competitive position and win F-35 subcontracts.[192]  Accordingly, the court concludes the same common nucleus of facts properly

---

[186] *Robinson v. City of Edmond*, 160 F.3d 1275, 1284 (10th Cir. 1998).

[187] Dkt. 278 at 6–7.

[188] Dkt. 305, *JBT's Reply in Support of Its Motion for Award of Attorneys' Fees and Nontaxable Expenses* at 4 n.3.

[189] Dkt. 278 at 7.

[190] Dkt. 299 at 10.

[191] *Id.*

[192] *See generally Summary Judgment Order* at 3–15 (summarizing Defendants' misconduct).

encompasses all of JBT's successful claims and its unsuccessful false advertising claim.[193]
These claims all centered on Defendants' misuse of JBT's proprietary materials to make
successful bids and were therefore "inextricably intertwined" with the conduct that gave rise to
JBT's Lanham Act and trade secret misappropriation claims.[194]

However, the court agrees that JBT's voluntarily dismissed trademark infringement claim
falls outside this common core of facts.[195]  In its Reply, JBT withdrew its request for fees
associated with this claim, proposing a "conservative[] . . . [five percent] reduction" in its total
request to account for this change.[196]  While the court accepts this proposed reduction,[197] it
concludes that a further reduction is needed to account for another unsuccessful claim that falls
outside the common core.  In particular, JBT's unsuccessful defamation claim bears only a
tangential relationship with the common core of facts giving rise to JBT's compensable claims.
Whereas those claims dealt with Defendants' misuse or misconstruction of JBT's proprietary
materials,[198] JBT's defamation claim was based on Defendants' statements about their former
business partner. [199]  While this conduct ran parallel to Defendants' misappropriation of JBT's
trade secrets and false designation of origin, it is not "inextricably intertwined" with JBT's

---

[193] *See Amended Complaint* ¶¶ 156–78, 185–99, 205–12.

[194] *See id.*; *Atlas Biologicals*, 2020 U.S. Dist. LEXIS 121433, at *9 (granting attorneys' fees on a breach of fiduciary duty claim as its factual basis "substantially overlapped" the plaintiff's Lanham Act claim); *see also Golden Meadows Props.*, 241 P.3d at 384 (explaining that fees related to a noncompensable claim are "appropriately included in" an award of attorneys' fees if the claim is "inextricably intertwined" with an otherwise compensable claim).

[195] *See* Dkt. 299 at 10 ("The claims in this case are not intertwined and they require different proof.  BGSE's use of metatags in its website have no relation to whether BGSE misappropriated JBT's PC-air operations manual.").

[196] Dkt. 305 at 5 n.3.

[197] *See Paradigm All.*, 2011 U.S. Dist. LEXIS 7153, at *6 (accepting the plaintiff's "estimated reduction of five percent of the aggregated total [of attorneys' fees]" based on "the [c]ourt's own extensive involvement with the litigation").

[198] *See generally Amended Complaint* ¶¶ 156–78, 185–99, 205–12.

[199] *See Summary Judgment Order* at 61–64 (discussing JBT's defamation claim).

compensable claims.[200]  The factual elements required to state a claim for false designation or

trade secret misappropriation are distinct from the allegedly defamatory statements made by

Bullerdick.[201]  Following JBT's lead, the court concludes it is therefore appropriate to reduce the

fee request by a further five percent, leading to a ten percent reduction of recoverable fees.[202]

### D.  JBT is Entitled to Attorneys' Fees on One of Defendants' Counterclaims

JBT also seeks to recover the fees spent defending against Defendants' counterclaims

under the North Carolina Unfair or Deceptive Trade Practices Act (UDTPA) and the Utah Truth

in Advertising Act (UTIAA).[203]  For the reasons discussed below, the court concludes JBT can

recover attorneys' fees under the UTIAA, but not the UDTPA.

### i.    UDTPA

The UDTPA provides that a prevailing party may recover reasonable attorneys' fees for

defending against an unsuccessful UDTPA claim if the party bringing the claim "knew, or should

have known, [it] was frivolous and malicious."[204]  "A claim is frivolous if a proponent can

present no rational argument based upon the evidence or law in support of it" and it is malicious

---

[200] *Cf. Paradigm All., Inc. v. Celeritas Techs., LLC*, No. 07-1121-EFM, 2011 U.S. Dist. LEXIS 7153, at *5 (D. Kan. Jan. 25, 2011) (concluding that a plaintiff's "contract claims and [] misappropriation of trade secrets claim [under the Kansas Uniform Trade Secret Act] arose from a set of facts that were inextricably intertwined" with other, noncompensable claims, but that a defamation counterclaim and other claims fell outside the common core).

[201] *Compare Summary Judgment Order* at 19–41 (discussing the legal and factual bases for JBT's trade secret misappropriation and Lanham Act claims), *with id.* at 61–64 (discussing the allegedly defamatory statements that JBT contends constitute defamation per se).

[202] *See* Dkt. 305 at 5 n.3; *see also Paradigm All.*, 2011 U.S. Dist. LEXIS 7153, at *6–7 (applying a five percent reduction to each claim or counterclaim that fell outside the common core of facts); *Wopsock v. Dalton*, No. 2:12-cv-00570-RJS, 2020 U.S. Dist. LEXIS 174744, at *21–22 (D. Utah Sep. 22, 2020) (applying a ten percent reduction because the "billing records intermingle[d] time spent on [compensable claims] with time spent on [noncompensable] claims").

[203] Dkt. 278 at 8–11.

[204] N.C. Gen. Stat. § 75-16.1

"if it is wrongful and done intentionally without just cause or excuse or as a result of ill will."[205]

"The decision whether or not to award attorney fees under [the UDTPA] rests within the sole discretion of the trial [court]."[206]

Here, Defendants' UDTPA counterclaim survived the summary judgment stage because the court found there was "a genuine dispute of material fact" whether JBT's communications caused Defendants to lose a contract.[207]  While the court expressed some doubts about whether Defendants could prove any damages,[208] Defendants still presented evidence at trial and submitted the claim to the jury.  Defendants' UDTPA counterclaim may have been unavailing, but "[c]laims are not frivolous simply because they are weak."[209]  Under these circumstances, the court cannot conclude Defendants knew or should have known the UDTPA claims were frivolous and malicious.[210]  As such, JBT's request for attorneys' fees associated with Defendants' UDTPA counterclaim is denied.

### ii.   UTIAA

The threshold for recovering attorneys' fees under the UTIAA is somewhat less exacting. In contrast to the UDTPA, reasonable fee awards are not limited to situations where the claimant "knew, or should have known, [it] was frivolous and malicious."[211]  Instead, the statute directs

---

[205] *W. Franklin Pres. L.P. v. Nurtur N.C., LLC*, No. 1:14-cv-266, 2016 U.S. Dist. LEXIS 69714, at *16–17 (E.D.N.C. May 27, 2016) (quoting *Blyth v. McCrary*, 646 S.E.2d 813, 819 n.5 (N.C. Ct. App. 2007) (citations, quotation marks, and alterations omitted)).

[206] *Blankenship v. Town & Country Ford, Inc.*, 622 S.E.2d 638, 643 (N.C. Ct. App. 2005).

[207] *Summary Judgment Order* at 77.

[208] *Id.*

[209] *Southeast Air Charter, Inc. v. Stroud*, 2015 NCBC 66, 63 (N.C. Super. Ct. June 30, 2015).

[210] *See Hatteras/Cabo Yachts, LLC v. M/Y Epic*, No. 4:17-cv-00025-BR, 2021 U.S. Dist. LEXIS 236968, at *5–6 (E.D.N.C. Dec. 9, 2021) (denying an award of attorneys' fees under the UDTPA where, "[a]lthough [the claim was] ultimately deemed legally insufficient, [it] survived—at least in part—a motion to dismiss and one for summary judgment" and the "counterclaim plaintiffs made efforts to introduce [] evidence at trial").

[211] *See* N.C. Gen. Stat. § 75-16.1.

that "[t]he court *shall* award attorneys' fees to the prevailing party."[212]  Defendants argue the

court cannot determine whether JBT was the prevailing party because it "issued no written

opinion when it dismissed [their] UTIAA counterclaim.  It did so by minute order."[213]  In the

alternative, Defendants challenge the sufficiency of JBT's efforts to properly delineate

recoverable fees under the UTIAA and posit that its "allocations are mere guesses . . . or []

otherwise do not rise to a level sufficient for [the court] to make the necessary findings."[214]  The

court disagrees with both contentions.

First, the court did not dismiss Defendants' UTIAA counterclaim by simply entering a

minute order on the docket.  It delivered a lengthy oral ruling that was heard by Defendants'

counsel and transcribed by a court reporter.[215]  In this ruling, the court explained that

Defendants' counterclaim failed to comply with a key notice requirement, warranting

dismissal.[216]  While the court did not specify whether dismissal was with or without prejudice,

JBT was unequivocally the prevailing party.  The claim asserted against it was dismissed and the

court expressed doubts about whether a UTIAA claim even provided the type of relief

Defendants sought.[217]  Under these circumstances, the plain language of the statute and relevant

---

[212] Utah Code Ann. § 13-11a-4(2)(c) (emphasis added).

[213] Dkt. 299 at 16 (citing Dkt. 121, *Minute Entry for Proceedings Held on September 25, 2018*).

[214] *Id.* at 16–17.

[215] *See* Dkt. 123, *Transcript for the Proceedings on September 25, 2018* at 19:12–28:22 (reflecting the court's oral ruling dismissing Defendants' UTIAA counterclaim).

[216] *Id.* at 20:17–28:7.

[217] *See id.* at 25:9–12 ("As an initial matter . . . it's not clear at all . . . that Section 13-11a-4 authorizes standalone suits for damages in any event.").

case law suggests reasonable attorneys' fees are not only available under the UTIAA, but mandatory.[218]

Second, the court disagrees with Defendants' contention that JBT failed to properly allocate its billing entries.[219]  On the contrary, the relevant records evince careful and constrained efforts by JBT to reduce entries to account for the time that was actually spent defending against the UTIAA claim.[220]  The resulting fees account for approximately one percent of JBT's total attorneys' fee request.[221]  Accordingly, JBT's request for attorneys' fees on its defense against Defendants' UTIAA counterclaim is granted.

### E.  Reasonableness of JBT's Fee Request

Having determined JBT is entitled to recover attorneys' fees spent pursuing all but two of its affirmative claims, as well as the fees spent defending against Defendants' UTIAA counterclaim, the court now considers whether its requested fees are reasonable.

JBT initially requested $2,616,746.68 in attorneys' fees for its common core claims,[222] which it later reduced to $2,485,909.35 after withdrawing its request for fees related to its

---

[218] *See* Utah Code Ann. § 13-11a-4(2)(c); *Xlear, Inc. v. Focus Nutrition, LLC*, No. 2:16-cv-643-DB, 2018 U.S. Dist. LEXIS 149534, at *2 (D. Utah Aug. 31, 2018) ("Under th[e] statutory language, if Defendant is determined to be the prevailing party under the facts presented, the [c]ourt *shall* award attorneys' fees for its defense of the UTIAA claim."); *see also Beach Blitz Co. v. City of Mia. Beach*, 13 F.4th 1289, 1300 (11th Cir. 2021) (holding that even when the district court dismissed claims without prejudice, its order granting a Rule 12(b)(6) motion carried "judicial imprimatur" and could convey prevailing party status).

[219] Dkt. 299 at 16–17.

[220] *See generally* Dkt. 279, *Declaration of Steven Zeller* ¶¶ 10–12 (discussing counsel's methodology for calculating the number of hours they spent on Defendants' UTIAA counterclaim and showing that less than 60 hours are attributed to the counterclaim); Dkt. 279-1, *Exhibit 1: Dykema Fee Records*; Dkt. 280, *Declaration of David Billings* ¶¶ 9, 11 ("Based on this allocation $3,742.50 in fees have been allocated to the UTIAA counterclaim . . . . The total fees requested by JBT billed by Fabian VanCott is $78,927.55."); Dkt. 280-1, *Exhibit 1: Fabian VanCott Fee Records*.

[221] *See* Dkt. 278 at 17.

[222] Dkt. 278 at 17.

trademark infringement claim.[223]  As discussed, it is appropriate to reduce JBT's fee award by an additional five percent to account for the need to eliminate JBT's defamation claim from the common core of claims entitled to attorneys' fees.[224]  Additionally, JBT requests $30,698.83 for its defense against Defendants' UTIAA counterclaim,[225] for a total attorneys' fee request of nearly $2.4 million.[226]

In determining the reasonableness of a request for attorneys' fees, district courts in the Tenth Circuit generally employ the familiar "lodestar" approach by multiplying counsel's hours reasonably spent on the litigation by a reasonable hourly rate.[227]  Under the lodestar approach, the party requesting the fees—JBT—bears the burden to "prove and establish the reasonableness of each dollar, each hour, above zero."[228]  JBT must also provide evidence supporting the hours

---

[223] *See* Dkt. 305 at 5 n.3.

[224] *See supra* Section III(C).

[225] Dkt. 278 at 17.

[226] The court observes a slight discrepancy between the Dykema fees listed in JBT's Motion for Attorneys' Fees and the Dykema billing records attached as an exhibit to Steven Zeller's Declaration.  *Compare* Dkt. 278 at 17 (requesting $2,657,742.29 for Dykema counsel's work), *with* Dkt. 279-1 (reflecting $2,660,659 in attorneys' fees after accounting for Dykema counsel's allocations and reductions).  It is unclear why there is a $2,916.71 difference between the two sums, but the court is inclined to recognize the lower figure set out in the Motion because (1) it benefits the paying parties—Defendants—and (2) it is the clearest indication of JBT's fee request.  Nevertheless, there are times where the court's evaluation centers on the Dykema billing records—for example, when adjusting billing rates or excluding specific time entries.  To reconcile the discrepancy between the Motion and the billing records, the court starts from the slightly lower figure set out in JBT's Motion ($2,657,742.29) but then applies the reductions as they are determined based on the billing records.  On balance, this approach slightly favors Defendants while recognizing that "[t]he essential goal in shifting fees is to do rough justice, not to achieve auditing perfection." *Fox v. Vice*, 563 U.S. 826, 838 (2011).

[227] *See, e.g.*, *United Phosphorus*, 205 F.3d at 1233 (applying the lodestar approach to determine the reasonableness of an attorneys' fee award under the Lanham Act); *Derma Pen, LLC v. 4EverYoung Ltd.*, No. 2:13-cv-00729-DN, 2019 U.S. Dist. LEXIS 113345, at *4–5 (D. Utah July 8, 2019) (same); *Bimbo Bakeries USA, Inc. v. Sycamore*, No. 2:13-cv-00749, 2019 U.S. Dist. LEXIS 36041, at *3–4 (D. Utah Mar. 5, 2019) (applying the lodestar approach for attorneys' fees granted on a plaintiff's trade secret claim); *Jensen v. W. Jordan City*, No. 2:12-cv-736-DAK, 2017 U.S. Dist. LEXIS 170076, at *77–78 (D. Utah Oct. 13, 2017) (using the lodestar approach to determine the reasonableness of an attorneys' fees award under the common core approach).

[228] *Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1210 (10th Cir. 1986).

worked and the claimed rate.[229]  Where this is found lacking, "the district court may reduce the award accordingly."[230]

### i.  Reasonable Hours

"[T]he first step in calculating the lodestar [is to] determin[e] the number of hours reasonably spent by counsel for the party seeking fees."[231]  In assessing the reasonableness of counsel's claimed hours, the court considers: "(a) whether the hours are supported by adequate billing records; (b) whether the attorney has exercised billing judgment; and (c) whether the hours expended on each task are reasonable."[232]

#### a.  Billing Records

The fee applicant must submit to the court "meticulous, contemporaneous time records that reveal, for each lawyer for whom fees are sought, all hours for which compensation is requested and how those hours were allotted to specific tasks."[233]  JBT's counsel from both Fabian VanCott (local counsel) and Dykema Gossett PLLC (Dykema counsel) have submitted detailed time records and billing statements covering the period from mid-2017 to the end of trial on October 6, 2022.[234]  During this six-year period, counsel's records show they spent roughly six thousand hours litigating JBT's common core claims and defending against the UTIAA counterclaim.[235]  Additionally, lead attorneys from Fabian VanCott and Dykema—David Billings and Steven Zeller, respectively—provide further context on counsel's representation during the

---

[229] *Hensley*, 461 U.S. at 433.

[230] *Id.*

[231] *Case by Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1250 (10th Cir. 1998).

[232] *Webb v. Cty. of Stanislaus*, No. 2:21-mc-00696-JNP-JCB, 2022 U.S. Dist. LEXIS 78387, at *8 (D. Utah Apr. 29, 2022) (citing *Case*, 157 F.3d at 1250).

[233] *Case*, 157 F.3d at 1250.

[234] *See* Dkt. 279-1; Dkt. 280-1.

[235] *Id.*

relevant period, supported by the aforementioned billing records.[236]  Though Defendants challenge some of the billing entries provided by counsel, they do not raise any general concerns with the adequacy of the records.[237]

   Still, the records are not perfect—JBT admits as much.[238]  Many of the proffered time entries contain descriptions of multiple tasks without explaining how time should be allocated among them, following a practice generally known as "block billing."[239]  And there are other time entries with vague or generic task descriptions, such as "review of documents,"[240] "trial preparation,"[241] or "prepare for hearing."[242]  While these billing shortcuts are discouraged because they hinder the court's ability "to determine the time allotted . . . to specific tasks and the reasonableness of that time,"[243] they are not necessarily fatal to JBT's fee application.[244]  Instead, where counsel's billing shortcuts prevent meaningful review, the court construes the deficient

---

[236] Dkt. 279; Dkt. 280.

[237] *See generally* Dkt. 299.

[238] *See* Dkt. 305 at 9–10 ("JBT made a good faith effort to allocate all time entries according to the protocol set forth in [Dkt. 279]. . . . Admittedly, such effort was not perfect.").

[239]  *See Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1554 n.15 (10th Cir. 1996) ("'Block billing' refers to the time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks.").

[240] *See* Dkt. 279-1 at 2, 16, 33, 38.

[241] *See id.* at 92–110.

[242] *See id.* at 6, 19, 77–78.

[243] *See Utah Physicians For A Healthy Env't, Inc. v. Diesel Power Gear, LLC*, No. 2:17-cv-00032-RJS, 2022 U.S. Dist. LEXIS 120277, at *9 (D. Utah July 6, 2022) (quoting *Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1215 (10th Cir. 2000)).

[244] *See, e.g., id.* (explaining that block-billed entries can be deemed reasonable "if the reviewing court is [] able to discern the specific tasks performed during that entry, and assess that those tasks were reasonable for the allotted time"); *First Mercury Ins. Co. v. Wonderland Homes*, No. 1:19-cv-00915-JLK-SKC, 2021 U.S. Dist. LEXIS 136485, at *8 (D. Colo. July 22, 2021) ("[W]hile counsel's practice of block billing in this matter is frowned on and renders [the court's] task more difficult, the Tenth Circuit has 'never mandated a reduction or a denial of a fee request based on block billing.' (quoting *BP Pipelines (N. Am.) Inc. v. C.D. Brown Constr., Inc.*, 473 F. App'x 818, 835 (10th Cir. 2012))); *Flitton v. Primary Residential Mortg., Inc.*, No. 2:03-cv-481-DAK, 2009 U.S. Dist. LEXIS 44235, at *17 (D. Utah May 7, 2009) (declining to reduce a fee award based on vague entries such as "trial prep" and "motion to compel," concluding that "most of the entries [were] adequately descriptive for purposes of reviewing the fee application").

entry against JBT—for example, by striking an entire block-billed entry that contains a non-compensable task along with compensable ones.[245]  Additionally, the court excludes JBT's "PLACEHOLDER" time entry for 0.8 hours.[246]

### b. Billing Judgment

Next, the court must ensure JBT's counsel properly "exercised billing judgment."[247] "Billing judgment consists of winnowing the hours actually expended down to the hours reasonably expended."[248]  In doing so, "[c]ounsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary."[249]

JBT claims "counsel . . . exercised appropriate billing judgment by carefully reviewing each billing entry . . . to determine whether those fees were reasonable."[250]  However, neither Billings nor Zeller explain how they exercised billing judgment beyond "reviewing each billing entry" and apportioning counsel's hours among the affirmative claims and counterclaims.[251] Billings suggests that all of the hours claimed by Fabian VanCott were deemed "reasonable and necessary," which leads the court to conclude that local counsel's reductions were likely minimal.[252]  However, the records from Dykema counsel evince some reductions for "travel" and

---

[245] *See Longdo v. Pelle*, No. 15-cv-01370-RPM, 2016 U.S. Dist. LEXIS 194036, at *10 (D. Colo. Sep. 8, 2016) (striking an entire time entry because it did "not separate any properly-billable time from the non-billable [] time"); *Martin v. SGT, Inc.*, No. 2:19-cv-00289-RJS, 2023 U.S. Dist. LEXIS 90346, at *30 (D. Utah May 22, 2023) (construing deficient billing records in a manner that favored the party paying the fees).

[246] Dkt. 279-1 at 49.

[247] *Case*, 157 F.3d at 1250.

[248] *Id.*

[249] *Hensley*, 461 U.S. at 434.

[250] Dkt. 278 at 14.

[251] *See generally id.*; Dkt. 279-1; Dkt. 280-1.

[252] Dkt. 280 ¶¶ 3, 14.

other non-compensable time entries, demonstrating at least some billing judgment.[253] Nevertheless, Defendants point to a number of time entries where counsel's billing judgment fell short, such as time entries for drafting a press release or supporting another lawsuit.[254] Defendants also critique the relatively high rate of billing by partners when compared with associates and paralegals.[255] After closely scrutinizing the proffered billing records, the court agrees with Defendants that these deficiencies undermine counsel's purported exercise of billing judgment and warrant a closer look at the reasonableness of JBT's fee request.

When, as here, "a party's attorneys do not exercise proper billing judgment, the court is obligated to exclude unreasonable hours from the fee request."[256] It "approach[es] this reasonableness inquiry much as a senior partner in a private law firm would review the reports of subordinate attorneys when billing clients"[257]—that is, by removing "hours that were unnecessary, irrelevant[,] and duplicative."[258] The court's "overriding consideration [is] whether the [] hours were 'necessary' under the circumstances."[259]

In reviewing the records provided by JBT, it is clear that many of counsel's proffered hours were non-billable, duplicative, or otherwise unreasonable. But as there are nearly three thousand time entries associated with JBT's fee request, it is "practically impossible" for the court to "identify and justify each disallowed hour."[260] In cases such as these, "in which the

---

[253] *See* Dkt. 279-1 at 79, 108 (showing that JBT is not requesting attorneys' fees for "travel" and other tasks).

[254] *See* Dkt. 299 at 6–7.

[255] *Id.* at 10–13.

[256] *Utah Physicians for a Healthy Env't., Inc. v. Diesel Power Gear, LLC*, No. 2:17-cv-00032-RJS, 2021 U.S. Dist. LEXIS 15091, at *26 (D. Utah Jan. 26, 2021) (citing *Malloy v. Monahan*, 73 F.3d 1012, 1018 (10th Cir. 1996)).

[257] *Robinson*, 160 F.3d at 1281 (internal quotation marks and citation omitted).

[258] *Case*, 157 F.3d at 1250 (internal quotation marks and citation omitted).

[259] *Robinson*, 160 F.3d at 1281.

[260] *Case*, 157 F.3d at 1250 (internal quotation marks and citation omitted).

parties generated thousands of pages of written work product and [] submitted [] over a hundred

pages [of] billing statements, it is neither practical nor desirable to expect the [] judge to have

reviewed each paper in the massive case file to decide, for example, whether a particular motion

could have been done in 9.6 hours instead of 14.3 hours."[261]   Under these circumstances, the

Tenth Circuit has noted, "[a] general reduction of hours claimed in order to achieve what the

court determines to be a reasonable number is not an erroneous method, so long as there is

sufficient reason for its use."[262]   Here, the court discerns two general categories of hours that are

"non-billable" or "otherwise unreasonable," and must therefore be excluded or reduced from

JBT's attorneys' fee award.

### 1. *Allocation of Hours to Partners*

First, the court reduces Dykema counsel's hours to account for the unreasonable

proportion of hours billed by senior partners.  For example, from May 16 to May 30, 2019,

Dykema counsel spent over ninety hours reviewing Defendants' Response to JBT's Motion for

Partial Summary Judgment,[263] researching relevant case law, and drafting a twenty-page Reply

brief.[264]   While these hours were not necessarily excessive given the case's posture and

complexity, it is notable that the lion's share of the work—seventy-five percent—was done by

two senior partners: Edward Weil, with "over thirty-five years [of experience] as a litigation

attorney," and Zeller, with twenty-six years.[265]   By contrast, associates performed about twenty

---

[261] *Id.*

[262] *Mares*, 801 F.2d at 1203 (10th Cir. 1986) (collecting cases).

[263] *See* Dkt. 145; Dkt. 147 [SEALED].

[264] *See* Dkt. 164, *JBT's Reply Memorandum in Further Support of Its Motion for Partial Summary Judgment on Its Affirmative Claims*; Dkt. 166 [SEALED].

[265] *See* Dkt. 279 ¶¶ 18–19.

hours of work, focused largely on research and editing.[266]  Of course, law firms are "at liberty to decide how to staff cases and utilize attorney time," but that does not "render the corresponding billing reasonable."[267]  On the contrary, "there is work that may be ably done by an associate, such as research, compiling documents, and drafting motions, the value of which is not enhanced merely because it is done by a senior partner."[268]

Here, the allocation of nearly seventy-five percent of the work to senior partners with over sixty years of combined experience strikes the court as excessive.[269]  And it is hardly an isolated incident.  In addition to the partner-heavy bill for JBT's Reply, Dkystra partners performed a disproportionate amount of work on other pre-trial matters, including responding to a *Daubert* motion,[270] opposing Defendants' Motion for Summary Judgment,[271] and preparing JBT's Amended Complaint.[272]  Moreover, Zeller appears to have played a particularly prominent role during the discovery process, performing nearly as much document review as the associates

---

[266] *See generally* Dkt. 279-1 at 72–75 (detailing Dykema counsel's efforts from May 16 to May 30, 2019).

[267] *Charbonneau v. Mortg. Lenders of Am. L.L.C.*, No. 2:18-cv-02062-HLT, 2021 U.S. Dist. LEXIS 196865, at *14–15 (D. Kan. Oct. 13, 2021).

[268] *Am. Petroleum Inst. v. U.S. E.P.A.*, 72 F.3d 907, 916 (D.C. Cir. 1996).

[269] *See, e.g.*, *City of Las Cruces v. Lofts at Alameda, LLC*, No. 17-809 JCH/GBW, 2022 U.S. Dist. LEXIS 124633, at *25 (D.N.M. July 14, 2022) (reducing hours where partners billed sixty-five percent of the time for a discovery dispute, explaining that "a fifty-fifty split between partners and associates [seems] more appropriate"); *Beastie Boys v. Monster Energy Co.*, 112 F. Supp. 3d 31, 51-53 (S.D.N.Y. 2015) (concluding "a material reduction in the requested fee award [was] merited" where a "firm billed nearly 2.5 times as many partner hours as associate hours"); *see also Charbonneau*, 2021 U.S. Dist. LEXIS 196865, at *14–17 (collecting cases).

[270] *See* Dkt. 148, *JBT's Response to Defendants' Motion to Preclude the Testimony and Expert Report of David R. Duski*; Dkt. 150 [SEALED].  Though counsel's block billing makes it difficult to determine the amount of time spent on specific workstreams, the court estimates counsel spent 73.1 hours reviewing Defendants' Motion to Exclude, Dkt. 128, researching relevant case law, and drafting JBT's Response.  Only 13.5 hours were billed by an associate, Christina Brunty, with the remaining time billed by Zeller, Weil, and another partner, Heather Kramer.

[271] *See* Dkt. 154, *JBT's Memorandum in Opposition to Defendants' Motion for Summary Judgment*; Dkt. 156 [SEALED].  The court estimates Dkystra counsel spent 153.2 hours preparing an opposition to Defendants' Motion for Summary Judgment, Dkt. 126, three-quarters of which was performed by Zeller and Weil.

[272] *See Amended Complaint*.  The court estimates Dkystra counsel spent 64.5 hours preparing the Amended Complaint.  Most of the work appears to have been performed by Zeller and Weil (58%), with most of the remainder allocated to a senior associate billed between $375 to $395.

assigned to the case.[273]  While there are certainly situations that call for the expertise of seasoned counsel, these tasks are a normal part of pre-trial litigation, where "associates [should] shoulder much of the work, under the active supervision of partners."[274]

The division of labor understandably shifts gears as the case heads to trial and experienced trial attorneys start taking a more hands-on approach.[275]  Yet, JBT's billing records evince an enthusiastic use of senior partners throughout the entire litigation.[276]  In total, Dykema partners account for sixty-four percent of the time requested for JBT's affirmative claims and UTIAA counterclaim defense, with associates and paralegals accounting for the rest.[277]  While "it is hard to argue with success,"[278] it would be unreasonable to burden Defendants with the full cost of JBT's top-heavy approach.  Following the lead of other district courts, the court will therefore reduce Dykema counsel's bill by ten percent.[279]

---

[273] *See generally* Dkt. 279-1.

[274] *Beastie Boys*, 112 F. Supp. 3d at 51.

[275] *See id.* (explaining that while "associates shoulder much of the work" with respect to discovery and other pre-trial tasks, "trial work tends to be more partner-intensive, befitting partners' greater trial expertise").

[276] *See generally* Dkt. 279-1; Dkt. 280-1.

[277] Based on the Dykema billing records, Dkt. 279-1, Dykema partners billed 3,381 out of the 5,286.9 hours requested for work on JBT's affirmative claims and the UTIAA counterclaim.

[278] *See Flying J Inc. v. Comdata Network, Inc.*, No. 1:96-CV-066BSJ, 2007 U.S. Dist. LEXIS 84554, at *65 (D. Utah Nov. 15, 2007) ("The fact is that [Defendant's] counsel ultimately prevailed in this proceeding, and the plaintiffs' counsel did not.  The outcome itself suggests that [Defendant] correctly invested the necessary litigation resources in its defense, while the plaintiffs somehow fell short of their own goal.").

[279] *See, e.g.*, *Catholic Bens. Ass'n LCA v. Azar*, No. CIV-14-240-R, 2018 U.S. Dist. LEXIS 139058, at *32–34 (W.D. Okla. Aug. 15, 2018) (applying a ten percent reduction where eighty-four to eighty-seven percent of hours were billed by partners or senior counsel); *Hitchens v. Thompson Nat'l Props., LLC*, No. 12-cv-02367-LTB-BNB, 2014 U.S. Dist. LEXIS 73186, at *11 (D. Colo. May 29, 2014) (applying "an across-the-board reduction of 10% of [partners'] billed hours . . . to reflect work that could have reasonably been performed by associates"); *Homeaway.com, Inc. v. City of N.Y.*, 523 F. Supp. 3d 573, 592–93 (S.D.N.Y. 2021) (reducing fee award by fifteen percent where partners billed over half of all hours); *see also Charbonneau*, 2021 U.S. Dist. LEXIS 196865, at *14–16 (collecting cases showing reductions of fifteen to forty percent to account for "top-heavy" bills).

### 2. *Unnecessary or Unrelated Tasks*

Second, the court excludes time entries that were either unnecessary or unrelated to JBT's case against Defendants. For example, JBT requests compensation for 7.7 hours for senior partners' review and revision of a press release following issuance of the court's Summary Judgment Order.[280] To be compensable, Tenth Circuit case law suggests the "assistance provided must be actually necessary or essential to proper representation rather than merely comforting or helpful."[281] With a few narrow exceptions, preparation of a press release falls within the latter, noncompensable category.[282] Because JBT does not explain how counsel's efforts regarding the press release were "actually necessary or essential to proper representation,"[283] these time entries are therefore excluded from JBT's award.

Yet, far more concerning than these noncompensable requests is counsel's failure to fully exclude time entries related to a separate action against a non-party—Twist. Of course, Twist and Defendants are hardly strangers to each other. As discussed herein, one of JBT's central allegations was that Bullerdick transmitted JBT's trade secrets to Twist to assist Twist's development of a product that could compete with JBT's ground equipment.[284] But Twist was never made a party to this action,[285] and it would be wholly inappropriate to burden Defendants with the fees JBT spent pursuing distinct claims against a non-party.

---

[280] *See* Dkt. 279-1 at 83–84.

[281] *Case*, 157 F.3d at 1252.

[282] *Cf. Catholic Bens. Ass'n*, 2018 U.S. Dist. LEXIS 139058, at *23–24 (assuming that work drafting press releases was "purely promotional and therefore non-compensable" when the fee applicant failed to offer evidence to support his claim that press work helped "recruit[] potential class members and educate[] current ones").

[283] *Case*, 157 F.3d at 1252.

[284] *See Summary Judgment Order* at 2, 12, 26–30.

[285] *See generally* Dkt. 2, *Verified Complaint*; *Amended Complaint*.

The Dykema billing records contain forty-five time entries referencing counsel's efforts related to Twist.[286]  While some of these time entries theoretically relate to the instant action, there are others denoted as "matters relating to new claims against Twist" and appear unrelated to JBT's claims against Defendants.[287]  These oversights—coupled with the ambiguity of counsel's time records—lead the court to conclude that a correction is needed to mitigate the risk of burdening Defendants with fees from a separate action against a non-party.  Accordingly, the court excludes all time entries that mention "Twist" for a total reduction of 110.5 hours.  While there is still a risk that other time entries relate to this separate matter without mentioning Twist by name, close scrutiny of the Dykema billing records indicates this risk is relatively low.  And the court's deliberate overcorrection—excluding all time entries mentioning "Twist" even though some of them potentially pertain to this action—amply guards Defendants against the risk of surviving Twist-related time entries.

### 3. Reductions Summary

To summarize, JBT initially requested an attorneys' fee award of approximately $2.74 million, reflecting over five thousand hours of work from Dykema and local counsel on JBT's affirmative claims and defense against the UDTPA and UTIAA counterclaims.  The court reduces JBT's total requested award in several ways.  First, fees related to Defendants' UDTPA counterclaim are excluded, which reduces the award by $89,124.16 at the outset.[288]  Second, the court excludes Dykema counsel's unnecessary, unrelated, or unclear time entries, including those

---

[286] *See generally* Dkt. 279-1.

[287] *See id.* at 22; *see also id.* at 62 ("Attention to Documents in Bullerdick Case to be Produced to Twist"), 84 ("[R]eviewed status of Twist Boom Air patent and related litigation; correspond with Mr. Penn re[garding] Twist Boom Air patent status.").

[288] *See supra* Section III(D)(i); *see also* Dkt. 278 at 17 (summarizing JBT's requested attorneys' fee award).

related to JBT's press release and the separate action against Twist.[289]  This leaves an award of approximately $2.58 million.  Third, the court applies a general reduction of ten percent to account for the exclusion of JBT's noncompensable trademark infringement and defamation claims.[290]  Concurrently, Dykema counsel's fees are reduced by a further ten percent to account for the firm's top-heavy allocation of work.[291]  These reductions leave a total potential fee award of $2,070,435.74.

| | | Dykema Counsel | Local Counsel | Total |
|---|---|---|---|---|
| **Initial Request** | | **$ 2,657,742.29** | **$ 78,827.38** | **$ 2,736,569.67** |
| Exclusions | UDTPA Claim | $ (85,406.13) | $ (3,718.03) | $ (89,124.16) |
| | Placeholder | $ (486.50) | $ - | $ (486.50) |
| | Press Release | $ (5,153.50) | $ - | $ (5,153.50) |
| | Twist Matter | $ (63,149.50) | $ - | $ (63,149.50) |
| **Subtotal** | | **$ 2,503,546.66** | **$ 75,109.35** | **$ 2,578,656.01** |
| Reductions | Trademark Infringement (5%) | $ (125,177.33) | $ (3,755.47) | $ (128,932.80) |
| | Defamation (5%) | $ (125,177.33) | $ (3,755.47) | $ (128,932.80) |
| | Top-Heavy (10%) | $ (250,354.67) | $ - | $ (250,354.67) |
| **Total** | | **$ 2,002,837.33** | **$ 67,598.42** | **$ 2,070,435.74** |

### c.  Reasonableness of Hours

Having satisfied "the obligat[ion] to exclude unreasonable hours from the fee request,"[292] the court next turns to the factors set forth in *Case by Case v. Unified Sch. Dist. No. 233*[293] and

---

[289] *See supra* Section III(E)(b)(2).

[290] *See supra* Section III(C).

[291] *See supra* Section III(E)(b)(1).

[292] *Utah Physicians*, 2021 U.S. Dist. LEXIS 15091, at *26 (citing *Malloy*, 73 F.3d at 1018).

[293] In making the reasonableness determination, the court "considers the following factors: (1) 'the complexity of the case,' (2) 'the number of reasonable strategies pursued,' (3) 'the responses necessitated by the maneuvering of the other side,' and (4) 'the potential duplication of services.'"  *Id.* at *7 (quoting *Case*, 157 F.3d at 1250).

*Johnson v. Georgia Highway Exp., Inc.* to determine whether the resulting award is reasonable or warrants further adjustment.[294]

First, the *Case* factors generally support the fees sought by JBT.  While some elements of the case were straightforward, there were also many complex legal and factual disputes, requiring extensive maneuvering by JBT's counsel.  Over the course of nearly six years, they prosecuted JBT's case through a labyrinth of counterclaims, amended complaints, cross-motions, and discovery disputes, finally culminating in a highly technical six-day trial focused on damages.  During that time, counsel also attempted mediation and settlement with Defendants to no avail.  While some of counsel's time entries reflect duplicative or unnecessary work—such as work performed on a potential action against a non-party—the court concludes the adjustments discussed above sufficiently guard against the potential for duplication of services.

The *Johnson* factors lend further support to the reasonableness of JBT's fee request. While the court need not discuss every *Johnson* factor,[295]  several are particularly relevant here. First, the past six years of litigation have required extensive time and labor from JBT's counsel, encompassing not only pre-trial motion practice, but also a six-day trial and now, extensive post-trial briefing.  Second, the case required counsel to address some novel questions surrounding reverse passing off claims under the Lanham Act and difficult questions about how to best calculate damages resulting from Defendants' basket of misconduct.  Third, JBT's counsel

---

[294] 488 F.2d 714, 717–19 (5th Cir. 1974) (stating that when considering the reasonableness of attorney fees, the court should consider: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases); *see also Gottlieb v. Barry*, 43 F.3d 474, 482 (10th Cir. 1994) (stating that the Tenth Circuit applies the twelve *Johnson* factors in statutory fee cases).

[295] *See Uselton v. Commercial Lovelace Motor Freight, Inc.*, 9 F.3d 849, 854 (10th Cir. 1993).

proved to be capable attorneys with an exacting attention to detail.  They were able to uncover

the full scope of Defendants' misconduct and achieve a high degree of success at both summary

judgment and trial.  Though the "results obtained" were less than JBT had hoped for, they still

represent a vindication of JBT's claims against Defendants and defeat of Defendants'

counterclaims.  And Defendants can hardly complain about the disparity between JBT's

requested attorneys' fees and the $1.1 million damages award when it was their own conduct that

necessitated JBT's odyssean legal journey.[296]  Having considered the rest of the *Johnson* factors,

the court concludes these factors either support the reasonableness of JBT's requested fees or

have little bearing on the present case.

In sum, the court declines to reduce JBT's fee award at this point beyond the reductions

already taken based on the court's billing judgment and non-compensability of certain claims.

*ii. Reasonable Rates*

The court next reviews the reasonableness of JBT's claimed hourly rates.  As "[t]he party

requesting fees," JBT bears "the burden of showing that the requested rates are in line with those

prevailing in the community for similar services by lawyers of reasonably comparable skill,

experience, and reputation."[297]  In contrast to the broad discretion generally afforded to district

courts in assessing attorneys' fees, the Tenth Circuit cautions district courts not to "ignore[] the

parties' market evidence and set[] an attorney's hourly rate using the rates [they] consistently

---

[296] *See City of Riverside v. Rivera*, 477 U.S. 561, 581 n.11 (1986) (stating that a party "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response"); *see also Brandau v. Kan.*, 168 F.3d 1179, 1181 n.1 (10th Cir. 1999) (upholding an attorneys' fee award that vastly outweighed the nominal damages award received by the plaintiff); *Read v. Okla. Flintrock Prods., LLP*, No. 21-CV-316-JFJ, 2023 U.S. Dist. LEXIS 86077, at *17 (N.D. Okla. May 17, 2023) (approving an attorneys' fee award that was "greater than the relief obtained" because it was "neither excessive nor unreasonable in light of the time expended and results obtained").

[297] *Ellis v. University of Kan. Med. Ctr.*, 163 F.3d 1186, 1203 (10th Cir. 1998).

grant[].”[298]  Moreover, courts may not use their “own knowledge to establish the appropriate rate

unless the evidence of prevailing market rates . . . is inadequate.”[299]

     The “relevant market” in this case is the Salt Lake City, Utah legal market, where JBT

decided to file suit.[300]  Yet, JBT’s Dykema counsel was based in Chicago, Illinois.  As such,

Defendants argue that Dykema counsel’s requested rates—ranging between $295 and $715 per

hour—should be reduced to match those of JBT’s local counsel, following an approach from

*Bimbo Bakeries USA, Inc. v. Sycamore*.[301]  For its part, JBT does not dispute that Salt Lake City

is the relevant market, nor does it raise any of the recognized exceptions to the prevailing market

rule.[302]  Instead, JBT counters that Dykema counsel’s out-of-state rates are consistent with the

rates for comparable representation in Salt Lake City, referencing, among other things, a report

from the American Intellectual Property Law Association (AIPLA), Billings’s opinion as a

member of the Utah legal community, and recent fee awards from this District.[303]

     At the outset, the court declines to follow the approach advocated by Defendants.

Notably, the court in *Bimbo Bakeries* was provided with competing declarations from local

attorneys disputing the requested out-of-state rates and an expert report on prevailing market

---

[298] *Case*, 157 F.3d at 1255.

[299] *United Phosphorus*, 205 F.3d at 1234; *see also Case*, 157 F.3d at 1257 (“Only if the district court does not have before it adequate evidence of prevailing market rates may the court, in its discretion, use other relevant factors, including its own knowledge, to establish the rate.”).

[300] *See Ramos v. Lamm*, 713 F.2d 546, 555 (10th Cir. 1983) (stating that the relevant market consists of “the area in which the litigation occurs” or “the area in which the court sits”); *accord Case*, 157 F.3d at 1256.

[301] *See* Dkt. 299 at 10–13 (citing *Bimbo Bakeries*, 2019 U.S. Dist. LEXIS 36041, at *7–8).

[302] *See generally* Dkt. 278; Dkt. 305; *see also Lippoldt v. Cole*, 468 F.3d 1204, 1225 (10th Cir. 2006) (“Unless the subject of the litigation is so unusual or requires such special skills that only an out-of-state attorney possesses, the fee rates of the local area should be applied even when the lawyers seeking fees are from another area.” (internal quotation marks and citations omitted)).

[303] *See* Dkt. 278 at 15–16 (citing Dkt. 279-3, *AIPLA 2019 Report of the Economy Survey*; Dkt. 280 ¶ 6); Dkt. 305 at 8–9 (citing *ESIP Series 1, LLC v. Doterra Int’l, LLC*, No. 2:15-cv-00779-RJS, 2022 U.S. Dist. LEXIS 231525, *13 (Dec. 23, 2022)).

rates.[304]  But Defendants offer neither.  Instead, they seem to argue that the court should reduce

Dykema counsel's rates to local counsel's rates as a matter of course.[305]  But *Bimbo Bakeries*

does not stand for such a sweeping proposition, and it would be inappropriate to mandate

reductions based purely on a disparity with local counsel's rates.  As with many out-of-state

representations, local counsel and Dykema counsel performed very different functions.  While

local counsel consulted on local rules, reviewed filings, and served as a liaison with the court,

Dykema counsel carried the weight of this years-long litigation.[306]  They untangled the full scope

of Defendants' misconduct during discovery and staffed the highly experienced and specialized

team that carried JBT's claims across the finish line.  Given these critical differences between

counsels' roles, it makes little sense to revert to local counsel's rates by default.

At the same time, the evidence JBT provided to support the reasonableness of Dykema

counsel's rates is unhelpful.  Billings's Declaration states that "the hourly rates charged to JBT

for Dykema's services in this matter [were] fair and reasonable" based on his extensive

experience and familiarity with the case.[307]  But he does not fully address the reasonableness of

Dykema counsel's rates with respect to the Salt Lake City legal market.  And the AIPLA survey

attached to JBT's fee application places Utah in an expansive "Other West" category that spans

thirteen states and fails to provide specific information related to prevailing rates in Salt Lake

---

[304] *See Bimbo Bakeries*, 2019 U.S. Dist. LEXIS 36041 at *4 n.15; *Bimbo Bakeries*, No. 2:13-cv-00749, Dkt. 591.

[305] *See* Dkt. 299 at 12 ("JBT's local counsel stated that their rates range from $230 to $300 for its partners. . . . In contrast, Chicago counsel bills at $490 to $715 for partners . . . . To the extent the [c]ourt awards any fees, it should follow the established practice from *Bimbo Bakeries* and . . . reduce Dykema's rates to those of JBT's local counsel.").

[306] *Compare* Dkt. 280-1 (detailing local counsel's relatively constrained role), *with* Dkt. 279-1 (detailing Dykema counsel's extensive efforts with regards to this action); *see also* Dkt. 280 ¶ 5 (discussing local counsel's understanding of Dykema counsel's services).

[307] Dkt. 280 ¶ 6.

City.[308]  Even when considered together, this evidence hardly satisfies JBT's "burden of showing

that the requested rates are in line with those prevailing *in the community* for similar services."[309]

Though JBT falls short of adequately supporting Dykema counsel's claimed rates in the

context of the Salt Lake City legal market, one thing is clear—Utah's legal community has

changed considerably over the past few years.  International law firms, once relegated to Chicago

and a handful of coastal cities, have opened up Salt Lake City offices with startling frequency,

helping drive rates to levels that would have been unthinkable before the COVID-19

pandemic.[310]  Meanwhile, rapid inflation and other economic developments have prompted

courts to revisit rates that were deemed reasonable less than two years ago.[311]  Recognizing these

---

[308] *See* Dkt. 279-3 at 2, 6; *see also ThermoLife Int'l LLC v. BPI Sports LLC, No. CV-20-02091-PHX-SPL*, 2023 U.S. Dist. LEXIS 88164, at *37–38 (D. Ariz. May 18, 2023) (concluding that the data from the AIPLA survey was "largely meaningless as it relates to the Phoenix legal market" as the "Other West" category "encompass[ed] *numerous* other large and diverse legal markets");  *Composite Res., Inc. v. Rood*, No. 2:21-cv-00500-BLW, 2023 U.S. Dist. LEXIS 38226, at *9 (D. Idaho Mar. 3, 2023) (concluding that the AIPLA survey did not "provide specific enough information to establish the market rate" in Idaho).

[309] *Ellis*, 163 F.3d at 1203 (emphasis added); *see also Composite Res.*, 2023 U.S. Dist. LEXIS 38226, at *7–15 (concluding that "neither [] declarations [from counsel based on general experience] nor the AIPLA Report [were] sufficient to establish the prevailing market rate" in Idaho).

[310] *See, e.g.*, Jack Dodson, *Big Law Has Arrived in Utah*, Utah Business Magazine (Aug. 7, 2023), https://www.utahbusiness.com/big-law-has-arrived-in-utah-what-does-this-mean-for-local-law-firms/; Savannah Beth Withers Taylor, *Roundtable: Utah's 2023 Legal Landscape*, Utah Business Magazine (June 14, 2023), https://www.utahbusiness.com/roundtable-utah-legal-landscape-experts/; Andrew Maloney, *Where Are Partner Billing Rates Surging the Most in Big Law*, American Lawyer (May 24, 2023, 11:18 AM), https://www.law.com/americanlawyer/2023/05/24/where-are-partner-billing-rates-surging-the-most-in-big-law/ ("Utah led the way in terms of partner billing rate growth among states, with the median rate climbing 6.2% in 2022, up to about $350 per hour."); Sara Merken, *Large Law Firms Still See Allure of Utah's 'Silicon Slopes'*, Reuters (Apr. 5, 2022, 1:49 PM), https://www.reuters.com/legal/legalindustry/large-law-firms-still-see-allure-utahs-silicon-slopes-2022-04-05/.

[311] *See Theo M. v. Beacon Health Options, Inc.*, No. 2:19-cv-00364-JNP-DBP, 2023 U.S. Dist. LEXIS 131275, at *16–17 (D. Utah July 27, 2023) ("[B]ecause of rapid inflation after the COVID-19 [p]andemic, the cost of living in Utah has increased and $450 is a lower relative rate than it was in early 2021.  Thus, accounting for the economic developments of the past two years, the court finds that a $500 per hour rate is [now] appropriate . . . in the Salt Lake City legal market.").

considerable changes to Utah's legal landscape, courts have repeatedly accepted rates that are comparable to those requested by Dykema counsel for certain complex matters.[312]

Yet, despite these changes, Dykema counsel's requested rates are still a bridge too far. They are higher than other rates determined to be reasonable in this District and would set a new high watermark with respect to Weil's claimed rate of $715 per hour.[313]  Without "competent, trustworthy evidence of the market" from JBT or Defendants,[314] the court must rely largely on its own knowledge of the Salt Lake City legal market to determine appropriate rates for Dykema counsel.[315]  In considering a range of factors—such as the rates awarded for comparable cases, market conditions, and the qualifications of Dykema counsel—the court concludes a ten percent reduction is needed to place the requested rates in line with those prevailing in Salt Lake City. The resulting rates—between $265.50 and $643.50 per hour—still represent a significant rate for the Salt Lake City legal market, but are nevertheless reasonable given the skill, experience, and reputation Dykema counsel brought to bear on a difficult and protracted case.

In light of this reduction, JBT's attorneys' fee award is further adjusted as follows:[316]

---

[312] *See, e.g.*, *Waas v. Red Ledges Land Development, Inc.*, No. 2:20-cv-00580-TC-DBP, 2022 U.S. Dist. LEXIS 1323, 2022 WL 35717, at *4 (D. Utah Nov. 2, 2021) (holding that $650 was a reasonable hourly rate for partners to bill in Salt Lake City); *ESIP Series 1*, 2022 U.S. Dist. LEXIS 231525, at *13 (approving rates between $275 and $695 per hour for "highly experienced attorneys that regularly litigate complex patent infringement cases"); *Martin*, 2023 U.S. Dist. LEXIS 90346, at *36–38 (finding rates of up to $695 per hour "reasonable based on the skill, experience, and reputation [] counsel brought to bear on a difficult case").

[313] *See Webb*, 2022 U.S. Dist. LEXIS 78387, at *14–15 (rejecting California counsel's requested rate of $600 per hour and finding "that a rate of $400 per hour [was] reasonable . . . [and] consistent with the high end of rates other courts have found to be reasonable" (collecting cases approving rates between $325 and $450 per hour)).

[314] *Case*, 157 F.3d at 1256 ("[I]n order to comply with precedent, the district court must award *rates* compatible with competent, trustworthy evidence of the market.").

[315] *See Utah Physicians*, 2021 U.S. Dist. LEXIS 15091, at *34–35 ("If the court has no adequate evidence before it, only then 'may the court, in its discretion, use other relevant factors, including its own knowledge, to establish the rate.'" (quoting *Case*, 157 F.3d at 1257)).

[316] The court calculated the appropriate reduction by subtracting Dykema counsel's post-exclusion fees as determined by the billing records ($2,506,400) by the post-exclusion fees reflecting a ten percent rate deduction for each time entry ($2,255,760).

|  |  | Dykema Counsel | Local Counsel | Total |
|---|---|---|---|---|
| **Initial Request** |  | $ 2,657,742.29 | $ 78,827.38 | $ 2,736,569.67 |
| Exclusions | UDTPA Claim | $ (85,406.13) | $ (3,718.03) | $ (89,124.16) |
|  | Placeholder | $ (486.50) | $ - | $ (486.50) |
|  | Press Release | $ (5,153.50) | $ - | $ (5,153.50) |
|  | Twist Matter | $ (63,149.50) | $ - | $ (63,149.50) |
| **Subtotal** |  | $ 2,503,546.66 | $ 75,109.35 | $ 2,578,656.01 |
| 10% Rate Reduction |  | $ (250,640.00) | $ - | $ (250,640.00) |
| **Post-Rate Reduction Subtotal** |  | $ 2,252,906.66 | $ 75,109.35 | $ 2,328,016.01 |
| Reductions | Trademark Infringement (5%) | $ (112,645.33) | $ (3,755.47) | $ (116,400.80) |
|  | Defamation (5%) | $ (112,645.33) | $ (3,755.47) | $ (116,400.80) |
|  | Top-Heavy (10%) | $ (225,290.67) | $ - | $ (225,290.67) |
| **Total** |  | $ 1,802,325.33 | $ 67,598.42 | $ 1,869,923.74 |

### F. Nontaxable Expenses

In addition to attorneys' fees, JBT seeks significant nontaxable expenses, totaling $328,392.37.[317]  These expenses consist of the following:

|  | Dykema Counsel | Local Counsel | Total |
|---|---|---|---|
| Travel | $ 30,158.56 | $ - | $ 30,158.56 |
| Mail/Delivery | $ 1,264.02 | $ 695.38 | $ 1,959.40 |
| Research | $ 10,748.05 | $ 267.46 | $ 11,015.51 |
| Electronic Discovery | $ 278,309.43 | $ - | $ 278,309.43 |
| Miscellaneous | $ 6,815.14 | $ 134.33 | $ 6,949.47 |
| **Total** | $ 327,295.20 | $ 1,097.17 | $ 328,392.37 |

As part of an award of attorneys' fees, the court may award "incidental and necessary expenses incurred in furnishing effective and competent representation."[318]  Courts have cautioned such awards should be limited to expenses that are: (1) necessary, (2) reasonable, and (3) those "typically and customarily charged by law firms to their clients."[319]  "This necessarily

---

[317] Dkt. 278 at 11–12; Dkt. 279 ¶¶ 13–14; Dkt. 280 ¶ 13.

[318] *StorageCraft*, 2012 U.S. Dist. LEXIS 140704, at *2 (quoting *Brown v. Gray*, 227 F.3d 1278, 1297 (10th Cir. 2000)); *see also Bimbo Bakeries*, 2019 U.S. Dist. LEXIS 36041, at *9 (granting nontaxable expenses for "travel, mail/delivery, research, and miscellaneous" as part of an attorneys' fee award under the UTSA); *Univ. of Kan. v. Sinks*, No. 06-2341, 2009 U.S. Dist. LEXIS 89783, at *49 (D. Kan. Sep. 28, 2009) (collecting cases granting certain nontaxable expenses as part of an attorneys' fee award under the Lanham Act).

[319] *StorageCraft*, 2012 U.S. Dist. LEXIS 140704, at *17; *Bimbo Bakeries*, 2019 U.S. Dist. LEXIS 36041, at *8–9 (discussing the requirements for including nontaxable expenses as part of an attorneys' fee award under the UTSA).

involves a factual inquiry into the billing practices of law firms in the region who provide services to fee-paying clients."[320]  Common examples of recoverable nontaxable expenses include "delivery, postage and shipping charges, travel expenses, as well as . . . legal research charges."[321]

Defendants generally challenge JBT's showing of reasonableness and necessity for the requested expenses.  They argue that "given JBT's highly capable local counsel, travel expenses for JBT's other counsel are questionable and deserve a significant reduction if not outright denial."[322]  They further contend JBT "has made no showing that less expensive methods could not have been used" to facilitate mail and delivery services.[323] Additionally, Defendants criticize JBT's vague descriptions of "legal research," which they assert "mak[es] it impossible to evaluate whether the research was reasonable or useful."[324]  Finally, Defendants maintain "JBT has failed to show the reasonableness" of the significant amount claimed for electronic discovery, which encompasses $19,511.28 for "personnel hours," $252,357.50 for "data hosting," and $6,440.65 for "other."[325] Given "the inclusion of fee entries relating to JBT's separate lawsuit against Twist," Defendants speculate that JBT's electronic discovery "database might also have been used in furtherance of that litigation," making an award of nontaxable expenses inappropriate.[326]

---

[320] *Brown*, 227 F.3d at 1297.

[321] *StorageCraft*, 2012 U.S. Dist. LEXIS 140704, at *2.

[322] Dkt. 299 at 18.

[323] *Id.*

[324] *Id.* at 19.

[325] *Id.* (citing Dkt. 279 ¶ 13).

[326] *Id.*

After carefully considering Defendants' arguments and JBT's underlying expense records, the court is persuaded that some reductions are needed to limit JBT's recoverable expenses to those that were necessary and reasonable under the circumstances.

First, the court excludes certain expenses associated with counsel's out-of-state travel.  As prefaced above, district courts in the Tenth Circuit do not adopt out-of-state rates for attorneys' fee awards unless "the subject of the litigation is so unusual or requires such special skills that only an out-of-state attorney possesses"[327] or the plaintiffs "were unable to locate any counsel . . . locally who would represent them."[328]  As other courts have explained, "[p]laintiffs should not be penalized for retaining counsel of their choice, but neither should they be permitted to impose additional costs on defendants for plaintiffs' decision to go outside the district."[329]  It follows that travel expenses associated with a plaintiff's decision to obtain out-of-state counsel should not be shifted to the defendant either.  In the civil rights context, the Tenth Circuit has recognized as much, explaining that "because there is no need to employ counsel from outside the area in most cases, [it does] not think travel expenses for such counsel . . . should be reimbursed."[330]  Given JBT's failure to show that this is an "unusual case" warranting "[d]eparture from this rule,"[331] the court finds a reduction is also appropriate here.  To that end, the court excludes all expenses associated with Dykema counsel's travel to and from Utah, but not those associated with other out-of-state depositions.  By the court's calculation, this requires

---

[327] *Lippoldt*, 468 F.3d at 1225.

[328] *Enable Okla. Intrastate Transmission, LLC v. 25 Foot Wide Easement*, 908 F.3d 1241, 1247 (10th Cir. 2018).

[329] *Student Pub. Int. Rsch. Grp. v. Monsanto Co.*, 721 F. Supp. 604, 618 (D.N.J. 1989), *modified on other grounds*, 727 F. Supp. 876 (D.N.J. 1989), *aff'd*, 891 F.2d 283 (3d Cir. 1989).

[330] *Ramos*, 713 F.2d at 559; *see also Univ. of Kan.*, 2009 U.S. Dist. LEXIS 89783, at *53–54 (awarding only 15% of requested travel expenses because "plaintiffs failed to make a showing that local counsel could not have reasonably handled th[e] litigation").

[331] *See supra* Section III(E)(ii).

a reduction of $21,442.21, or approximately seventy-one percent, leaving $8,716.35 in awarded travel expenses.

Second, the court reduces expenses associated with Dykema counsel's electronic discovery and research by two-and-a-half percent to account for the risk of overlap between the instant action and JBT's lawsuit against Twist.[332]  This is roughly equivalent to the deduction made to account for JBT's Twist-specific time entries.  Given that Twist discovery materials were still relevant to JBT's action against Defendants, this deduction is potentially overinclusive, but the court concludes it is needed to reduce the risk of penalizing Defendants with expenses that should be borne by another party, if not JBT itself.

Having reviewed the rest of JBT's requested nontaxable expenses, the court concludes they were generally necessary, reasonable, and the type of expenses expected to be charged by law firms to their clients.  Accordingly, JBT's nontaxable expenses are reduced as detailed below, leaving an amount of $301,169.01.

|  | Dykema Counsel | Local Counsel | Total |
|---|---|---|---|
| Travel | $ 30,158.56 | $ - | $ 30,158.56 |
| *Out-of-State Exclusion* | $ (21,442.21) | $ - | $ (21,442.21) |
| Mail/Delivery | $ 1,264.02 | $ 695.38 | $ 1,959.40 |
| Research | $ 10,748.05 | $ 267.46 | $ 11,015.51 |
| *Twist Reduction* | $ (214.96) | $ - | $ (214.96) |
| Electronic Discovery | $ 278,309.43 | $ - | $ 278,309.43 |
| *Twist Reduction* | $ (5,566.19) | $ - | $ (5,566.19) |
| Miscellaneous | $ 6,815.14 | $ 134.33 | $ 6,949.47 |
| **Total** | **$ 300,071.84** | **$ 1,097.17** | **$ 301,169.01** |

## IV.    JBT's Motion for Leave to Register Judgment in Other Districts[333]

In the final post-trial motion now before the court, JBT seeks leave to register the Judgment in the Western District of North Carolina and the Northern District of West Virginia

---

[332] *See supra* Section III(E)(i)(b)(2).

[333] Dkt. 295.

pursuant to 28 U.S.C. § 1963.[334]  It notes, "[f]ederal law permits a judgment . . . to be registered in any other district 'when the judgment has become final by appeal or expiration of the time for appeal or *when ordered by the court that entered the judgment for good cause shown*.'"[335]  Here, JBT contends good cause exists because "Defendants are suspected of owning significant property in both the Western District of North Carolina and the Northern District of West Virginia."[336]  They further note that "Bullerdick owns residential real property in Mecklenburg County, North Carolina" and "BGSE is a North Carolina limited liability property,"[337] attaching numerous public records search results as exhibits.[338]  However, Defendants challenge that "mere residency in another jurisdiction does not constitute good cause under 28 U.S.C. § 1963," and contest JBT's assertion that relevant persons and entities possess "substantial property" in other districts that would be subject to execution.[339]

"While the Tenth Circuit has not spoken regarding what constitutes good cause in this setting, other courts have stated that the 'good cause requirement may be satisfied if the judgment debtor has substantial property in a foreign district and insufficient property in the rendering district to satisfy the judgment.'"[340]  "It takes very little to make the good cause showing."[341]  While JBT does not provide any evidence there is "insufficient property [in this District] to satisfy the judgment," courts have found this requirement is met where, as here,

---

[334] *Id.* at 1–3.

[335] *Id.* at 2 (quoting 28 U.S.C. § 1963).

[336] *Id.* at 3.

[337] *Id.*

[338] *See generally* Dkts. 295-1–4, *Exhibits to JBT's Motion for Leave to Register Judgment in Other Districts*.

[339] Dkt. 307, *Defendants' Response to JBT's Motion for Leave to Register Judgment in Other Districts* at 2–4.

[340] *Republic Bank v. AMTEC Precision Prods., Inc.*, No. 1:06-cv-112 TS, 2008 U.S. Dist. LEXIS 10317, at *3 (D. Utah Feb. 12, 2008) (quoting *Schreiber v. Kellogg*, 839 F. Supp. 1157, 1162 (E.D. Pa. 1993)).

[341] *Bunnet & Co. v. Dores*, No. 1-15-CV-1104 LY, 2019 U.S. Dist. LEXIS 108077, at *4 (W.D. Tex. June 27, 2019).

Defendants do not dispute the movant's assertion of insufficient assets in the rendering district.[342]  In terms of the second element—substantial property—case law is clear that the "judgment creditor need not provide exact evidence of the debtor's assets."[343]  Instead, the court "may rely on affidavits and other documentary evidence."[344]  In the absence of contrary evidence from Defendants, the court concludes JBT has sufficiently demonstrated that Defendants possess substantial property in other districts, thereby showing "good cause" under 28 U.S.C. § 1963.[345]  Accordingly, JBT's Motion is granted.

## CONCLUSION

For the reasons discussed above, JBT's Motion for Enhanced Damages is DENIED.[346]  JBT's Motion for Pre- and Post-Judgment Interest is GRANTED IN PART and DENIED IN PART.[347]  JBT is entitled to post-judgment interest under 28 U.S.C. § 1961, but not prejudgment interest.  Further, JBT's Motion for Attorneys' Fees and Expenses is GRANTED IN PART and DENIED IN PART,[348] leaving JBT with an attorneys' fee award of $1,869,923.74 and nontaxable

---

[342] *Treasure Chest Themed Value Mail, Inc. v. David Morris Int'l, Inc.*, 2019 U.S. Dist. LEXIS 76812, at *4–6 (S.D.N.Y. May 6, 2019); *Pharmacy Corp. of Am. v. Concord Healthcare Grp., LLC*, No. 3:17-CV-00037-GNS, 2017 U.S. Dist. LEXIS 224752, at *4-5 (W.D. Ky. Oct. 4, 2017) (collecting cases).

[343] *Ambac Assurance Corp. v. Adelanto Pub. Util. Auth.*, 2014 U.S. Dist. LEXIS 87697, at *10 (S.D.N.Y. June 26, 2014).

[344] *HSH Nordbank AG N.Y. Branch v. Swerdlow*, 2010 U.S. Dist. LEXIS 47956, at *3 (S.D.N.Y. May 14, 2010).

[345] *See Republic Bank*, 2008 U.S. Dist. LEXIS 10317, at *1–2 (finding good cause existed for registration in other districts where the defendant denied transacting business in the state where judgment was obtained and equipment that was the basis for the litigation was located in the state where the plaintiff sought to register judgment); *Bank of Am., N.A. v. Esparza*, No. 03-0346 MV, 2017 U.S. Dist. LEXIS 233835, at *7–9 (D.N.M. Oct. 25, 2017) (finding good cause justifying registration in another state where it was "undisputed the [defendants had] no assets in New Mexico" and they previously attested that they "receive[d] substantial salaries from [a] company" in another state); *Navigato v. SJ Rests., LLC*, No. 09-2101-DJW, 2011 U.S. Dist. LEXIS 103811, at *6–7 (D. Kan. Sep. 14, 2011) (finding that "the judgment debtors' own statements and public records" sufficiently evinced "good cause" for registration in other districts, where, among other concessions, Defendants did not dispute the first prong of the good cause showing).

[346] Dkt. 285.

[347] Dkt. 286.

[348] Dkt. 278.

expenses of $301,169.01, for a total award of $2,171,092.75.  Finally, JBT's Motion for Leave to Register the Judgment in Other Districts is GRANTED.[349]

      SO ORDERED this 21st day of September, 2023.

                         BY THE COURT:

                         _____

                         ROBERT J. SHELBY
                         United States Chief District Judge

---

[349] Dkt. 295.